UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| MYFREEMEDICINE.COM LLC and GEOFFREY J. HASLER, Plaintiffs | ) | |
| v. | ) | CASE NO. _________________ |
| ALPINE INVESTORS, LP, JAMES N. DEWOLFE, FRANK G. DEWOLFE, SCOTT MACCHEYNE, JEFFREY STANEK, GRAHAM WEAVER, WILLIAM T. MAGUY, WILLIAM M. ADAMS, and BRIAN G. FLAHERTY, Defendants | ) | **C O M P L A I N T** (Jury Trial Demanded) |

**This is a civil action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). The Defendants defrauded the Plaintiffs and the public as part of a broader pattern in which the Defendants misrepresented that other products they sold were safe and all natural cures for hair loss, erectile dysfunction, and diabetes.**

**The Defendants operated as members of a racketeering enterprise whose hub is a telemarketing call center located at 121 Mill Street in Auburn, Maine. This enterprise began in 1999 and continues today. The call center was merely a physical base from which the enterprise operated. The actual enterprise is an association-in-fact that includes Alpine Investors, LP (hereinafter "Alpine"), individual partners at Alpine, managers and executives at the call center (which operated under multiple names), and other employees and managers at the call center and fulfillment centers operated by the multiple corporate**

**entities that at one time or another were headquartered at 121 Mill Street in Auburn, Maine. Though individual membership has changed over time, the enterprise endures because of its overlapping leadership, financial interdependence of its constituents, and a pattern of activity designed to defraud the public and enrich its members. This association is referred to as "the 121 Mill Street Enterprise" or "the Enterprise".**

**Plaintiff MyFreeMedicine.com LLC (hereinafter "MyFreeMedicine") is a professional service company that assists qualifying members of the public to apply for free prescription medications provided by U.S. pharmaceutical companies such as Pfizer, GlaxoSmithKline, Lilly, AstraZeneca and Merck under long established Patient Assistance Programs ("PAPs"). As explained below, only individuals who meet strict guidelines are eligible for the program. All of these people are indigent, and many are elderly. In 2004, MyFreeMedicine engaged a call center operated by the Defendants to provide inbound telemarketing and order fulfillment services. MyFreeMedicine paid the Defendants when they enrolled a caller with MyFreeMedicine, or shipped information to the caller. The Defendants enrolled 10,843 people. The Defendants systematically misrepresented MyFreeMedicine, obtained thousands of credit card and bank account numbers from the public, and used this information to make fraudulent bank transfers for the financial benefit of the Defendants. The Defendants mailed MyFreeMedicine Registration Packages to unqualified callers, and charged MyFreeMedicine for unearned commissions. The Defendants convinced the Plaintiffs to participate in an elaborate shared media funding scheme that increased call volume (thereby increasing Defendants' opportunities for fraud), and charged the Plaintiffs thousands of dollars in interest fees. In executing these schemes, Defendants made widespread use of instrumentalities of interstate commerce,**

**including but not limited to the U.S. mail, email, and telephone lines. Through their misrepresentations of MyFreeMedicine, the Defendants also engaged in widespread financial institution fraud in violation of federal laws.**

Plaintiffs MyFreeMedicine and Geoffrey J. Hasler, by and through their attorney, complain against Defendants as follows:

## PARTIES

1. Geoffrey J. Hasler, of Prospect, Kentucky, is an adult and citizen of Kentucky.

2. MyFreeMedicine.com, LLC is a limited liability corporation and citizen of Kentucky, with its principal place of business in Prospect, Kentucky.

3. Defendant Alpine Investors, LP (hereinafter "Alpine") is a limited partnership and a citizen of California, with its principal place of business in San Francisco, California.

4. Defendant James N. DeWolfe of Falmouth, Maine, is an adult citizen of Maine.

5. Defendant Frank G. DeWolfe of Cumberland, Maine is an adult citizen of Maine.

6. Defendant Graham C. Weaver of Mill Valley, California, is an adult citizen of California.

7. Defendant William (also known as "Will") Montgomery Adams is an adult citizen of California.

8. Defendant Jeffrey B. Stanek of Wales, Maine, is an adult citizen of Maine.

9. Defendant Scott MacCheyne of Maine is an adult citizen of Maine.

10. Defendant William ("Billy") T. Maguy of California is an adult citizen of California.

11. Defendant Brian G. Flaherty of Cape Elizabeth, Maine, is an adult citizen of Maine.

12. Upon information and belief, Defendants Weaver, Adams, Stanek, and Maguy are owners, employees, members, managers, and/or partners of Defendant Alpine Investors, LP.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as this is a civil action arising under the laws of the United States. Specifically, this action arises under the RICO statutes, including 18 U.S.C. §§ 1962 and 1964. Jurisdiction is also proper under 28 U.S.C. § 1367, as the state law claims are so related to the RICO claims that they form part of the same case or controversy. Jurisdiction is proper pursuant to 28 U.S.C. § 1332. There is diversity of citizenship among the parties. The amount in controversy exceeds $75,000.

14. Venue is proper pursuant to 28 U.S.C. § 1391(b). A substantial part of the events and omissions giving rise to Plaintiffs' claims occurred within the District of Maine. The Defendants James DeWolfe, Frank DeWolfe, Jeffrey Stanek, Scott MacCheyne, and Brian Flaherty are individuals residing in the District of Maine. The racketeering enterprise is based in Maine. The majority of witnesses to the wrongdoing, including past and present customer service representatives employed by the Defendants, reside in Maine. Defendants Will Adams, Billy Maguy and Graham Weaver regularly engaged in business giving rise to the Plaintiffs' claims in the District of Maine and continue to do business in the District of Maine.

MYFREEMEDICINE BACKGROUND AND BUSINESS MODEL

15. Most U.S. pharmaceutical companies that manufacture and market medications in the United States have programs in which they give free medications to select indigent people who lack prescription medication insurance. These long established, but not widely known programs are commonly called Patient Assistance Programs ("PAPs").

16. Recently, these PAPs have become better known to the public. However, in 2003, they were little known.

17. The potential use of PAPs is huge, since approximately 40 million Americans lack health insurance.

18. According to the Pharmaceutical Research and Manufacturers of America, an industry group, nationwide pharmaceutical companies gave away $4 billion in medication by filling 22 million prescriptions in 2004.

19. The oldest U.S. pharmaceutical companies have offered free medications for over 50 years. Historically, much of that was done informally by dropping off free medications at doctors' offices. However, as the number of the manufacturers proliferated, the U.S. pharmaceutical companies began to set up formal programs in which individual patients would apply for free medications directly to the pharmaceutical companies.

20. There are presently more than 200 free medication programs in the United States offered by pharmaceutical companies such as Pfizer, GlaxoSmithKline, AstraZeneca, Lilly and Merck.

21. Although there are similarities in the different programs, the specific requirements and paperwork vary from program to program.

22. Programs have been changed, cancelled or suspended without notice and many programs require differing documentation.

23. So, for example, one maker of cardiovascular women's health medication unilaterally suspended its free medication program for new patients because it stated it was oversubscribed. King Pharmaceuticals, for example, curtailed its PAP due to "excessive" enrollments.

24. Applicants for free medication may have difficulty submitting their paperwork to the pharmaceutical companies because there are many different PAPs.

25. Many of the forms for free medication are only available on the Internet.

26. Many of the indigent Americans who qualify for free medications through a PAP lack Internet access.

27. In 2003, even fewer indigent Americans who qualified for free medication had access to the Internet, where some (but not all) forms were available.

28. Some doctors are able to help their indigent patients obtain free medication through PAPs, however many doctors lack the time and resources to maintain up to date forms and information required of a successful application.

29. Applying for free medication is also difficult because some companies reject applications without notice to the patient, meaning the fact that an application has been made and no response is received, may mean a number of things, including that the pharmaceutical company has not reviewed the application, that it was rejected and set aside, or some other problem.

30. The current applications for free medication may only cover a short time and have to be resubmitted periodically in order for the patient to continue receiving their medication.

31. These free medication programs tend to be understaffed by the U.S. pharmaceutical companies.

32. The programs are not necessarily designed to make the process either easy to understand or easy to complete.

33. It was amidst this environment that in 2003 MyFreeMedicine sought to fulfill the needs of millions of Americans by assisting them in obtaining free medication for which they qualified.

34. Plaintiff Hasler started MyFreeMedicine in 2003. MyFreeMedicine obtained customers by advertising, 1-800 numbers, direct mail, doctor office referrals, and over the Internet.

35. When MyFreeMedicine was launched, it processed applications for almost 150 U.S. pharmaceutical companies participating in free medication programs.

36. After a new patient joins MyFreeMedicine, he or she is sent a packet of material including paperwork to be completed that requires the patient to specify the particular medications that the patient needs. This initial packet, or "Registration Package", is sent by MyFreeMedicine to the patient by first-class, U.S. mail.

37. After the patient specifies the particular medications needed and returns the Registration Package, MyFreeMedicine uses specially designed software and experienced staff to prepare more detailed paperwork that specifically addresses the medications that the patient requests.

38. MyFreeMedicine licenses specialized medical software from a specialist medical software provider at a substantial cost. This vendor company designs custom software solutions

for hospitals, healthcare providers, government and social agencies, and faith-based organizations throughout the United States.

39. Much like a computer's anti-virus software downloads regular updates so that it may respond to the changing threats of hackers, MyFreeMedicine's proprietary software downloads regular updates of pharmaceutical company Patient Assistance Program forms to ensure that on any given day, MyFreeMedicine is using the most recent forms and procedures available to access the free medication programs. Failure to use the most recent forms and procedures required by U.S. pharmaceutical companies may result in denial of a patient's application.

40. MyFreeMedicine then sends this individually tailored paperwork to the patient for signature. During this stage, the patient's doctor must also sign the forms, and provide a prescription for the medication.

41. Once the patient gathers this information and returns the paperwork to MyFreeMedicine, MyFreeMedicine submits it to the relevant U.S. pharmaceutical company, so that the medication may be shipped directly to the patient or his or her doctor.

42. Some pharmaceutical companies require supporting documentation with the application for free medicine, such as proof of income and insurance status. At this stage, MyFreeMedicine may request additional information from the patient in order to satisfy the pharmaceutical company's specific requirements.

43. Using the aforementioned software and staff, MyFreeMedicine processes the individual pharmaceutical company applications, and sends them to the specific pharmaceutical companies on behalf of the patient.

44. To date, MyFreeMedicine has processed over 100,000 individual prescription requests on behalf of patients.

45. MyFreeMedicine continues to provide this service, and currently accesses over 2,000 brand name medications from over 150 U.S. pharmaceutical companies.

46. Even after using specialized software and experienced staff to prepare an application, many patients and doctors may still not receive the medications.

47. In these cases, MyFreeMedicine will follow-up with the pharmaceutical company to ensure delivery of medications. Sometimes the program will have been changed or suspended without notice. Sometimes the programs are understaffed or the staff is uncooperative. Sometimes the medications are forwarded to the patient's physician's office without notice to the patient, and the physician's office neglects to call the patient.

48. It is not unusual for patients with multiple medications, for MyFreeMedicine to make multiple calls to the pharmaceutical companies and the doctor's offices on their behalf.

49. For this service MyFreeMedicine charges $33 a month, that is, $199.95 every six months, regardless of the number of medications involved. Because of this fee, MyFreeMedicine usually does not recommend its service to patients who spend less than $100.00 a month on medications.

50. In approximately January of 2004, due to the increasing volume of calls that MyFreeMedicine was receiving from around the country about its services, and following representations about its call center expertise from the Defendants, MyFreeMedicine began to do business with a call center known as AdvanceTel Direct. In fact, the Plaintiffs began dealing with the 121 Mill Street Enterprise, a broad racketeering network.

## FACTUAL CLAIMS

### FORMATION OF THE 121 MILL STREET ENTERPRISE

51. The 121 Mill Street Enterprise evolved from a telemarketing call center first established by Defendants Frank and James DeWolfe to a sophisticated network of investors, media buyers, business analysts, customer service representatives, trainers, computer experts, shipping and mail supervisors, and other contributors to the Enterprise's schemes.

52. The members of the 121 Mill Street Enterprise operate behind the veil of multiple business entities engaged in the business of telemarketing and order fulfillment services. None of these business associations lasts more than two or three years.

53. Despite using multiple legal identities, the 121 Mill Street Enterprise acts as a consistent association-in-fact.

54. Since 1999, the call center at 121 Mill Street has been known as PowerTel Marketing Group, LLC, PowerTel Marketing Group, Inc., FD&H Enterprises, LLC, AdvanceTel Direct, LLC, and Great Falls Marketing, LLC.

55. Defendants James and Frank DeWolfe started the 121 Mill Street Enterprise. They initially referred to it as FD&H Enterprises, LLC, as well as PowerTel.

56. Upon information and belief, when Defendants James and Frank DeWolfe opened FD&H Enterprises, LLC and PowerTel, these businesses consisted of a telemarketing call center located at 121 Mill Street in Auburn, Maine. The call center employed approximately one hundred customer service representatives (who answered calls), shipping managers and personnel, and trainers who instructed customer service representatives how to field calls and sell products.

57. On or about February 12, 1999, FD&H Enterprises, LLC was created as a limited liability company organized under Maine law.

58. "PowerTel" was a term that included the separate business entities PowerTel Marketing Group, LLC, PowerTel Marketing, Inc., and PowerTel Technologies, LLC.

59. On or about February 12, 1999, Articles of Organization were filed with the Maine Secretary of State, establishing PowerTel Marketing Group, LLC as a Maine limited liability company, with initial managers including Defendant James N. DeWolfe, Defendant Frank G. DeWolfe, and Andrew M. Elmhirst.

60. On or about February 12, 1999, PowerTel Marketing Group, Inc. filed a Proof of Resolution Allowing Use of a Similar Name with the Maine Secretary of State, granting to PowerTel Marketing Group, LLC the similar name of PowerTel Marketing Group, Inc. This was signed by Defendant James DeWolfe as President of PowerTel Marketing Group, Inc.

61. On or about May 9, 2000, PowerTel Marketing Group, LLC filed Articles of Amendment with the Maine Secretary of State, changing the name of the company to PowerTel Technologies, LLC.

62. Upon information and belief, FD&H Enterprises and PowerTel shared a physical location, financial resources, employees, personnel files, client files, computers and telephones, and other miscellaneous business resources and expenses.

63. On or about August 28, 2000, the Annual Report of PowerTel Marketing Group, LLC, signed by Defendant James DeWolfe as President, was filed by the Maine Secretary of State. This report described the company as engaged in the business of marketing within the State of Maine.

64. By 2002, the call center became known as AdvanceTel Direct, LLC.

65. Throughout its many name changes, the call center engaged in direct marketing and point of sale services in interstate commerce by receiving calls and shipping products sold throughout the country.

66. The officers and managers of these business entities overlapped throughout the many legal changes in its name or form.

67. These businesses share their employees as a common resource. Upon information and belief, employees were asked to sign consent forms authorizing different business entities such as FD&H Enterprises and PowerTel to have access to their personnel files. This practice continues today, as many customer service representatives employed by Great Falls Marketing are former employees of FD&H Enterprises, PowerTel, and/or AdvanceTel Direct.

68. Most of these business entities were organized in Indiana, although they conducted their activities in Maine.

69. The principal business activity involved a call center and occurred at 121 Mill Street in Auburn, Maine. For a time, a secondary call center operated in Augusta, Maine.

70. Secondary business activities involved a fulfillment center and occurred at 280 Park Street in Lewiston, Maine.

71. Upon information and belief, in or before 2002, Alpine Investors, LP, a San Francisco based firm acquired an ownership interest in the 121 Mill Street Enterprise.

72. Though the call center became known as AdvanceTel Direct, LLC, PowerTel and FD&H were affiliated entities.

73. On or about April 19, 2002, AdvanceTel Direct, LLC was created as a limited liability company, with its address at 130 North Main Street, P.O. Box 575, Goshen, Indiana, 46527.

74. On or about June 2, 2002, the Application for Authority to do Business of PowerTel Technologies, LLC, was filed with the State of Maine, which Defendant Graham Weaver signed as Chairman.

75. On or about June 27, 2002, Articles of Amendment were filed with the Maine Secretary of State, signed by Defendant James DeWolfe on behalf of PowerTel Technologies, LLC.

76. The June 27, 2002 Articles of Amendment changed the name of PowerTel Technologies, LLC to FD&H Enterprises, LLC.

77. On June 27, 2002, AdvanceTel Direct, LLC was qualified to do business in Maine as a foreign corporation, registered as a limited liability company organized under the laws of Indiana, and also known as PowerTel Marketing Group, LLC, and PowerTel Technologies, LLC.

78. On or about July 16, 2002, a notice of termination was filed with the State of Maine, signed by Defendant James DeWolfe and terminating the name of PowerTel Marketing Group, LLC on behalf of FD&H Enterprises, LLC.

79. Upon information and belief, many of the employees, managers, owners, and executives of PowerTel and FD&H Enterprises became employees of AdvanceTel Direct once PowerTel and FD&H Enterprises were dissolved.

80. By 2002, members of Alpine Investors, LP, including Defendant Graham Weaver, played an integral role in the 121 Mill Street Enterprise's operation.

81. In 2003, FD&H Enterprises, LLC filed its annual report with the Maine Secretary of State, listing Defendant James N. DeWolfe and Andrew Elmhirst, both of 121 Mill Street, Auburn, Maine, as its Managers.

82. The 2003 Annual Report of PowerTel Technologies, LLC listed its home office as P.O. Box 575 in Goshen, Indiana.

83. The 2003 Annual Report of PowerTel Technologies, LLC was signed by Defendant Graham Weaver of San Francisco, California, as the Chairman of PowerTel Technologies, LLC.

84. On or about April 10, 2003, the Amended Application for Authority to do Business of PowerTel Technologies, LLC, was filed with the State of Maine, and changed the name of the company to AdvanceTel Direct, LLC. Defendant Graham Weaver signed this document as Chairman, and Defendant James DeWolfe signed as Manager, on behalf of FD&H Enterprises.

85. Defendant Graham Weaver is the founder of Alpine Investors, LP.

86. At no time has Defendant Graham Weaver been an employee of AdvanceTel Direct or Great Falls Marketing.

87. The 2003 Annual Report of PowerTel Technologies, LLC, described its business as "an in-bound call center, providing in-bound sales, order processing, shipping and fulfillment, media buying and customer care/service."

88. The 2003 Annual Report of PowerTel Technologies, LLC, listed FD&H Enterprises, LLC, of 121 Mill Street, Auburn, Maine, as a Manager, in addition to Defendant Graham Weaver of San Francisco, California, and Douglas H. Martin of Little Rock, Arkansas.

89. In 2004, AdvanceTel Direct, LLC, filed its Annual Report with the Maine Secretary of State.

90. The 2004 Annual Report of AdvanceTel Direct, LLC listed FD&H Enterprises, LLC of 121 Mill Street, Auburn, Maine, as a Manager.

91. The 2004 Annual Report of AdvanceTel Direct, LLC listed Defendant Graham Weaver of 121 Mill Street, Auburn, Maine, as a manager.

92. The 2004 Annual Report of Advance Tel Direct, LLC listed Douglas H. Martin as a manager, but did not specify any address for Mr. Martin.

93. The 2004 Annual Report of AdvanceTel Direct, LLC listed the home office as P.O. Box 575 in Goshen, Indiana.

94. In 2004, FD&H Enterprises, LLC filed an annual report with the Maine Secretary of State, listing Defendant James N. DeWolfe of 121 Mill Street, Auburn, Maine as its Manager.

95. In May 2005, the 121 Mill Street Enterprise extinguished its identities as AdvanceTel Direct, FD&H, and PowerTel, and reinvented itself as Great Falls Marketing. Great Falls Marketing was initially led by Will Adams as CEO, and is currently led by the former AdvanceTel Direct Information Technology Manager, Defendant Scott MacCheyne.

96. Upon information and belief, the 121 Mill Street Enterprise closed AdvanceTel and opened Great Falls Marketing in an attempt to avoid liability for its involvement in the Avacor scheme described below. This closure occurred approximately one week after the State of Arkansas sued MyFreeMedicine, as explained below.

97. As late as April 20, 2005, Defendant William Adams, a partner at Alpine Investors, LP, held himself out as CEO of AdvanceTel Direct.

98. On May 31, 2005, Great Falls Marketing, LLC was created as a limited liability company organized in Indiana and doing business in Maine.

99. On July 22, 2005, Great Falls Marketing, LLC was recognized by the Maine Secretary of State as a foreign company doing business in Maine.

100. FD&H Enterprises, LLC was administratively dissolved by the Maine Secretary of State on October 25, 2005, after failing to file an annual report.

101. On or about October 25, 2005, the Maine Secretary of State revoked AdvanceTel Direct, LLC's qualification of a foreign company to do business in Maine after AdvanceTel Direct, LLC failed to file an annual report.

102. On February 22, 2008, AdvanceTel Direct, LLC was administratively dissolved by the Indiana Secretary of State.

103. The Indiana Secretary of State lists PowerTel Technologies, LLC, as a former name for the dissolved entity known as AdvanceTel Direct, LLC.

104. Great Falls Marketing, LLC, remains an active limited liability company organized in Indiana, with its address as 121 Mill Street, Auburn, Maine.

105. Great Falls Marketing, LLC is presently a company in good standing with the Maine Secretary of State.

106. Great Falls Marketing, LLC continues to operate a call center located at 121 Mill Street, Auburn, Maine.

107. Defendant Scott MacCheyne is currently the President of Great Falls Marketing.

108. Great Falls Marketing currently lists Alpine Investors, LP as an affiliate.

109. Prior to 2005, Alpine Investors, LP listed AdvanceTel Direct, LLC as an "investment" on its website.

110. Defendant Graham Weaver remains a partner at Alpine Investors, LP.

111. Defendant William Adams remains a partner at Alpine Investors, LP.

112. Defendant Billy Maguy remains a partner at Alpine Investors, LP.

113. Throughout the many changes in business entity, a telemarketing call center operated at 121 Mill Street in Auburn, Maine. This call center hired hundreds of customer service representatives to receive calls, trained new employees how to make a sale, and closely monitored the performance of all employees. These activities are more fully described in the following paragraphs.

OVERVIEW OF DEFENDANTS' ROLES IN THE 121 MILL STREET ENTERPRISE

114. The Defendants are members of a broad racketeering venture referred to here as the 121 Mill Street Enterprise. They are not its sole members. Other members of the 121 Mill Street Enterprise are believed to include customer service representatives working at the call center, the shipping and fulfillment center's manager, Great Falls Marketing, and the manufacturers of the Avacor and Vinarol products.

115. Each of the named Defendants participated in multiple racketeering schemes with other members of the 121 Mill Street Enterprise. However, upon information and belief, the named Defendants are most responsible for harm to the Plaintiffs.

116. An overview of the Defendants' roles in the Enterprise follows, with additional discussion of their racketeering activities discussed throughout this Complaint.

**Alpine Investors, LP**

117. Defendant Alpine Investors, LP (hereinafter "Alpine") is a San Francisco based firm.

118. Alpine's role in the 121 Mill Street Enterprise was that of banker, promoter and manager, infusing the venture with the necessary capital to broaden its activities, and participating in and making decisions regarding the Enterprise.

119. Defendant Graham Weaver founded Alpine in 2001.

120. After investing in a company, Alpine works closely with the existing management of that company, often placing Alpine partners "in residence" at their places of investment.

121. In fact, Alpine has intermittently placed “in residence” Alpine managers at the 121 Mill Street Enterprise including, but not limited to, Defendant Will Adams.

122. Alpine introduces new business strategies to its investment companies in order to increase profitability.

123. When these strategies are successful, Alpine profits.

124. Alpine distributes profits to its individual partners.

125. Alpine also reinvests its profits in other business ventures located in the United States.

126. Upon information and belief, Alpine acquired an ownership interest in the 121 Mill Street Enterprise in or before 2002.

127. Alpine paid, directly or indirectly, Defendants James and Frank DeWolfe to acquire this ownership interest.

128. Once Alpine held a stake in the call center at 121 Mill Street, Will Adams began to visit the location and attended meetings with Defendants James and Frank DeWolfe.

129. Defendant Graham Weaver also visited 121 Mill Street.

130. Through 2003 and 2004, Alpine partners Defendants Weaver, Adams, and Maguy increased the amount of time they spent at 121 Mill Street.

131. Alpine was in regular contact with call center managers.

132. Defendant Will Adams regularly exchanged emails and phone calls with call center managers.

133. Defendant Graham Weaver regularly exchanged emails and phone calls with call center managers.

134. Alpine solicited new clients for the call center.

135. From January 2004 until October 2004, Alpine encouraged MyFreeMedicine to use the 121 Mill Street Enterprise as its exclusive call center. After October 2004, a contract between Alpine and MyFreeMedicine required MyFreeMedicine to use AdvanceTel Direct as the exclusive call center for MyFreeMedicine.

136. Alpine helped MyFreeMedicine to develop telephone scripts for the call center to use on MyFreeMedicine calls.

137. Alpine encouraged MyFreeMedicine to embark on a more expensive television advertising campaign.

138. The extra television campaigns that Alpine devised for MyFreeMedicine were designed to bring more business to the 121 Mill Street Enterprise.

139. By bringing more business to the call center, Alpine increased its return on investment.

140. Alpine had a financial stake in the relationship between MyFreeMedicine and the call center.

141. Alpine currently holds directly or indirectly an ownership interest in Great Falls Marketing, listing it as an investment on the Alpine website.

142. Alpine continues to derive revenue from the 121 Mill Street Enterprise.

143. Individual partners at Alpine, including Defendants Graham Weaver, Billy Maguy and Will Adams, continue to work closely with the 121 Mill Street Enterprise.

144. Members of Alpine currently serve as executives at Great Falls Marketing, through which they controlled the 121 Mill Street Enterprise.

**Graham Weaver**

145. Defendant Graham Weaver is the founder of Alpine Investors and may be considered the mastermind of the 121 Mill Street Enterprise. His role was that of the high level executive, overseeing from a global perspective the 121 Mill Street Enterprise's multiple business ventures, marketing, capital investment schemes, and client relationships.

146. Upon information and belief, Defendant Graham Weaver received substantial sums of money from the 121 Mill Street Enterprise.

147. Defendant Graham Weaver was involved in the 121 Mill Street Enterprise in his individual capacity, and used multiple business titles to shield himself from individual responsibility.

148. Defendant Graham Weaver served as Manager and Chairman of AdvanceTel Direct.

149. Defendant Graham Weaver signed corporate filings as Manager and Chairman of PowerTel.

150. Defendant Graham Weaver was involved in the media buying strategy led by Defendant Maguy on a day-to-day basis. Defendant Graham Weaver's involvement with media buying included the Avacor product, in addition to MyFreeMedicine.

151. Defendant Graham Weaver was highly involved in the Avacor and MyFreeMedicine activity described throughout this Complaint.

152. Defendant Graham Weaver regularly reviewed the correspondence between Alpine and MyFreeMedicine.

153. Upon information and belief, Defendant Graham Weaver corresponded with Avacor and other clients of the 121 Mill Street Enterprise.

154. Defendant Graham Weaver encouraged MyFreeMedicine to invest more money in the television advertising strategies.

155. By encouraging MyFreeMedicine to invest more money in the shared television advertising scheme detailed below, Defendant Graham Weaver encouraged MyFreeMedicine to repay Alpine for shared media expenses with a 60% premium per year, generating profits for Alpine.

**William T. ("Billy") Maguy**

156. Defendant Billy Maguy's role in the Enterprise was that of advertising specialist, encouraging MyFreeMedicine and other Enterprise clients to invest further in a lucrative media buying venture that earned Alpine tens of thousands of dollars in interest fees and boosted the volume of calls to the 121 Mill Street Enterprise.

157. Upon information and belief, Defendant Billy Maguy received thousands of dollars for his role in the 121 Mill Street Enterprise.

158. Defendant Billy Maguy was involved in the 121 Mill Street Enterprise in his individual capacity.

159. Beginning in or around November 2004, Defendant Billy Maguy bore primary responsibility for MyFreeMedicine's television advertising and was instrumental in shaping this strategy.

160. As part of his duties, Defendant Billy Maguy directed hundreds of thousands of dollars of MyFreeMedicine's advertising budget towards television purchasing and extra call center staffing.

161. Defendant Billy Maguy was an intermediary between Quigley Simpson (the Los Angeles based advertising firm recommended by Alpine to MyFreeMedicine), MyFreeMedicine, and the call center (then known as AdvanceTel Direct).

162. Defendant Billy Maguy worked closely with Plaintiff Geoff Hasler and with the Quigley Simpson media agency to purchase television advertising between October 2004 and the summer of 2005.

163. For example, Defendant Billy Maguy provided detailed analysis of the media strategy in an email to Plaintiff Geoff Hasler on November 24, 2004. There are hundreds of other similar emails.

164. Defendant Billy Maguy frequently told Plaintiff Geoff Hasler that he spent half of his working time on the MyFreeMedicine account, and the other half of his time working on Avacor. The Avacor scheme is discussed separately below.

165. Through this media buying strategy, Alpine convinced MyFreeMedicine to spend hundreds of thousands of dollars on television advertising that Alpine arranged.

166. This strategy was designed to increase the return on Alpine's investment in the call center, thereby enriching Defendants Graham Weaver and Will Adams, as well as Defendant Billy Maguy.

167. For example, on January 20, 2005, Plaintiff Geoff Hasler told Defendant Billy Maguy that he could wire $30,000 for extra television media purchases, and that MyFreeMedicine, due to cash flow constraints, could not afford to pay Alpine the $35,000 that Defendant Billy Maguy requested at that particular time.

168. When Plaintiff Geoff Hasler expressed a temporary inability to keep funding the advertising scheme, Defendants Billy Maguy and Graham Weaver immediately requested a telephone call and encouraged him to obtain additional funding for the scheme.

**William ("Will") Adams**

169. Of all the Alpine partners, Defendant Will Adams had the most direct interaction with other members of the 121 Mill Street Enterprise. In essence, he was the on site coordinator of all Enterprise activity.

170. Upon information and belief, Defendant Will Adams received thousands of dollars for his role in the 121 Mill Street Enterprise.

171. Throughout his involvement in the 121 Mill Street Enterprise, Adams acted in his individual capacity, deriving revenue from the multiple business entities that comprise the 121 Mill Street Enterprise.

172. Defendant Will Adams continues to play a leadership role at Great Falls Marketing and for a time was its Chief Operating Officer or Chief Executive Officer.

173. Defendant Will Adams is also a current partner at Alpine.

174. Before Great Falls Marketing was created, Defendant Will Adams held a variety of managerial roles at AdvanceTel Direct.

175. Because of Alpine's ownership interest in the call center, Defendant Will Adams wished to expand the relationship between MyFreeMedicine and AdvanceTel Direct.

176. On August 6, 2004, Defendant Will Adams wrote an email to Plaintiff Geoff Hasler in which he described AdvanceTel Direct as a "partner," a "trusted entity," and "the very best at what they do."

177. In this email, Defendant Will Adams told Plaintiff Geoff Hasler that Alpine would be equally loyal to AdvanceTel as to MyFreeMedicine.

178. In fact, Defendant Will Adams knew that Alpine already owned a significant portion of AdvanceTel.

179. When Defendant Will Adams told Plaintiff Geoff Hasler that Alpine would be equally loyal to MyFreeMedicine as to AdvanceTel, Weaver had already signed corporate documents on behalf of the call center for over two years.

180. It was simply impossible for Alpine to ignore its financial stake in the 121 Mill Street Enterprise during its negotiations with MyFreeMedicine.

181. Defendant Will Adams was aware of this conflict of interest, and misrepresented his loyalties throughout his contact with MyFreeMedicine.

182. Defendant Will Adams proceeded to negotiate a "Partnership Proposal" between MyFreeMedicine and Alpine that required using AdvanceTel Direct as the exclusive call center for MyFreeMedicine.

183. As part of finalizing this agreement, in October 2004, Defendant Will Adams traveled to MyFreeMedicine's place of business in Kentucky, accompanied by then Chief Operating Officer of AdvanceTel Direct, LLC, Defendant Brian Flaherty.

184. After MyFreeMedicine contracted with Alpine Investors and AdvanceTel Direct, Defendant Will Adams suggested changing the telephone scripts that customer service representatives used for MyFreeMedicine.

185. Defendant Will Adams knew of the misrepresentations made regarding MyFreeMedicine.

186. Defendant Will Adams knew that the call center recorded all incoming and outgoing calls.

187. Defendant Will Adams knew that these call recording were electronically stored at the call center.

188. Defendant Will Adams knew of the fraudulent and criminal schemes that the 121 Mill Street Enterprise conducted.

**Frank DeWolfe**

189. Defendant Frank DeWolfe was an initial founder of the 121 Mill Street Enterprise, and throughout his association with the venture remained a "ground level captain" of the client and customer service activities.

190. Upon information and belief, Defendant Frank DeWolfe received hundreds of thousands of dollars for his role in the Enterprise.

191. Defendant Frank DeWolfe is the brother of Defendant James DeWolfe.

192. Defendant Frank DeWolfe held an ownership stake in FD&H Enterprises.

193. Defendant Frank DeWolfe helped establish PowerTel and AdvanceTel Direct.

194. Defendant Frank DeWolfe eventually became a Manager at AdvanceTel Direct.

195. Upon information and belief, Defendant Frank DeWolfe received pecuniary benefits from one or more corporate entities operating the 121 Mill Street Enterprise through both wages and as an investor.

196. As a manager, Defendant Frank DeWolfe regularly screened the calls made by customer service representatives, and cultivated an atmosphere of fraud and misrepresentation on the customer service floor.

197. Defendant Frank DeWolfe also served as a liaison between the 121 Mill Street Enterprise and its clients.

198. Defendant Frank DeWolfe reviewed customer service scripts and approved changes to them.

199. While clients were supposed to approve all telephone scripts, Defendant Frank DeWolfe authorized new scripts for use before clients approved them.

200. Frank DeWolfe promised results to clients of the 121 Mill Street Enterprise, that were simply unattainable if customer service representatives followed an approved script verbatim.

201. To deliver on his promises, Defendant Frank DeWolfe encouraged customer service representatives to deviate from approved scripts.

202. Many customer service representatives developed their own scripts for certain products, so called "freelancing," without ever obtaining the approval of the client whose products the customer service representatives were selling and marketing over the telephone.

203. This behavior continued when MyFreeMedicine began doing business with the 121 Mill Street Enterprise.

204. Upon information and belief, Defendant Frank DeWolfe encouraged customer service representatives to misrepresent the products they were discussing in order to make money for the Enterprise.

205. Defendant Frank DeWolfe knew of the misrepresentations made regarding MyFreeMedicine.

206. Upon information and belief, Defendant Frank DeWolfe sold some or his entire ownership stake in the call center to Alpine either directly or indirectly through an asset sale.

**James ("Jim") DeWolfe**

207. Defendant James DeWolfe (also known as “Jim”) was an initial founder of the 121 Mill Street Enterprise and throughout his association with the venture, served as boss of day to day activity.

208. Through threats to terminate underperforming customer service representatives, he enforced a system of misrepresenting products and services in order to "close" sales and earn money for the Enterprise.

209. Upon information and belief, Defendant James DeWolfe was paid hundreds of thousands of dollars, if not millions of dollars, for his role in the Enterprise.

210. In the early days of the 121 Mill Street Enterprise, Defendant James DeWolfe was the executive in charge.

211. Defendant James DeWolfe held an ownership stake in FD&H Enterprises.

212. Defendant James DeWolfe held an ownership stake in AdvanceTel Direct.

213. Defendant James DeWolfe was the President of PowerTel.

214. Defendant James DeWolfe held an ownership stake in PowerTel.

215. Defendant James DeWolfe was the President of AdvanceTel Direct.

216. Defendant James DeWolfe also served as Chief Executive Officer of AdvanceTel Direct.

217. On January 14, 2004, Defendant James DeWolfe signed a Marketing Agreement with MyFreeMedicine, on behalf of AdvanceTel Direct, LLC.

218. The object of this agreement was for MyFreeMedicine to engage the telemarketing services of the call center.

219. Defendant James DeWolfe developed telephone scripts for MyFreeMedicine.

220. Defendant James DeWolfe regularly encouraged customer service representatives to misrepresent products, services and otherwise engage in fraudulent schemes.

221. Defendant James DeWolfe created the belief among customer service representatives that they needed to make sales at any cost, even if it meant misrepresenting a product or service.

222. Defendant James DeWolfe instilled fear in customer service representatives; upbraiding them for losing sales, firing underperforming employees, and humiliating representatives who expressed reservations about the activities of the 121 Mill Street Enterprise.

223. Defendant James DeWolfe also cultivated an atmosphere of lawlessness and drug use within the 121 Mill Street Enterprise.

224. Upon information and belief, in 2005 Defendant James DeWolfe sold some or all of his ownership stake in the call center to Alpine either directly or indirectly through an asset sale.

**Scott MacCheyne**

225. Throughout MyFreeMedicine's relationship with the 121 Mill Street Enterprise, Defendant Scott MacCheyne controlled evidence and records of the venture's activity. He may be considered the technology expert of the 121 Mill Street Enterprise.

226. Upon information and belief, Defendant MacCheyne has been paid hundreds of thousands of dollars for his role as Information Technology ("IT") Director and later, CEO of business entities used by the Enterprise.

227. Upon information and belief, Defendant Scott MacCheyne knows how telephone calls were recorded and stored throughout the existence of the 121 Mill Street Enterprise, is

believed to know many of the Enterprise's secrets, and at relevant times is alleged to have possessed complete control over electronic records of the Enterprise's activities.

228. Defendant Scott MacCheyne was the IT Director at AdvanceTel direct, and is believed to have held similar supervisory roles during the early history of the 121 Mill Street Enterprise.

229. While the call center was known as AdvanceTel Direct, Defendant Scott MacCheyne worked with Defendant Will Adams.

230. While the call center was known as AdvanceTel Direct, Defendant Scott MacCheyne worked with Defendant Graham Weaver.

231. Upon information and belief, Defendant Scott MacCheyne also worked for PowerTel Marketing before it became AdvanceTel Direct.

232. As IT Director at AdvanceTel Direct, Defendant Scott MacCheyne controlled and managed all telephone and computer information technology at the call center.

233. As IT Director of AdvanceTel Direct, Defendant Scott MacCheyne controlled all of the call center's electronic records.

234. Defendant Scott MacCheyne knew that the call center recorded all incoming and outgoing telephone calls during its relationship with MyFreeMedicine.

235. Defendant Scott MacCheyne regularly listened to recordings of calls for MyFreeMedicine and other customers.

236. These telephone calls were stored on a dedicated file server that contained recordings of calls made while the company was known as both Great Falls Marketing and AdvanceTel Direct.

237. Defendant Scott MacCheyne regularly reviewed these recordings and shared them with other members of the 121 Mill Street Enterprise.

238. Upon information and belief, Defendant Scott MacCheyne selected recordings of only those customer service and sales calls that did not contain misrepresentations to share with MyFreeMedicine, or with other clients who requested them.

239. Defendant Scott MacCheyne did not share recordings of misleading calls with the customer.

240. These telephone recordings may still exist on the computer systems of Great Falls Marketing. After the dissolution of AdvanceTel, the 121 Mill Street Enterprise promoted MacCheyne to its highest ranks.

241. Upon information and belief, Defendant Scott MacCheyne fraudulently altered the invoices and billing records sent to clients after reviewing prerecordings of telemarketing calls.

242. Defendant Scott MacCheyne is the current President and Chief Information Officer of Great Falls Marketing.

243. As President of Great Falls Marketing, Defendant Scott MacCheyne contributes to all of the call center's current strategic decisions and methodologies.

244. As President of Great Falls Marketing, Defendant Scott MacCheyne regularly manages client relationships.

245. As President of Great Falls Marketing, Defendant Scott MacCheyne is directly responsible for maintaining the call center's profitability, and oversees all of the day to day responsibilities of the 121 Mill Street Enterprise.

246. Defendant Scott MacCheyne was aware of the details of the various fraudulent and criminal schemes undertaken by the Enterprise.

**Jeffrey Stanek**

247. Defendant Jeffrey Stanek was the Financial Controller at AdvanceTel Direct. His role in the Enterprise was that of book keeper.

248. Upon information and belief, Defendant Jeffrey Stanek received tens of thousands of dollars by the Enterprise for his services as book keeper

249. As Financial Controller, Defendant Jeffrey Stanek had knowledge of the bills that the call center sent to MyFreeMedicine, as well as to other clients.

250. Upon information and belief, Defendant Jeffrey Stanek was aware that the call center was fraudulently billing MyFreeMedicine and other clients for services that involved misrepresenting MyFreeMedicine and other products.

251. Upon information and belief, Defendant Jeffrey Stanek's records were used to fraudulently charge MyFreeMedicine and other clients for services that the 121 Mill Street Enterprise had not provided.

**Brian G. Flaherty**

252. Defendant Brian Flaherty was the Chief Operating Officer of AdvanceTel Direct and a senior member of the 121 Mill Street Enterprise in 2004 and 2005.

253. As Chief Operating Officer, Defendant Flaherty was responsible for day to day operations of the call center that the 121 Mill Street Enterprise operated.

254. Upon information and belief, Defendant Flaherty was also responsible for securing and maintaining clients for the 121 Mill Street Enterprise.

255. As part of his client relationship responsibilities, Defendant Flaherty traveled to Kentucky on or about October 23, 2004, along with one other member of the 121 Mill Street Enterprise (Defendant Will Adams), in order to sign an exclusive marketing agreement between MyFreeMedicine and AdvanceTel Direct.

256. Upon information and belief, Defendant Flaherty was responsible for consolidating all reports about call center performance and the effectiveness of the 121 Mill Street Enterprise's media strategy.

257. Upon information and belief, Defendant Flaherty was the executive responsible for all packet fulfillment activities of the 121 Mill Street Enterprise, which included all shipments of MyFreeMedicine information to members of the public using U.S. mail.

258. Upon information and belief, Defendant Flaherty was responsible for processing payments between the parties, and has knowledge of the financial and accounting practices of the 121 Mill Street Enterprise, including its billing and mailing procedures.

## THE CALL CENTER INDUSTRY

259. As described above, the 121 Mill Street Enterprise includes Great Falls Marketing, a successor entity to AdvanceTel Direct and PowerTel. All of these entities are or were direct marketing call centers located at 121 Mill Street in Auburn, Maine.

260. As call centers, Great Falls Marketing, AdvanceTel Direct, and PowerTel, contract with clients to support their marketing and business development activities.

261. The direct marketing call center business model consists of a client who hires the call center, the individual sales representatives who actually talk to callers on the telephone, and trainers who instruct the sales representatives ("the representatives") on how to execute a call. Usually, in call centers, supervisors perform quality control checks by reviewing the calls of

individual sales representatives to ensure that their calls adhere to prearranged scripts and guidelines, and to ensure that the sales representatives maintain high sales percentages (often called a "close rate").

262. When a client retains a call center, the client commonly pays fees based on call volume and a percentage of successful calls. If the call center is hired to sell a product, both the call center and the individual representative are paid on a commission basis. This creates an incentive for the call center to sell the client's goods or services to callers.

263. Many call centers operate 24 hours a day, and are expected to structure their staffing to coincide with other advertising efforts of their clients. For example, if a client is planning to run a television advertisement at 5:00 p.m. Friday, the call center can be expected to have extra representatives on staff between 5:00 p.m. and 8:00 p.m. because it is most likely that the television audience will call soon after they see the commercial.

264. If the call center fails to provide adequate staffing at the time of the client's television advertising, the client will be unable to capitalize on its media expenditures, and will have essentially wasted the money spent on television advertising.

265. The success of the call center's effort is measured in part, by dropped calls, meaning calls in which the person hangs up before the call is answered. The dropped call rates are reported regularly, as much as daily, to the clients who hire the call center.

266. In this manner, call centers promote themselves as an integral component of any company's marketing and communications efforts.

267. When a new client retains a call center, they often develop a detailed and specific call script for the representatives to follow. This is a crucial aspect of the industry, because the call center has no intrinsic knowledge of the client's business, apart from what it has been told by

the client. The script also acts as a check or control on what the representatives can say, in order to avoid misrepresentation. This assumes of course, that the call center intends to discourage misrepresentations.

THE ENTERPRISE USES A CALL CENTER TO PERPETRATE ITS SCHEMES

**The Call Center and Employee Compensation**

268. At all relevant times, the 121 Mill Street Enterprise operated, and continues to operate today, a call center that interacts with the public.

269. For a time, it also operated a fulfillment center located in Lewiston, Maine, out of which writings and/or product were shipped.

270. At all times pertinent to this Complaint, the 121 Mill Street Enterprise operated principally at 121 Mill Street in Auburn, Maine.

271. For a time, the 121 Mill Street Enterprise also operated a second call center located in Augusta, Maine.

272. At times the 121 Mill Street Enterprise had as many as 150 employees at the two call centers. Upon information and belief, the Enterprise employed at least 2,000 different residents of Central Maine at one time or another.

273. The 121 Mill Street Enterprise hires low income, many times young employees, and pays minimum wage plus very generous commissions.

274. As a result of the pay arrangement, an employee must be successful in selling to earn a living wage.

275. The Enterprise, through Great Falls Marketing continues to tout this commission based compensation system when appealing to prospective clients through such marketing statements as: "Our agent compensation is heavily tied to commission – so they share the same

incentives and interests as the clients we serve. We have many opportunities to generate revenue; closing the sale, maximizing the ticket, and up-selling the customer into continuity and cross-sell offerings."

276. Some of these employees become members of the 121 Mill Street Enterprise when they misrepresent the products and services that they are hired to sell to the public. By misrepresenting products to improve sales, the customer service representatives increase their commissions. Through the commission-based compensation system, the 121 Mill Street Enterprise encourages its new customer service representatives to become participants in the Enterprise's schemes, as described in the following paragraphs.

277. The 121 Mill Street Enterprise continues to exist and operate a call center at 121 Mill Street in Auburn, Maine, and it continues to link employee compensation to sales productivity.

278. The 121 Mill Street Enterprise continues to defraud the public using direct marketing telephone calls and the U.S. mail.

**Defendants Systematically Control All Activities of Customer Service Representatives and Train Them How to Misrepresent Products and Services in Order to Increase Sales**

279. Upon information and belief, the following section describes how the 121 Mill Street Enterprise implemented specific schemes to defraud the public. Operating as Great Falls Marketing, the 121 Mill Street Enterprise is believed to continue using the following tools and methods.

280. The Defendants maintained tight control over all aspects of the 121 Mill Street Enterprise, keeping order among the customer service representatives and reprimanding call center employees whose sales were deemed inadequate.

281. The call center was monitored by video cameras.

282. All phone calls in and out of 121 Mill Street were digitally recorded, and were regularly monitored by the Enterprise.

283. Members of the 121 Mill Street Enterprise, including Defendant James DeWolfe, would monitor live calls and simultaneously email the customer service representatives as they spoke over the telephone with customers. The purpose of these messages was to coach or encourage representatives to make sales, even if making the sale (or "close") required misrepresenting products to the public.

284. On at least one occasion while listening to a live telephone call, Defendant James DeWolfe emailed a customer service representative to tell her that he would fire her if she did not make the sale.

285. Through electronic instant messaging, call monitoring, and direct personal meetings, managers and executives continually pressured customer service representatives to sell products at any cost, and taught them to use sophisticated methods of distracting, confusing, and misleading the caller in order to “close” the sale.

286. For example, the 121 Mill Street Enterprise on more than one occasion brought in a psychiatrist to teach employees how to overcome the defenses of the public and to assist the Enterprise in its activities.

287. The 121 Mill Street Enterprise employed formal trainers who instructed new customer service representatives in the products they would be selling, as well as the sales techniques and methods developed by the Enterprise.

288. Employees were encouraged by example, by trainers and by Defendant James DeWolfe to make untrue exaggerated and fraudulent claims.

289. Another common method of the 121 Mill Street Enterprise involved the use of false testimonials, where the customer service representatives would tell a caller that they or someone close to them had used the product with success.

290. To develop these false testimonials, customer service representatives were encouraged to ingest the products they marketed, endangering the health of the representatives and subjecting them to common side effects of medication. For example, female employees consumed Vinarol (described in full below), and experienced bluish vision, a common reaction to the prescription medication sildenafil citrate (Viagra).

291. On another occasion, customer service representatives tried a sample of "Right Size," a product made by the manufacturer of Vinarol and marketed by the 121 Mill Street Enterprise without disclosing its high levels of ephedrine. The representative experienced heart palpitations that prompted her to seek medical attention.

292. Not only were customer service representatives encouraged to lie about these symptoms and side effects, the 121 Mill Street Enterprise endangered their health by encouraging experimentation with prescription and recreational drugs.

293. Defendant James DeWolfe played a central role in all of these activities and misrepresentations. Through most of the relevant time period, he was in charge of the day to day operations of the 121 Mill Street Enterprise.

294. While Defendant James DeWolfe threatened to fire customer service representatives who failed to "close" a sale, he would also promise them a lavish lifestyle if they were successful.

295. For example, Defendant James DeWolfe would summon his staff for “town meetings” in which he encouraged employees to increase their sales by promising that they would soon own houses, boats, new cars, and other possessions.

296. Defendant James DeWolfe held himself up as an example of this new lavish lifestyle by driving flashy cars to work.

297. To the customer service representatives employed by the 121 Mill Street Enterprise, who were paid a low wage with the potential for generous commissions and bonuses, this environment created a powerful incentive to "close" sales by any means.

298. Not only were the Defendants aware of these activities and misrepresentations, and not only did they encourage customer service representatives to "close" sales using any necessary means, but customer service representatives were fired for having low sales.

299. When Defendant James DeWolfe felt that sales figures were too low, he also held conference calls with managers and trainers in which he threatened to fire staff if sales did not improve.

300. Staff members were routinely fired, regardless of their tenure, if their sales "close-rates" were too low.

301. It was therefore a worse offense against the 121 Mill Street Enterprise to have low sales numbers, than to outright lie about the products and services they were selling.

302. The 121 Mill Street Enterprise also maintained control and order through a system of written warnings. These warnings disciplined customer service representatives for a broad range of infractions, from their attendance records to the quality of their telephone calls, to their sales "close" rates.

303. For example, on at least one occasion, a customer service representative was disciplined for asking a caller whether he or she was of legal age to purchase a product such as Avacor or Vinarol.

304. Whenever a customer service representative received a pay rate change, was assigned to a different schedule, or was assigned to a different customer service team, the 121 Mill Street Enterprise documented the action in a written report.

305. Even “verbal” warnings were documented and recorded in a customer service representative's personnel file.

306. Warnings could be issued for failing to follow "sales process," which did not necessarily mean failure to follow an approved script. Rather, it meant failure to build a rapport with the caller, isolate their concerns, and rebut any objections in order to "close" the sale. These warnings threatened termination if the customer service representative did not improve his or her sales figures to the satisfaction of the 121 Mill Street Enterprise.

307. These warnings indicate the scrupulous record keeping and call monitoring methods used by the 121 Mill Street Enterprise. Every individual call and transaction was identified and recorded by identifying number.

308. Upon information and belief, call records of the Enterprise's activities continue to exist and remain highly organized.

309. As a result of these formal warnings, procedures, and threats of termination, customer service representatives were indoctrinated in the methods employed and results demanded by the 121 Mill Street Enterprise. These control techniques allowed new customer service representatives to be manipulated to achieve goals of the 121 Mill Street Enterprise.

310. Further, the sophisticated call monitoring technology enabled leaders of the 121 Mill Street Enterprise to selectively enforce employment policies and justify terminating customer service representatives who did not fulfill the unofficial expectations of the Enterprise.

311. Employees were not fired for defrauding the customer or the public.

312. Defendants Frank and James DeWolfe encouraged these activities.

313. Defendant Will Adams was aware of these activities and misrepresentations.

314. Defendant Jeffrey Stanek was aware of these activities and misrepresentations.

315. Defendant Graham Weaver was aware of these activities and misrepresentations.

316. Defendant Billy Maguy was aware of these activities and misrepresentations.

317. Defendant Brian Flaherty was aware of these activities and misrepresentations.

**A Culture of Lawlessness and Recklessness Pervades the 121 Mill Street Enterprise**

318. Defendant James DeWolfe created an atmosphere of recklessness and lawlessness through various devices and encouragements.

319. The use of illegal drugs was an ongoing part of this culture and atmosphere.

320. At least on one occasion an employee who was struggling with doing the work of the Enterprise was told by a supervisor to go outside and smoke marijuana to see if its effects helped him to sell products.

321. Defendant James DeWolfe used what appeared to be cocaine and snorted lines of white powder on his desk in view of his employees.

322. Employees observed hypodermic needles in the bathroom.

323. For at least eight years, the 121 Mill Street Enterprise has engaged in a series of racketeering schemes designed to enrich its members and defraud the public. These schemes are related through the use of a call center at 121 Mill Street in Auburn, Maine, misrepresentations

concerning the effects and ingredients of supposedly “all natural” medications, and a series of other related misrepresentations and common techniques to defraud the public using the wires and mails. The 121 Mill Street Enterprise is alleged to have perpetrated at least six different schemes involving “all natural” health products. The following schemes are selected as a representative sample.

REPRESENTATIVE SCHEMES OF THE 121 MILL STREET ENTERPRISE

324. For at least eight years, the 121 Mill Street Enterprise has engaged in a series of racketeering schemes designed to enrich its members and defraud the public. These schemes are related through the use of a call center at 121 Mill Street in Auburn, Maine, misrepresentations concerning the products that the call center marketed or sold, and a series of other related misrepresentations and common techniques to defraud the public. The following schemes explain this pattern of racketeering activity.

**The Avacor Scheme**

325. For five years, beginning in 2000 and continuing until the summer of 2005, the 121 Mill Street Enterprise sold a product called Avacor.

326. Through the Avacor scheme, members of the 121 Mill Street Enterprise perpetrated an elaborate "snake oil" ruse upon members of the American public, misleading them to believe that Avacor was an all natural hair replacement regimen when in fact, it was merely a hoax product devised to evade F.D.A. regulation.

327. The product was sold in the United States, Puerto Rico, Guam and Canada.

328. The sales of Avacor in California alone were estimated at $58,000,000 with the 121 Mill Street Enterprise commission for the California sales estimated at anywhere between $7 million and $17 million.

329. Upon information and belief, all nationwide telemarketing calls for Avacor were received by the 121 Mill Street Enterprise. The product was sold over telephone lines routed into its call center.

330. Upon information and belief, the 121 Mill Street Enterprise was responsible for all sales of Avacor.

331. The product was both sold by and distributed by the 121 Mill Street Enterprise in partnership with Global Vision Products, meaning, the 121 Mill Street Enterprise operated both a call center taking calls from the public, and a so-called fulfillment center by packing and shipping the product to the public.

332. The 121 Mill Street Enterprise shipped Avacor from its fulfillment facility located at 280 Park Street in Lewiston, Maine. Upon information and belief, the F.D.A. was never notified that this facility was shipping Avacor, nor did the F.D.A. ever inspect these facilities as is required for any pharmaceutical shipment or processing center.

333. In written and television advertising, Avacor was described as a “clinically proven,” “revolutionary” and a “unique” treatment for hair loss and hair re-growth.

334. In fact, the marketing of Avacor was an elaborate hoax involving fictitious clinics and treatment centers, a fabricated “medical study,” and unsubstantiated efficacy claims promising a “90% success rate.”

335. Customer service representatives described Avacor as an all natural product, when, in fact, it contained a number of ingredients subject to Federal Food and Drug Administration ("F.D.A.") oversight. For example:

a. Avacor's "Scalp Detoxifying Shampoo" was packaged in six ounce bottles whose ingredients included: polysorbate 80, Peg 80, Sodium Trideceth,

Peg 150, Cocamidropyl, Hydroxysultaine, disodium, Citric Acid, Quaternium 15, Lauramphodiscetate, Diazodinyl Urea, Methylpaben, Propylparaben.

b. Avacor included a "Physicians Topical Formula" whose ingredients included: Alcohol, Propylene Glycol, water, L A-4, 2.4 Diamino-6 piperdinopyrimidine 3-oxide 1.2 ml, Gly-1, L-2 Amino-5, and Guaninovolicio acid.

c. Propylene glycol is a chemical used in products regulated by the F.D.A., such as underarm deodorant, toothpaste, and cosmetics. It is frequently used as an ingredient in antifreeze.

336. Avacor used one David Gordon as its spokesperson. Gordon appeared in television advertisements wearing a white laboratory coat and presenting himself as a medical doctor. In fact, Gordon has been stripped of his license to practice medicine in New York, and spent time in prison for Medicaid fraud.

337. Avacor marketing literature suggested it was developed and tested by doctors at the “Hair and Skin Treatment Center,” the “New York Hair Clinic,” and the “Avacor clinic.” In fact, each of these so-called clinics shares the same address as Global Vision Products and, in fact, there are no doctors or patients involved in the hair loss treatment at these clinics.

338. For example, the label "Physicians Topical Formula" was designed to confuse members of the public and mislead them into believing that Avacor was a medically safe product designed by doctors.

339. The product was sold as an "herbal base topical formulation," however, it actually contained the drug Minoxidil, the active ingredient in F.D.A. regulated products such as Rogaine.

340. Minoxidil is a drug. Upon information and belief, when the 121 Mill Street Enterprise sold Avacor, Minoxidil required a prescription. Even today, though Minoxidil is available over the counter, it remains subject to F.D.A. regulation and its use may result in serious medical side effects.

341. Minoxidil's F.D.A. approved warnings of side effects include headaches, nausea, vomiting, dizziness, changes in heart rate or blood pressure, chest pain, swelling of hands or feet, and fatigue.

342. Dosages are different between men and women.

343. Minoxidil is contraindicated for women who are pregnant or breast feeding, for persons with a history of heart problems, kidney problems, liver problems, and drug allergies.

344. It is a federal crime to introduce misbranded drugs into interstate commerce.

345. It is a federal crime to fail to register an establishment in which drugs are manufactured, prepared, propagated, compounded or processed.

346. Neither Global Vision Products nor any member of the 121 Mill Street Enterprise was registered to propagate or otherwise handle drugs.

347. Federal law requires pharmaceutical companies to report any adverse drug reactions.

348. The 121 Mill Street Enterprise received calls from the public complaining about adverse drug reactions, including rashes, blistering on the head and face, and hair loss.

349. Neither Global Vision Products nor the 121 Mill Street Enterprise reported any adverse drug reactions to the F.D.A.

350. Avacor was widely advertised on television and other media. The 121 Mill Street Enterprise received calls through a 1-800 number, which was prominently featured in Avacor promotional materials.

351. When the 121 Mill Street Enterprise received calls for Avacor, customer service representatives sometimes read from a script that members of the 121 Mill Street Enterprise developed in conjunction with Avacor ("the Avacor script").

352. The 121 Mill Street Enterprise told its staff to describe Avacor as “safe to use.”

353. Reading from the Avacor script, customer service representatives told the public that Avacor would deliver the following benefits, among others:

a. Avacor would "make your hair grow thicker and fuller from the first application"

b. "Avacor is safe and effective and comes complete with a risk free guarantee from the date that you receive the product and for the entire time of your purchase."

c. "Our scalp detoxifying shampoo is a deep cleansing shampoo designed to remove pollutants and residue to keep your scalp in optimum condition."

354. If female callers asked whether Avacor would regrow their hair, representatives were instructed to distract the caller and misrepresent the product by telling them that "The oral Nutricap will help promote a healthy hair follicle and provide nutritional support for your hair's health and growth," and that Avacor "must be used on an ongoing basis, or any positive effects from the product can be lost over several months."

355. Customer service representatives were paid additional commissions to sell associated Avacor products such as the "Boost" and "Haircare" lines, to be used with Avacor.

356. The 121 Mill Street Enterprise told the public that Avacor came with a money back – no risk – guarantee. That, in fact, was a misrepresentation. For example, in 2001 the representatives of 121 Mill Street Enterprise told a member of the public, "If you do not grow hair, and I don't mean peach fuzz, but real hair then you can return it for your money back." The public was told that it might take 6 months to see results. As a result of these misrepresentations, many callers purchased Avacor through 121 Mill Street Enterprise.

357. When, after paying hundreds of dollars for the product and not growing hair a person asked for a refund, they were told they waited too long, and that refunds had to be requested within 30 days of sale.

358. In essence, misrepresenting the Avacor refund policy was a scam technique because the Enterprise told callers that refunds had to be requested within 30 days, while the 121 Mill Street Enterprise previously told callers that they would not know if Avacor worked until after they had used it for six months. The Avacor refund policy was a classic hoax device because it required the members of the public to waive their rights to a refund before they ever had a chance to see if Avacor even worked.

359. When a caller wished to order Avacor, he or she was instructed to mail a check to Avacor at 121 Mill Street, Auburn, Maine 04210.

360. The 121 Mill Street Enterprise shipped Avacor to customers using the U.S. Postal Service, United Parcel Service, and Parcel Direct.

361. The receipt and shipping of Avacor violated 21 USC §331(c) which, among other things, prohibits the receipt in interstate commerce of any drug that is misbranded.

362. The 121 Mill Street Enterprise sold and misrepresented to the public that Avacor was all natural.

363. The 121 Mill Street Enterprise sold and misrepresented to the public that Avacor had no chemicals.

364. The 121 Mill Street Enterprise sold and misrepresented to the public that Avacor had no side effects.

365. These statements by 121 Mill Street Enterprise were false.

366. The statements by 121 Mill Street Enterprise were material.

367. The public relied on statements of the 121 Mill Street Enterprise in its decision to purchase Avacor to its detriment.

368. There was general knowledge within the 121 Mill Street Enterprise that Avacor had the drug Minoxidil in it, in fact, the trainers employed by the 121 Mill Street Enterprise told the staff that it had Minoxidil in it.

369. Defendant James DeWolfe knew and told others, including the staff and employees, that Avacor had Minoxidil in it.

370. Defendant Frank DeWolfe knew that Avacor had Minoxidil in it.

371. Some customers specifically asked if Avacor had Rogaine or chemicals in it. If the sales staff thought that disclosing these ingredients would "close" the sale, callers were told that Avacor contained Minoxidil. If the staff thought it would interfere with the sale, they would lie about its Minoxidil content.

372. Therefore, some salespeople perceived Minoxidil as a selling point for Avacor.

373. During the 2000-2005 time period, the 121 Mill Street Enterprise introduced Defendants Alpine, Weaver, Maguy and Adams to Global Vision Products. Thereafter,

Defendants Alpine, Weaver, Maguy and Adams participated in and directly financed the promotion of Avacor.

374. Defendant Maguy, the Enterprise's media strategist, told the Plaintiffs that he spent up to half of his work time on Avacor related business.

375. The 121 Mill Street Enterprise received a percentage of all Global Vision Product revenue for Avacor which was derived from the fraudulent marketing of Avacor by customer service representatives employed by the 121 Mill Street Enterprise. These proceeds are estimated to be in the millions of dollars.

376. Defendant Alpine, through Defendants Weaver, Maguy and Adams, and on its own, lent money to Global Vision Products for the payment of exorbitant rates of interest and on the condition it would continue to do business exclusively with the 121 Mill Street Enterprise.

377. Defendant Alpine helped fund media purchases, did advertising analysis, and assisted media buying for Global Vision Products on the condition that it would continue to do business exclusively with the 121 Mill Street Enterprise.

378. Defendant Alpine received money from the 121 Mill Street Enterprise directly by receiving payments from Global Vision Products and indirectly through its indirect ownership of AdvanceTel.

379. As a result of the 121 Mill Street Enterprise's Avacor scheme, a class action lawsuit was filed in the Superior Court of California against Global Vision Products and PowerTel, among other defendants, resulting in a judgment exceeding $30 million.

380. Through these acts and omissions, the 121 Mill Street Enterprise defrauded the public using interstate commerce, including the wires and mails.

## The Vinarol Scheme

381. For approximately fourteen months, beginning in February 2002 and ending in April of 2003, the 121 Mill Street Enterprise sold a product called Vinarol.

382. Like the Avacor Scheme, the Vinarol scheme consisted of "snake-oil" sales tactics designed to perpetrate an elaborate and dangerous hoax upon the American public, evade F.D.A. oversight, and earn millions of dollars for the 121 Mill Street Enterprise.

383. Vinarol was sold throughout the United States.

384. Vinarol was sold over telephone lines that came into the 121 Mill Street Enterprise.

385. Vinarol was sold as a “new fast acting all natural herbal formula” that was developed to help increase sexual desire and enhance the sexual experience for both men and women.

386. It was promoted as a formula that was developed by nearly ten years of ongoing research and development to provide optimal purity, potency and performance during intercourse.

387. Vinarol was promoted as increasing sexual sensitivity and stimulation for both men and women, as well as increasing blood flow to genitalia and increasing erection firmness.

388. In addition to these claims, Vinarol was promoted as “100% all-natural herbal product” and a dietary supplement.

389. When a product is classified as a dietary supplement, it is not subject to the extensive F.D.A. oversight and regulation to which prescription drugs are subjected.

390. In fact Vinarol was not all natural but contained sildenafil citrate, the active ingredient found in the prescription drug Viagra.

391. Viagra is a prescription drug developed by Pfizer Inc. as an oral therapy for erectile dysfunction.

392. Viagra is the trade name for sildenafil citrate.

393. Sildenafil citrate causes a dilation of the blood vessels, a process affecting the structure of human bodily function, which is subject to regulation under the Federal Food, Drug, and Cosmetic Act, which the F.D.A. oversees.

394. Only Pfizer Inc. is approved by the F.D.A. to sell sildenafil citrate, therefore only Pfizer may legally market this drug in the United States.

395. Viagra is prescribed to treat erectile dysfunction in men. There is no form of sildenafil citrate that has received approval for women from the U.S. Food and Drug Administration.

396. No member of the 121 Mill Street Enterprise notified the F.D.A. that they were shipping the prescription drug sildenafil citrate.

397. When the 121 Mill Street Enterprise marketed and shipped Vinarol, which contained sildenafil citrate, the Enterprise violated federal laws designed to protect the health, safety and welfare of the public.

398. As a result of an investigation done by the U.S. Food and Drug Administration the importers of Vinarol have been indicted in the United States District Court, District of Arizona, criminal docket #: 2:08-cr-00036-PGR-06. That indictment includes among other things felony criminal charges including introducing misbranded drugs into interstate commerce, mail fraud, wire fraud, money laundering.

399. When the 121 Mill Street Enterprise marketed Vinarol to members of the public without disclosing that it contained sildenafil citrate, the Enterprise endangered the health and well being of the public.

400. The health and safety of Vinarol customers was jeopardized by the possible adverse effects of the drug, which include the risk of heart attack, stroke and death.

401. Other adverse reactions to sildenafil citrate include headaches, facial flushing, upset stomach, temporary bluish vision or blurred vision, sensitivity to light and, in some instances, a report of sudden loss of vision or hearing.

402. Sildenafil citrate is contraindicated if the person is taking nitrates often prescribed for chest pain as this may result in a sudden unsafe drop in blood pressure. It is also contraindicated for persons over 65 years old who have serious liver or kidney problems.

403. Because of these possible side effects, the F.D.A. requires Viagra to be prescribed by licensed medical professionals who are qualified to warn patients about these effects, and who are medically qualified to assess whether a patient may safely take sildenafil citrate.

404. No member or the 121 Mill Street Enterprise is a medical professional licensed to prescribe medication.

405. No member of the 121 Mill Street Enterprise is a medical professional qualified to diagnose patients with erectile dysfunction, or assess patient risk for the dangerous side effects of sildenafil citrate.

406. Nonetheless, members of the 121 Mill Street Enterprise engaged in widespread marketing, sale, and distribution of sildenafil citrate as part of the Vinarol Scheme.

407. Since this product was marketed as a cure for erectile dysfunction, the 121 Mill Street Enterprise could easily market Vinarol as a hassle-free, no prescription required cure that

would save members of the public from the embarrassment of discussing these problems with a physician, or having a prescription filed at a local pharmacy. This made older men an easy target for the Vinarol scheme, and also made these targets reluctant to report that they had been harmed through a scheme to market a male enhancement pill, because doing so would require admitting to an embarrassing intimate condition.

408. Nonetheless, many customers who purchased Vinarol from the 121 Mill Street Enterprise called to report adverse effects, yet no adverse drug reactions were reported to the F.D.A.

409. Both male and female customer service representatives at the 121 Mill Street Enterprise were given samples of Vinarol, and ingested them on the sales floor. Some representatives reported blue vision, a common side effect of sildenafil citrate.

410. Defendant James DeWolfe was aware that Vinarol contained sildenafil citrate.

411. Defendant Frank DeWolfe was aware that Vinarol contained sildenafil citrate.

412. Defendant Graham Weaver was aware that Vinarol contained sildenafil citrate.

413. Defendant Will Adams was aware that Vinarol contained sildenafil citrate.

414. Defendant Jeff Stanek was aware that Vinarol contained sildenafil citrate.

415. Defendant Scott MacCheyne was aware that Vinarol contained sildenafil citrate.

416. The 121 Mill Street Enterprise sold Vinarol at least for a time after it was widely reported in the news that Vinarol contained prescription drugs.

417. The sale of Vinarol in the United States generated revenues of more than $7,500,000.

418. Through these acts and omissions, the 121 Mill Street Enterprise defrauded the public using interstate commerce including the wires and mails.

## The Thermal Carb Scheme

419. For approximately four years, the 121 Mill Street Enterprise sold a product called Thermal Carb, which was also known as Thermal Carb Ultra, beginning sometime in 2000 and continuing through 2004.

420. Thermal Carb was marketed as an all natural diet tool.

421. Thermal Carb was marketed as a dual fat burner and carbohydrate blocker, contained in a single pill.

422. Upon information and belief, Thermal Carb initially contained the drug ephedrine, a dangerous stimulant.

423. Customer service representatives told callers that all they had to do was take one tablet of Thermal Carb before eating, and they would lose weight.

424. Customer service representatives told callers that Thermal Carb would block the carbohydrates they consumed, preventing the body from producing too much insulin. The script for Thermal Carb also included the following claims:

> Thermal-Carb blocks the carbohydrates that you eat and your body doesn't overproduce insulin. The carbs are now burnt more efficiently or pass through your body instead of being turned into body fat. It turns your body into a **FAT BURNING MACHINE** rather than a **FAT STORAGE MACHINE**! It is the only product on the market today that actually helps to control and correct the problem of weight gain and promote weight loss. … It puts your body's digestive system in "Ideal Shape" for your body's natural metabolism to work more efficiently.

425. Customer service representatives told callers that Thermal Carb was "the most advanced diet product ever manufactured and is not available anywhere else, at any price."

426. Customer service representatives told callers that they had "absolutely nothing to lose except those unwanted pounds and inches!"

427. The Thermal Carb weight loss system was also sold with a seven day cleansing system.

428. Customer service representatives told callers to use the cleansing system for one week before beginning Thermal Carb, in order to rid their bodies of toxic by-products and accumulated wastes.

429. During the Thermal Carb scheme, the 121 Mill Street Enterprise used a tiered pricing mechanism in order to "upsell" more product. For example, one bottle of Thermal Carb cost, $79.95, three bottles cost $149.85, and six bottles cost $219.85.

430. When closing a sale, customer service representatives were instructed to tell the caller that Thermal Carb would enroll the caller into a preferred continuity weight loss program. This program was nothing more than a scheme to continue billing the customer's credit card at regular intervals.

431. Once a customer agreed to be enrolled for free into the preferred continuity weight loss program, the 121 Mill Street Enterprise would ship an additional bottle of Thermal Carb to the customer at a set date. The 121 Mill Street Enterprise would then bill the customer's credit card for the additional product. Customer service representatives were instructed to tell the caller as follows:

> In and around 28, 82, or 170 days we'll send a one bottle supply for the low price of $35.90 – that includes the shipping and handling, everything. Each month thereafter you will receive another bottle for that incredibly low price. You can see it's a great savings. You will be billed to the same card you are using today.

432. In addition to the seven day cleansing system and Thermal Carb, the 121 Mill Street Enterprise also marketed the product called the Thermal Carb Fat Cutting Gel.

433. The Thermal Carb Fat Cutting Gel was claimed to reduce visible surface body fat and cellulite.

434. Callers were instructed to rub the fat cutting gel all over their hips, thighs, buttocks, arms, chin and stomach in order to reduce cellulite and body fat.

435. Customer service representatives were instructed to tell callers the following in order to sell the Thermal Carb Fat Cutting Gel:

> If you're like millions of people who have tried dieting and exercising but still have problem areas that you can't seem to tone up or trim down, then Thermal Carb Fat Cutting Gel is the breakthrough you have been looking for. New from Thermal Carb is their fat cutting gel that reduces the visible signs of fat in specific areas of the body. You can now target specific problem areas and lose surface body fat around your stomach, hips, thighs, buttock, back of your arm, or under your chin. Melt away those love handles or cellulite. Simply apply the topical fat gel to those problem areas and watch as your fat simply melts away. Normally it sells for $29.95 a bottle, but today we can get you out a free supply with your order. How do you spell your last name?

436. The weight loss promises were unsubstantiated, but insisted customers would lose weight without exercising, if they simply rubbed gel on their bodies.

437. All of the Thermal Carb associated products were marketed as all natural.

438. The Thermal Carb seven day cleansing system contained ingredients such as licorice root extract, juniper berry powder, corn silk, oat fiber, citrus pectin, orange juice crystal, and aloe vera. Customer service representatives could list these ingredients to the customer, and mislead them into thinking that the products could do nothing but make the customer healthier.

439. Customers were led to believe that if they took the Thermal Carb Cleansing System, that their digestive tract would become healthier, facilitating weight loss.

440. In fact, Thermal Carb has never been shown to remove "accumulative wastes", increase the metabolism, or prevent the body from manufacturing too much insulin.

441. Thermal Carb has never been proven to reduce weight.

442. Until April 2004, Thermal Carb contained ephedrine.

443. Ephedrine is derived from ephedra, a powerful stimulant that, upon information and belief, is either derived from Chinese plants or synthetically manufactured, and is then manipulated for use in a variety of pharmaceutical products and narcotics.

444. The Food and Drug Administration has long regarded ephedra-based dietary supplements as potential health hazards.

445. For example, ephedra-based cold medications were often used to make dangerous drugs such as methamphetamine. In response to the dangers posed by ephedra-based products, federal agencies have imposed strict regulations on any products containing ephedra-based chemicals such as pseudoephedrine, phenylpropanolamine, and ephedrine.

446. Substantial evidence of harm emerged in 2003, when a major study reported more than 16,000 adverse events associated with the use of ephedra-containing dietary supplements, including heart palpitations, tremors, and insomnia. The study also found little evidence that ephedra is effective in increasing weight loss, as claimed by the Enterprise.

447. In spite of these reports and studies, the 121 Mill Street Enterprise continued to aggressively misrepresent Thermal Carb.

448. On April 12, 2004, the F.DA. enacted a final rule prohibiting the sale of dietary supplements containing ephedra.

449. Customer service representatives at the 121 Mill Street Enterprise tried taking Thermal Carb and experienced none of its described benefits.

450. Upon information and belief, the 121 Mill Street Enterprise shipped the Thermal Carb products from its physical facilities in either Lewiston or Auburn, Maine.

451. The 121 Mill Street Enterprise shipped the Thermal Carb products using interstate commerce including the U.S. Postal Service, the United Parcel Service, and Parcel Direct.

452. Callers purchasing Thermal Carb products were instructed to mail their checks to Thermal Carb, 121 Mill Street, Auburn, Maine 04210.

453. Through these acts and omissions, the 121 Mill Street Enterprise defrauded the public using interstate commerce including the wires and mails.

**The Glucotrin Scheme**

454. For approximately three years beginning in the Fall of 2005, the 121 Mill Street Enterprise has sold a product called Glucotrin.

455. The Glucotrin scheme is believed to be an ongoing and continuing activity of the 121 Mill Street Enterprise.

456. The nature of the Enterprise and the fraud it undertakes by necessity required it to change names and/or corporate form every few years, although the 121 Mill Street Enterprise continues the same techniques and methods throughout its long term racketeering conduct.

457. By the Fall of 2005, the 121 Mill Street Enterprise had shed its AdvanceTel name and corporate entity and was known as Great Falls Marketing.

458. As of the date of this Complaint, the 121 Mill Street Enterprise operates under the name of Great Falls Marketing and is controlled in fact by Defendant Alpine Investors, as well as Defendants Graham Weaver, Billy Maguy, Will Adams and others.

459. Beginning in approximately the summer of 2005, the Enterprise began selling products for one Klee Irwin of Van Nuys, California. It started with a product called Dual Action Cleanse and by the fall of 2005 took on Mr. Irwin's product called Glucotrin.

460. This product was sold over the telephone lines to the United States and Canada using the familiar call center model as described previously in this Complaint.

461. Upon information and belief, all nationwide telemarketing calls for Glucotrin were routed through 121 Mill Street in Auburn, Maine.

462. Upon information and belief, the 121 Mill Street Enterprise was responsible for all sales of Glucotrin.

463. In order to legally market a drug in interstate commerce, the drug's manufacturer was required to comply with all applicable provisions of the Food, Drug and Cosmetic Act (FD&C Act), 21 USC §321 et seq. and its implementing regulations. The Food and Drug Administration (FDA) is responsible for enforcing provisions of the FD&C Act.

464. The FD&C Act defines the term "drug" to include articles that (1) were intended for use in the diagnosis, cure, mitigation, treatment or prevention of disease in man, or (2) were intended to affect the structure or function of the body of man. 21 USC §321(g)(1)(B) and (C).

465. In addition to its responsibility with regard to drugs, the FDA also has been charged with responsibility of protecting the health and safety of the American public by assuring, among other things, that "food" intended for human consumption was not adulterated or misbranded. 21 USC §321(f)(1)(3).

466. Under the FD&C Act, a "dietary supplement" is deemed to be food. The FD&C Act defines the term "dietary supplement" to mean a product intended to supplement the diet and, among other things, was labeled a dietary supplement.

467. Because they are considered foods and not drugs, under the FD&C Act, dietary supplements are not subject to any of the FDA extensive pre-market regulatory authority. 21

USC §355. Similarly, manufacturers and marketers of dietary supplements are subject to less rigorous facility inspection than are drug manufacturers and marketers.

468. The FD&C Act requires any establishment that engages in the manufacture, preparation, propagation, compounding or processing of a drug to register with the FDA in accordance with 21 USC §360. The failure to register is a prohibited act under the FD&C Act. 21 USC §331(p).

469. The FD&C Act prohibits the introduction or delivery for introduction into interstate commerce, or the causing thereof, of any drug or food that was misbranded. 21 USC §331(a).

470. Under the FD&C Act, a drug is misbranded if:

a. if its labeling was false or misleading in any particular, 21 USC §352(a); or
b. if it is false or misleading in any particular. 21 USC §343(a).

471. Glucotrin contains, among other things, gymnena, sylvestre, perialla oil and banaba leaf.

472. Through media advertising, people interested in Glucotrin were directed by telephone to the 121 Mill Street Enterprise.

473. The public was left to believe that they were contacting the Blood Sugar Institute. In fact, they were talking to representatives at the 121 Mill Street Enterprise.

474. The Blood Sugar Institute is not, as its name implies, a legitimate medical institute but is instead a scam associated with the person known as Klee Irwin.

475. Once a call is received by the 121 Mill Street Enterprise, the representatives are instructed and taught to tell the caller that by taking Glucotrin that:

(a) you may never have to take diabetes medication again;

(b) Glucotrin heals diabetes;

(c) by taking Glucotrin, you can "free yourself from diabetes"; and

(d) you can discontinue your diabetes medication while taking Glucotrin.

476. These misrepresentations amount to the promotion of Glucotrin as a cure, mitigation, treatment or prevention of diabetes in man.

477. These misrepresentations violate the FD&C Act as Glucotrin is not a drug approved by the FDA.

478. These misrepresentations do not have a reasonable basis, are not supported by scientific studies and constitute deceptive and fraudulent advertising in violation of Sections 5(a) and 12 of the Federal Trade Commission Act.

479. Diabetes is a recognized disease in which the body does not produce or properly use insulin. Insulin is a hormone that is needed to convert sugar, starches and other foods into energy needed for daily life.

480. According to the American Diabetes Association, there are 23.6 million children and adults in the United States who have diabetes.

481. The Glucotrin scheme is intended to victimize people in the United States with diabetes.

## THE SCHEME TO DEFRAUD MYFREEMEDICINE

### Overview

482. When the 121 Mill Street Enterprise began taking calls for MyFreeMedicine, it continued its pattern of misrepresenting products to the American consumer.

483. A typical transaction began with an elderly or low income caller seeing a television advertisement for MyFreeMedicine, and noting a toll free number contained in the advertisement.

484. As described above, Defendants Billy Maguy and Alpine Investors devised this television advertising strategy in order to direct more calls to the 121 Mill Street Enterprise.

485. Once the advertisement was broadcast, members of the television audience who were having trouble affording their medication would call the toll free number.

486. The phone call would be received at the 121 Mill Street Enterprise by a customer service representative who answered the call on behalf of MyFreeMedicine.

487. The representative would answer as if the call were coming to MyFreeMedicine, so that the public thought that they were directly speaking with MyFreeMedicine.

488. From the very moment a customer approached MyFreeMedicine, they were in fact dealing with the 121 Mill Street Enterprise.

489. The customer service representatives proceeded to say whatever was necessary in order to sign up the caller for MyFreeMedicine, charge the caller for the program, and earn a commission.

490. Representatives commonly told callers that the $199.95 price would enable the caller to receive free medication for a year when, in fact, this was the price for six months of service.

491. The call center ignored the income eligibility guidelines, telling callers who exceeded these guidelines that they were qualified to receive free medication. After the callers were charged for the program, they learned that they did not qualify, but were denied a refund.

492. Representatives claimed the prescriptions were coming from the government, or through a government program.

493. The government program misrepresentation was the brainchild of Defendant James DeWolfe and as a result became part of the official training program. This misrepresentation was particularly insidious in that it enabled the Enterprise to overcome defenses and gain credibility with indigent Americans who thought they were doing business with the federal government or a program under the supervision of the federal government. Accordingly, it was much easier to get people to give bank account numbers and other information a person would not normally give, and to convince callers to agree to be charged for the program.

494. Representatives told the public that medications were covered when in fact they were not on the list of approved medication.

495. Representatives refused to cancel orders when customers requested to withdraw from the program or requested not to be charged.

496. Representatives either failed to disclose the refund policy or misrepresented it.

497. The 121 Mill Street Enterprise continued to charge customers for MyFreeMedicine's services, even after the customer called back to request a refund and withdraw from the program.

498. On some occasions, representatives would simply withdraw money from people's accounts who had only called to find out about the service.

**MyFreeMedicine Hires AdvanceTel, Beginning its Involvement with the Enterprise**

499. In late 2003, due to rising demand for its professional service, MyFreeMedicine needed to use a more experienced call center.

500. Through MyFreeMedicine's initial contacts in the media advertising industry, Plaintiff Geoff Hasler heard of Chris Johnson, a sales manager at AdvanceTel Direct and a member of the 121 Mill Street Enterprise.

501. Plaintiff Geoff Hasler contacted Mr. Johnson, and after they discussed AdvanceTel Direct handling calls for MyFreeMedicine, Mr. Johnson sent Plaintiff Hasler a standard contract.

502. On January 14, 2004, the Plaintiffs signed a Marketing Agreement with Defendant James DeWolfe, acting on behalf of AdvanceTel Direct, which Defendant Frank DeWolfe witnessed. In this agreement, MyFreeMedicine hired the call center operated by the 121 Mill Street Enterprise "to provide telemarketing services."

503. As part of the January 14, 2004 agreement, AdvanceTel agreed to receive telephone calls generated by MyFreeMedicine's advertising, and to enroll qualified callers in MyFreeMedicine.

504. The 121 Mill Street Enterprise, acting as AdvanceTel, agreed to develop scripts with MyFreeMedicine, subject to MyFreeMedicine's approval, for use by customer service representatives. The 121 Mill Street Enterprise promised to submit all sales scripts to MyFreeMedicine for review for substantive accuracy, not to use them without MyFreeMedicine's written approval, and not to materially deviate from any approved scripts.

505. The 121 Mill Street Enterprise agreed to provide MyFreeMedicine with detailed data regarding call volume, the number of dropped calls, and "close rate," among other metrics.

506. The January 14, 2004 agreement designated Frank DeWolfe as "Contact Person" between the 121 Mill Street Enterprise and MyFreeMedicine.

507. The agreement provided for MyFreeMedicine to pay the 121 Mill Street Enterprise a commission based on sales volume generated by the 121 Mill Street Enterprise.

508. This agreement also provided for MyFreeMedicine to pay the 121 Mill Street Enterprise a varying rate for the total amount of talk time fielded by customer service representatives.

509. The agreement between MyFreeMedicine and AdvanceTel direct was substantially the same boilerplate contract that the 121 Mill Street Enterprise used with all new clients. Under this contract, the 121 Mill Street Enterprise had an incentive to produce a sale as fast as possible on every call received for MyFreeMedicine.

510. The January 14, 2004 agreement also contained a fee schedule covering the use of the 121 Mill Street Enterprise's fulfillment capabilities.

511. MyFreeMedicine agreed to pay the 121 Mill Street Enterprise an up front "set-up fee" of $2,000, to cover training of all customer service agents on the MyFreeMedicine product, as well as establishing specialized data reporting for MyFreeMedicine.

512. On February 26, 2004, Geoff Hasler and James DeWolfe signed an Addendum to their January 14, 2004 Marketing Agreement, in which they agreed that MyFreeMedicine would pay the 121 Mill Street Enterprise the amount of fifty-cents per package shipped by the fulfillment facility.

## The Use of Scripts

513. When Geoff Hasler began working with the 121 Mill Street Enterprise, he presented them with a telemarketing script that was developed in consultation with advertising law attorneys.

514. Plaintiff Geoff Hasler stipulated that customer service representatives follow this script.

515. Representatives of the 121 Mill Street Enterprise told Plaintiff Hasler that his existing scripts should be rewritten and edited to “flow better.” To this end, the 121 Mill Street Enterprise assigned copywriter Geneen Meagher to work with MyFreeMedicine and Mr. Hasler on developing and improving the script so that it would be better suited to the “model” of a call center operated by the 121 Mill Street Enterprise.

516. James DeWolfe was actively involved in developing and revising the MyFreeMedicine script. In fact, James DeWolfe routinely requested changes to the MyFreeMedicine script, and presented himself as an expert in developing telemarketing scripts.

517. Plaintiff Geoff Hasler rejected the suggestions of James DeWolfe and other members of the 121 Mill Street Enterprise regarding the MyFreeMedicine script. Plaintiff Hasler rejected their "suggestions" for misinterpreting the requirements of the MyFreeMedicine program.

518. As explained above, the MyFreeMedicine program is only available to members of the public who met strict income and insurance guidelines, and whose medication is included on the most recent list produced by MyFreeMedicine.

519. These script discussions continued throughout January and February of 2004.

520. The 121 Mill Street Enterprise promised the Plaintiffs to train its sales representatives to fully comply with the scripts approved by MyFreeMedicine and its attorneys, and to adhere to the in-person training that Mr. Hasler conducted.

521. In fact, every manager and supervisor in the 121 Mill Street Enterprise was aware that customer service representatives engaged in a practice known as "freelancing," in which representatives deviated substantially from the scripts approved by MyFreeMedicine, even though Plaintiff Geoff Hasler repeatedly insisted that the scripts be followed verbatim.

522. Upon information and belief, "freelancing" occurred once the 121 Mill Street Enterprise began fielding calls from the public for MyFreeMedicine and continued to experiment with changes in the MyFreeMedicine script beyond those authorized by the Plaintiffs. The 121 Mill Street Enterprise began using unauthorized versions of a MyFreeMedicine script, and encouraged customer service representatives to develop their own script and strategies for selling MyFreeMedicine.

523. Even though the contract between MyFreeMedicine and the 121 Mill Street Enterprise required customer service representatives to follow an approved script verbatim, customer service representatives deviated from the approved script from the very outset of the relationship between the parties. Through these deviations from the approved script, members of the 121 Mill Street Enterprise misrepresented MyFreeMedicine.

524. Throughout the relationship between MyFreeMedicine and the 121 Mill Street Enterprise, customer service representatives routinely ignored the approved script and said whatever they felt would induce members of the public to divulge their financial information, permitting the 121 Mill Street Enterprise to charge the caller, mail him or her a MyFreeMedicine packet, and bill MyFreeMedicine for both services.

525. To this end, customer service representatives often misrepresented to the public that MyFreeMedicine was a government program, misrepresented or ignored the income and insurance guidelines, and misrepresented to members of the public that MyFreeMedicine was affiliated with or sponsored by pharmaceutical companies.

**"Training"**

526. When MyFreeMedicine began working with the 121 Mill Street Enterprise in January 2004, Plaintiff Geoff Hasler began traveling to Auburn, Lewiston, and Augusta, Maine to train customer service representatives on the MyFreeMedicine program. Plaintiff Hasler visited each facility operated by the 121 Mill Street Enterprise. Plaintiff Geoff Hasler's visits lasted 2 to 3 days, and included multiple group instructional sessions in a classroom environment.

527. Between January 2004 and the summer of 2005, Plaintiff Geoff Hasler visited the Maine locations at least five or six times to conduct training.

528. In February 2004, Geoff Hasler emailed a database of all of the covered medications in the MyFreeMedicine program to Angela Stinchfield at AdvanceTel Direct. Once again, he insisted that all of the customer service representatives consult this list of medications when the public called to ask if their drugs were covered: "It should be provided to all your agents, so they can look up any drug to tell people if they are included." Throughout his visits to the 121 Mill Street Enterprise's locations, and in all of his telephone or email contacts with its representatives, Mr. Hasler continued to insist that customer service representatives consult the current list of covered medications during all contacts with the public.

529. During Mr. Hasler's training sessions, he worked with 8 to 10 customer service representatives at a time. Typically, these training sessions were scheduled at the beginning or end of a customer service representative's shift.

530. As part of the training for MyFreeMedicine, Plaintiff Hasler insisted that customer service representatives only enroll members of the public who met the strict income or insurance guidelines of the free medication Patient Assistance Programs. He also explained that not every single form of medication was available under a free medication program. Plaintiff Hasler explained to all of the customer service representatives he trained that pharmaceutical companies routinely updated and revised their free medication programs. He explained that MyFreeMedicine tracked these revisions through the use of regularly updated medication lists. Plaintiff Hasler again explained the importance of consulting only the most recent medication lists provided by MyFreeMedicine.

531. Through these detailed training sessions, MyFreeMedicine and Plaintiff Geoff Hasler made every effort to educate the customer service representatives employed by the 121 Mill Street Enterprise about the MyFreeMedicine product.

532. The Defendants and other members of the 121 Mill Street Enterprise were explicitly and unequivocally aware of the details of the program and knew that the misrepresentations they made were false.

533. Nonetheless, the Defendants and other members of the 121 Mill Street Enterprise pressured customer service representatives to acquire the bank account and credit card numbers from members of the public, and to do so through any means necessary.

534. Though these activities began in early 2004, they continued throughout the relationship between the Plaintiffs and the 121 Mill Street Enterprise.

**Alpine Approaches MyFreeMedicine**

535. By the time MyFreeMedicine signed its contract with AdvanceTel Direct, Alpine Investors had already acquired an ownership interest in the Enterprise, and Defendants Will Adams, Billy Maguy, and Graham Weaver were spending significant amounts of time at its facilities.

536. Alpine had become deeply involved in the Avacor scheme, and was deriving substantial income from the misrepresentations that the Enterprise was making regarding Avacor.

537. Defendants James DeWolfe and Will Adams were working closely together on Avacor by the time the 121 Mill Street Enterprise began fielding calls for MyFreeMedicine.

538. However, by 2004 the Avacor scheme encountered growing complaints from the public to federal and state authorities, and the 121 Mill Street Enterprise sought a new scheme to defraud the public.

539. Thus, when Geoff Hasler heard about AdvanceTel through his marketing contractors and began negotiating with Defendants Frank and James DeWolfe in late 2003, MyFreeMedicine arrived on the scene at the same time the Enterprise was seeking new business.

540. At some point in early 2004, when Plaintiff Geoff Hasler began visiting the physical facilities of the 121 Mill Street Enterprise, Defendant James DeWolfe introduced him to Defendants Will Adams and Billy Maguy, who were on location frequently and, unbeknownst to Geoff Hasler, were participating in the Avacor scheme. In particular, Defendant Maguy was conducting extensive media analysis and marketing strategy designed to increase the sales and telephone call volume for Avacor directed towards the 121 Mill Street Enterprise.

541. Throughout the spring and summer of 2004, Defendants Will Adams and the Alpine partners made repeated overtures to Plaintiffs. Their purpose in making these overtures was to convince MyFreeMedicine to deal exclusively with the 121 Mill Street Enterprise as its call center and fulfillment center, and also to convince MyFreeMedicine to embark on an elaborate media buying campaign in which Alpine loaned funds for television advertisements to be repaid by MyFreeMedicine at usurious rates.

542. After many months of telephone calls to Plaintiffs, Defendant Will Adams sent Geoff Hasler an email on August 6, 2004, in which he expressed Alpine's desire to "partner" with MyFreeMedicine and encouraged the Plaintiffs to develop a relationship with AdvanceTel.

543. During his August 6, 2004 email, Will Adams promised that Alpine Investors would be equally loyal to MyFreeMedicine and to AdvanceTel. In fact, Alpine Investors already owned AdvanceTel and was a full participant in the 121 Mill Street Enterprise.

544. As part of its overture to MyFreeMedicine, Alpine Investors offered a "Partnership Proposal" in which Alpine Investors offered to fund 50% of the MyFreeMedicine media advertising, promising that MyFreeMedicine would "**Gain a financial partner with deep pockets**" and that "Alpine/AdvanceTel will hold weekly meetings to review performance, identify and address issues, and revise operational and strategic plans as needed."

545. In August 2004, Geoff Hasler met Graham Weaver, Will Adams and Billy Maguy at the San Francisco offices of Alpine Investors, to discuss collaborating to enhance the business prospects of MyFreeMedicine. During this meeting, the Alpine partners repeated their desire to replicate their success with Avacor in the context of MyFreeMedicine.

546. During this meeting, Defendants Graham Weaver, Will Adams, and Billy Maguy told Plaintiff Geoff Hasler that they admired the business model for MyFreeMedicine, and

wanted to become partners in its development and success. Alpine and its members boasted of their many successful business ventures, their advanced business administration degrees from top universities, and the capital surpluses that they wanted to invest in MyFreeMedicine. However, from the beginning, Alpine's offer was conditioned upon MyFreeMedicine using the 121 Mill Street Enterprise for its exclusive order fulfillment and telemarketing call center.

547. Throughout the summer and fall of 2004, Alpine Investors and the Plaintiffs continued to negotiate a marketing agreement.

548. Alpine Investors performed extensive analysis of media strategy, and crafted an elaborate business development and media buying strategy.

549. On October 23, 2004, Defendant Will Adams sent Plaintiff Geoff Hasler an email in which he urged the Plaintiffs to adopt a more aggressive and faster approach to building MyFreeMedicine in order to enhance the return on Alpine Investor's media expenditures. During this email, Defendant Adams said: "To date you have proceeded cautiously in building MyFreeMedicine – too cautiously to the thinking of many of your partners [i.e. Alpine] who know that when you have something that works as well as MFM in this industry, you should run with it..." In this manner, Defendants Will Adams, Alpine, and the rest of the 121 Mill Street Enterprise aggressively pushed MyFreeMedicine to follow its advice.

550. During these negotiations, as for example, in the October 23, 2004 email, Will Adams continued to push for the 121 Mill Street Enterprise to serve as exclusive call center for MyFreeMedicine, including right of first refusal on all call service emanating from MyFreeMedicine's advertising. AdvanceTel Direct, as the then current business front for the Enterprise, was designated responsibility of "generally working to optimize the disposition of calls associated with the MyFreeMedicine campaign," and Plaintiffs agreed not to contract with

any other call center without the prior permission of AdvanceTel Direct, Will Adams, or Alpine Investors.

551. Will Adams assured the Plaintiffs that he would not “advance the interests of AdvanceTel Direct at the expense of the interests of My Free Medicine.”

552. The parties signed their finalized agreement ("the October 2004 agreement") on October 23, 2004. On this date, Defendants Will Adams and Brian Flaherty (then the Chief Operating Officer of AdvanceTel Direct) traveled to MyFreeMedicine’s offices in Kentucky. A copy of this agreement is attached and all of its terms are incorporated herein by reference.

553. On November 10, 2004, MyFreeMedicine sent a facsimile copy of the signed agreement to Alpine Investors at their San Francisco office.

554. The agreement provided that MyFreeMedicine would use AdvanceTel Direct as its exclusive direct marketing call center. The final agreement also provided that AdvanceTel Direct would perform all point of sales activity services from their facility in Auburn, Maine.

555. Following the agreement, Plaintiff Geoff Hasler again traveled to Auburn, Maine to conduct further training sessions. During these training sessions, Plaintiff Hasler again explained the MyFreeMedicine business model, with particular emphasis on the income and lack of insurance requirements that callers were required to satisfy in order to qualify for free medications.

556. After signing the agreement with Alpine, MyFreeMedicine's contact with Defendants James and Frank DeWolfe declined, and Defendants Will Adams and Billy Maguy became Plaintiffs' primary contacts with the 121 Mill Street Enterprise.

557. After signing the October 2004 agreement, MyFreeMedicine began to direct all of its telemarketing calls to the 121 Mill Street Enterprise, and the media funding arrangement was put into action.

558. As part of the new media strategy devised by Alpine through the leadership of Billy Maguy, MyFreeMedicine began to purchase television advertising time through a Los Angeles based agency known as Quigley Simpson. Quigley Simpson handles advertising accounts for such prominent companies as Visa, Starbucks, the Los Angeles Times, and Procter and Gamble.

559. Once Quigley Simpson began handling MyFreeMedicine's advertising, the MyFreeMedicine promotional expenses soared.

560. Alpine wired tens of thousands of dollars to Quigley Simpson each week, and billed MyFreeMedicine for a 50% contribution of the total media purchases. Since Alpine advanced the greater portion of the advertising money, MyFreeMedicine was expected to make its contribution to the venture by simply repaying Alpine for its share of the media budget. Alpine charged and was paid a 60% annual interest premium on MyFreeMedicine's contributions to this initiative.

561. On November 10, 2004, Adams emailed Hasler to notify him that Alpine had set up a bank account with First Republic Bank, designed to service the media buying campaign. Adams later provided the account and routing numbers to Hasler so that Plaintiffs could make deposits to this account, but insisted that Alpine retain control over the funds: "this is effectively a joint account but is being set-up under the Alpine umbrella and we will be the name on the account." Adams sought a guarantee that Plaintiffs would repay Alpine for its media expenditures.

562. On November 15, 2004, Adams emailed Hasler to confirm receipt of a check for $12,500, to put towards the media buying campaign.

563. On November 24, 2004 alone, Maguy emailed Hasler (and copied Adams and Weaver) to notify Plaintiffs that he had wired $15,000 to Quigley Simpson for one week's media purchases, and that MyFreeMedicine was expected to contribute $7,500, plus interest. This is just a small example of the elaborate and costly media purchasing scheme. There were dozens of similar individual transactions as part of this overall arrangement.

564. Through this sophisticated media purchasing scheme, the 121 Mill Street Enterprise defrauded Plaintiffs of tens of thousands of dollars in interest fees alone.

565. From week to week, Maguy, Adams and Weaver spoke and corresponded with Plaintiffs regarding the strategy's progress. The analysis was quite detailed. For example, Maguy knew that the WB television network produced better results late in the day and on weekends, that the SOAPNET network performed better during the week, and that Turner South television network produced the best return late in the day and afternoon.

566. The call center facilities worked in concert with this media buying strategy.

567. For example, on November 18, 2004, Adams emailed Geoff Hasler, Brian Flaherty, Billy Maguy, and Frank Dewolfe, to present an analysis of "the first batches of MFM calls" received in response to the new media campaign. During this email, which Adams sent from his account at Alpine, he referred to the customer service representatives as "our agents." Adams confirmed that he had listened to a total of 34 transferred telephone calls with the public, and found that customer service representatives "take a lot of liberty with the script and tend to ask the questions in whatever order they want rather than following the order of the script."

568. Plaintiff Geoff Hasler strenuously objected to these practices of deviating from the script. The Defendants repeatedly assured Plaintiff Hasler that they would correct these practices.

569. In fact, the 121 Mill Street Enterprise intended to continue misrepresenting MyFreeMedicine through any means necessary to boost their sales commissions.

570. From the beginning of the October 2004 agreement's implementation, members of the 121 Mill Street Enterprise engaged in the following behavior:

a. Defendant Will Adams and other members of the 121 Mill Street Enterprise listened to sales calls for MyFreeMedicine;

b. These calls were received in response to the new media advertising campaign engineered by Defendant Maguy;

c. The media and call center operations worked together as integrated components of the 121 Mill Street Enterprise;

d. Adams and Alpine controlled the manner in which customer service representatives fielded calls for MyFreeMedicine; and

e. The 121 Mill Street Enterprise was aware that customer service representatives were deviating from the approved MyFreeMedicine script and misrepresenting MyFreeMedicine.

571. From November 2004 through the summer of 2005, the media advertising program continued, with all of the calls being directed to the 121 Mill Street Enterprise.

572. Throughout this time, Defendants Adams, Maguy, Weaver, and Plaintiff Hasler remained in close contact, monitoring the weekly media buying and customer service sales figures. For example, on April 20, 2005, Will Adams emailed Geoff Hasler with updates

regarding a marketing effort involving direct mail of post cards to the public. In this email, Adams boasted of "another $12,600 in revenue yesterday and a 40% close rate on these calls." Defendant Adams signed his email as CEO of AdvanceTel Direct, and attached a number of detailed reports on the media campaign and call center activity.

573. To attain these high revenue close rates the 121 Mill Street Enterprise and the Defendants misrepresented MyFreeMedicine.

574. When the public called in response to a MyFreeMedicine television advertisement planned by the 121 Mill Street Enterprise, customer service representatives routinely quoted a six month price for MyFreeMedicine and represented it as a full year's rate ($199.95).

575. Even though Geoff Hasler repeatedly instructed trainers, managers, and customer service representatives to consult the current list of medications before telling a caller that their medications were covered by the program, representatives routinely told callers that unlisted medications were covered by MyFreeMedicine.

576. This misrepresentation was systematically encouraged by leaders of the 121 Mill Street Enterprise repeatedly telling the sales representatives that the medication list was out of date, in effect telling them to sell the subscription without regard to whether the clients' medications were covered or not covered.

577. The 121 Mill Street Enterprise misrepresented MyFreeMedicine as a government program.

578. The 121 Mill Street Enterprise withdrew funds from callers' bank accounts and charged their credit cards without authorization. This was achieved by obtaining a caller's checking account number at the beginning of a call. If a caller later hung up or refused to enroll in MyFreeMedicine, the 121 Mill Street Enterprise would still charge the caller for the service,

usually in the amount of $199.95. As a result of this scheme, many elderly and low income callers experienced overdrawn accounts, and only noticed the withdrawal when their financial institutions notified them that the account was overdrawn. This often resulted in financial institutions imposing overdraft charges on the caller who contacted the 121 Mill Street Enterprise.

579. The 121 Mill Street Enterprise routinely misrepresented the income guidelines for enrolling in MyFreeMedicine. In order for members of the public to qualify, a single person was required to earn less than $1,300 per month, and a married couple could earn no more than $2,000 per month. These guidelines were clearly noted in the scripts approved by MyFreeMedicine, and in all of the training exercises conducted by Geoff Hasler. However, customer service representatives routinely ignored callers' income and told them that they qualified for the program in order to "close" a sale.

580. The 121 Mill Street Enterprise routinely misrepresented the insurance guidelines for MyFreeMedicine. Any member of the public with prescription medication coverage, whether in the form of private insurance or a government prescription program, is automatically disqualified from MyFreeMedicine. However, customer service representatives frequently ignored this guideline and told callers with prescription coverage that they were eligible for MyFreeMedicine in order to sign up another sale.

581. The 121 Mill Street Enterprise misrepresented the MyFreeMedicine refund guidelines.

582. Members of the public frequently called the 121 Mill Street Enterprise following their initial phone contact and in consideration of MyFreeMedicine. These callers expressed their desire to refuse enrollment. However, since the Enterprise had previously collected the

caller's financial institution data, it already had the full capacity to withdraw funds from the caller's bank account. The 121 Mill Street Enterprise routinely withdrew these funds even after the caller denied authorization and stated his or her desire not to enroll. These orders should have been canceled. Instead, the public was defrauded of tens of thousands of dollars, and callers blamed MyFreeMedicine for the harm they suffered.

583. During the time of MyFreeMedicine's dealings with the Enterprise it would receive regular reports on calls including such things as close rates and dropped calls.

584. During this time Defendant Scott MacCheyne would, with the knowledge of the 121 Mill Street Enterprise, fraudulently manipulate the reported numbers to make the call center's performance look better than it was.

585. As a result of the fraudulent practices directed toward them, members of the public complained about MyFreeMedicine to federal and state officials, including the Attorney General of the United States, the Attorneys General of Arkansas and Missouri, the Better Business Bureau, and the Federal Trade Commission. Since the 121 Mill Street Enterprise answered all of these calls on behalf of MyFreeMedicine, as if the caller were actually speaking with the Plaintiffs, these members of the public simply had no idea that they were speaking with a racketeering enterprise instead of MyFreeMedicine.

586. When the Federal Trade Commission brought suit against MyFreeMedicine and Geoff Hasler, it identified a sample of callers to the 121 Mill Street Enterprise who had experienced one or more of the 121 Mill Street Enterprise's misrepresentations. Since all calls going in or out of the 121 Mill Street Enterprise's facilities were recorded, Geoff Hasler sought the recordings of each of these calls in order to defend himself in federal court. Thereafter, Plaintiff Hasler emailed Defendant Will Adams to request these tapes.

587. Defendant Adams at first responded that the tapes would be provided, but thereafter stopped returning Plaintiff Geoff Hasler's calls and referred him to an attorney in Indiana (where many of the corporate identities of the 121 Mill Street Enterprise listed their place of incorporation).

588. At or about that time, Defendant Adams and others belonging to the Enterprise listened to recordings of the sales calls.

589. Thereafter, the Enterprise fraudulently misrepresented to Plaintiff Hasler that the recordings had been destroyed.

590. MyFreeMedicine has ceased doing business with the 121 Mill Street Enterprise.

591. As explained above, AdvanceTel Direct closed its doors in May 2005 (almost immediately after the Arkansas Attorney General sued MyFreeMedicine), and the 121 Mill Street Enterprise re-launched its efforts under the guise of Great Falls Marketing.

CONSUMERS HARMED BY THE SCHEME TO DEFRAUD MYFREEMEDICINE

592. A representative sample of MyFreeMedicine customers listed below demonstrates how the 121 Mill Street Enterprise made specific misrepresentations regarding MyFreeMedicine.

**Lavonne Norris**

593. The 121 Mill Street Enterprise defrauded Lavonne Norris by misrepresenting the cost of MyFreeMedicine and the scope of the program.

594. On January 19, 2004, Lavonne Norris of Cave City, Kentucky, made a call to MyFreeMedicine in response to advertising.

595. Consistent with the practice, that phone call went to the 121 Mill Street Enterprise and was fielded by one of their operators.

596. On that date, fraudulent misrepresentations concerning the MyFreeMedicine program were made including, but not limited to, as follows:

a. That the $199.95 covered a one year subscription as opposed to six months;

b. That all of her medications were covered when only some were; and

c. The she and her husband could have income of $30,000.00 and still qualify when, in fact, at that income level she was not qualified.

597. Within a day or two of the call, the 121 Mill Street Enterprise sent her the Registration Package by U.S. mail.

598. As a result of these fraudulent misrepresentations, Ms. Norris paid through the 121 Mill Street Enterprise $199.95, and the Enterprise enrolled her in MyFreeMedicine.

599. Mrs. Norris never received any of her medications free.

600. Mrs. Norris filed a complaint against MyFreeMedicine to the Federal Trade Commission.

**Ronnie S. Hicks**

601. The 121 Mill Street Enterprise defrauded Ronnie S. Hicks of Pocahontas, Arkansas, by misrepresenting the cost of MyFreeMedicine.

602. On February 17, 2005, Mr. Hicks called the 1-800 number for MyFreeMedicine and spoke to a customer service representative named Serena.

603. Mr. Hicks thought that he was speaking with an employee of MyFreeMedicine.

604. In fact, he was speaking to an employee of the 121 Mill Street Enterprise.

605. During the call, Serena told Mr. Hicks that he qualified for free medicine.

606. Serena told Mr. Hicks that a charge of $287.00 would cover his free medicine, as well as that of his wife.

607. The 121 Mill Street call center charged Mr. Hicks this amount.

608. Shortly after Mr. Hicks' telephone call, the 121 Mill Street Enterprise shipped him the MyFreeMedicine Registration Package using the U.S. Mail. Upon information and belief, the Enterprise shipped this package from its fulfillment center located at 280 Park Street in Lewiston, Maine.

609. When Mr. Hicks received the paperwork from the 121 Mill Street Enterprise, he realized that he would not qualify for the program, based on his income.

610. Mr. Hicks called the 1-800 number again, and spoke with another representative of the 121 Mill Street Enterprise. He told the representative that he wished to decline the program, and requested a refund.

611. Because Mr. Hicks believed he was dealing directly with MyFreeMedicine during his calls, when he was actually speaking to the 121 Mill Street call center, he reported MyFreeMedicine to the Arkansas Attorney General.

**Mary Upshaw**

612. The 121 Mill Street Enterprise defrauded Mary Upshaw of Wynona, Oklahoma, by misrepresenting MyFreeMedicine.

613. After Mary Upshaw heard about MyFreeMedicine on the radio, she called 1-800-628-9187 on July 14, 2004.

614. Ms. Upshaw thought she was speaking with MyFreeMedicine, when in fact she was speaking with the 121 Mill Street call center.

615. Ms. Upshaw told the customer service representative that her husband was retired, and that she did not work.

616. The customer service representative told Ms. Upshaw that she and her husband could both be enrolled in MyFreeMedicine for one year, if she paid $199.95.

617. Ms. Upshaw agreed to enroll in the program based on this statement, and gave the customer service representative her debit card number.

618. The 121 Mill Street Enterprise charged Ms. Upshaw's debit card on June 18, 2004.

619. Shortly after her telephone call to the 1-800 number, the 121 Mill Street Enterprise shipped Ms. Upshaw the MyFreeMedicine Registration Package using the U.S. Mail. Upon information and belief, the Enterprise shipped this package from the fulfillment center located on Park Street in Lewiston, Maine.

620. Shortly thereafter, Ms. Upshaw received a bill and notification that the true cost of MyFreeMedicine was $195.00 per person. This was a per person charge, for six months.

621. Ms. Upshaw called the 121 Mill Street call center and requested a refund.

622. As a result of the 121 Mill Street Enterprise's misrepresenting the price of MyFreeMedicine, Ms. Upshaw filed a complaint against MyFreeMedicine with the Better Business Bureau.

**Doreen Richardson**

623. The 121 Mill Street Enterprise defrauded Mrs. Doreen Richardson of Puyallup, Washington, by misrepresenting the qualification guidelines for MyFreeMedicine.

624. Mrs. Richardson called MyFreeMedicine on February 7, 2005, after seeing an advertisement on television.

625. Mrs. Richardson's call was routed to the 121 Mill Street call center.

626. Mrs. Richardson spoke with a customer service representative, and told the representative that she and her husband spent approximately $300 a month on their medications.

627. Based on the cost of their medication, and without considering the income guidelines, the phone representative told Mrs. Richardson that she qualified for MyFreeMedicine.

628. The phone representative told Mrs. Richardson to send her payment in the amount of $399.90, in order to sign up for the program. Mrs. Richardson complied and mailed payment in the form of a personal check, which she sent to the 121 Mill Street Enterprise.

629. Within a day or two of the sale, the 121 Mill Street Enterprise shipped Mrs. Richardson the MyFreeMedicine Registration Package using the U.S. Mail. Upon information and belief, the Enterprise shipped this package from the fulfillment center located on Park Street in Lewiston, Maine.

630. After she paid the 121 Mill Street Enterprise, Mrs. Richardson received a mailing telling her that she did not qualify for the program.

**Virginia Foos**

631. The 121 Mill Street call center defrauded Ms. Virginia Foos of Greeley, Colorado by misrepresenting the cost of MyFreeMedicine, and by convincing her that MyFreeMedicine was authorized by and associated with pharmaceutical companies.

632. On or about January 19, 2005, after seeing a television commercial for MyFreeMedicine, Ms. Foos called the toll free number from the advertisement.

633. The 121 Mill Street Enterprise received Ms. Foos' call, and the customer service representative told her that she qualified for free prescription medications.

634. Ms. Foos was told that if she paid $199.95, she would receive a year's worth of free prescription medications.

635. In fact, the customer service representative was quoting the six month price, and promising a year's worth of coverage.

636. The customer service representative led Ms. Foos to believe that pharmaceutical companies had authorized MyFreeMedicine to provide free prescriptions.

637. Ms. Foos relied on these misrepresentations to her detriment.

638. Ms. Foos agreed to pay the cost of the program through a bank transfer.

639. Within a day or two of the sale, the 121 Mill Street Enterprise shipped Ms. Foos the MyFreeMedicine Registration Package using the U.S. Mail. Upon information and belief, the Enterprise shipped this package from the fulfillment center located on Park Street in Lewiston, Maine.

640. Ms. Foos did not receive any prescriptions for six months.

641. Ms. Foos refused to pay any more money, and told a customer service representative of the 121 Mill Street Enterprise, that she wanted to withdraw from the program. She requested a refund of the money she had paid, because she never received any free medication.

642. The customer service representative became hostile, and told Ms. Foos that she would receive no refund.

643. Ms. Foos subsequently called Eli Lilly, Abbott, and Merck pharmaceutical companies, who told her that they had not authorized MyFreeMedicine to act on their behalf.

644. As a result of her treatment by the 121 Mill Street Enterprise, Ms. Foos called the United States Attorney General's office to report MyFreeMedicine. The U.S. Attorney General

placed Ms. Foos in contact with the Attorney General of Kentucky, with whom she filed a complaint against MyFreeMedicine.

**Owen Bennett**

645. The 121 Mill Street Enterprise defrauded Owen Bennett of Snoqualmie, Washington, by misrepresenting MyFreeMedicine.

646. Mr. Bennett telephoned MyFreeMedicine's 1-800 number on February 2, 2005.

647. Mr. Bennett thought that he was speaking with MyFreeMedicine, when in fact he was speaking with the 121 Mill Street call center.

648. Mr. Bennett's phone call with the 121 Mill Street Enterprise lasted approximately thirty (30) minutes. During his call, Mr. Bennett asked the customer service representative whether all of his prescription medication would be covered under the MyFreeMedicine program. Mr. Bennett reviewed each prescription with the customer service representative. The customer service representative from the 121 Mill Street Enterprise told him that each medication would be covered. The sales representative told him that MyFreeMedicine would be able to cover all of his prescriptions.

649. During Mr. Bennett's telephone conversation with a customer service representative from the 121 Mill Street Enterprise, he disclosed his checking account number to the representative.

650. On February 9, 2005, the 121 Mill Street Enterprise removed $199.95 from Owen Bennett's checking account.

651. Within two weeks of Mr. Bennett's initial phone conversation with a customer service representative for the 121 Mill Street Enterprise, the Enterprise shipped the MyFreeMedicine Registration Packet to Mr. Bennett using the U.S. Postal Service.

652. On February 14, 2005, Mr. Bennett completed the MyFreeMedicine Registration Packet, and submitted it for processing. The MyFreeMedicine National Processing Office in Kentucky received Mr. Bennett's Registration Packet on February 21, 2005.

653. When the MyFreeMedicine Processing Center in Kentucky received Mr. Bennett's Registration Packet in February 2005, this was the first time that MyFreeMedicine had actual contact with Mr. Bennett.

654. In reviewing this initial information received directly from Mr. Bennett, MyFreeMedicine noticed that only three of his medications were actually covered by the program.

655. On March 11, 2005, the MyFreeMedicine office in Kentucky sent paperwork for the three covered medications to Mr. Bennett.

656. When Mr. Bennett received this second mailing, which was the first mailing actually sent to him by MyFreeMedicine, Mr. Bennett realized that the customer service representative with whom he spoke, who was employed by 121 Mill Street Enterprise, had misrepresented the MyFreeMedicine program by telling him that all of his prescriptions would be covered.

657. On March 31, 2005, Owen Bennett filed a complaint against MyFreeMedicine with the Better Business Bureau. Mr. Bennett's complaint is based on the mistaken belief that he was dealing with an employee of MyFreeMedicine when he asked if his medications were covered, when in fact, he was speaking with a customer service representative employed by the 121 Mill Street Enterprise.

658. In this manner the 121 Mill Street Enterprise defrauded the plaintiffs and the public using the wires and the mails.

659. The 121 Mill Street Enterprise, through its misrepresentations of MyFreeMedicine, convinced Owen Bennett to disclose his checking account number and remove $199.95 from the account, the 121 Mill Street Enterprise committed financial institution fraud.

**Marie Best**

660. The 121 Mill Street Enterprise defrauded Marie Best of Mt. Olive, North Carolina, by misrepresenting MyFreeMedicine and by making unauthorized withdrawals from Ms. Best's bank accounts.

661. On December 18, 2004, Marie Best saw a television advertisement for MyFreeMedicine. That same night, she called the MyFreeMedicine toll free number.

662. The 121 Mill Street Enterprise received Ms. Best's call, and answered on behalf of MyFreeMedicine. Ms. Best thought that she was speaking directly with MyFreeMedicine when she called. In fact, she was speaking with a customer service representative employed by the 121 Mill Street Enterprise.

663. Upon information and belief, the 121 Mill Street Enterprise obtained the checking account numbers belonging to Marie Best and her husband on December 18, 2004.

664. When Marie Best spoke with the customer service representative, she told the representative not to place her order for MyFreeMedicine, because Ms. Best wanted to discuss the program with her husband before enrolling. The customer service representative agreed to hold her enrollment until Monday, December 20, 2004. Ms. Best agreed to call back on December 20, and tell the customer service representative whether or not to proceed with her order.

665. When Marie Best called back on December 20, she gave the representative information regarding her husband's prescription medications. At no time during Ms. Best's

phone call on December 20, 2004, did the customer service representative notify her that she would be charged for the MyFreeMedicine service.

666. Upon information and belief, the 121 Mill Street Enterprise sent the MyFreeMedicine Registration Packet to Marie Best using the U.S. mails in the days following her December 20, 2004 phone conversation with a customer service representative. During this time, the 121 Mill Street Enterprise also made an unauthorized withdrawal from the checking accounts belonging to Marie Best and her husband. The Enterprise withdrew $399.90 from the account of Marie Best, as well as $199.95 from her husband's account.

667. In this manner, the 121 Mill Street Enterprise defrauded Marie Best using the mails, and also engaged in wire fraud and financial institution fraud.

668. On December 27, 2004, after repeated attempts to speak with a customer service representative, Marie Best spoke with a representative of the 121 Mill Street Enterprise, who told her that Ms. Best could not withdraw from the MyFreeMedicine program.

669. Upon information and belief, the 121 Mill Street Enterprise billed MyFreeMedicine for this call, and transmitted an invoice for this call to the Plaintiffs using the wires and mails.

670. On December 27, 2004, after the 121 Mill Street Enterprise told Ms. Best that she would not receive a refund, Ms. Best filed a complaint against MyFreeMedicine with the Better Business Bureau.

671. In this manner, the 121 Mill Street Enterprise defrauded Marie Best and the Plaintiffs using the wires, mails, and also engaged in financial institution fraud.

**Elmer and Ruby Boone**

672. Elmer and Ruby Boone called MyFreeMedicine in July 2004. Their initial phone call was routed to the 121 Mill Street Enterprise.

673. When the 121 Mill Street Enterprise answered the Boone's initial phone call on behalf of MyFreeMedicine, they defrauded Mr. and Mrs. Boone, as well as MyFreeMedicine, by misrepresenting the MyFreeMedicine refund policy. The 121 Mill Street Enterprise also defrauded Mr. and Mrs. Boone and MyFreeMedicine, by telling the Boones that they would receive all of their medication free after they paid an enrollment a charge of $195.00.

674. In fact, the charge for MyFreeMedicine was $195.00 per person, which covered a six month enrollment period. Only specific medications from an updated list would be provided to qualified enrollees.

675. The customer service representative told the Boones that if they did not receive all of their medication free, that they would receive a full refund of their payment. In fact, the MyFreeMedicine refund policy provided for a pro-rata refund, for any medication in which the customer submitted all required paperwork, and the pharmaceutical company denied the request.

676. Upon information and belief, the 121 Mill Street Enterprise sent the MyFreeMedicine Registration Packet to Mr. and Mrs. Boone via U.S. mail in the days immediately following the Boones' July 2004 phone call.

677. Upon information and belief, after misrepresenting MyFreeMedicine to the Boones, the 121 Mill Street Enterprise charged MyFreeMedicine for enrolling them in the program, and for mailing a Registration Packet to Mr. and Mrs. Boone.

678. On August 9, 2004, the MyFreeMedicine Processing Center received the Boones' Registration Packet. After this date, the MyFreeMedicine Processing Center handled the

Boones' paperwork. However, because of the initial misrepresentations regarding the MyFreeMedicine refund policy and the scope of the program, it is believed that Mr. and Mrs. Boone misunderstood how the program worked.

679. Between August 2004 and February 2005, the MyFreeMedicine Processing Center sent four (4) mailings to the Boones. Each of these mailings included paperwork for different medications, which the Boones and their physicians were required to complete and return before MyFreeMedicine could submit them to the pharmaceutical companies. The Boones only returned a single packet of information, which MyFreeMedicine processed and sent to a pharmaceutical company on February 25, 2005.

680. By this time, Mr. and Mrs. Boone expected to receive free medication. Because they were not receiving their medication, they made repeated calls to the 121 Mill Street Enterprise, and to the MyFreeMedicine Processing Center, to request a refund of their money.

681. On June 21, 2005, the Boones filed a complaint against MyFreeMedicine with the Better Business Bureau.

682. On July 13, 2005, MyFreeMedicine responded to the Boones' Better Business Bureau complaint. In the MyFreeMedicine response, the Plaintiffs confirmed that the Boones would be issued a pro-rata refund for the one medication that had been denied by a pharmaceutical company. MyFreeMedicine also confirmed that it had not received all of the paperwork required of the Boones. Without this paperwork, MyFreeMedicine was unable to submit a complete and accurate application for the Boones' medication to the relevant pharmaceutical companies. Nonetheless, MyFreeMedicine offered a free six month enrollment to the Boones, in order for them to get their MyFreeMedicine account on track, and to begin receiving medication. MyFreeMedicine also stated in its July 13, 2005 response to the Better

Business Bureau complaint that it would be willing to send any additional forms or paperwork required for free medication to the Boones. MyFreeMedicine restated its refund policy, confirming that the Plaintiffs would offer a pro-rata refund if a customer was denied any medication by a pharmaceutical company in which the application was properly filled out and submitted, which was required to be evidenced by a denial letter from the pharmaceutical company.

683. In this manner, the 121 Mill Street Enterprise defrauded MyFreeMedicine, as well as Elmer and Ruby Boone, using the wires and the mails.

**Shirley and James Bradley**

684. The 121 Mill Street Enterprise defrauded MyFreeMedicine, and James and Shirley Bradley of Onalaska, Texas, by misrepresenting the income qualification guidelines for MyFreeMedicine.

685. During March 2005, Shirley and James Bradley saw a television advertisement for MyFreeMedicine. They called the 1-800 number contained in the advertisement, and were directed to the 121 Mill Street Enterprise.

686. Upon information and belief, a customer service representative employed by the 121 Mill Street Enterprise answered Mr. and Mrs. Bradley's phone call on behalf of MyFreeMedicine.

687. During the Bradleys' initial phone conversation with a customer service representative employed by the 121 Mill Street Enterprise, they discussed the income qualification guidelines for MyFreeMedicine.

688. The customer service representative told Mr. and Mrs. Bradley that they were qualified because they did not exceed a $2,100 a month income requirement. In fact, if a couple

earned $2,000 a month, they would be disqualified from participating in the MyFreeMedicine program, as discussed elsewhere in this Complaint.

689. During Mr. and Mrs. Bradley's initial phone conversation with the 121 Mill Street Enterprise, the customer service representative obtained their checking account number. Upon information and belief, the Enterprise was able to obtain this checking account number through the customer service representative's misrepresentation of the MyFreeMedicine income guidelines.

690. On April 11, 2005, the 121 Mill Street Enterprise withdrew $199.95 from the checking account of Shirley and James Bradley.

691. On or about April 11, 2005, the 121 Mill Street Enterprise sent the MyFreeMedicine Registration Packet to James and Shirley Bradley using the mails.

692. Upon information and belief, the 121 Mill Street Enterprise charged MyFreeMedicine for enrolling the Bradleys and for mailing them a Registration Packet. The 121 Mill Street Enterprise sent MyFreeMedicine an invoice for these services using the wires and mails.

693. When the Bradleys received and reviewed the MyFreeMedicine Registration Packet, they learned that the maximum income guideline for MyFreeMedicine was $2,000 a month for a couple. At this time, the Bradleys realized that the customer service representative with whom they spoke had misrepresented the MyFreeMedicine program. They also learned that through this misrepresentation, the customer service representative enrolled them in MyFreeMedicine and withdrew money from their bank account, even though the Bradleys were ineligible for MyFreeMedicine.

694. On April 21, 2005, the Bradleys returned the MyFreeMedicine Registration Packet as instructed by the 121 Mill Street Enterprise. The 121 Mill Street Enterprise received this packet care of Shop Right Solutions, 165 Pleasant Ave., South Portland, Maine 04106.

695. Upon information and belief, Justin Featherman, the head of fulfillment for the 121 Mill Street Enterprise, used Shop Right Solutions as an occasional mailing vendor.

696. The Bradleys attempted to contact MyFreeMedicine at the 1-800 number that originally channeled their call to the 121 Mill Street Enterprise. Eventually, they spoke with MyFreeMedicine's facilities in Kentucky, and requested a refund from them. However, since the Bradleys returned their package to the 121 Mill Street Enterprise, and had all of their contact through a customer service representative employed by the 121 Mill Street Enterprise, MyFreeMedicine was unaware that the 121 Mill Street Enterprise had told the Bradleys they qualified for the program, when in fact they exceeded the $2,000 a month income ceiling.

697. As a result of these misrepresentations, the Bradleys complained against MyFreeMedicine to the Better Business Bureau on June 6, 2005.

698. In this manner, the 121 Mill Street Enterprise harmed the Plaintiffs and the public using the wires, the mails, and through financial institution fraud.

**Carolyn B. Bright**

699. The 121 Mill Street Enterprise defrauded Carolyn Bright, of Dallas, Texas, by misrepresenting MyFreeMedicine.

700. On December 27, 2004, Ms. Bright telephoned the MyFreeMedicine 1-800 number. Upon information and belief, her call was routed to the 121 Mill Street Enterprise, and answered by a customer service representative employed by the 121 Mill Street Enterprise.

701. During Ms. Bright's initial telephone conversation with the 121 Mill Street Enterprise, she disclosed that she had health insurance with a prescription medication plan. Upon information and belief, Ms. Bright called MyFreeMedicine because she expected her medication insurance coverage to terminate six months after she called.

702. Any caller with prescription drug insurance was automatically disqualified from the MyFreeMedicine program, as discussed elsewhere in this Complaint. Nonetheless, the customer service representative charged Ms. Bright $199.95 on December 17, 2004.

703. Upon information and belief, the 121 Mill Street Enterprise charged MyFreeMedicine for enrolling Ms. Bright. The 121 Mill Street Enterprise sent MyFreeMedicine an invoice for this and other services using the wires and mails.

704. In early January 2005, having received nothing from MyFreeMedicine, Ms. Bright placed a second call to the 121 Mill Street Enterprise. During this call, she requested a refund of the $199.95 that the customer service representative charged her during her initial contact.

705. Ms. Bright was denied a refund, and filed a complaint against MyFreeMedicine with the Better Business Bureau. In her complaint, Ms. Bright lists the MyFreeMedicine business address as 121 Mill Street, Auburn, Maine 04210.

706. In this manner, the 121 Mill Street Enterprise defrauded the Plaintiffs and Ms. Bright through use of the wires, and also committed financial institution fraud against Ms. Bright.

**Gary Knupp**

707. The 121 Mill Street Enterprise defrauded MyFreeMedicine and Gary Knupp of Broadway, Virginia, by charging Mr. Knupp for MyFreeMedicine without his authorization.

708. In December 2004, Mr. Knupp saw a television advertisement for MyFreeMedicine. He called the 1-800 number contained in the television ad. Mr. Knupp's call was routed to the 121 Mill Street Enterprise.

709. During Mr. Knupp's phone conversation, a customer service representative requested his credit card information or bank account and routing numbers. After Mr. Knupp disclosed this information, the 121 Mill Street Enterprise withdrew $199.95 from Mr. Knupp's bank account without his authorization.

710. Upon information and belief, the 121 Mill Street Enterprise charged MyFreeMedicine for enrolling Mr. Knupp, and sent MyFreeMedicine an invoice for this and other services using the wires and mails.

711. Mr. Knupp made numerous phone calls to the 1-800 number he noted in MyFreeMedicine's television advertisement. In January, February, March, and April 2005, Mr. Knupp called the 121 Mill Street Enterprise to request a refund of the $199.95 that was withdrawn from his bank account. Upon information and belief, Mr. Knupp continued to call the 1-800 number he originally noted in MyFreeMedicine's television advertisement.

712. In June 2005, Gary Knupp filed a complaint against MyFreeMedicine with the Better Business Bureau. He also sought the assistance of Blue Ridge Legal Services of Harrisonburg, Virginia, in connection with his request for a refund. Blue Ridge Legal Services sent a letter to the Better Business Bureau on behalf of Mr. Knupp.

713. In this manner, the 121 Mill Street Enterprise defrauded Gary Knupp and MyFreeMedicine using the wires, and also engaged in financial institution fraud.

**Elmerene Mattson**

714. The 121 Mill Street Enterprise defrauded Elmerene Mattson of Dillsboro, Indiana, by misrepresenting MyFreeMedicine. Specifically, the 121 Mill Street Enterprise misrepresented the income requirements, as well as the covered medications to Ms. Mattson.

715. In February 2005, Elmerene Mattson called the MyFreeMedicine 1-800 number. Ms. Mattson's phone call was routed to the 121 Mill Street Enterprise, and answered by a customer service representative employed by the Enterprise.

716. Upon information and belief, the customer service representative answered Ms. Mattson's call on behalf of MyFreeMedicine. In fact, Ms. Mattson was speaking with a representative of the 121 Mill Street Enterprise.

717. The customer service representative who took Ms. Mattson's call told her that she could apply for MyFreeMedicine over the phone if she disclosed her debit or credit card number during the phone call. Ms. Mattson gave the customer service representative her bank information to pay the application fee of $199.95.

718. Upon information and belief, the customer service representative told Elmerene Mattson that she qualified for the MyFreeMedicine program based on her income.

719. On February 7, 2005, the 121 Mill Street Enterprise charged Elmerene Mattson's bank account for the amount of $199.95.

720. In the days following Elmerene Mattson's February 2005 telephone conversation with a customer service representative employed by the 121 Mill Street Enterprise, the Enterprise sent Ms. Mattson the MyFreeMedicine Registration Packet through the mails.

721. Upon information and belief, the 121 Mill Street Enterprise charged MyFreeMedicine for enrolling Ms. Mattson and for mailing her a Registration Packet. The 121

Mill Street Enterprise sent MyFreeMedicine an invoice for these and other services using the wires and mails.

722. When Ms. Mattson received the MyFreeMedicine Registration Packet, she discovered that she did not qualify for the program because her income exceeded the monthly guideline.

723. When she returned the MyFreeMedicine Registration Packet, Ms. Mattson enclosed a note expressing her wish to cancel the MyFreeMedicine application. She also requested a refund of the registration fee that she had been already charged. Upon information and belief, Ms. Mattson also enclosed a copy of her most recent IRS Form W-2, as evidence that she exceeded the income guidelines.

724. In September 2005, Elmerene Mattson submitted a complaint against MyFreeMedicine to the Better Business Bureau.

725. By misrepresenting the income qualification guidelines to Ms. Mattson, charging her for MyFreeMedicine even though she did not qualify for the service, by mailing the MyFreeMedicine Registration Packet from its fulfillment center, and by billing MyFreeMedicine for the "sale," the 121 Mill Street Enterprise defrauded Elmerene Mattson and the Plaintiffs through the use of the wires, the mails, and through financial institution fraud.

**Kay Motley**

726. The 121 Mill Street Enterprise defrauded Kay Motley of Tampa, Florida, by misrepresenting to her that Oxycodone was a covered medication under the MyFreeMedicine program.

727. Ms. Motley called MyFreeMedicine on September 28, 2004. When Ms. Motley called MyFreeMedicine, she did so using the 1-800 number included in MyFreeMedicine's advertising. Her call was routed to the 121 Mill Street Enterprise.

728. Upon information and belief, a customer service representative employed by the 121 Mill Street Enterprise answered Kay Motley's telephone call on behalf of MyFreeMedicine. Ms. Motley therefore believed that she was speaking directly with MyFreeMedicine. In fact, she was speaking with a customer service representative of the 121 Mill Street Enterprise.

729. Ms. Motley asked the customer service representative if her medication, Oxycodone, was covered by the program. Ms. Motley specifically mentioned that this is a controlled substance, and that her doctor might not have wished to comply with the program's requirements.

730. Upon information and belief, the customer service representative told Ms. Motley that if her doctor would not comply with the MyFreeMedicine documentation requirements, Ms. Motley would receive a refund of the program fee.

731. This was a misrepresentation of the MyFreeMedicine refund policy which was contained in scripts that the Plaintiffs authorized.

732. Kay Motley later learned that Oxycodone is not a medication covered by MyFreeMedicine. Upon information and belief, she learned that her medications were not covered when she received the MyFreeMedicine Registration Packet.

733. Upon information and belief, the 121 Mill Street Enterprise charged MyFreeMedicine for enrolling Ms. Motley in the program and for mailing her a Registration Packet. The 121 Mill Street Enterprise sent MyFreeMedicine an invoice for these services using the wires and mails.

734. Upon information and belief, this MyFreeMedicine Registration Packet, which confirmed that Oxycodone was not covered, was mailed by the 121 Mill Street Enterprise using the U.S. Postal Service.

735. Therefore, the 121 Mill Street Enterprise defrauded Kay Motley by misrepresenting the prescription medications covered by MyFreeMedicine, a scheme that involved using the wires and mails of the United States.

**Violet Nebel**

736. The 121 Mill Street Enterprise defrauded Violet Nebel, of Hobe Sound, Florida.

737. On or about March 2, 2005, Violet Nebel called the MyFreeMedicine 1-800 number to inquire about the program.

738. Upon information and belief, Ms. Nebel's telephone call was routed to the 121 Mill Street Enterprise.

739. Upon information and belief, a customer service representative employed by the 121 Mill Street Enterprise answered Ms. Nebel's telephone call on behalf of MyFreeMedicine. Therefore, when Ms. Nebel spoke with the customer service representative, she believed that she was speaking directly with a representative of MyFreeMedicine. In fact, she was speaking with a representative of the 121 Mill Street Enterprise.

740. The purpose of Ms. Nebel's telephone call was to learn more about the MyFreeMedicine product. The customer service representative who answered her call told Ms. Nebel that in order to learn about MyFreeMedicine, she was required to submit her checking account information.

741. Ms. Nebel disclosed her checking account information to the customer service representative who took her call.

742. The customer service representative proceeded to tell Ms. Nebel that the cost of MyFreeMedicine was $199.95 for a six month enrollment. Ms. Nebel told the customer service representative that she was not interested in the program, and would call back if she changed her mind.

743. Three days after Ms. Nebel's initial telephone call to the MyFreeMedicine 1-800 number, which was received at the 121 Mill Street Enterprise's facilities, the 121 Mill Street Enterprise withdrew $199.95 from the checking account of Violet Nebel. Ms. Nebel never agreed to enroll in MyFreeMedicine, and never authorized the 121 Mill Street Enterprise or anyone else to withdraw money from her account.

744. Upon information and belief, the 121 Mill Street Enterprise charged MyFreeMedicine for enrolling Ms. Nebel. The 121 Mill Street Enterprise sent MyFreeMedicine an invoice for these services using the wires and mails.

745. On March 8, 2005, Violet Nebel filed a complaint against MyFreeMedicine with the Better Business Bureau.

746. By making an unauthorized withdrawal of $199.95 from the checking account of Violet Nebel, the 121 Mill Street Enterprise engaged in financial institution fraud. By telling Violet Nebel during her initial telephone call to the 121 Mill Street Enterprise, that she was required to submit her checking account information in order to learn anything about MyFreeMedicine, the 121 Mill Street Enterprise misrepresented MyFreeMedicine and defrauded Violet Nebel by use of the wires.

747. Upon information and belief, when the 121 Mill Street Enterprise billed MyFreeMedicine for enrolling Ms. Nebel even though she declined to be charged for the

program, and sending MyFreeMedicine a bill for this "sale," the 121 Mill Street Enterprise defrauded the Plaintiffs using the wires and mails.

**Norma E. Owen**

748. The 121 Mill Street Enterprise defrauded Norma E. Owen of Palm Beach Gardens, Florida, through an unauthorized bank transaction.

749. On or about August 25, 2004, Ms. Owen saw a telephone advertisement for MyFreeMedicine. She noted the 1-800 telephone number contained in the advertisement, and called it.

750. Ms. Owen's telephone call was routed to the 121 Mill Street Enterprise, where a customer service representative answered on behalf of MyFreeMedicine. Since the customer service representative answered on behalf of MyFreeMedicine, Ms. Owen believed she was speaking directly with MyFreeMedicine when in fact, she was speaking with a representative of the 121 Mill Street Enterprise.

751. During Norma Owen's initial telephone call, she told the customer service representative that she wished to speak with her mother before making a decision about whether to enroll in the program. The customer service representative assured Ms. Owen that she would not be charged until she called back and authorized the transaction.

752. Without Ms. Owen's authorization, the 121 Mill Street Enterprise immediately withdrew $199.95, using banking information obtained during the call. This withdrawal occurred on or about August 25, 2004.

753. Shortly after the August 25th telephone call, the 121 Mill Street Enterprise sent the MyFreeMedicine Registration Packet to Norma E. Owen's mother, using the U.S. mails.

754. Upon information and belief, the 121 Mill Street Enterprise charged MyFreeMedicine for this enrollment and mailing. The 121 Mill Street Enterprise is believed to have sent MyFreeMedicine an invoice for these services using the wires and mails.

755. At no time did Norma E. Owen authorize the 121 Mill Street Enterprise to charge her bank account, nor did she request that the MyFreeMedicine Registration Packet be sent.

756. Norma Owen later requested a refund of her $199.95, and filed a complaint against MyFreeMedicine with the Better Business Bureau.

757. By making an unauthorized withdrawal from Norma Owen's bank account, by telling Ms. Owen that she would not be charged without authorization, and by sending the MyFreeMedicine Registration Packet to Ms. Owen's mother even though it was never requested, the 121 Mill Street Enterprise defrauded Norma Owen using the wires and mails of the United States. In addition, by misrepresenting to Ms. Owen that her bank account would not be charged, and immediately withdrawing $199.95 without authorization, the 121 Mill Street Enterprise engaged in financial institution fraud.

758. Upon information and belief, the 121 Mill Street Enterprise defrauded MyFreeMedicine using the wires and mails when it charged a commission for these services.

**Phyllis J. Reamer**

759. The 121 Mill Street Enterprise defrauded Phyllis J. Reamer of Bath, New York, through an unauthorized withdrawal from her bank account.

760. In August 2004, Ms. Reamer saw the television advertisement for MyFreeMedicine.

761. Upon information and belief, Ms. Reamer noted the 1-800 number contained in the MyFreeMedicine television advertisement.

762. On or about September 10, 2004, Phyllis Reamer called the 1-800 number she noted from the MyFreeMedicine television advertisement.

763. Upon information and belief, Ms. Reamer's call was routed to the 121 Mill Street Enterprise, where a customer service representative answered on behalf of MyFreeMedicine.

764. In fact, she was speaking with a customer service representative of the 121 Mill Street Enterprise.

765. During her phone conversation with the customer service representative of the 121 Mill Street Enterprise, Ms. Reamer is believed to have divulged her checking account number.

766. On September 10, 2004, the 121 Mill Street Enterprise withdrew $199.95 from Ms. Reamer's bank account.

767. Phyllis Reamer never authorized any withdrawal of funds from her bank account.

768. On or about September 10, 2004, the 121 Mill Street Enterprise sent Phyllis Reamer the MyFreeMedicine Registration Packet using the U.S. mails.

769. On December 17, 2004, Ms. Reamer filed a complaint against MyFreeMedicine with the New York Office of the Attorney General.

770. Upon information and belief, the 121 Mill Street Enterprise charged MyFreeMedicine for this enrollment and mailing. The 121 Mill Street Enterprise is believed to have sent MyFreeMedicine an invoice for these services using the wires and mails.

771. In this manner, the 121 Mill Street Enterprise defrauded Phyllis Reamer and the Plaintiffs using the wires and the mails of the United States. In this manner, the 121 Mill Street Enterprise also engaged in financial institution fraud.

**Charles T. Rice**

772. In February 2005, the 121 Mill Street Enterprise defrauded Charles T. Rice of Paul, Idaho, through an unauthorized bank account withdrawal.

773. In late January or early February, 2005, Mr. Rice saw a television advertisement for MyFreeMedicine.

774. On February 7, 2005, Mr. Rice called the 1-800 number from MyFreeMedicine's television advertisement.

775. Mr. Rice's February 7, 2005 telephone call was routed to the 121 Mill Street Enterprise. A customer service representative named Todd answered his call, and is believed to have told Mr. Rice that he (Todd) worked for MyFreeMedicine.

776. In fact, "Todd" was a customer service representative employed by the 121 Mill Street Enterprise.

777. During Charles Rice's telephone conversation on February 7, 2005, Mr. Rice asked questions about the MyFreeMedicine program. Mr. Rice asked if he could get help with his prescription medications.

778. At the request of the customer service representative Mr. Rice also disclosed his name, date of birth, age, address, and bank account numbers.

779. The customer service representative told Mr. Rice that the cost for MyFreeMedicine was $199.95 every six months. Upon information and belief, the representative stated that this price would cover Mr. Rice and his wife for six months.

780. Mr. Rice stated that he did not have a $199.95 in his bank account at any one time. The customer service representative told Mr. Rice that he (the representative known as

Todd) would place the charge in a "hold" file until Mr. Rice notified him that he wanted to enroll in the program.

781. After terminating the initial February 7 telephone call, Mr. Rice and his wife decided not to enroll in the program.

782. Mr. Rice again called the 1-800 number, citing a reference number he was given during his initial telephone conversation. During this second call, which is believed to have occurred on February 7, 2005, Mr. Rice told a customer service representative of the 121 Mill Street Enterprise that he did not wish to enroll in the program, and that he wished for his order to be cancelled.

783. On February 22, 2005, $199.95 was withdrawn from the checking account of Charles Rice.

784. Mr. Rice never authorized this withdrawal.

785. As a result of this withdrawal, Mr. Rice's bank account was overdrawn, and his bank charged him overdraft fees.

786. Upon information and belief, the 121 Mill Street Enterprise charged MyFreeMedicine for these phone calls and this enrollment. The 121 Mill Street Enterprise is believed to have sent MyFreeMedicine an invoice for these services using the wires and mails.

787. On March 17, 2005, the Idaho Attorney General's Office received a complaint submitted by Charles T. Rice against MyFreeMedicine.

788. In this manner, the 121 Mill Street Enterprise defrauded Charles Rice and MyFreeMedicine using the wires, and engaged in financial institution fraud against Mr. Rice.

**Darlene Robinson**

789. The 121 Mill Street Enterprise defrauded Darlene Robinson and her husband, of Maysville, Missouri, by misrepresenting that their medication was covered by the MyFreeMedicine program.

790. In early December 2004, Mr. and Mrs. Robinson watched a television advertisement for MyFreeMedicine. During this television ad, the Robinsons noticed the 1-800 number for MyFreeMedicine.

791. Shortly after viewing the ad, Mr. and Mrs. Robinson called the 1-800 number listed in the commercial. Their call was routed to the 121 Mill Street Enterprise. A customer service representative working who identified himself as Ken Lausier answered their call.

792. Upon information and belief, Mr. Lausier represented that he was working for MyFreeMedicine.

793. In fact, he was a customer service representative from the 121 Mill Street Enterprise.

794. During the Robinsons' phone conversation with Ken Lausier, the Robinsons listed all six medications that Mrs. Robinson was taking. The customer service representative told the Robinsons that all of these medications were on his list, and would be covered by the MyFreeMedicine program.

795. As a result of the customer service representative's statement that all of Mrs. Robinson's medication would be covered by MyFreeMedicine, Darlene Robinson disclosed her checking account number to the customer service representative of the 121 Mill Street Enterprise. Mr. Robinson told the customer service representative that he and his wife were receiving social security disability and could not afford to lose $195.00. The customer service

representative assured the Robinsons that their medication would be covered, and that they should enroll in the program at no risk.

796. Upon information and belief, the 121 Mill Street Enterprise charged the Robinsons' checking account immediately following their phone conversation with a customer service representative known as Ken Lausier.

797. The 121 Mill Street Enterprise also sent the MyFreeMedicine Registration Packet to the Robinsons, using the U.S. mails. The Enterprise sent this Registration Packet in the day or days following the Robinsons' phone conversation with a customer service representative.

798. Upon information and belief, the 121 Mill Street Enterprise charged MyFreeMedicine for this enrollment and mailing. The 121 Mill Street Enterprise is believed to have sent MyFreeMedicine an invoice for these services using the wires and mails.

799. The Robinsons filled out and returned the Registration Packet.

800. While the customer service representative of the 121 Mill Street Enterprise had represented to the Robinsons that all six of Mrs. Robinson's medications would be covered, in fact, only two were eligible for MyFreeMedicine's program.

801. In February 2005, the Robinsons filed a complaint against MyFreeMedicine with the Better Business Bureau.

802. By February 19, 2005, MyFreeMedicine had refunded the $195.00 to Mr. and Mrs. Robinson.

803. In this manner, the 121 Mill Street Enterprise used the wires and mails to defraud Mr. and Mrs. Robinson, as well as MyFreeMedicine. The 121 Mill Street Enterprise also engaged in financial institution fraud.

**Lynn Smith**

804. The 121 Mill Street Enterprise defrauded Lynn Smith, of Lake Jackson, Texas.

805. In March 2005, Lynn Smith called the MyFreeMedicine 1-800 number, seeking information about the service.

806. Ms. Smith's call was routed to the 121 Mill Street Enterprise, and fielded by a customer service representative. The customer service representative answered on behalf of MyFreeMedicine.

807. In fact, Ms. Smith was actually speaking a customer service representative employed by the 121 Mill Street Enterprise.

808. During this initial phone conversation with a customer service representative of the 121 Mill Street Enterprise, Ms. Smith disclosed her checking account number.

809. The customer service representative told Lynn Smith that there would be a $99.00 charge in order for him to tell Ms. Smith about the services offered by MyFreeMedicine.

810. In fact, there was no charge for information about MyFreeMedicine's products and services.

811. Ms. Smith told the customer service representative that she did not have enough money for this at the time, and would call back in a couple of months.

812. Ms. Smith never authorized the 121 Mill Street Enterprise, or anyone else, to withdraw money from her checking account in connection with MyFreeMedicine.

813. Immediately following Lynn Smith's telephone conversation with a customer service representative of the 121 Mill Street Enterprise, the Enterprise withdrew $199.95 from Lynn Smith's checking account. As a result, Ms. Smith's account was overdrawn.

814. Upon information and belief, the 121 Mill Street Enterprise charged MyFreeMedicine for this enrollment. The 121 Mill Street Enterprise is believed to have sent MyFreeMedicine an invoice for these services using the wires and mails.

815. In April 2005, Lynn Smith filed a complaint against MyFreeMedicine with the Better Business Bureau. In her complaint, Ms. Smith lists MyFreeMedicine's business address as 121 Mill Street, Auburn, Maine.

816. In this way, the 121 Mill Street Enterprise defrauded Lynn Smith and the Plaintiffs using the wires, and committed financial institution fraud.

**Tina Thompson**

817. The 121 Mill Street Enterprise defrauded Tina Thompson of Pitkin, Louisiana, by misrepresenting the MyFreeMedicine income guidelines.

818. Upon information and belief, Tina Thompson called MyFreeMedicine, and her call was routed to the 121 Mill Street Enterprise.

819. During Ms. Thompson's initial phone conversation, she spoke with a customer service representative employed by the 121 Mill Street Enterprise. The customer service representative, upon information and belief, told Ms. Thompson that he or she was speaking on behalf of MyFreeMedicine.

820. In fact, Ms. Thompson was speaking with a customer service representative employed by the 121 Mill Street Enterprise.

821. During Ms. Thompson's initial phone conversation, the customer service representative told her that her husband's income did not matter when assessing eligibility for MyFreeMedicine.

822. In fact, the total household income is considered when assessing eligibility for the MyFreeMedicine program. Total household income for a married couple cannot exceed $2,000 a month.

823. During Ms. Thompson's phone conversation, she disclosed her checking account number to the customer service representative of the 121 Mill Street Enterprise.

824. Immediately following Ms. Thompson's phone conversation, the 121 Mill Street Enterprise withdrew $199.50 from Ms. Thompson's checking account.

825. Also following Ms. Thompson's initial phone conversation, the 121 Mill Street Enterprise sent the MyFreeMedicine Registration Packet to Ms. Thompson using the U.S. mail.

826. Upon information and belief, the 121 Mill Street Enterprise charged MyFreeMedicine for this enrollment. The 121 Mill Street Enterprise is believed to have sent MyFreeMedicine an invoice for these services using the wires and mails.

827. When Ms. Thompson received the MyFreeMedicine Registration Packet, she learned that she was not qualified for MyFreeMedicine, because her household income exceeded the ceiling.

828. Tina Thompson filed a complaint against MyFreeMedicine with the Better Business Bureau on or about March 14, 2005.

829. In this manner, the 121 Mill Street Enterprise committed mail fraud, wire fraud, and financial institution fraud against Tina Thompson and the Plaintiffs.

**Ira Dean Tidwell**

830. The 121 Mill Street Enterprise defrauded Ira Dean Tidwell, of Junction City, Kansas, by misrepresenting the income guidelines for MyFreeMedicine.

831. On September 3, 2004, Mr. Tidwell called the MyFreeMedicine 1-800 number. His call was routed to the 121 Mill Street Enterprise. A customer service representative answered Mr. Tidwell's call, and told Mr. Tidwell that the representative was speaking on behalf of MyFreeMedicine.

832. The customer service representative told Mr. Tidwell that he qualified for MyFreeMedicine. Mr. Tidwell paid $199.95.

833. Two months after Mr. Tidwell's initial phone conversation with a member of the 121 Mill Street Enterprise, he received the MyFreeMedicine Registration Packet. Upon information and belief, the 121 Mill Street Enterprise had sent this packet to Mr. Tidwell using the U.S. mails.

834. Upon information and belief, the 121 Mill Street Enterprise charged MyFreeMedicine for this enrollment and for mailing the Registration Packet to Mr. Tidwell. The 121 Mill Street Enterprise is believed to have sent MyFreeMedicine an invoice for these services using the wires and mails.

835. Mr. Tidwell's application for MyFreeMedicine was denied, on the basis that his income in 2003 exceeded the guidelines from MyFreeMedicine.

836. In April 2005, Mr. Tidwell filed a complaint against MyFreeMedicine with the Better Business Bureau.

837. When the 121 Mill Street Enterprise charged Mr. Tidwell for the MyFreeMedicine program on September 3, 2004, even though he did not meet the income requirements, the 121 Mill Street Enterprise engaged in financial institution fraud. The 121 Mill Street Enterprise also defrauded Mr. Tidwell and the Plaintiffs using the mails and wires.

**Rebecca Clinton**

838. The 121 Mill Street Enterprise defrauded Rebecca Clinton of Joplin, Missouri, by misrepresenting MyFreeMedicine.

839. In September and October, 2004, Rebecca Clinton learned about MyFreeMedicine from a television advertisement.

840. In October 2004, Ms. Clinton called the 1-800 number for MyFreeMedicine. Ms. Clinton's call was routed to the 121 Mill Street Enterprise, and answered by a customer service representative named Gigi. Upon information and belief, Gigi answered the call on behalf of MyFreeMedicine.

841. In fact, Gigi was not an employee of MyFreeMedicine, but rather, was a customer service representative employed by the Enterprise.

842. During Ms. Clinton's telephone call with the customer service representative known as Gigi, Gigi asked Ms. Clinton about her income. Rather than ask Ms. Clinton if her income exceeded the monthly MyFreeMedicine guidelines, Gigi gave Ms. Clinton multiple income ranges from which to choose. Selecting from the ranges presented by the customer service representative, Ms. Clinton told the representative that she was in the $25,000.00 per year and under income range.

843. Because Ms. Clinton stated that she earned less than $25,000.00 per year, Gigi told her that she qualified for free medicine.

844. The customer service representative of the 121 Mill Street Enterprise promised Rebecca Clinton that she would receive all of her medication for free.

845. The customer service representative told Ms. Clinton that the MyFreeMedicine program charged a $199.00 fee for the service. Ms. Clinton was reluctant to pay this amount of

money, until Gigi told her that there was a no risk 100% money back guarantee. The customer service representative told Ms. Clinton that if, after she received a packet of program information, and was not satisfied with MyFreeMedicine, that Ms. Clinton could return to the packet for a full refund.

846. In fact, the MyFreeMedicine refund policy provides for a pro-rata refund only if a customer receives a decline letter from a pharmaceutical company. Because the representative promised that there was no risk, Rebecca Clinton gave Gigi her checking account information.

847. Immediately after Rebecca Clinton's phone conversation, the 121 Mill Street Enterprise withdrew $199.00 from her checking account.

848. In the days following this phone conversation, the 121 Mill Street Enterprise sent the MyFreeMedicine Registration Packet to Rebecca Clinton using the mails.

849. Upon information and belief, the 121 Mill Street Enterprise charged MyFreeMedicine for this enrollment and mailing. The 121 Mill Street Enterprise is believed to have sent MyFreeMedicine an invoice for these services using the wires and mails.

850. After Ms. Clinton received and reviewed the Registration Packet, she decided that she did not wish to enroll in MyFreeMedicine. In late October or early November 2004, Ms. Clinton called MyFreeMedicine to cancel her enrollment and seek a full refund of the $199.00 that the 121 Mill Street Enterprise withdrew from her account. She eventually spoke with Plaintiff Geoff Hasler, who told Ms. Clinton that if she returned the packet to MyFreeMedicine, he would send her a full refund. Rebecca Clinton returned the MyFreeMedicine Registration Packet to Louisville, Kentucky.

851. Rebecca Clinton received a refund check from MyFreeMedicine in the amount of $195.00.

852. On January 13, 2005, Rebecca Clinton filed a complaint against MyFreeMedicine with the Better Business Bureau. She also contacted the Missouri State Attorney General's Office.

853. In this manner, the 121 Mill Street Enterprise defrauded Rebecca Clinton and the Plaintiffs using the wires and mails of the United States. The 121 Mill Street Enterprise also committed financial institution fraud against Rebecca Clinton by misrepresenting MyFreeMedicine policy and income guidelines in order to induce her to disclose her checking account number.

**John Thiery**

854. The 121 Mill Street Enterprise defrauded John Thiery through repeated unauthorized withdrawals from his checking account.

855. During the fall of 2004, John Thiery saw a television ad for MyFreeMedicine.

856. Mr. Thiery called the phone number he saw during the MyFreeMedicine television advertisements.

857. Upon information and belief, Mr. Thiery's call was routed to the 121 Mill Street Enterprise, and answered by a customer service representative on behalf of MyFreeMedicine.

858. Upon information and belief, the customer service representative told Mr. Thiery that he could receive free medication simply by filling out a membership form, and having a checking account.

859. In fact, there was no requirement that members of the public have a checking in order to be eligible for MyFreeMedicine. This was merely a technique that the 121 Mill Street Enterprise used to perpetrate its schemes.

860. Mr. Thiery told the customer service representative that he did indeed have a checking account at the Sun Bank/Omega Bank in Shamokin, Pennsylvania. During the call, the customer service representative induced Mr. Thiery to disclose his checking account number. The customer service representative stated that there were no fees for the program, and that his checking account would not be charged.

861. Following Mr. Thiery's initial phone conversation with a representative of the 121 Mill Street Enterprise, the Enterprise began making monthly withdrawals from his checking account. These withdrawals were in the amount of $199.95. The withdrawals continued for approximately three months. Mr. Thiery never authorized any of these withdrawals.

862. The 121 Mill Street Enterprise also sent Mr. Thiery the MyFreeMedicine Registration Package via U.S. mail immediately following Mr. Thiery's initial phone conversation with a customer service representative.

863. Upon information and belief, the 121 Mill Street Enterprise charged MyFreeMedicine for this enrollment and mailing. The 121 Mill Street Enterprise is believed to have sent MyFreeMedicine an invoice for these services using the wires and mails.

864. As a result of the misconduct by the 121 Mill Street Enterprise, John Thiery filed a complaint against MyFreeMedicine with the Better Business Bureau in January 2005. He wrote a letter dated January 30, 2005. On February 14, 2005, Mr. Thiery sent a second letter to the Better Business Bureau in which he listed the MyFreeMedicine business name and address.

865. The 121 Mill Street Enterprise committed financial institution fraud against John Thiery by making repeated unauthorized withdrawals from his checking account. The Enterprise also engaged in wire and mail fraud against Mr. Thierry and the Plaintiffs.

**Carla J. Byrom**

866. In 2004, a church friend told Carla Byrom about MyFreeMedicine. Ms. Byrom's friend told her that MyFreeMedicine helped low income individuals get low cost medications. She gave Ms. Byrom a 1-800 number, and urged her to call MyFreeMedicine.

867. Ms. Byrom was interested in signing up for this program, because her asthma medication, Advair, was costing her $134.00 for a 15-day supply. In 2004, Ms. Byrom was working at Walmart, had no health insurance or prescription medication coverage, and made $1,000 or less per month.

868. In November or early December 2004, Ms. Byrom called the 1-800 number to learn about MyFreeMedicine. Ms. Byrom's call was answered by a woman who told her that she was from MyFreeMedicine.

869. In fact, the call had been routed to the 121 Mill Street Enterprise, and was answered by a customer service representative of the Enterprise.

870. During Ms. Byrom's initial call, she explained the asthma medication she was taking, with particular emphasis on Advair. The customer service representative told Ms. Byrom that MyFreeMedicine would cover all of her medications, which would be sent directly to her home, doctor's office, or pharmacy.

871. As explained elsewhere in this Complaint, only medications that were specifically included on the updated lists were eligible for the MyFreeMedicine program.

872. The customer service representative then sought to obtain payment from Ms. Byrom during the telephone call. Ms. Byrom resisted the initial attempts at obtaining her financial information. The customer service representative told Ms. Byrom that her payment would be secure, and that if she was not satisfied, MyFreeMedicine would refund her money.

The customer service representative never told Ms. Byrom that in order to receive a refund she would have to have a written rejection of her application for free medication. Ms. Byrom told the customer service representative that she could not afford to pay the $199.95 enrollment fee at the time of their call, so she told her that she would call back after she received her next paycheck.

873. In December 2004, Carla Byrom called the MyFreeMedicine 1-800 number a second time. She spoke to a different customer service representative. The representative told Ms. Byrom that her information was already in the company’s records. Ms. Byrom disclosed her checking account number to the customer service representative. On December 31, 2004, $199.95 was withdrawn from Ms. Byrom’s checking account.

874. Approximately one month after withdrawing funds from Ms. Byrom's bank account, the 121 Mill Street Enterprise sent Ms. Byrom the initial MyFreeMedicine Registration Packet via the U.S. mail.

875. Upon information and belief, the 121 Mill Street Enterprise charged MyFreeMedicine for this enrollment and mailing. The 121 Mill Street Enterprise is believed to have sent MyFreeMedicine an invoice for these services using the wires and mails.

876. Carla Byrom filled out the forms and returned them as instructed. Thereafter, Ms. Byrom received a second mailing, containing forms for her doctor to sign. Ms. Byrom thought that this required her to apply for Medicaid, which she did not want to do.

877. Because Ms. Byrom did not want to apply for Medicaid, she called MyFreeMedicine to tell her that she did not wish to enroll in the program. Ms. Byrom requested a refund of the $199.95 that she had already paid.

878. In fact, the refund program required her to receive a written denial of her application for free medication.

879. As a result of the customer service representative misrepresenting the refund policy, Ms. Byrom contacted the Better Business Bureau and filed a complaint against MyFreeMedicine.

880. Therefore, the 121 Mill Street Enterprise defrauded Carla Byrom and MyFreeMedicine using the wires and mails, and committed financial institution fraud against Ms. Byrom.

**Christine Coccia**

881. The 121 Mill Street Enterprise defrauded Christine Coccia of Webster, Massachusetts.

882. In December 2004, Christine Coccia's niece saw a television advertisement for MyFreeMedicine, and wrote down the 1-800 number contained in the advertisement. The 1-800 number was 1-800-683-0225.

883. On December 4, 2004, Christine Coccia called the 1-800 number contained in MyFreeMedicine's television advertisement. Christine Coccia spoke with a female customer service representative. Upon information and belief, this representative answered the phone call on behalf of MyFreeMedicine.

884. In fact, the representative was an employee of the 121 Mill Street Enterprise.

885. During Ms. Coccia's initial phone call, she told the customer service representative that her salary was approximately $1,340.00 per month, and that her husband received a social security benefit of $808.00 per month. This amounts to a total monthly income of approximately $2,148.00.

886. The maximum monthly income for a couple to be eligible for MyFreeMedicine was $2,000.00, as discussed elsewhere in this Complaint. Nonetheless, the customer service representative told Christine Coccia that she was eligible for the MyFreeMedicine program.

887. Christine Coccia then listed her prescription medications for the customer service representative. Ms. Coccia also listed all of her husband's medications. The customer service representative told Ms. Coccia that she definitely qualified, and would receive all of her medication for free. When Ms. Coccia asked what would happen if her medication changed, the customer service representative told Ms. Coccia not to worry because MyFreeMedicine would have most of them.

888. In fact, only medication that was contained in an updated current list produced by MyFreeMedicine would be covered by the program.

889. The customer service representative told Ms. Coccia that the MyFreeMedicine program would cost $399.90 in order to cover her and her husband for six months. Ms. Coccia told the representative that she could not afford this payment as she did not have $399.90 in her bank account. The customer service representative told Ms. Coccia to send a check over the telephone, and that the representative would not cash the check for two weeks.

890. The representative also told Ms. Coccia that if she did not have enough money in her bank account in two weeks, to call back and MyFreeMedicine would cancel her enrollment and would not charge the account.

891. Christine Coccia gave the customer service representative her checking account number.

892. Approximately one week after Ms. Coccia's initial phone conversation, she received the MyFreeMedicine Registration Packet. Upon information and belief, the 121 Mill

Street Enterprise had sent this packet following Ms. Coccia's phone conversation, using U.S. mail.

893. Upon information and belief, the 121 Mill Street Enterprise charged MyFreeMedicine for this enrollment and mailing. The 121 Mill Street Enterprise is believed to have sent MyFreeMedicine an invoice for these services using the wires and mails.

894. Ms. Coccia realized on December 13, 2004, that she could not afford the MyFreeMedicine charge of $399.90.

895. On December 17, 2004, Ms. Coccia called the MyFreeMedicine 1-800 number to cancel her enrollment in the program. Again, the customer service representative with whom she spoke assured Ms. Coccia that she would not be charged for the service.

896. Ms. Coccia called back on December 30, 2004 to confirm that her MyFreeMedicine enrollment was cancelled and that her checking account would not be charged. On January 13, 2005, Ms. Coccia again called the 1-800 number to cancel her enrollment in MyFreeMedicine, requesting that her checking account not be charged. On this date, Ms. Coccia spoke with a male customer service representative who told her that he could hold her order for an additional two weeks. Ms. Coccia responded that she did not have enough money in her account and she wished to completely cancel her enrollment. This male customer service representative promised to cancel Ms. Coccia's enrollment.

897. The very next day, January 14, 2005, the 121 Mill Street Enterprise withdrew $399.90 from Christine Coccia's checking account.

898. On January 20, 2005, Christine Coccia again called MyFreeMedicine's 1-800 number in order to seek a refund of the money that the 121 Mill Street Enterprise withdrew from

her account. Upon information and belief, Ms. Coccia actually spoke with MyFreeMedicine for the first time on January 20, 2005.

899. On February 6, 2005, Christine Coccia and her husband John filed a complaint against MyFreeMedicine with the Better Business Bureau.

900. The 121 Mill Street Enterprise misrepresented the income guidelines for MyFreeMedicine to Christine Coccia. The Enterprise also told her that her medications would be covered; when in fact, only specific medications were eligible for the program. After inducing Ms. Coccia to disclose her checking account number by misrepresenting the scope of medications covered by MyFreeMedicine, the 121 Mill Street Enterprise sent a MyFreeMedicine Registration Packet to Ms. Coccia using the mails. The 121 Mill Street Enterprise used the checking account information it obtained by misrepresenting MyFreeMedicine to make an unauthorized withdrawal from Christine Coccia's checking account.

901. Therefore, the 121 Mill Street Enterprise defrauded Christine Coccia and MyFreeMedicine using the wires and mails, and committed financial institution fraud against Christine Coccia.

**Dorothy DeFluiter**

902. The 121 Mill Street Enterprise defrauded Dorothy DeFluiter of Cameron, Oklahoma.

903. In April 2004, Dorothy DeFluiter's friend told her about MyFreeMedicine.

904. Soon after learning about MyFreeMedicine from her friend, Ms. DeFluiter telephoned the toll free number.

905. Ms. DeFluiter's phone call was routed to the 121 Mill Street Enterprise. Initially, an automated recording answered her call. While Ms. DeFluiter was on hold, she heard

testimonials of three or four different elderly voices, each saying that they were able to save money on their prescription medications through MyFreeMedicine. Eventually, a live customer service representative answered the call, and told Ms. DeFluiter that the representative was speaking on behalf of MyFreeMedicine.

906. In fact, this customer service representative was employed by the 121 Mill Street Enterprise.

907. During Ms. DeFluiter's initial telephone call, the customer service representative told her that MyFreeMedicine consisted of a prescription assistance program that had several people getting a year's worth of medicine for only $199.95.

908. In fact, the customer service representative was quoting the six-month price for MyFreeMedicine.

909. The customer service representative then asked Ms. DeFluiter how much she was spending a month on prescription medication, and what her monthly income was. When Ms. DeFluiter described her monthly income and medical expenses, the customer service representative told her that she definitely qualified. The customer service representative told Ms. DeFluiter that she was "the most qualified person that they had talked to in a long time."

910. The customer service representative told Ms. DeFluiter that she only had to fill out some paperwork and that she would start receiving medications for free within two to three weeks. The customer service representative told Ms. DeFluiter that this packet of paperwork would cost $199.95, which would cover all of her medication for a full year.

911. Ms. DeFluiter gave the customer service representative her mailing address and authorized a payment of $199.95 from her checking account by use of an electronic check.

912. The customer service representative never asked Ms. DeFluiter what medications she or her family required.

913. On April 26, 2004, the 121 Mill Street Enterprise withdrew $199.95 from the joint checking account of Douglas E. DeFluiter and Dorothy DeFluiter. This account was held with the Arkansas Best Federal Credit Union, in Fort Smith, Arkansas.

914. On May 3, 2004, the 121 Mill Street Enterprise withdrew an additional $199.95 from the DeFluiters' joint checking account.

915. Upon information and belief, the 121 Mill Street Enterprise charged MyFreeMedicine for this enrollment. The 121 Mill Street Enterprise is believed to have sent MyFreeMedicine an invoice for these services using the wires and mails.

916. In May 2004, Ms. DeFluiter made repeated phone calls to the MyFreeMedicine 1-800 number. On each occasion, her call was initially answered by an automatic answering system consisting of elderly voices testifying about the success of the MyFreeMedicine program. Each of these subsequent calls was also routed to the 121 Mill Street Enterprise.

917. During each subsequent call, Ms. DeFluiter spoke with customer service representatives of the 121 Mill Street Enterprise. Each representative told Ms. DeFluiter that there was a "glitch" in the system that was preventing her from getting a refund of the additional charges.

918. Throughout the spring of 2005, Ms. DeFluiter made regular and frequent phone calls to the 121 Mill Street Enterprise. She filed complaints against MyFreeMedicine with the Federal Trade Commission and the Better Business Bureau.

919. In this manner, the 121 Mill Street Enterprise defrauded Dorothy DeFluiter and MyFreeMedicine using the wires and mails, and committed financial institution fraud against her.

**Chester Dunnam, Jr.**

920. The 121 Mill Street Enterprise defrauded Chester Dunnam, Jr. of Knoxville, Tennessee, by misrepresenting MyFreeMedicine.

921. Mr. Dunnam learned about MyFreeMedicine in May 2004, when he saw an advertisement on Turner South television, Channel 25, in Knoxville, Tennessee.

922. On May 17, 2004, Mr. Dunnam called the telephone number in the MyFreeMedicine commercial: 1-800-260-4973.

923. Mr. Dunnam’s call was routed to the 121 Mill Street Enterprise. A male customer service representative answered the call on behalf of MyFreeMedicine.

924. In fact, Mr. Dunnam was speaking with a customer service representative of the 121 Mill Street Enterprise.

925. The customer service representative asked Mr. Dunnam if he had insurance. Mr. Dunnam replied that he did not.

926. The customer service representative asked Mr. Dunnam if he spent over $100.00 per month on medication. Mr. Dunnam responded in the affirmative.

927. On the basis of Mr. Dunnam’s answers to these two questions, the representative told him that he was qualified for MyFreeMedicine.

928. In fact, a determination of Mr. Dunnam's eligibility required consideration of his income.

929. The customer service representative then told Mr. Dunnam that the fee for the MyFreeMedicine program was $199.95, which would cover all of his medications for one year.

930. Mr. Dunnam then requested that the customer service representative verify that all of his medications would be covered by the program. Mr. Dunnam listed each prescription medication he was taking. The representative told Mr. Dunnam he was looking up the medications in his computer system. The representative then assured Mr. Dunnam that all three of his medications were covered by the program, and that Mr. Dunnam would receive all three of them for free.

931. The representative again confirmed for Mr. Dunnam that he qualified for the program.

932. The representative then requested Mr. Dunnam's checking account number and bank routing number in order to pay the fee for MyFreeMedicine.

933. On May 19, 2004, the 121 Mill Street Enterprise withdrew $199.95 from Mr. Dunnam's bank account. Mr. Dunnam's bank account is located at the Knoxville TVA Employees Credit Union, in Knoxville, Tennessee.

934. Shortly after Mr. Dunnam's initial phone conversation in May 2004, 121 Mill Street Enterprise sent him the MyFreeMedicine Registration Packet using the U.S. mails.

935. Upon information and belief, the 121 Mill Street Enterprise charged MyFreeMedicine for this enrollment and mailing. The 121 Mill Street Enterprise is believed to have sent MyFreeMedicine an invoice for these services using the wires and mails.

936. During the interval between Mr. Dunnam's initial phone call and his receipt of the MyFreeMedicine Registration Packet, Mr. Dunnam had a medical emergency that required him to apply for state subsidized health insurance.

937. On August 2, 2004, Mr. Dunnam called the MyFreeMedicine phone number to cancel his enrollment. Mr. Dunnam knew that since he now had health insurance, he would not qualify.

938. Mr. Dunnam's August 2, 2004 phone call was again routed to the 121 Mill Street Enterprise. He again spoke with a customer service representative, this time a female, and told her that he no longer qualified for the program. Mr. Dunnam requested a refund. The customer service representative told him to mail his MyFreeMedicine Registration Packet to 280 Park Street in Lewiston, Maine.

939. On August 3, 2004, Mr. Dunnam mailed the MyFreeMedicine Registration Packet to the Lewiston, Maine address he had been given. He mailed his packet from the Farragut Branch Post Office in Knoxville, Tennessee. This was sent by the U.S. Postal Service Priority Mail, using an envelope with serial number 030415600000512979924.

940. The 121 Mill Street Enterprise received Mr. Dunnam's MyFreeMedicine Registration Packet on August 6, 2004 at 12:54 p.m.

941. The 280 Park Street, Lewiston, Maine address was not a business address for MyFreeMedicine. In fact, it was the address of the 121 Mill Street Enterprise's fulfillment center. This center was led by Justin Featherman. Its activities are discussed elsewhere in this Complaint, and involved distributing large amounts of Avacor.

942. On November 12, 2004, Mr. Dunnam submitted a complaint against MyFreeMedicine to the Better Business Bureau.

943. In December, 2004, Mr. Dunnam filed a complaint against MyFreeMedicine with the U.S. Postal Inspection Service.

944. Therefore, the 121 Mill Street Enterprise engaged in wire fraud, mail fraud, and financial institution fraud against Mr. Dunnam and the Plaintiffs.

**Carole Gardner**

945. The 121 Mill Street Enterprise defrauded Carole Gardner of Wallace, Nebraska.

946. In the fall of 2004, Ms. Gardner saw a television advertisement for MyFreeMedicine on the ABC network. Ms. Gardner wrote down the toll free number contained in the advertisement.

947. Carole Gardner called the toll free number contained in the MyFreeMedicine advertisement. Her call was routed to the 121 Mill Street Enterprise. A woman answered her call with the greeting "Welcome to MFM".

948. The customer service representative who answered Ms. Gardner's call was an employee of the 121 Mill Street Enterprise.

949. The customer service representative asked Ms. Gardner to confirm her monthly income and prescription medication expenses. Ms. Gardner told the representative that she and her husband had a monthly income of approximately $2,225.00 per month.

950. As explained elsewhere in this Complaint, the monthly maximum income of a married couple could not exceed $2,000.00 in order to be qualified for MyFreeMedicine.

951. The customer service representative told Ms. Gardner that her prescriptions were covered by MyFreeMedicine.

952. The customer service representative then requested Ms. Gardner's checking account number.

953. In response to the request for a checking account number, Ms. Gardner told the customer service representative that she did not have enough money at the time. The customer

service representative told Ms. Gardner that she would give Ms. Gardner an extension, and that MyFreeMedicine would not withdraw any money until Ms. Gardner confirmed that she had enough money in her account. The representative told Ms. Gardner that she had until December 28, 2004, to confirm that she could afford the $200.00 MyFreeMedicine fee.

954. Following this promise not to withdraw funds until Ms. Gardner authorized the withdrawal, Ms. Gardner gave the customer service representative her checking account numbers.

955. In the days immediately following Ms. Gardner's initial telephone conversation with a customer service representative of the 121 Mill Street Enterprise, the Enterprise sent Ms. Gardner the MyFreeMedicine Registration Packet using the U.S. mails.

956. Upon information and belief, the 121 Mill Street Enterprise charged MyFreeMedicine for this enrollment and mailing. The 121 Mill Street Enterprise is believed to have sent MyFreeMedicine an invoice for these services using the wires and mails.

957. After a discussion with her doctor in December 2004, Ms. Gardner decided that she did not wish to enroll in MyFreeMedicine.

958. On December 26, 2004, Ms. Gardner called the MyFreeMedicine toll free number and requested that they not charge her account for the program. Ms. Gardner told the customer service representative that she wanted to cancel her enrollment in MyFreeMedicine. The customer service representative that Ms. Gardner initially spoke with on December 26, 2004 told her that he was unable to help her cancel the enrollment in MyFreeMedicine.

959. On December 29, 2004, the 121 Mill Street Enterprise withdrew $199.95 from the checking account of Carole Gardner.

960. In this manner, the 121 Mill Street Enterprise defrauded Carole Gardner and the Plaintiffs using the mails and wires. The 121 Mill Street Enterprise also committed financial institution fraud against Carole Gardner.

**Pamela Lanier**

961. The 121 Mill Street Enterprise defrauded Pamela Lanier of Brookfield, Georgia.

962. Ms. Lanier learned about MyFreeMedicine from a television advertisement that aired in February 2004.

963. On February 6, 2004, Pamela Lanier called the 1-800 number in MyFreeMedicine's television advertisement. The number was 1-800-260-5167.

964. Ms. Lanier's call was routed to the 121 Mill Street Enterprise.

965. A customer service representative from the 121 Mill Street Enterprise identified herself as Amanda. Upon information and belief, Amanda told Ms. Lanier that she was representing MyFreeMedicine.

966. Ms. Lanier asked the customer service representative about MyFreeMedicine.

967. Amanda told Ms. Lanier that she qualified based on her age and the number of medications that she was requesting.

968. The customer service representative known as Amanda never asked Ms. Lanier about her income.

969. The customer service representative known as Amanda never asked Ms. Lanier if she had health insurance.

970. The customer service representative known as Amanda never asked Ms. Lanier what medications she was taking.

971. Ms. Lanier asked Amanda if all of her prescriptions would be covered under the program. Amanda responded that Ms. Lanier would be able to get all of her prescriptions for free.

972. The customer service representative known as Amanda told Ms. Lanier that MyFreeMedicine had connections with pharmaceutical companies.

973. The customer service representative known as Amanda told Ms. Lanier that the cost for MyFreeMedicine's program was $199.95.

974. The customer service representative known as Amanda told Ms. Lanier that she could cancel her membership in MyFreeMedicine at any time, and would receive a full refund.

975. After hearing the customer service representative's description of the MyFreeMedicine program and procedures, Pamela Lanier gave her checking account information over the phone.

976. The customer service representative known as Amanda assured Ms. Lanier that she would not be charged for MyFreeMedicine until after she received the Registration Packet. The customer service representative also assured Ms. Lanier that if she had any questions, she could call back and would receive a full refund.

977. Following Ms. Lanier's initial telephone call to the 121 Mill Street Enterprise, the Enterprise sent her the MyFreeMedicine Registration Packet using the mails.

978. Upon information and belief, the 121 Mill Street Enterprise charged MyFreeMedicine for this enrollment and mailing. The 121 Mill Street Enterprise is believed to have sent MyFreeMedicine an invoice for these services using the wires and mails.

979. When Ms. Lanier reviewed the MyFreeMedicine Registration Packet, she noticed that some of her prescriptions were not included on the list of medications.

980. On February 27, 2004, the 121 Mill Street Enterprise charged Ms. Lanier's checking account the amount of $199.95. This charge was processed in the name of MyFreeMedicine.

981. In late February or early March 2004, Ms. Lanier again called the MyFreeMedicine 1-800 number to ask whether the medications Methyl-HCTZ, Propoxyphene, and Baclofen were covered by the MyFreeMedicine program. Again her call was routed to the 121 Mill Street Enterprise and answered by a customer service representative in the name of MyFreeMedicine.

982. Ms. Lanier told the customer service representative who answered this call that these medications were not included on the list she received as part of the MyFreeMedicine Registration Packet. In response, this customer service representative told Ms. Lanier that MyFreeMedicine would contact the pharmaceutical companies and get these prescriptions for her anyway.

983. In March 2004, after discussing the MyFreeMedicine program with her doctor, Pamela Lanier decided to cancel her enrollment.

984. On April 26, 2004, Pamela Lanier called the MyFreeMedicine 1-800 number. Again her call was routed to the 121 Mill Street Enterprise, and answered by a customer service representative on behalf of MyFreeMedicine. During this call, Ms. Lanier told the representative that she wanted to cancel her membership and desired a refund. The customer service representative told Ms. Lanier to send her cancellation letter to MyFreeMedicine's address in Maine at 280 Park Street, Lewiston, Maine 04240. Ms. Lanier returned the MyFreeMedicine Registration Packet to this address.

985. In fact, the 280 Park Street address was the fulfillment center of the 121 Mill Street Enterprise.

986. Throughout May and June 2004, Pamela Lanier made the repeated request for a refund of her MyFreeMedicine purchase price to the 121 Mill Street Enterprise. She telephoned 1-800-260-5167 on May 5, 2004, May 18, 2004, May 24, 2004, and May 31, 2004. On each of these occasions her call was routed to the 121 Mill Street Enterprise, and answered by a customer service representative on behalf of MyFreeMedicine. On each occasion, a customer service representative would tell Ms. Lanier a different reason why she had not received a refund.

987. Ms. Lanier continued to call the 121 Mill Street Enterprise in June 2004 to request a refund. She called on June 1, 2004, June 3, 2004 and June 4, 2004. On each occasion she called the MyFreeMedicine 1-800 number, and her call was routed to the 121 Mill Street Enterprise.

988. On June 5, 2004, Pamela Lanier spoke with a customer service representative employed by the 121 Mill Street Enterprise, who advised Ms. Lanier to send all the information that she had received from MyFreeMedicine to the Lewiston, Maine address. Ms. Lanier, for a second time, mailed her information to the Lewiston, Maine address that she was provided.

989. Upon information and belief, every mailing that Ms. Lanier sent back to MyFreeMedicine in Lewiston, Maine was received at the 121 Mill Street Enterprise's fulfillment center.

990. On August 5, 2004, Pamela Lanier filed a complaint against MyFreeMedicine with the Better Business Bureau.

991. During the course of these events, the 121 Mill Street Enterprise defrauded Pamela Lanier and the Plaintiffs through use of the wires and mails. The Enterprise also committed financial institution fraud.

**Joanna Cranmer**

992. The 121 Mill Street Enterprise defrauded Joanna Cranmer of Buckhannon, West Virginia.

993. In late May or early June 2004, Joanna Cranmer saw a television advertisement for MyFreeMedicine. She noted the toll free phone number broadcast in the ad.

994. On or about June 8, 2004, Joanna Cranmer telephoned the toll free number contained in MyFreeMedicine's television ad. Her call was routed to the 121 Mill Street Enterprise. Ms. Cranmer initially received an automated answer, followed by a live customer service representative who answered on behalf of MyFreeMedicine.

995. In fact, Ms. Cranmer was speaking with a customer service representative of the 121 Mill Street Enterprise.

996. During Ms. Cranmer's telephone conversation, she asked the customer service representative if the service covered the prescription medication Advair. The customer service representative responded confidently that MyFreeMedicine did cover Advair. Ms. Cranmer proceeded to list her other medications, and the customer service representative confirmed that each of these would be covered by the MyFreeMedicine program.

997. Upon information and belief, the customer service representative who answered Joanna Cranmer's telephone call of June 8, 2004, was not an employee of MyFreeMedicine. Rather, she was a customer service representative employed by the 121 Mill Street Enterprise.

998. At no time during the call with Ms. Cranmer did the customer service representative ask Ms. Cranmer about her monthly income.

999. Joanna Cranmer asked the customer service representative if she could enroll by mailing a check. The representative said that she had to enroll by credit card because it was faster would allow Ms. Cranmer to receive her medication sooner.

1000. Because Ms. Cranmer was paying up to $140 a month for Advair, she agreed to authorize payment on her VISA credit card.

1001. On June 8, 2004, the 121 Mill Street Enterprise charged Ms. Cranmer's Bank of America VISA account.

1002. The customer service representative gave Ms. Cranmer a confirmation number for her transaction: 744356. The representative also told Ms. Cranmer that she would receive paperwork to complete within a week.

1003. Within a month of Ms. Cranmer's initial telephone call, she received the MyFreeMedicine Registration Packet from the 121 Mill Street Enterprise. Upon information and belief, the Enterprise shipped these materials to Ms. Cranmer using the mails.

1004. Upon information and belief, the 121 Mill Street Enterprise charged MyFreeMedicine for this enrollment and mailing. The 121 Mill Street Enterprise is believed to have sent MyFreeMedicine an invoice for these services using the wires and mails.

1005. When Ms. Cranmer opened the MyFreeMedicine initial packet, she saw a list of medications that were covered by the program. This medication list did not include Advair.

1006. Ms. Cranmer decided to withdraw from the program. Upon information and belief, Joanna Cranmer again called the MyFreeMedicine 1-800 number in June 2004, and her call was routed to the 121 Mill Street Enterprise. Ms. Cranmer told the customer service

representative that she was unsatisfied with the program and wanted a refund. The representative told Ms. Cranmer that if she had received the initial Registration Packet, she could not get a refund. Ms. Cranmer told the representative that she was going to complain to the Better Business Bureau about MyFreeMedicine if she was not given a refund. The representative responded: "You go right ahead."

1007. During this call, Ms. Cranmer was speaking with a customer service representative of the 121 Mill Street Enterprise.

1008. Following this telephone call, Joanna Cranmer filed a complaint against MyFreeMedicine with the Better Business Bureau.

1009. In this manner, the 121 Mill Street Enterprise defrauded Joanna Cranmer and MyFreeMedicine using the wires and mails.

**Raymond Clarke**

1010. The 121 Mill Street Enterprise defrauded Raymond Clarke of St. Louis, Missouri.

1011. Raymond Clarke learned of MyFreeMedicine in February 2004, after seeing a television ad.

1012. During the day on which Mr. Clarke saw the ad for MyFreeMedicine, he called the 1-800 number.

1013. Upon information and belief, Mr. Clarke's call was routed to the 121 Mill Street Enterprise. A customer service representative employed by the Enterprise answered Mr. Clarke's call as if he were an employee of MyFreeMedicine.

1014. During this call, the customer service representative asked Mr. Clarke about his income and credit card number. The representative told Mr. Clarke that to qualify for the program, his annual income had to be $16,000 or less. Mr. Clarke told the representative that he

made slightly more than $16,000, estimating that he made over $700.00 more than the $16,000 threshold that the customer service representative cited. The customer service representative responded that most people qualified for MyFreeMedicine, so Mr. Clarke should join the program anyway.

1015. In fact, a caller with Mr. Clarke's income would not have been accepted under the strict income guidelines for MyFreeMedicine.

1016. Nonetheless, Raymond Clarke was induced to give the representative his credit card number.

1017. On February 9, 2004, the 121 Mill Street Enterprise charged Raymond Clarke's credit card the amount of $195.00.

1018. During Mr. Clarke's telephone conversation in early February 2004, the customer service representative with whom he spoke explained no details of the MyFreeMedicine program, and did not explain the fee.

1019. A few days after Mr. Clarke's phone conversation, the 121 Mill Street Enterprise sent him the initial MyFreeMedicine Registration Packet using the U.S. mails.

1020. Upon information and belief, the 121 Mill Street Enterprise charged MyFreeMedicine for this enrollment and mailing. The 121 Mill Street Enterprise is believed to have sent MyFreeMedicine an invoice for these services using the wires and mails.

1021. When Raymond Clarke reviewed the initial Registration Packet, he saw the disclaimer stating the MyFreeMedicine was not affiliated with any pharmaceutical companies.

1022. Raymond Clarke completed the forms and returned them to MyFreeMedicine. He then received additional mailings with pre-printed personal information for his doctors to fill out.

1023. By the time Mr. Clarke received the second mailing with personal pre-printed forms from MyFreeMedicine, his income had risen through disability payment increases, as well as an inheritance that he received.

1024. Raymond Clarke again called MyFreeMedicine, and notified the program of his increase in income. Mr. Clarke was instructed to return all the MyFreeMedicine paperwork, and he would receive a refund.

1025. In August 2004, Raymond Clarke received another set of forms from MyFreeMedicine, asking him to re-enroll for an additional 36 months.

1026. In November 2004, Raymond Clarke filed a complaint against MyFreeMedicine with the Better Business Bureau.

1027. The 121 Mill Street Enterprise misrepresented the MyFreeMedicine income guidelines to Raymond Clarke. By misrepresenting these income guidelines, the 121 Mill Street Enterprise induced Raymond Clarke to disclose his credit card number to the Enterprise. The Enterprise charged Mr. Clarke, even though he would not qualify for the program. The Enterprise also mailed Mr. Clarke a MyFreeMedicine Registration Packet after he agreed to enroll in a program for which he was not qualified.

1028. In this manner, the 121 Mill Street Enterprise defrauded Raymond Clarke and MyFreeMedicine using the wires and mails, and committed financial institution fraud against Mr. Raymond Clarke.

**Forest Lloyd**

1029. The 121 Mill Street Enterprise defrauded Forest Lloyd of Middleton, Idaho.

1030. In February 2005, Mr. Lloyd saw a television advertisement from MyFreeMedicine, and noted the toll free number contained the ad.

1031. Mr. Lloyd called the toll free number contained in the MyFreeMedicine advertisement.

1032. Mr. Lloyd's call was routed to the 121 Mill Street Enterprise, and answered by a customer service representative on behalf of MyFreeMedicine.

1033. Forest Lloyd spoke with a male customer service representative employed by the 121 Mill Street Enterprise.

1034. The customer service representative told Mr. Lloyd that MyFreeMedicine would help him get a six month supply of all of his medication for a fee of $195.00 plus $4.95 for shipping. The customer service representative with whom Mr. Lloyd spoke never asked Mr. Lloyd for any information about his income, nor did he ask which prescription medications Mr. Lloyd was taking.

1035. The customer service representative told Mr. Lloyd that if he decided to enroll in MyFreeMedicine, the representative could debit the $199.95 fee from his checking account.

1036. Forest Lloyd disclosed his checking account information to the customer service representative employed by the 121 Mill Street Enterprise.

1037. On February 10, 2005, the 121 Mill Street Enterprise debited $343.90 from the joint checking account of Forest Lloyd, Mary Jane Lloyd, and Russell B. Lloyd.

1038. Shortly after debiting Mr. Lloyd's checking account, the 121 Mill Street Enterprise sent him the MyFreeMedicine initial Registration Packet using the U.S. mails.

1039. Upon information and belief, the 121 Mill Street Enterprise charged MyFreeMedicine for this enrollment and mailing. The 121 Mill Street Enterprise is believed to have sent MyFreeMedicine an invoice for these services using the wires and mails.

1040. When Mr. Lloyd received the MyFreeMedicine initial Registration Packet, he learned that he exceeded the income requirement for MyFreeMedicine.

1041. In this manner, the 121 Mill Street Enterprise defrauded Forest Lloyd and MyFreeMedicine using the wires and mails, and committed financial institution fraud.

**David Rowland, Jr.**

1042. The 121 Mill Street Enterprise defrauded David Rowland, Jr., of Decatur, Georgia, by misrepresenting MyFreeMedicine.

1043. In late August 2004, David Rowland, Jr. saw a television commercial for MyFreeMedicine.

1044. On August 25, 2004, Mr. Rowland called the MyFreeMedicine 1-800 number.

1045. Upon information and belief, Mr. Rowland’s call was routed to the 121 Mill Street call center. A male customer service representative employed by the 121 Mill Street Enterprise answered Mr. Rowland’s call on behalf of MyFreeMedicine.

1046. David Rowland told the customer service representative that he was interested in ordering medicine through the program.

1047. The customer service representative told Mr. Rowland the cost for MyFreeMedicine was $99.95, and that this covered a one year enrollment in the program.

1048. In fact, the customer service representative misrepresented the price for MyFreeMedicine. The true cost of MyFreeMedicine was $199.95 for a six month enrollment.

1049. The customer service representative never asked Mr. Rowland about his income.

1050. The customer service representative never asked Mr. Rowland about the medications he was taking.

1051. As described throughout this Complaint, income and the names of requested medications are crucial factors in determining ones eligibility for the MyFreeMedicine program.

1052. The customer service representative did, however, ask Mr. Rowland for his credit card number.

1053. David Rowland, Jr. gave his credit card number to a customer service representative of the 121 Mill Street Enterprise during a phone conversation on August 25, 2004.

1054. The 121 Mill Street Enterprise charged Mr. Rowland's credit card in the amount of $99.95 on August 25, 2004.

1055. Following Mr. Rowland's August 25, 2004 phone conversation, the 121 Mill Street Enterprise sent him the MyFreeMedicine initial Registration Packet using the U.S. mails.

1056. Upon information and belief, the 121 Mill Street Enterprise charged MyFreeMedicine for this enrollment and mailing. The 121 Mill Street Enterprise is believed to have sent MyFreeMedicine an invoice for these services using the wires and mails.

1057. Mr. Rowland reviewed the initial Registration Packet and decided that he no longer wished to enroll in the MyFreeMedicine program.

1058. On September 1, 2004, David Rowland, Jr. called the MyFreeMedicine 1-800 number to cancel his enrollment and seek a refund.

1059. On November 3, 2004, Mr. Rowland filed a complaint against MyFreeMedicine with the Better Business Bureau.

1060. In this manner, the 121 Mill Street Enterprise defrauded the Plaintiffs and Mr. Rowland through use of the wire and mails.

**Joseph Paradiso**

1061. The 121 Mill Street Enterprise defrauded Joseph Paradiso of Midland, Texas, by misrepresenting MyFreeMedicine.

1062. Upon information and belief, Joseph Paradiso saw a television advertisement for MyFreeMedicine in late November or early December 2004.

1063. On December 9, 2004, Mr. Paradiso called the toll free number from the MyFreeMedicine television advertisement.

1064. Upon information and belief, Mr. Paradiso's call was routed to the 121 Mill Street Enterprise. A customer service representative employed by the Enterprise answered Mr. Paradiso's call on behalf of MyFreeMedicine.

1065. Upon information and belief, the customer service representative employed by the 121 Mill Street Enterprise misrepresented the MyFreeMedicine income guidelines to Mr. Paradiso during his December 9, 2004 telephone call.

1066. Upon information and belief, the customer service representative obtained Mr. Paradiso's checking account number during the December 9, 2004 telephone call.

1067. On December 9, 2004, the 121 Mill Street Enterprise withdrew $199.95 from the checking account of Joseph Paradiso at Wells Fargo Bank.

1068. In the days following Mr. Paradiso's telephone call to the 121 Mill Street Enterprise, the Enterprise sent him the MyFreeMedicine initial Registration Packet using the U.S. mails.

1069. Upon information and belief, the 121 Mill Street Enterprise charged MyFreeMedicine for this enrollment and mailing. The 121 Mill Street Enterprise is believed to have sent MyFreeMedicine an invoice for these services using the wires and mails.

1070. Once Mr. Paradiso received the MyFreeMedicine initial Registration Packet, he realized that he was ineligible for the MyFreeMedicine program based on his income.

1071. Upon information and belief, Mr. Paradiso made repeated phone calls to the 121 Mill Street Enterprise throughout December 2004. In each of these calls, he requested a refund of the $199.95 that the 121 Mill Street Enterprise withdrew from his account.

1072. On February 24, 2005, Joseph Paradiso sent a complaint against MyFreeMedicine to the Better Business Bureau.

1073. In this manner, the 121 Mill Street Enterprise defrauded Joseph Paradiso and the Plaintiffs using the wires and mails.

**William McDermott**

1074. The 121 Mill Street Enterprise defrauded William McDermott of East Moline, Illinois, by failing to adhere to the MyFreeMedicine income guidelines.

1075. Upon information and belief, William McDermott learned about the MyFreeMedicine program in September 2004 through television advertising.

1076. Upon information and belief, William McDermott called MyFreeMedicine's toll free number on September 30, 2004.

1077. Upon information and belief, Mr. McDermott's call was routed to the 121 Mill Street Enterprise, and answered by a customer service representative employed by the Enterprise.

1078. Upon information and belief, the customer service representative answered William McDermott's call on behalf of MyFreeMedicine.

1079. Upon information and belief, the customer service representative obtained William McDermott's checking account number during the September 30, 2004 telephone call to the 121 Mill Street Enterprise.

1080. Upon information and belief, the customer service representative never confirmed whether Mr. McDermott met the income requirements of the MyFreeMedicine program.

1081. The 121 Mill Street Enterprise withdrew $199.95 from William McDermott's bank account.

1082. After the 121 Mill Street Enterprise withdrew these funds, a customer service representative told Mr. McDermott that he would be charged an additional monthly fee of $33.95.

1083. On November 5, 2004, a customer service representative told Mr. McDermott that he was ineligible for the MyFreeMedicine program.

1084. On March 3, 2005, William McDermott completed a complaint against MyFreeMedicine, and submitted it to the Illinois Attorney General's Office.

1085. Therefore, the 121 Mill Street Enterprise failed to comply with the pre-approved MyFreeMedicine script, and did not verify that Mr. McDermott was disqualified from MyFreeMedicine based on his income. In addition, the customer service representative misrepresented the MyFreeMedicine price by telling Mr. McDermott that he would be charged both a $199.95 fee and a $33.95 monthly fee. The customer service representative combined two alternative forms enrollment.

1086. Upon information and belief, the 121 Mill Street Enterprise charged MyFreeMedicine for enrolling Mr. McDermott, even though the customer service representative with whom Mr. McDermott spoke never confirmed his eligibility. The 121 Mill Street Enterprise is believed to have sent MyFreeMedicine an invoice for these services using the wires and mails.

1087. In this manner, the 121 Mill Street Enterprise defrauded William McDermott and MyFreeMedicine using the wires and mails.

**Linda L. Lax**

1088. The 121 Mill Street Enterprise defrauded Linda Lax, of Brinnon, Washington, by misrepresenting MyFreeMedicine.

1089. On September 16, 2004, Linda Lax called the MyFreeMedicine toll free number in response to a television advertisement.

1090. Upon information and belief, Ms. Lax's phone call was routed to the 121 Mill Street Enterprise.

1091. A customer service representative named Serena answered Ms. Lax's call on behalf of MyFreeMedicine.

1092. Upon information and belief, the customer service representative known as Serena was actually an employee of the 121 Mill Street Enterprise.

1093. During Ms. Lax's phone conversation with the representative known as Serena, Ms. Lax inquired whether all of her medication, as well as her husband's MS Contin were available under the program. Serena told Ms. Lax several times that her medication would be covered.

1094. In fact, MS Contin was not available at the time of Ms. Lax's call. MS Contin was not on the approved list for MyFreeMedicine at this time.

1095. Upon information and belief, the customer service representative never consulted the appropriate list of medications.

1096. The customer service representative then told Ms. Lax that only limited spots in the MyFreeMedicine program were available.

1097. In fact, there was no limit to the number of qualified individuals who could enroll in MyFreeMedicine.

1098. The customer service representative then asked Ms. Lax if she wished to hold a spot in the program by disclosing her checking account information to the customer service representative known as Serena.

1099. Linda Lax then agreed, and gave the representative of the 121 Mill Street Enterprise her checking account information.

1100. The 121 Mill Street Enterprise withdrew $394.95 from the checking account of Linda Lax, using the information provided to the customer service representative known as Serena.

1101. In the days following Ms. Lax's September 16, 2004 telephone call to the MyFreeMedicine toll free number, the 121 Mill Street Enterprise sent her the initial MyFreeMedicine Registration Packet using the mails.

1102. Upon information and belief, the 121 Mill Street Enterprise charged MyFreeMedicine for this enrollment and mailing. The 121 Mill Street Enterprise is believed to have sent MyFreeMedicine an invoice for these services using the wires and mails.

1103. When Linda Lax received the initial MyFreeMedicine Registration Packet, she consulted the list of covered medications. MS Contin was not on the list.

1104. Linda Lax called MyFreeMedicine after realizing that MS Contin was not on the list of approved medications. She eventually spoke with Larry Mann, an employee of MyFreeMedicine, not an employee of the 121 Mill Street Enterprise. Mr. Mann told Ms. Lax that MS Contin had not been available at the time of her initial phone call.

1105. Linda Lax continued to request a refund from MyFreeMedicine, and filed a letter of complaint against MyFreeMedicine with the Attorney General of Washington.

1106. By misrepresenting to Linda Lax that MS Contin was a covered medication under the MyFreeMedicine program, by misrepresenting to Linda Lax that a limited number of spots were available in the MyFreeMedicine program, and that a checking account number was required in order to secure a place, the 121 Mill Street Enterprise misrepresented MyFreeMedicine to Linda Lax and defrauded Ms. Lax using the wires and mails.

1107. In this manner, the 121 Mill Street Enterprise committed financial institution fraud against Linda Lax and defrauded Ms. Lax and the Plaintiffs using the wires and mails.

**Thurmond Champion**

1108. The 121 Mill Street Enterprise defrauded Thurmond Champion of Cordova, Tennessee, by misrepresenting MyFreeMedicine.

1109. Mr. Champion learned of MyFreeMedicine through a television advertisement broadcast in late November and early December 2004.

1110. On or about December 10, 2004, Mr. Champion called the MyFreeMedicine toll free number.

1111. Upon information and belief, Mr. Champion’s call was routed to the 121 Mill Street Enterprise.

1112. A customer service representative named Chris answered Mr. Champion’s call on behalf of MyFreeMedicine.

1113. In fact, Chris was actually a customer service representative employed by the 121 Mill Street Enterprise.

1114. Mr. Champion told the customer service representative that his wife had six prescriptions. "Chris" told Mr. Champion that he would check the list of approved medications to see if the prescriptions that Mr. Champion described were eligible for MyFreeMedicine. The customer service representative informed Mr. Champion that all but one of the medications were covered.

1115. The customer service representative told Mr. Champion that MyFreeMedicine charged a fee of $199.95 every six months.

1116. The customer service representative told Mr. Champion that he would need to disclose his checking account number in order to enroll in the program.

1117. Mr. Champion told the representative that he would not have enough money in his account to cover this charge until December 30, 2004. The representative agreed to wait until December 30, 2004 before withdrawing the money from Mr. Champion's account. The customer service representative known as Chris told Mr. Champion that he would send Mr. Champion an application to see if he qualified for MyFreeMedicine during the interval between Mr. Champion's December 10, 2004 phone call and the date on which Mr. Champion could afford the $199.95 fee. Six days later, on December 16, 2004, the 121 Mill Street Enterprise withdrew $199.95 from Thurmond Champion's checking account.

1118. Upon information and belief, no representative of the 121 Mill Street Enterprise ever asked Mr. Champion about his income level before the Enterprise withdrew money from his checking account.

1119. In the days following Mr. Champion's initial phone call to the 121 Mill Street Enterprise, the Enterprise shipped him the MyFreeMedicine initial Registration Packet using the mails. Mr. Champion received this packet on or about December 20, 2004.

1120. Upon information and belief, the 121 Mill Street Enterprise charged MyFreeMedicine for this enrollment and mailing. The 121 Mill Street Enterprise is believed to have sent MyFreeMedicine an invoice for these services using the wires and mails.

1121. In January 2005, Thurmond Champion began completing the application from MyFreeMedicine that he received from the 121 Mill Street Enterprise. At this time, Mr. Champion realized that the application asked for his income in 2003.

1122. Due to a medical emergency, Mr. Champion was forced to withdraw retirement funds in 2003. As a result, Mr. Champion's 2003 income far exceeded the MyFreeMedicine income guidelines.

1123. After Mr. Champion realized that his income exceeded the MyFreeMedicine guidelines, he called and requested a refund.

1124. On March 8, 2005, the Kentucky Attorney General's Office received a complaint from Mr. Champion regarding MyFreeMedicine.

1125. Through these acts, the 121 Mill Street Enterprise misrepresented MyFreeMedicine and defrauded Thurmond Champion using the wires and mails. By withdrawing $199.95 from Mr. Champion's checking account without verifying that he met the income guidelines for MyFreeMedicine, the 121 Mill Street Enterprise committed financial institution fraud against Thurmond Champion.

**Shari Lambert**

1126. The 121 Mill Street Enterprise defrauded Shari Lambert, of Sparks, Nevada.

1127. During the first week of February 2005, Shari Lambert learned of MyFreeMedicine through its website: www.myfreemedicine.com.

1128. In February 2005, Ms. Lambert telephoned MyFreeMedicine to learn if she was eligible to receive her prescriptions free of charge.

1129. Upon information and belief, Ms. Lambert's call was routed to the 121 Mill Street Enterprise.

1130. Upon information and belief, a customer service representative of the 121 Mill Street Enterprise answered Ms. Lambert's call.

1131. The customer service representative who received Ms. Lambert's call answered: "Thank you for calling MyFreeMedicine. Can I have your name?"

1132. The customer service representative then asked Ms. Lambert for her zip code and a list of the medications that she needed.

1133. Ms. Lambert provided her name, zip code, and the name of medication she was taking.

1134. The customer service representative told Ms. Lambert that her prescription was on the MyFreeMedicine list of covered medications.

1135. After explaining how the MyFreeMedicine program worked, the customer service representative told Ms. Lambert that the fee for enrolling was $195.00. The customer service representative told Ms. Lambert that this was a one time fee.

1136. The customer service representative told Ms. Lambert that she could authorize a payment of the MyFreeMedicine fee over the telephone. The customer service representative encouraged Ms. Lambert to give her a checking account number so that the fee could be withdrawn.

1137. Ms. Lambert told the customer service representative that she wanted to enroll, but did not have enough money in her checking account at the time of the call.

1138. The customer service representative agreed to wait until February 23, 2005, before withdrawing any money from Ms. Lambert's account.

1139. Shari Lambert gave the customer service representative her checking account information.

1140. Following Ms. Lambert's telephone call, the $121 Mill Street Enterprise sent her the MyFreeMedicine initial Registration Packet using the mails. Ms. Lambert received this packet on or about February 15, 2005. Ms. Lambert completed the initial paperwork and returned it to MyFreeMedicine.

1141. Between February 15, 2005 and February 19, 2005, Ms. Lambert learned that she had been approved by a different patient assistance program, and would receive her medication for free through this alternative organization. On February 19, 2005, Ms. Lambert called MyFreeMedicine to cancel her order.

1142. On February 24, 2005, the 121 Mill Street Enterprise withdrew $199.95 from Shari Lambert's checking account.

1143. Upon information and belief, the 121 Mill Street Enterprise charged MyFreeMedicine for this enrollment and mailing. The 121 Mill Street Enterprise is believed to have sent MyFreeMedicine an invoice for these services using the wires and mails.

1144. Shari Lambert learned that MyFreeMedicine had a location in Auburn, Maine. She made regular phone calls to this location to request a refund. Upon information and belief, Shari Lambert repeatedly requested that members of the 121 Mill Street Enterprise return her money.

1145. During one of Ms. Lambert's calls to the 121 Mill Street Enterprise, she spoke with one Sharity Frost, who told Ms. Lambert that she (Frost) was a manager for MyFreeMedicine.

1146. In fact, Sharity Frost held a variety of positions within the 121 Mill Street Enterprise. At the time of Ms. Lambert's call, Frost is believed to have been the customer service manager at the 121 Mill Street Enterprise's call center facility.

1147. Shari Lambert eventually spoke with Plaintiff Geoff Hasler, who told her that he could not give her a refund because he had no record of her payment.

1148. Upon information and belief, MyFreeMedicine and Plaintiff Hasler had no record of Ms. Lambert's payment, because the funds were withdrawn by the 121 Mill Street Enterprise without notifying MyFreeMedicine of Shari Lambert's application.

1149. Plaintiff Geoff Hasler instructed Shari Lambert to fax him a copy of her bank statement showing the MyFreeMedicine charge.

1150. On April 7, 2005, MyFreeMedicine credited Shari Lambert's checking account in the amount of $199.95.

1151. Before Shari Lambert received a refund from MyFreeMedicine, she filed complaints against MyFreeMedicine with the Better Business Bureau.

1152. Through these acts, the 121 Mill Street Enterprise defrauded Shari Lambert and the Plaintiffs, using the wires and mails of the United States.

**The 121 Mill Street Enterprise Harmed MyFreeMedicine & Geoff Hasler**
**(Damages)**

1153. During the sixteen month period from January 2004 through May 2005, the Enterprise sold approximately 10,843 subscriptions to MyFreeMedicine. During that time, the Enterprise in effect was MyFreeMedicine's face to the world as all new calls went to 1-800 numbers of the Enterprise.

1154. During the duration of the scheme to defraud MyFreeMedicine, meaning January 2004 to May, 2005, anytime MyFreeMedicine received a complaint or had a problem from a consumer that could be attributed to the 121 Mill Street Enterprise, the 121 Mill Street Enterprise would dismiss it as not true, and would assure Plaintiffs that it had checked the recordings and verified the sale was conducted consistent with the script. Only rarely would the 121 Mill Street Enterprise tell MyFreeMedicine be told there was a problem, and recommend that MyFreeMedicine issue a refund to the customer. The Enterprise told and misled MyFreeMedicine into believing that the misrepresentations concerning its product were isolated incidents.

1155. In fact, the misrepresentations to the public were systemic and widespread.

1156. Plaintiffs reasonably relied on the 121 Mill Street Enterprise's representations that customer service representatives were following the script and that the misrepresentations were not being made to the public.

1157. Plaintiffs relied upon the misrepresentations as truthful in part because Alpine (particularly Defendants Graham Weaver and Will Adams), repeatedly assured MyFreeMedicine that Alpine "owned" AdvanceTel Direct, that they were honest, trustworthy, and sophisticated business people. The Defendants assured Plaintiffs that they were "partners" with

MyFreeMedicine. The Defendants, particularly Defendants Alpine, Weaver, and Adams, repeatedly promised the Plaintiffs during in person meetings, telephone calls, and in emails, that "as individuals and as a team, [they] believe[ed] in unwavering honesty, fairness, and integrity," that they believed in "acting with humility and respect," and that they brought "enthusiasm, commitment and passion into everything [they] do." These members of the 121 Mill Street Enterprise repeatedly assured the Plaintiffs that they (at the time through AdvanceTel) were the best at what they did. These representations were made in person and by telephone between January 2004 and the summer of 2005.

1158. As a result of these misrepresentations by members of the 121 Mill Street Enterprise, MyFreeMedicine continued to do business with the Enterprise and continued to spend well over a million dollars in advertising.

1159. As a result of the misrepresentations to the public and directly to MyFreeMedicine outlined above, MyFreeMedicine as a business was essentially destroyed because after a time the misrepresentations became widely reported on the Internet and on the news.

1160. In the summer of 2005, MyFreeMedicine and Geoffrey Hasler were sued by the Federal Trade Commission alleging fraud based on the conduct of the enterprise.

1161. In May 2005, MyFreeMedicine and Geoffrey Hasler were sued by the Attorney General of Arkansas alleging fraud based on the conduct of the Enterprise.

1162. The Arkansas Attorney General issued multiple press releases in which MyFreeMedicine was described as criminal and a fraud. These press statements have been continuously publicized since 2005 and are readily accessible by potential customers or clients of MyFreeMedicine.

1163. MyFreeMedicine was sued by the Attorney General of Missouri alleging fraud based on the conduct of the Enterprise.

1164. Complaints about MyFreeMedicine were made to the Better Business Bureau.

1165. Complaints about MyFreeMedicine appeared on the Internet.

1166. On June 6, 2006, the ABC television show, Good Morning America, featured a consumer segment on MyFreeMedicine and Geoff Hasler. The Arkansas Attorney General personally appeared on this program.

1167. In that broadcast, ABC displayed a portion of a telephone call to the 121 Mill Street Enterprise which was recorded by an investigator for the Federal Trade Commission. A representative of the 121 Mill Street Enterprise answered the call on behalf of MyFreeMedicine. The segment showed misrepresentation of the MyFreeMedicine product.

1168. The Good Morning America segment was watched by millions of Americans and its host at the time, Charles Gibson, was and remains one of the most respected news anchors in the United States.

1169. At about the time when these lawsuits and publicity peaked, the 121 Mill Street Enterprise, at the time doing business as AdvanceTel, closed its doors without notice to MyFreeMedicine.

1170. Approximately a week later, 121 Mill Street Enterprise reopened its doors as Great Falls Marketing.

1171. While at first under the guise of Great Falls Marketing, Defendant Will Adams agreed to provide the recordings so that MyFreeMedicine could defend themselves consistent with the assurances that had been made all along, he (and other member of the 121 Mill Street Enterprise such as Defendant MacCheyne) actually reviewed the recordings and then refused to

provide them. Thereafter, Defendant Adams stated that the computer upon which the audio files were kept had been destroyed or damaged.

1172. Upon information and belief, this latter statement is a misrepresentation and the audio files do, in fact, exist.

1173. As a proximate result of the scheme and misrepresentations, Plaintiffs MyFreeMedicine and Geoff Hasler incurred attorney fees, expenses, fines, and court costs defending themselves from lawsuits brought against them.

1174. As a further proximate result of the schemes, the reputation of MyFreeMedicine was irreparably damaged and virtually destroyed resulting in people refusing to do business with MyFreeMedicine.

1175. As a further proximate result of the schemes, MyFreeMedicine's renewal rates for subscribers dramatically dropped off due to the damage caused to the professional service company business.

1176. As a further proximate result, many millions of dollars of advertising costs to build the business and create good will were irretrievably lost.

1177. As a further proximate result of the schemes, MyFreeMedicine's startup costs funded directly and personally by Plaintiff Geoff Hasler were lost, including all the costs associated with and starting the venture. The costs included such things as intellectual property, IT, computers, supplies, software, staff salaries and administrative expenses.

1178. As a further proximate result of the schemes, MyFreeMedicine paid many hundreds of thousands of dollars of fees and commissions to AdvanceTel and Alpine.

## CLAIMS FOR RELIEF

COUNT ONE: RICO
18 U.S.C. § 1964(c)
18 U.S.C. § 1962(c)

NOW COME the Plaintiffs and complain against all named Defendants as follows:

1179. The Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 1178 as if fully set forth herein.

1180. At all relevant times, Defendant Alpine Investors, LP was a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

1181. At all relevant times, Defendant James N. DeWolfe was a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

1182. At all relevant times, Defendant Frank G. DeWolfe was a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

1183. At all relevant times, Defendant Scott MacCheyne was a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

1184. At all relevant times, Defendant Jeffrey Stanek was a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

1185. At all relevant times, Defendant Graham Weaver was a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

1186. At all relevant times, Defendant Billy Maguy was a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

1187. At all relevant times, Defendant Will Adams was a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

1188. At all relevant times, Defendant Brian Flaherty was a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

1189. At all relevant times, the Defendants and others belonged to an association-in-fact referred to as the 121 Mill Street Enterprise, for the purposes of defrauding the Plaintiffs and the public. This association-in-fact was an “enterprise” within the meaning of RICO, 18 U.S.C. § 1961(4).

1190. At all relevant times, this enterprise was engaged in, and its activities affected, interstate commerce.

1191. The Defendants directly or indirectly participated in these schemes or artifices knowingly, willingly, and with the specific intent to defraud the Plaintiffs and the public in order to sign up as many customers for MyFreeMedicine as possible, and to bill MyFreeMedicine for enrolling unqualified members of the public. Defendants transmitted these bills to MyFreeMedicine using the wires and using the U.S. mails.

1192. Defendants shipped MyFreeMedicine information to members of the public who were unqualified for MyFreeMedicine, using the U.S. mails.

1193. The Defendants, acting as the 121 Mill Street Enterprise, engaged in "racketeering activity" within the meaning of 18 U.S.C. § 1961(1) by engaging in the predicate acts described in this Complaint, which are a representative sample of thousands of qualifying activities under RICO, 18 U.S.C. § 1961(1). These acts violate the following statutes: 18 U.S.C. § 1341 (mail fraud); 18 U.S.C. § 1343 (wire fraud); and 18 U.S.C. § 1344 (bank fraud). Each of the Defendants committed and/or aided and abetted the commission of two or more of these acts of racketeering activity. As applied to MyFreeMedicine, these acts typically consisted of a customer responding to a MyFreeMedicine advertisement, that call being routed to the 121 Mill

Street Enterprise's call center, where a customer service representative answered on behalf of MyFreeMedicine and misrepresented MyFreeMedicine in order to obtain the caller's checking account or credit card information. The 121 Mill Street Enterprise then withdrew funds from the caller's financial institution, and mailed the caller information about MyFreeMedicine that often notified the caller that he or she did not qualify for the program.

1194. Through an elaborate media funding scheme that broadcast television advertisements for MyFreeMedicine in multiple states, the Defendants channeled more telephone calls for MyFreeMedicine to the call center operated by the 121 Mill Street Enterprise. As part of this scheme, the Defendants charged MyFreeMedicine thousands of dollars in interest payments using a shared media purchasing scheme.

1195. As a direct and proximate result of the Defendants' violation of 18 U.S.C. § 1962(c), the Plaintiffs were injured in their business or property within the meaning of 18 U.S.C. § 1964(c). The Plaintiffs lost millions of dollars in advertising costs and business startup expenses. The Plaintiffs were sued by the Federal Trade Commission, the Attorney General of Arkansas, and the Attorney General of Missouri. The Defendants were required to spend thousands of dollars in attorneys' fees to defend themselves in this litigation. As a result of the Defendants' racketeering activities, the Plaintiffs were widely portrayed in the media and on the Internet as an illegitimate business, resulting in consequential damages in lost revenue because few members of the public will do business with the Plaintiffs as a result of the Defendants' activities.

1196. At all relevant times, the Defendants, acting as the 121 Mill Street Enterprise, conducted or participated, directly and indirectly, in the conduct of the Enterprise's affairs

through a "pattern of racketeering activity" within the meaning of RICO. 18 U.S.C. § 1961(1); 18 U.S.C. § 1961(5); 18 U.S.C. § 1962(c).

1197. The acts of racketeering activity referred to in the preceding paragraph and detailed throughout this Complaint constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5). The Defendants' activities were continuous and related. The Defendants, operating through the 121 Mill Street Enterprise, cloaked their activities using a series of apparently legitimate businesses to engage in multiple racketeering schemes. The Avacor scheme began in 2000 and lasted five years. The Vinarol scheme lasted for approximately fourteen months. The Thermal Carb scheme lasted approximately four years. The Enterprise has been perpetrating a scheme involving Glucotrin since Fall 2005 and continues to engage in this scheme today. These schemes are related by virtue of the common participants (the Defendants and customer service representatives employed by the 121 Mill Street Enterprise), common victims (MyFreeMedicine, Geoff Hasler, and members of the public who called to purchase Avacor, Vinarol, ThermalCarb, Glucotrin, and other products and services), a common method of commission (use of a call center to defraud the public), and the common purpose and common result of defrauding the Plaintiffs and the public and enriching the Defendants at their expense.

1198. To execute the scheme to defraud MyFreeMedicine, the Defendants employed an elaborate television advertising strategy that broadcast advertisements for MyFreeMedicine throughout the country that were designed to channel more calls to the 121 Mill Street Enterprise's call center. When members of the public called in response to these advertisements, the Defendants transmitted or caused to be transmitted by means of wire communications in interstate commerce, the following misrepresentations regarding MyFreeMedicine:

a. misrepresenting the MyFreeMedicine six month price as covering a year's worth of services;

b. misrepresenting the individual price of $199.95 as covering a married couple;

c. telling callers who exceeded the income ceiling that they were qualified for the MyFreeMedicine program;

d. misrepresenting that all of a caller's medications were eligible for the MyFreeMedicine program, when in fact only specific medications were covered;

e. misrepresenting that MyFreeMedicine was a government program;

f. claiming that only limited spots were available in the MyFreeMedicine program, when in fact, no such limits exist;

g. falsely claiming that MyFreeMedicine was associated with the pharmaceutical companies, when in fact it was not;

h. misrepresenting prescription medication insurance guidelines;

i. promising a full refund if a customer was not satisfied with MyFreeMedicine and ignoring the specific MyFreeMedicine refund requirements;

j. promising to cancel a caller's order but refusing to do so;

k. making false promises not to withdraw funds from a caller's bank account until authorized; and

l. withdrawing funds from customers' accounts without authorization.

1199. The Defendants' schemes constitute long term racketeering activity. The Defendants misrepresented products and services to thousands of members of the public through telephone calls, used an elaborate television advertising strategy to increase the volume of incoming calls to the call center operated by the Enterprise, shipped MyFreeMedicine

Registration Packets to unqualified members of the public using the U.S. mails, shipped Avacor to thousands of members of the public using the U.S. mail. and fraudulently misrepresented Avacor, Vinarol, Thermal Carb, Glucotrin, and MyFreeMedicine. This constitutes a continuous pattern of fraud by wire and television as proscribed at 18 U.S.C. § 1343, and is racketeering activity under RICO, 18 U.S.C. § 1961(1).

1200. Where the Defendants systematically misrepresented the nature of Avacor, Vinarol, Thermal Carb, Glucotrin, and MyFreeMedicine in order to obtain payment from the bank accounts and credit cards of members of the public whose calls were routed to the call center operated by the 121 Mill Street Enterprise, the Defendants engaged in a continuous pattern of bank fraud as defined at 18 U.S.C. § 1344, which constitutes racketeering activity under RICO, 18 U.S.C. § 1961(1).

1201. As detailed in the preceding paragraphs, as a direct and proximate result of the Defendants' acts of mail, wire, and bank fraud, and their violations of 18 U.S.C. § 1962(c), the Plaintiffs have been injured in their business or property within the meaning of 18 U.S.C. § 1964(c), as described above.

WHEREFORE, Plaintiffs pray for a judgment in their favor for:

A. compensatory damages in the amount of $25 million, trebled pursuant to RICO;

B. punitive damages in an amount to be determined at trial;

C. their costs, fees, and other expenses, including attorneys' fees, pursuant to 18 U.S.C. § 1964(c); and

D. such other and further relief as may be just and proper.

COUNT TWO: RICO
18 U.S.C. § 1964(c)
18 U.S.C. § 1962(b)

NOW COME the Plaintiffs and complain against each of the Defendants as follows:

1202. The Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 1201 as if fully set forth herein.

1203. As described above and throughout this Complaint, each of the Defendants maintained, directly or indirectly, an interest in and control of the 121 Mill Street Enterprise, which was a racketeering enterprise whose activities were engaged in and affected interstate commerce.

1204. By maintaining these positions of interest and control within the 121 Mill Street Enterprise, the Defendants directly and indirectly maintained an interest in and control over a racketeering enterprise affecting interstate commerce, in violation of RICO. 18 U.S.C. §§ 1961(1) and (5); 18 U.S.C. § 1962(b); 18 U.S.C. § 1343; 18 U.S.C. § 1344.

1205. As detailed in the preceding paragraphs, as a direct and proximate result of the Defendants' control over and interest in an enterprise engaged in the described pattern of mail, wire, and bank fraud, and their violations of 18 U.S.C. § 1962(b), the Plaintiffs have been injured in their business or property within the meaning of 18 U.S.C. § 1964(c), as described above.

WHEREFORE, Plaintiffs pray for a judgment in their favor for:

A. compensatory damages in the amount of $25 million, trebled pursuant to RICO;

B. punitive damages in an amount to be determined at trial;

C. their costs, fees, and other expenses, including attorneys' fees, pursuant to 18 U.S.C. § 1964(c); and

D. such other and further relief as may be just and proper.

COUNT THREE: RICO
18 U.S.C. § 1964(c)
18 U.S.C. § 1962 (a)

NOW COME the Plaintiffs and complain against all Defendants as follows:

1206. The Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 1205 as if fully set forth herein.

1207. Through their participation in the pattern of racketeering activity described above, the Defendants received income, which they directly and indirectly invested in the 121 Mill Street Enterprise, a racketeering enterprise affecting interstate commerce.

1208. As described above, the Defendants were heavily involved in the marketing, shipment and sale of Avacor throughout the United States. They were full participants in the Avacor scheme, as described in the preceding paragraphs. As a result of these activities, the Defendants were paid hundred of thousands, if not millions, of dollars.

1209. As described above, the Avacor scheme involved a pattern of racketeering activity because of the misrepresentations made about the nature of Avacor using the wires and television, and also involved the use of fraudulent misrepresentations to obtain payment from the credit cards and bank accounts of members of the public who called in response to Avacor advertising.

1210. Upon information and belief, the Defendants received income through the 121 Mill Street Enterprise's other schemes, such as Thermal Carb, and Vinarol.

1211. The Defendants invested the proceeds of the Avacor and other schemes in the scheme to defraud MyFreeMedicine, and in acquiring a complete ownership stake in the call center operated by the 121 Mill Street Enterprise.

1212. Upon information and belief, Defendants Alpine, Weaver, Adams and Maguy invested the proceeds of the Avacor, Vinarol, Thermal Carb and other schemes, as well as the scheme to defraud MyFreeMedicine, in the establishment of Great Falls Marketing.

1213. As explained above, Defendants Alpine, Weaver, Adams and Maguy promised the Plaintiffs that they wanted to do for MyFreeMedicine what they had done for Avacor, and told Plaintiff Hasler that they wanted to invest the proceeds they earned through Avacor in new business ventures.

1214. Upon information and belief, Great Falls Marketing is merely a front established by the 121 Mill Street Enterprise to avoid liability for the activities conducted through AdvanceTel Direct, PowerTel, and other business entities that the 121 Mill Street Enterprise has used to shield its members from individual responsibility for their racketeering activities.

1215. Upon information and belief, Defendants Alpine, Weaver, Adams and Maguy invested the proceeds of the Avacor, Vinarol, Glucotrin, and Thermal Carb schemes, and the scheme to defraud MyFreeMedicine, in the current venture involving Glucotrin, as well as other products that, upon information and belief, the 121 Mill Street Enterprise is presently misrepresenting to the public under the guise of Great Falls Marketing.

1216. When Defendants Alpine, Weaver, Adams and Maguy received income from racketeering activity and invested it in the 121 Mill Street Enterprise and the scheme to defraud MyFreeMedicine, Defendants Alpine, Weaver, Adams and Maguy injured the Plaintiffs in their business and property within the meaning of 18 U.S.C. § 1964(c), as described above.

WHEREFORE, Plaintiffs pray for a judgment in their favor for:

A. compensatory damages in the amount of $25 million, trebled pursuant to RICO;

B. punitive damages in an amount to be determined at trial;

C. their costs, fees, and other expenses, including attorneys' fees, pursuant to 18 U.S.C. § 1964(c); and

D. such other and further relief as may be just and proper.

COUNT FOUR: RICO CONSPIRACY
18 U.S.C. § 1964(c)
18 U.S.C. § 1962(d)

NOW COME the Plaintiffs and complain against all Defendants as follows:

1217. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 1216 as if fully set forth herein.

1218. At all relevant times, the Defendants and other members of the 121 Mill Street Enterprise agreed and conspired to violate 18 U.S.C. § 1962(c), that is, they agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the 121 Mill Street Enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

1219. At all relevant times, Defendants Alpine, Weaver, Adams and Maguy agreed and conspired to violate 18 U.S.C. § 1962(a), that is, they agreed to receive income derived through a pattern of racketeering activity and invest it in the conduct and affairs of the 121 Mill Street Enterprise.

1220. At all relevant times, all of the Defendants agreed and conspired to violate 18 U.S.C. § 1962(b), that is, they agreed to engage in a pattern of racketeering activity in order to maintain and control the 121 Mill Street Enterprise, whose activities are engaged in and affect interstate commerce.

1221. The Defendants and others committed and caused to be committed a series of overt acts in furtherance of the Conspiracy and to affect the objects thereof, including but not limited to the acts described throughout this Complaint.

1222. As a result of the Defendants' violations of 18 U.S.C. § 1962(d), the Plaintiffs suffered damages as outlined above.

1223. As a result of the conspiracy, the Defendants are liable to the Plaintiffs for their losses in an amount to be determined at trial.

1224. Pursuant to RICO, 18 U.S.C. § 1964(c), MyFreeMedicine and Geoff Hasler are entitled to recover threefold their damages, plus costs and attorneys' fees from the Defendants.

WHEREFORE, Plaintiffs pray for a judgment in their favor for:

A. compensatory damages in the amount of $25 million, trebled pursuant to RICO;

B. punitive damages in an amount to be determined at trial;

C. their costs, fees, and other expenses, including attorneys' fees, pursuant to 18 U.S.C. § 1964(c); and

D. such other and further relief as may be just and proper.

COUNT FIVE: BREACH OF CONTRACT

NOW COME the Plaintiffs and complain against Defendant Alpine as follows:

1225. Plaintiffs repeat and reallege paragraphs 1 through 1224 as if the same were fully set forth herein.

1226. On October 23, 2004, Plaintiffs signed a contract with Defendant Alpine Investors, LP, in which MyFreeMedicine agreed to use AdvanceTel Direct as its exclusive telemarketing call center. Defendants Will Adams and Alpine promised to work with the Plaintiffs on a media funding campaign "with openness, full disclosure, and fairness for all parties involved and...never advance the interests of AdvanceTel Direct at the expense of the interests of MyFreeMedicine". A copy of the contract is attached as **Exhibit A** and is incorporated herein by reference.

1227. When Alpine signed the contract with MyFreeMedicine, it already owned some or all of AdvanceTel Direct, but did not disclose this ownership interest to the Plaintiffs. Defendants Graham Weaver, Will Adams, and Billy Maguy had personal financial stakes in AdvanceTel Direct, and were devoting a substantial amount of their working time to running AdvanceTel Direct.

1228. Through their involvement with AdvanceTel Direct, Defendants Graham Weaver, Will Adams, and Billy Maguy were involved in the marketing and shipment of Avacor. Through their involvement with Avacor, the Defendants Alpine, Weaver, Adams, and Maguy were aware that customer service representatives employed by AdvanceTel Direct, PowerTel, or any other name used by the call center located at 121 Mill Street in Auburn, Maine, were misrepresenting products in order to defraud the public and reap financial gain for themselves and for their employer.

1229. Under the contract between the Plaintiffs and Alpine, the parties owed one another an implied obligation of good faith and fair dealing.

1230. Defendant Alpine breached its contract to Plaintiffs by failing to disclose the nature and extent of the fraud, misrepresentations and the true racketeering enterprise behind AdvanceTel.

1231. Defendants breached their contract to Plaintiffs by failing to deal with Plaintiffs with openness, full disclosure, and fairness to Plaintiffs.

1232. Defendants further breached their contract to Plaintiffs by failing to disclose the financial circumstances of AdvanceTel.

1233. As a result of Defendants Alpine and Will Adams' breach of said contract, the Plaintiffs have suffered damage as more fully described above.

WHEREFORE, the Plaintiffs demand judgment against Defendant Alpine in the amount of $25 million, plus costs and interest, and for such other and further relief as this Court deems just and proper.

COUNT SIX: BREACH OF FIDUCIARY DUTY

NOW COME the Plaintiffs and complain against Defendants Alpine, Weaver, Maguy, and Adams as follows:

1234. Plaintiffs repeat and reallege paragraphs 1 through 1233 as if the same were fully set forth herein.

1235. As part of the contract between MyFreeMedicine and Alpine, Defendant Will Adams promised that Alpine would serve as a full partner with MyFreeMedicine in growing its business. Defendant Adams described how he and his colleagues at Alpine held business degrees from the most prestigious universities in the United States. Defendant Adams represented to the Plaintiffs that Defendants Alpine, Weaver, Adams and Maguy were experienced in growing businesses such as MyFreeMedicine. Defendant Adams promised the Plaintiffs that Defendants Alpine, Weaver, Adams, and Maguy would provide financial support to help MyFreeMedicine reach its full business potential. Defendant Adams told the Plaintiffs that they were proceeding too cautiously in the development of MyFreeMedicine, and that if MyFreeMedicine did not adopt the aggressive media strategy that Defendants Alpine, Adams, Weaver and Maguy proposed, that MyFreeMedicine risked losing its business to a competitor.

1236. By virtue of the above, Defendants Alpine, Weaver, Maguy, and Adams undertook fiduciary obligations to the Plaintiffs. Through Defendant Adams' solicitation of MyFreeMedicine as a business partner, the Defendants encouraged the Plaintiffs to place them in a position of trust and confidence.

1237. As a result of these promises by Defendants Alpine, Adams, Weaver and Maguy, the Plaintiffs placed these Defendants in a position of substantial trust, influence and confidence.

1238. Defendants Alpine, Adams, Weaver and Maguy had an obligation to disclose their knowledge concerning the fraud and misrepresentations undertaken by the Enterprise as outlined above, which they did not.

1239. Defendants Alpine, Adams, Weaver and Maguy had an obligation to disclose their knowledge of AdvanceTel's financial circumstances, which they did not.

1240. As a result of Defendants Alpine, Adams, Weaver and Maguy's breach of their fiduciary duty to Plaintiffs, the Plaintiffs were damaged as described above.

WHEREFORE, the Plaintiffs demand judgment against Defendants Alpine, Adams, Weaver and Maguy in an amount of $25 million compensatory damages, punitive damages, plus interest and costs, and for such other and further relief as this Court deems just and proper.

COUNT SEVEN:
TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

NOW COME the Plaintiffs and complain against all named Defendants as follows:

1241. Plaintiffs repeat and reallege paragraphs 1 through 1241 as if the same were fully set forth herein.

1242. When members of the public called the toll free numbers for MyFreeMedicine, their calls were routed to a call center operated by the Defendants.

1243. During these telephone calls, customers agreed to pay for MyFreeMedicine's services in the amount of $199.95 per person, for six months.

1244. Callers agreed to pay the MyFreeMedicine enrollment fee and complete required paperwork in exchange for receiving fee medications covered by the program.

1245. In this manner, a contract or prospective economic relationship existed between MyFreeMedicine and its customers.

1246. All of the Defendants interfered with this contract by participating in, encouraging, and misrepresenting MyFreeMedicine to callers. Through the misrepresentations described throughout this Complaint, existing and prospective customers were misinformed about the MyFreeMedicine services. These misrepresentations consisted of false and fraudulent statements described throughout this Complaint, and included misrepresenting the price and duration of MyFreeMedicine's program, misrepresenting MyFreeMedicine as a government program, telling customers that all of their medication would be covered, and telling customers that they qualified regardless of income and prescription medication insurance, among other things.

1247. As a result of these misrepresentations, customers of MyFreeMedicine filed complaints with the Federal Trade Commission, the Attorney General of the United States, and the Attorneys General of Arkansas and Missouri. These complaints resulted in litigation in Federal and State courts. Because of these complaints and this litigation, MyFreeMedicine has acquired a nationwide reputation as a dishonest company, and is unable to continue growing as a business.

1248. As a result of these misrepresentations, few qualified customers renew their enrollment with MyFreeMedicine, causing further damage to Plaintiffs by depriving them of business revenue.

1249. Therefore, the Defendants committed tortious interference with the Plaintiffs' prospective economic advantage to their damage as described above.

WHEREFORE, the Plaintiffs demand judgment against the Defendants in an amount of $25 million compensatory damages, punitive damages, interest and costs, and for such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Plaintiffs request trial by jury on all counts so triable.

Dated: Auburn, Maine
October 22, 2008

/s/ Stephen B. Wade
Stephen B. Wade, Esq.
Attorney for Plaintiffs

SKELTON, TAINTOR & ABBOTT
95 Main Street, P.O. Box 3200
Auburn, Maine 04212-3200
(207) 784-3200

H:\DOCS\WADE\MyFreeMedicine.com, LLC cm\PLEADINGS\Complaint.doc