*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | | |
|---|---|---|
| *MYFREEMEDICINE.COM, et al.,* | ) | |
| | ) | |
| *Plaintiffs* | ) | |
| | ) | |
| *v.* | ) | *Civil No. 08-362-P-W* |
| | ) | |
| *GEOFFREY J. HASLER, et al.,* | ) | |
| | ) | |
| *Defendants* | ) | |

*RECOMMENDED DECISION ON MOTIONS TO DISMISS*

The defendants move to dismiss this action, in motions filed by defendants Alpine Investors, LP, Scott MacCheyne, Graham Weaver, William T. Maguy, William M. Adams, and Brian G. Flaherty (Docket No. 35); James N. DeWolfe and Frank G. DeWolfe (Docket No. 29); and Jeffrey Stanek (Docket No. 36).  Oral argument was held before me on April 3, 2009.  I now recommend that the court grant the motions.

### I.  Applicable Legal Standard

The motions invoke Fed. R. Civ. P. 12(b)(6).  Motion to Dismiss of Defendants Alpine Investors, LP, et al. ("Alpine Motion") (Docket No. 35) at 1; Motion to Dismiss of Defendants James N. DeWolfe and Frank G. DeWolfe ("DeWolfe Motion") (Docket No. 29) at 1; Defendant Jeffrey Stanek's Motion to Dismiss ("Stanek Motion") (Docket No. 36) at 1.  The DeWolfe Motion also invokes Fed. R. Civ. P. 9(b).  DeWolfe Motion at 1.

As the Supreme Court recently has clarified:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need
> detailed factual allegations, a plaintiff's obligation to provide the grounds of his
> entitlement to relief requires more than labels and conclusions, and a formulaic

1

recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level.

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) (citations omitted).[1]

"In ruling on a motion to dismiss [under Rule 12(b)(6)], a court must accept as true all the factual allegations in the complaint and construe all reasonable inferences in favor of the plaintiffs." *Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001).  Ordinarily, in weighing a Rule 12(b)(6) motion, "a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment." *Id.*  "There is, however, a narrow exception for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." *Id.* (citation and internal quotation marks omitted).

## II. Factual Background

The 171-page, 1,249-paragraph complaint in this action includes the following relevant factual allegations.

Plaintiff Geoffrey J. Hasler started plaintiff MyFreeMedicine.com, LLC, in 2003. Complaint (Docket No. 1) ¶¶ 1-2, 34.  Its principal place of business, and Hasler's residence, are in Kentucky.  *Id.* ¶¶ 1-2.  It was intended to assist individuals in obtaining free medications from manufacturers who offered such medications to qualifying individuals.  *Id.* ¶¶ 15, 33.  It charges $33 per month, or $199.95 every six months, for this service.  *Id.* ¶ 49.

---

[1] In so explaining, the Court explicitly backed away from the Rule 12(b)(6) standard articulated in *Conley v. Gibson*, 355 U.S. 41 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly*, 127 S. Ct. at 1968 (quoting *Conley*, 355 U.S. at 45-46).  The Court observed: "[A]fter puzzling the profession for 50 years, this famous observation has earned its retirement.  The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.* at 1969.

Defendant Alpine Investors, LP ("Alpine") is a limited partnership with a principal place of business in California.  *Id*. ¶ 3.  Defendant Graham Weaver founded Alpine in 2001. *Id*. ¶¶ 85, 119.  Defendants James N. DeWolfe and Frank G. DeWolfe are residents of Maine who established a telemarketing call center in Lewiston, Maine, that was initially known as FD&H Enterprises, LLC, and PowerTel.  *Id*. ¶¶ 4-5, 55.  Defendants Graham Weaver, William Adams and William Maguy, residents of California, and Jeffrey Stanek, a Maine resident, are owners, employees, members, managers, and/or partners of Alpine.  *Id*. ¶¶ 6-8, 10, 12.  Defendants Scott MacCheyne and Brian Flaherty are residents of Maine.  *Id*. ¶¶ 9, 11.

When MyFreeMedicine was launched, it processed applications for almost 150 U.S. pharmaceutical companies participating in free medication programs.  *Id*. ¶ 35.   When a patient joins MyFreeMedicine, he or she is sent a packet of paperwork to be completed that requires the patient to specify the medications needed.  *Id*. ¶ 36.  This packet is sent by first-class United States mail.  *Id*.   After this paperwork is returned, MyFreeMedicine sends the patient more detailed paperwork that addresses the medications that the patient requests.  *Id*. ¶ 37.  At this point, the patient's doctor must also sign the forms and provide a prescription for the medication. *Id*. ¶ 40.   Once the paperwork is returned, MyFreeMedicine submits it to the relevant pharmaceutical company so that the medication may be shipped directly to the patient or doctor. *Id*. ¶ 41.

To date, MyFreeMedicine has processed over 100,000 individual prescription requests. *Id*. ¶ 44.  In approximately January 2004, due to the increasing volume of calls that it was receiving, MyFreeMedicine began to do business with a call center known as AdvanceTel Direct, which operated from 121 Mill Street in Lewiston, Maine.  *Id*. ¶ 50.  This call center evolved from a telemarketing call center first established by the DeWolfe defendants.  *Id*. ¶ 51.

Since 1999, the call center at 121 Mill Street has been known as PowerTel Marketing Group, LLC, PowerTel Marketing Group, Inc., FD&H Enterprises, LLC, AdvanceTel Direct, LLC, and Great Falls Marketing, LLC. *Id.* at 54. Throughout its name changes, the call center engaged in direct marketing and point of sale services in interstate commerce by receiving calls and shipping products throughout the country. *Id.* ¶ 65. The officers and managers of these business entities overlapped throughout the changes in name or form and shared employees as a common resource. *Id.* ¶¶ 66-67. For a time, a secondary call center operated in Augusta, Maine. *Id.* ¶ 69.

In or before 2002, Alpine acquired an ownership interest in the 121 Mill Street enterprise. *Id.* ¶ 71. By 2002, members of Alpine, including Weaver, played an integral role in the operation of the 121 Mill Street enterprise. *Id.* ¶ 80. In 2003, FD&H Enterprises, LLC listed James DeWolfe as one of its managers. *Id.* ¶ 81. In 2003, Weaver was identified as chairman of PowerTel Technologies, LLC. *Id.* ¶ 83. In 2003, PowerTel Technologies changed its name to AdvanceTel Direct, LLC, of which Weaver was chairman and James DeWolfe was manager. *Id.* ¶ 84. In 2004, Weaver was listed as its manager. *Id.* ¶ 91.

In May 2005, the enterprise at 121 Mill Street became Great Falls Marketing, which was initially led by Adams and is currently led by MacCheyne. *Id.* ¶ 95. Great Falls Marketing lists Alpine as an affiliate. *Id.* ¶ 108. Prior to 2005, Alpine listed AdvanceTel Direct, LLC, as an "investment" on its website. *Id.* ¶ 109.

Alpine's role in the enterprise at 121 Mill Street was that of banker, promoter, and manager, infusing the venture with the necessary capital to broaden its activities, and participating in and making decisions regarding the enterprise. *Id.* ¶ 118. Between January 2004 and October 2004, Alpine encouraged MyFreeMedicine to use the 121 Mill Street enterprise as its exclusive call center. *Id.* ¶ 135. After October 2004, a contract between Alpine

and MyFreeMedicine required MyFreeMedicine to use AdvanceTel Direct as its exclusive call center. *Id*. Alpine's website lists Great Falls Marketing as an investment on its website. *Id*. ¶ 141. Individual partners at Alpine continue to work closely with the 121 Mill Street enterprise. *Id*. ¶ 143.

Weaver oversaw from a global perspective the multiple business ventures, marketing, capital investment, and client relationships of the 121 Mill Street enterprise. *Id*. ¶ 145. His involvement included serving as manager and chairman of AdvanceTel Direct, manager and chairman of PowerTel, buying media concerning the Avacor product, reviewing correspondence between Alpine and MyFreeMedicine, involvement in day-to-day media buying strategy, and encouraging MyFreeMedicine to invest more money in a shared television advertising scheme. *Id*. ¶¶ 148-55.

Maguy was an advertising specialist, encouraging MyFreeMedicine and other clients of the call center to invest further in a lucrative media buying venture that boosted the volume of calls. *Id*. ¶ 156. He worked closely with Hasler and the Quigley Simpson media agency to purchase television advertising between October 2004 and the summer of 2005. *Id*. ¶ 162. Alpine thus convinced MyFreeMedicine to spend hundreds of thousands of dollars on television advertising that Alpine arranged. *Id*. ¶ 165.

Adams was the on-site coordinator of all activity at 121 Mill Street. *Id*. at 169. He was for a time chief operating officer or chief executive officer of Great Falls Marketing. *Id*. ¶ 172. He is also a partner at Alpine. *Id*. ¶ 173. He held a variety of management roles at AdvanceTel Direct. *Id*. ¶ 174. Adams told Hasler that Alpine would be equally loyal to AdvanceTel as to MyFreeMedicine. *Id*. ¶ 177. He was aware that Alpine had a financial stake in the 121 Mill Street enterprise and that this was a conflict of interest. *Id*. ¶¶ 179-81. In October 2004, Adams

5

negotiated a partnership proposal between MyFreeMedicine and Alpine that required MyFreeMedicine to use AdvanceTel Direct as its exclusive call center. *Id.* ¶ 182. Adams then suggested changing the telephone scripts that customer service representatives used for MyFreeMedicine. *Id.* ¶ 184.

Frank and James DeWolfe are brothers. *Id.* ¶ 191. Frank DeWolfe founded the 121 Mill Street enterprise and remained involved in client and customer service activities. *Id.* ¶ 189. He held an ownership stake in FD&H Enterprises and helped establish PowerTel and AdvanceTel Direct. *Id.* ¶¶ 192-93. He became a manager at AdvanceTel Direct. *Id.* ¶ 194. As a manager, he regularly screened calls made by customer service representatives and cultivated an atmosphere of fraud and misrepresentation on the customer service floor. *Id.* ¶ 196. He authorized new telephone scripts for use before clients approved them. *Id.* ¶ 199. He promised results to clients that were unattainable if customer service representatives followed an approved script verbatim, so he encouraged customer service representatives to deviate from approved scripts and to "freelance," or develop their own scripts for certain products, without ever obtaining the approval of the client whose products were being marketed. *Id.* ¶¶ 200-02. He encouraged customer service representatives to misrepresent the products they were marketing. *Id.* ¶ 204. He sold some or all of his stake in the call center to Alpine. *Id.* ¶ 206.

James DeWolfe founded the 121 Mill Street enterprise and served as "boss" of day-to-day activity. *Id.* ¶ 207. Through threats to terminate underperforming customer service representatives, he enforced a system of misrepresenting products and services. *Id.* ¶ 208. He held ownership stakes in FD&H Enterprises, AdvanceTel Direct, and PowerTel. *Id.* ¶¶ 211-12, 214. He was president of AdvanceTel Direct and PowerTel. *Id.* ¶¶ 213, 215. On January 14, 2004, he signed a marketing agreement with MyFreeMedicine on behalf of AdvanceTel Direct.

*Id.* ¶ 217.   He developed telephone scripts for MyFreeMedicine.  *Id.* ¶ 219.   He regularly encouraged customer service representatives to misrepresent products and services and otherwise engage in fraudulent schemes.  *Id.* ¶ 220.   He cultivated an atmosphere of lawlessness and drug use within the 121 Mill Street enterprise.  *Id.* ¶ 223.   In 2005, he sold some or all of his ownership stake in the call center to Alpine.  *Id.* ¶ 224.

MacCheyne controlled the records of the activities of the 121 Mill Street enterprise throughout MyFreeMedicine's relationship with that enterprise.  *Id.* ¶ 225.   At relevant times, he possessed complete control over the enterprise's electronic records.  *Id.* ¶ 227.   He was the IT director of AdvanceTel Direct.  *Id.* ¶ 228.   He knew that the call center recorded all incoming and outgoing calls during its relationship with MyFreeMedicine.  *Id.* ¶ 234.   He regularly reviewed these recordings and selected recordings of only those customer service and sales calls that did not contain misrepresentations to share with MyFreeMedicine or other clients who requested them.  *Id.* ¶¶ 237-38.   He fraudulently altered the invoices and billing records sent to clients after reviewing prerecordings of telemarketing calls.  *Id.* ¶ 241.   He is the current president and chief information officer of Great Falls Marketing.  *Id.* ¶ 242.   He oversees all of the day-to-day activities of the 121 Mill Street enterprise.  *Id.* ¶ 245.

Stanek was the financial controller at AdvanceTel Direct.  *Id.* ¶ 247.   He had knowledge of the bills that the call center sent to MyFreeMedicine.  *Id.* ¶ 249.   He was aware that the call center was fraudulently billing MyFreeMedicine for services that involved misrepresenting MyFreeMedicine.  *Id.* ¶ 250.   His records were used to fraudulently charge MyFreeMedicine for services that the 121 Mill Street enterprise had not provided.  *Id.* ¶ 251.

Flaherty was the chief operating officer of AdvanceTel Direct in 2004 and 2005.  *Id.* ¶ 252.   He was responsible for day-to-day operations of the call center.  *Id.* ¶ 253.   He was

responsible for consolidating all reports about call center performance and the effectiveness of the 121 Mill Street enterprise's media strategy. *Id*. ¶ 256. He was responsible for all shipments of MyFreeMedicine information to members of the public through the mail. *Id*. ¶ 257. He was responsible for processing payments between the parties. *Id*. ¶ 258.

At times the 121 Mill Street enterprise had as many as 150 employees at its two call centers. *Id*. ¶ 272. It employed at least 2,000 different residents of Central Maine at one time or another. *Id*. It pays minimum wage plus very generous commissions. *Id*. ¶ 273. An employee must be successful in selling to earn a living wage. *Id*. 274. By misrepresenting products in order to improve sales, the customer service representatives increase their commissions. *Id*. ¶ 276.

James DeWolfe would monitor live calls and simultaneously e-mail the customer service representative as he or she spoke over the telephone with a customer. *Id*. ¶ 283. Managers and executives continually pressured customer service representatives to sell products at any cost. *Id*. ¶ 285. Employees were encouraged to make untrue, exaggerated, and fraudulent claims. *Id*. ¶ 288. Customer service representatives were encouraged to ingest the products they marketed, so that they could tell a caller that they had used the product with success. *Id*. ¶¶ 289-90. They were encouraged to lie about symptoms and side effects caused by the products. *Id*. ¶ 292. Customer service representatives were fired for having low sales. *Id*. ¶ 298. They were not fired for defrauding the customer or the public. *Id*. ¶ 311.

From 2000 through the summer of 2005, the 121 Mill Street enterprise sold a product called Avacor, which was misrepresented as an all-natural hair replacement regimen, with no chemicals and no side effects. *Id*. ¶¶ 325-26, 363-64. The marketing of Avacor was an elaborate hoax involving fictitious clinics and treatment centers, a fabricated "medical study," and

unsubstantiated efficacy claims. *Id*. ¶ 334. Avacor contained the drug Minoxidil. *Id*. ¶ 339. Callers were told that Avacor came with a money-back, no-risk guarantee, which was a misrepresentation. *Id*. ¶ 356. The 121 Mill Street enterprise shipped Avacor to customers using the U.S. Postal Service, United Parcel Service, and Parcel Direct. *Id*. ¶ 360. The 121 Mill Street enterprise received a percentage of all Global Vision Product revenue for Avacor sold by its customer service representatives. *Id*. ¶ 375. Alpine, directly and through Weaver, Maguy, and Adams, lent money to Global Vision Products so that it would continue to do business exclusively with 121 Mill Street. *Id*. ¶ 376.

From February 2002 through April 2003, the 121 Mill Street enterprise sold a product called Vinarol as a "new fast acting all natural herbal formula" developed to help increase sexual desire and enhance the sexual experience for both men and women. *Id*. ¶¶ 381, 385. Vinarol was promoted as a "100% all-natural herbal product" and a dietary supplement. *Id*. ¶ 388. In fact, Vinarol contained sildenafil citrate, the active ingredient found in the prescription drug Viagra. *Id*. ¶ 390. No form of sildenafil citrate has been approved for women. *Id*. ¶ 395. Both male and female customer service representatives at 121 Mill Street were given samples of Vinarol to ingest. *Id*. ¶ 409. Some reported blue vision, a common side effect of sildenafil citrate. *Id*. The 121 Mill Street enterprise sold Vinarol at least for a time after it was widely reported that Vinarol contained prescription drugs. *Id*. ¶ 416.

For approximately four years, the 121 Mill Street enterprise sold a product called Thermal Carb beginning sometime in 2000. *Id*. ¶ 419. It was marketed as an all-natural diet tool, although it initially contained the drug ephedrine, a dangerous stimulant. *Id*. ¶¶ 420, 422. Customer service representatives told callers that Thermal Carb would block the carbohydrates they consumed, preventing the body from producing too much insulin. *Id*. ¶ 424. The enterprise

also marketed Thermal Carb Fat Cutting Gel, which customers were instructed to rub on areas of their bodies to reduce cellulite and body fat. *Id*. ¶¶ 432, 434. Thermal Carb has never been proven to reduce weight. *Id*. ¶ 441. The 121 Mill Street enterprise shipped Thermal Carb products through the U. S. Postal Service, United Parcel Service, and Parcel Direct. *Id*. ¶ 451.

For approximately three years beginning in the fall of 2005, the 121 Mill Street enterprise sold a product called Glucotrin, which contains, among other things, gymnena, sylvestre, perialla oil, and banana leaf. *Id*. ¶¶ 454, 471. Through media advertising, people interested in Glucotrin were led to believe that they were contacting the Blood Sugar Institute when in fact they were talking to customer service representatives at 121 Mill Street. *Id*. ¶¶ 472-73. Customer service representatives misrepresented Glucotrin as a cure, mitigation, treatment, or prevention of diabetes. *Id*. ¶ 476.

A typical transaction for MyFreeMedicine began with an elderly or low income caller responding to a television advertisement and calling a number that would be answered at 121 Mill Street. *Id*. ¶¶ 483, 486. Representatives commonly told callers that the $199.95 price would enable the caller to receive free medication for a year when, in fact, that was the price for six months of service. *Id*. ¶ 490. Callers who exceeded income eligibility guidelines were told that they were qualified to receive free medication, and, after they were charged and learned that they did not qualify, they were denied a refund. *Id*. ¶ 491. In order to obtain information that a caller would not normally give, representatives told callers that the prescriptions were coming from the government, or through a government program. *Id*. ¶¶ 492-93. Representatives told callers that certain medications were covered when in fact they were not on the list of approved medications and refused to cancel orders when customers asked to withdraw from the program or

not to be charged.  *Id*. ¶¶ 494-95.  On some occasions, representatives would withdraw money from the accounts of people who had only called for information about the service.  *Id*. ¶ 498.

On January 14, 2004, the plaintiffs signed a marketing agreement with James DeWolfe, acting on behalf of AdvanceTel Direct, by which MyFreeMedicine hired the call center to provide telemarketing services.  *Id*. ¶ 502.  AdvanceTel Direct agreed to receive telephone calls generated by MyFreeMedicine's advertising, and to enroll qualified callers in MyFreeMedicine. The 121 Mill Street enterprise, acting as AdvanceTel Direct, agreed to develop scripts, subject to MyFreeMedicine's approval, for use by customer service representatives.  *Id*. ¶¶ 503-04.  The 121 Mill Street enterprise agreed not to use the scripts without MyFreeMedicine's written approval and not to deviate materially from any approved scripts.  *Id*. ¶ 504.  The agreement provided for MyFreeMedicine to pay the 121 Mill Street enterprise a commission based on sales volume and a varying rate based on the total amount of talk time fielded by customer service representatives.  *Id*. ¶¶ 507-08.  MyFreeMedicine agreed to pay an up-front "set-up fee" of $2,000 to cover training of customer service agents and specialized data reporting.  *Id*. ¶ 511.  It also agreed to pay 50 cents per package shipped by the enterprise's fulfillment facility.  *Id*. ¶ 512.

Hasler went to the enterprise's Maine locations in 2004 and 2005 to train customer service representatives on the MyFreeMedicine program.  *Id*. ¶¶ 526-27.  He provided a database of all medications covered by the program and insisted that customer service representatives consult the current list of covered medications during all contacts with the public.  *Id*.¶ 528.  He insisted that they only enroll people who met the strict income or insurance guidelines of the free medication Patient Assistance Programs.  *Id*. ¶ 530.  He explained the importance of consulting only the most recent medication lists provided by MyFreeMedicine.  *Id*.

Knowing that the representations they made were false, the defendants and other members of the 121 Mill Street enterprise nonetheless pressured customer service representatives to acquire the bank account and credit card numbers of people who called, through any means necessary. *Id*. ¶¶ 532-33.

Throughout the spring and summer of 2004, Adams and the Alpine partners made overtures to the plaintiffs in order to convince them to deal exclusively with the 121 Mill Street enterprise and to embark on an elaborate media buying campaign in which Alpine loaned funds for television advertisements to be repaid at usurious rates. *Id*. ¶ 541. Alpine offered to fund 50% of the MyFreeMedicine media advertising. *Id*. ¶ 544. On October 23, 2004, Adams urged Hasler to adopt a more aggressive and faster approach to building MyFreeMedicine in order to enhance the return on Alpine's media expenditures. *Id*. ¶ 549. Adams assured the plaintiffs that he would not "advance the interests of AdvanceTel Direct at the expense of the interests of MyFreeMedicine." *Id*. ¶ 551.

After the parties signed an agreement in October 2004, Alpine directed the purchase of television advertising time through a Los Angeles agency, Quigley Simpson, and MyFreeMedicine's promotional expenses soared. *Id*. ¶¶ 552, 558-59. Alpine charged and was paid a 60% annual interest premium on MyFreeMedicine's 50% contribution to this initiative. *Id*. ¶ 560. The 121 Mill Street enterprise defrauded the plaintiffs of tens of thousands of dollars in interest fees. *Id*. ¶ 564.

Despite Hasler's strenuous objections and the defendants' repeated assurances that they would correct the practice of not following the approved script, the enterprise intended to continue misrepresenting MyFreeMedicine through any means necessary to boost the sales commissions. *Id*. ¶¶ 567-69. Customer service representatives routinely told callers that unlisted

12

medications were covered by MyFreeMedicine. *Id.* ¶ 575. They routinely misrepresented the income, insurance, and refund guidelines for enrolling in MyFreeMedicine in order to sign up another sale. *Id.* ¶¶ 579-81.

MacCheyne would, with the knowledge of other defendants, fraudulently manipulate the reported close rates and numbers of dropped calls to make the call center's performance look better than it was. *Id.* ¶ 584.

As a result of the fraudulent practices directed toward them, members of the public complained about MyFreeMedicine to federal and state officials, including the Attorney General of the United States, the attorneys general of Arkansas and Missouri, the Better Business Bureau, and the Federal Trade Commission. *Id.* ¶ 585. When the Federal Trade Commission brought suit against MyFreeMedicine and Hasler, it identified a sample of callers who had experienced one or more of the 121 Mill Street enterprise's misrepresentations. *Id.* ¶ 586. Hasler sought recordings of each of these calls. *Id.* Adams told Hasler that the tapes would be provided, but thereafter stopped returning Hasler's calls and referred him to an attorney in Indiana. *Id.* ¶ 587. The 121 Mill Street enterprise thereafter fraudulently misrepresented to Hasler that the recordings had been destroyed. *Id.* ¶ 589. AdvanceTel Direct closed its doors in May 2005, almost immediately after the Arkansas Attorney General sued MyFreeMedicine, and the 121 Mill Street enterprise adopted the name Great Falls Marketing. *Id.* ¶ 591.

The following consumers were harmed by misrepresentations about MyFreeMedicine made by the 121 Mill Street enterprise: Lavonne Norris of Cave City, Kentucky, *id.* ¶¶ 593-600; Ronnie S. Hicks of Pocahontas, Arkansas, *id.* ¶¶ 601-11; Mary Upshaw of Wynona, Oklahoma, *id.* ¶¶ 612-22; Doreen Richardson of Puyallup, Washington, *id.* ¶¶ 623-30; Virginia Foos, of Greeley, Colorado, *id.* ¶¶ 631-44; Owen Bennett of Snoqualmie, Washington, *id.* ¶¶ 645-59;

Marie Best, of Mt. Olive, North Carolina, *id*. ¶¶ 660-71; Elmer and Ruby Boone, *id*. ¶¶ 672-83;

Shirley and James Bradley, of Onalaska, Texas, *id*. ¶¶ 684-98; Carolyn B. Bright, of Dallas,

Texas, *id*. at ¶¶ 699-706; Gary Knupp, of Broadway, Virginia, *id*. ¶¶ 707-13; Elmerene Mattson,

of Dillsboro, Indiana, *id*. ¶¶ 714-25; Kay Motley, of Tampa, Florida, *id*. ¶¶ 726-35; Violet Nebel,

of Hobe Sound, Florida, *id*. ¶¶ 736-47; Norma E. Owen, of Palm Beach Gardens, Florida, *id*.

¶¶ 748-58; Phyllis J. Reamer, of Bath, New York, *id*. ¶¶ 759-71; Charles T. Rice, of Paul, Idaho,

*id*. ¶¶ 772-88; Darlene Robinson, of Maysville, Missouri, *id*. ¶¶ 789-803; Lynn Smith, of Lake

Jackson, Texas, *id*. ¶¶ 804-16; Tina Thompson, of Pitkin, Louisiana, *id*. ¶¶ 817-29; Ira Dean

Tidwell, of Junction City, Kansas, *id*. ¶¶ 830-37; Rebecca Clinton, of Joplin, Missouri, *id*.

¶¶ 838-53; John Thiery, *id*. ¶¶ 854-65; Carla J. Byrom, *id*. ¶¶ 866-80; Christine Coccia, of

Webster, Massachusetts, *id*. ¶¶ 881-901; Dorothy DeFluiter, of Cameron, Oklahoma, *id*. ¶¶ 902-

19; Chester Dunnam, Jr., of Knoxville, Tennessee, *id*. ¶¶ 920-44; Carole Gardner, of Wallace,

Nebraska, *id*. ¶¶ 945-60; Pamela Lanier, of Brookfield, Georgia, *id*. ¶¶ 961-91; Joanna Cranmer,

of Buckhannon, West Virginia, *id*. ¶¶ 992-1009; Raymond Clarke, of St. Louis, Missouri, *id*.

¶¶ 1010-28; Forest Lloyd, of Middleton, Idaho, *id*. ¶¶ 1029-41; David Rowland, Jr., of Decatur,

Georgia, *id*. ¶¶ 1042-60; Joseph Paradiso, of Midland, Texas, *id*. ¶¶ 1061-73; William

McDermott, of East Moline, Illinois, *id*. ¶¶ 1074-87; Linda L. Lax, of Brinnon, Washington, *id*.

¶¶ 1088-1107; Thurmond Champion, of Cordova, Tennessee, *id*. ¶¶ 1108-25; and Shari Lambert,

of Sparks, Nevada, *id*. ¶¶ 1126-52.

     From January 2004 through May 2005, the 121 Mill Street enterprise sold approximately

10,843 subscriptions to MyFreeMedicine. *Id*. ¶ 1153. Whenever MyFreeMedicine received a

complaint from a consumer that could be attributed to the 121 Mill Street enterprise, the 121 Mill

Street enterprise would dismiss it as untrue and would assure the plaintiffs that it had checked the

recordings and verified that the sale had been conducted consistent with the script.  *Id*. ¶ 1154.  It told MyFreeMedicine that any misrepresentations concerning its product were isolated incidents.  *Id*.  In fact, the misrepresentations to the public were systemic and widespread.  *Id*. ¶ 1155.

The plaintiffs relied on the 121 Mill Street enterprise's misrepresentations as truthful in part because Alpine, and particularly Weaver and Adams, repeatedly assured MyFreeMedicine that they were honest, trustworthy, and sophisticated business people.  *Id*. ¶¶ 1156-57.  Alpine, Weaver, and Adams repeatedly told the plaintiffs that they believed in unwavering honesty, fairness, and integrity, that they believed in acting with humility and respect, and that they brought enthusiasm, commitment, and passion into everything they did.  *Id*. ¶ 1157.  As a result of these misrepresentations, MyFreeMedicine continued to do business with the 121 Mill Street enterprise and spent well over a million dollars in advertising.  *Id*. ¶ 1158.

MyFreeMedicine was essentially destroyed when the misrepresentations to the public became widely reported on the internet and on the news.  *Id*. ¶ 1159.  In 2005, the plaintiffs were sued by the Federal Trade Commission and the attorney general of Arkansas alleging fraud.  *Id*. ¶¶ 1160-61.  MyFreeMedicine was sued by the attorney general of Missouri alleging fraud.  *Id*. ¶ 1163.  On June 6, 2006, the ABC television show Good Morning America featured a consumer segment on the plaintiffs in which it displayed a portion of a telephone call to the 121 Mill Street enterprise which was recorded by an investigator for the Federal Trade Commission and in which misrepresentations were made about the MyFreeMedicine product.  *Id*. ¶ 1166-67.

### III.  Discussion

### A.  Stanek's Motion

Defendant Jeffrey Stanek adopts the arguments made by the other defendants in support of their motions to dismiss, and also contends that the complaint fails to state a claim against him

because the allegations specific to him do not include all of the elements of any of the claims asserted against him.  Defendant Jeffrey Stanek's Motion to Dismiss ("Stanek Motion") (Docket No. 36) at 1-6.  I agree with the latter contention.

Counts One through Four (violation of 18 U.S.C. §§ 1962(c) & 1964(c); "RICO") and Seven (tortious interference with a prospective economic advantage) of the complaint are asserted against Stanek.  Complaint ¶¶ 1179-1224, 1241-49.  The only specific factual allegations concerning Stanek are the following: (1) he was the financial controller at AdvanceTel Direct and was the bookkeeper for "the Enterprise," which is defined as "an association-in-fact that includes Alpine Investors, LP . . . , individual partners at Alpine, managers and executives at the call center . . . , and other employees and managers at the call center and fulfillment centers operated by the multiple corporate entities that at one time or another were headquartered at 121 Mill Street in Auburn, Maine," *id*. at 1-2 & ¶ 247; (2) he "received tens of thousands of dollars by [sic] the Enterprise for his services as book keeper," *id*. ¶ 248; (3) he had knowledge of the bills that the call center sent to MyFreeMedicine and to other clients, *id*. ¶ 249; (4) he was aware that the call center was fraudulently billing MyFreeMedicine and other clients for services that involved misrepresenting MyFreeMedicine and other products, *id*. ¶ 250; his records were used to fraudulently charge MyFreeMedicine and other clients for services that the 121 Mill Street enterprise had not provided, *id*. ¶ 251; he was aware that customer service representatives were encouraged to make "untrue exaggerated and fraudulent claims" to potential customers, encouraged to experiment with prescription and recreational drugs, and closely controlled in their sales activities, *id*. ¶¶ 283-85, 288, 292, 297-300, 302-07, 314; and he was aware that that Vinarol contained sildenafil citrate, *id*. ¶ 414.

In response to Stanek's specific contentions that these allegations fail to state a claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-68, and on the state-law claim of tortious interference, Stanek Motion at 4-6, the plaintiffs' entire argument, so far as I can determine, is that "Defendant Stanek kept the books and mailed fraudulent invoices to clients such as MyFreeMedicine," citing some of the listed paragraphs of the complaint.  Plaintiffs' Consolidated Opposition to the Defendants' Motions to Dismiss ("Opposition") (Docket No. 47) at 12.

But, the complaint does not allege that Stanek mailed anything to anyone; it alleges only that he knew that fraudulent bills were sent to MyFreeMedicine and others and that his records were used to do so.  In order to state a claim that Stanek violated RICO (Counts One through Three), the complaint must allege "(1) conduct, (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *Bessette v. Avco Financial Servs., Inc.*, 230 F.3d 439, 448 (1st Cir. 2000) (citation omitted).  "At a bare minimum, an allegation of RICO liability under 1962(c) must indicate how the defendant used the alleged enterprise to facilitate the fraudulent conduct."  *Id*. at 449 (citation and internal punctuation omitted).  "RICO claims are subject to a heightened pleading standard . . . and require more detailed statements of claim."  *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 456 F.Supp.2d 131, 149 (D. Me. 2006) (citation and internal punctuation omitted).  A "pattern" requires at least two predicate acts of racketeering activity, 18 U.S.C. § 1961(5), and the plaintiff "must demonstrate that the predicates are related, *and* that they amount to or pose a threat of continued criminal activity."  *Id*. (citation and internal punctuation omitted; emphasis in original).  When fraud is the predicate act, as it is here, Opposition at 13 ("Plaintiffs have clearly laid out a long term series of fraudulent activities[.]"), 16 ("The Complaint is sufficient to put the Defendants on notice that they have been accused of

17

multiple acts of mail, financial institution, and wire fraud[.]"), a plaintiff must satisfy the heightened pleading standard of Fed. R. Civ. P. 9(b).  *District 1199P Health & Welfare Plan v. Janssen, L.P.*, 2008 WL 5413105 (D.N.J. Dec. 23, 2008), at *10.

In this complaint, there is simply no factual allegation that Stanek himself engaged in mail fraud, wire fraud, or financial institution fraud or that he approved of such acts of fraud by another alleged member of the enterprise.  The fact that he knew about the alleged fraudulent actions of the customer service representatives does not mean that he approved of such actions in advance.  Simply to allege, in a conclusory fashion, that all of the defendants were engaged in alleged fraudulent acts is not sufficient.  There must be some indication that Stanek either engaged in the predicate acts himself or knew that someone else was going to engage in those acts on behalf of the enterprise of which he was allegedly a part.  *See, e.g., Smith v. Jones, Gregg, Creehan & Gerace, LLP*, 2008 WL 5129916 (W.D.Pa. Dec. 5, 2008), at *1 (there must be a nexus alleged between the particular defendant and the pattern of racketeering activity).

With respect to the alleged RICO conspiracy (Count Four), in order to state a viable claim, a complaint must allege, *inter alia*, that each defendant agreed to commit, or in fact committed, two or more specified predicate acts.  *Feinstein v. Resolution Trust Corp.*, 942 F.2d 34, 41 (1st Cir. 1991).  This complaint makes no such allegation against Stanek.

Similarly, the complaint does not state a claim against Stanek for tortious interference. The plaintiffs have made clear that the prospective economic advantage with which they allege all of the defendants have tortiously interfered is their "prospective economic advantage with qualifying members of the public."  Opposition at 41.  They assert that this claim is "based on the Defendants' fraudulent misrepresentations of the MyFreeMedicine service."  *Id*.  Again, the complaint does not allege that Stanek made any misrepresentations himself, and only that he was

aware of them, not that he ordered, approved, directed, or otherwise caused the misrepresentations to be made.  The elements of such a claim under Maine law are the existence of a valid prospective economic advantage, interference with that advantage through fraud or intimidation, and damages proximately caused by the interference.  *Barnes v. Zappia*, 658 A.2d 1086, 1090 (Me. 1995).  The allegations in the complaint about this claim are conclusory, alleging only that "[a]ll of the Defendants" interfered with the plaintiffs' prospective economic relationship with their customers "by participating in, encouraging, and misrepresenting MyFreeMedicine to callers."  Complaint, ¶ 1246.  There is no allegation in the complaint to the effect that Stanek himself participated in or encouraged any misrepresentation of the plaintiffs to people who called the call center.  The complaint alleges only that he knew this was happening.  That is not enough.

Stanek's motion to dismiss should be granted.

### B.  The DeWolfe Motion

Defendants James N. DeWolfe and Frank G. DeWolfe move to dismiss the complaint against them on the grounds that the elements of fraud are not pled with particularity, as required by Fed. R. Civ. P. 9(b), and that each count asserted against them, Counts One through Four and Count Seven, fails to state a claim upon which relief may be granted.  Motion to Dismiss of Defendants James N. DeWolfe and Frank G. DeWolfe ("DeWolfe Motion") (Docket No. 29) at 1.[2]

They first assert that the complaint makes no allegation of a predicate act of fraud by them directed against the plaintiffs.  *Id*. at 6.  They incorporate by reference "any arguments

---

[2] The page numbered 1 in the DeWolfe Motion is actually page number 2.  The last page of the text of the motion is numbered 21, although it is actually the twenty-second page, and thus exceeds this court's 20-page limit on dispositive motions, Local Rule 7(e).  Local Rule 7(e)'s requirement that leave to exceed the 20-page limit be requested no later than 3 business days in advance of the date for filing the memorandum is not an onerous one.  Such leave should have been requested here by the DeWolfes' prior counsel before filing their motion.

made by any co-defendants in their motions," *id*. at [1], which reference appears to be the only source of any authority for their argument that the predicate acts must have been directed at the plaintiffs in order for the complaint to state a RICO complaint against them.  There is no authority, nor even any explanation of the argument, in their memorandum of law.  *See id*. at 6. They also assert, in conclusory fashion, that any allegations of fraud by them against the plaintiffs, rather than the public, "are, at most, allegations of common law fraud," which the First Circuit does not consider to be predicate acts for purposes of RICO.  *Id*.  They do not identify the allegations in the complaint that they so characterize.

It is possible that this presentation is meant to refer to the causal nexus requirement to which these defendants refer in their reply memorandum filed by successor counsel.  Reply of Defendants James N. DeWolfe and Frank G. DeWolfe to Plaintiffs' Consolidated Opposition to the Defendants' Motions to Dismiss ("DeWolfe Reply") (Docket No. 55) at 1-2.  There, they contend that the plaintiffs have failed to show a direct causal relationship between the injuries they allege and the conduct alleged, depriving them of standing under RICO.  On this point, the plaintiffs contend that the Supreme Court's decision in *Bridge v. Phoenix Bond & Indem. Co.*, 128 S.Ct. 2131 (2008), controls.  Opposition at 24-26.

### 1. *The Allegations in the Complaint*

The complaint makes the following specific relevant allegations about the DeWolfe defendants.  The DeWolfe defendants are brothers.  Complaint ¶ 191.  They established a telemarketing call center that "evolved" into a "sophisticated network of investors, media buyers, business analysts, customer service representatives, trainers, computer experts, shipping and mail supervisors, and other contributors," also characterized as "a broad racketeering network."  *Id*. ¶¶ 50-51, 55.  They initially referred to the business as FD&H Enterprises, LLC, as well as

20

PowerTel.  *Id*. ¶ 55.  The call center became known as AdvanceTel Direct, LLC, but PowerTel and FD&H Enterprises, LLC, were affiliated entities.  *Id*. ¶ 72.  Many of the employees, managers, owners, and executives of Power Tel and FD&H Enterprises became employees of AdvanceTel Direct after PowerTel and FD&H Enterprises were dissolved. *Id*. ¶ 79.  FD&H Enterprises was administratively dissolved by the Maine Secretary of State on October 25, 2005.  *Id*. ¶ 100.

On or about April 10, 2003, James DeWolfe signed an amended application for authority to do business in Maine changing the name of PowerTel Technologies to AdvanceTel Direct, as manager, on behalf of FD&H Enterprises.  *Id*. ¶ 84.  Alpine Investors acquired an ownership interest in the enterprise by paying James and Frank DeWolfe for it, directly or indirectly.  *Id*. ¶¶ 126-27.  Frank DeWolfe regularly screened the calls made by customer service representatives and cultivated an atmosphere of fraud and misrepresentation on the customer service floor.  *Id*. ¶ 196.  He reviewed customer service scripts and approved changes to them. *Id*. ¶ 198.  He authorized new scripts for use before clients approved them.  *Id*. ¶ 199.  He promised results to clients of the enterprise that were unattainable, if customer service representatives followed an approved script verbatim.  *Id*. ¶ 200.  As a result, he encouraged customer service representatives to deviate from approved scripts.  *Id*. ¶ 201.  He encouraged them to misrepresent the products they were discussing with customers in order to make money for the enterprise.  *Id*. ¶ 204.  He knew about the misrepresentations being made about MyFreeMedicine.  *Id*. ¶ 205.  He was designated as the "contact person" between the enterprise and MyFreeMedicine.  *Id*. ¶ 506.

James DeWolfe enforced a system of misrepresenting products and services in order to earn money for the enterprise.  *Id*. ¶ 208.  He was president of PowerTel and AdvanceTelDirect.

*Id.* ¶¶ 213, 215.   He signed a marketing agreement with MyFreeMedicine on behalf of AdvanceTelDirect.  *Id.* ¶ 217.  He developed telephone scripts for MyFreeMedicine.  *Id.* ¶ 219. He routinely requested changes to the MyFreeMedicine script.  *Id.* ¶ 516.  He encouraged customer service representatives to misrepresent products and services and otherwise engage in fraudulent schemes.  *Id.* ¶ 220.  He instilled fear in customer service representatives, and cultivated an atmosphere of lawlessness and drug use within the enterprise.  *Id.* ¶¶ 222-23.  He sold all or some of his ownership interest in the call center to Alpine either directly or indirectly. *Id.* ¶ 224.

James DeWolfe would monitor calls in which customer service representatives were engaged and simultaneously e-mail the representatives to encourage them to make sales, even if that meant misrepresenting products to the public.  *Id.* ¶ 283.  He played a central role in the making of misrepresentations by customer service representatives and, for most of the relevant period, was in charge of the day-to-day operations of the enterprise.  *Id.* ¶ 293.  James DeWolfe told staff and employees that Avacor had Minoxidil in it.  *Id.* ¶ 369.  Frank DeWolfe knew this. *Id.* ¶ 370.  They were both aware that Vinarol contained sildenafil citrate.  *Id.* ¶¶ 410-11.

It was the "brainchild" of James DeWolfe for customer service representatives to claim that the prescription medications sent to customers as a result of MyFreeMedicine's efforts came from the government or through a government program.  *Id.* ¶¶ 492-93.  He worked closely with defendant Adams on Avacor.  *Id.* ¶ 537.

After October 23, 2004, MyFreeMedicine's contact with James and Frank DeWolfe declined.  *Id.* ¶¶ 552, 556.

*2.  Causal Nexus*

The parties attempt to ascribe more import to *dictum* from the Supreme Court's opinion in *Bridge* than that language will bear.  The only matter at issue in that case was the question of whether a person can be injured "by reason of" mail fraud under RICO even if he has not relied on any misrepresentations made by the defendant.  *Bridge*, 128 S.Ct. at 2139.  That is not an issue in this case.  The parties focus on the following "example" from the decision:

> [S]uppose an enterprise that wants to get rid of rival businesses mails misrepresentations about them to their customers and suppliers, but not to the rivals themselves.  If the rival businesses lose money as a result of the misrepresentations, it would certainly seem that they were injured in their business "by reason of" a pattern of mail fraud, even though they never received, and therefore never relied on, the fraudulent mailings. Yet petitioners concede that, on their reading of § 1964(c), the rival businesses would have no cause of action under RICO, . . . even though they were the primary and intended victims of the scheme to defraud.

*Id*.  The Court characterizes this as a "counterintuitive position" lacking textual support, but then concludes that neither this argument nor any other proffered by the petitioners "persuades us to read a first-party reliance requirement into a statute that by its terms suggests none."  *Id.*

The foregoing discussion does not, expressly or *sub silentio*, overrule the long line of cases that interpret RICO to require that the alleged fraudulent conduct be the direct cause of the plaintiff's injury.  Indeed, the *Bridge* opinion specifically distinguishes what is at issue in that case from the RICO causal nexus requirement: "Nor is first-party reliance necessary to ensure that there is a sufficiently direct relationship between the defendant's wrongful conduct and the plaintiff's injury to satisfy the proximate-cause principles articulated in *Holmes* and *Anza*."  128 S.Ct. at 2144.  In *Holmes v. Securities Inv. Protection Corp.*, 503 U.S. 258 (1992), the Supreme Court held that "but for" causation is insufficient to support a RICO claim; there must be proximate cause as well.  *Id*. at 269-70.  In *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451

(2006), the Court, holding that *Holmes* governed a claim that the plaintiff's competitor had knowingly failed to charge its customers sales tax and submitted false tax returns to the state, thereby selling at lower prices than the law-abiding plaintiff, *id.* at 454, said:

> When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries. In the instant case, [where the alleged mail fraud was the filing of false tax returns], the answer is no.

*Id.* at 461.

In *Bridge*, that causal nexus was not in doubt; the plaintiff was the "primary and intended victim[] of the scheme to defraud." 128 S.Ct. at 2139. In the instant case, however, the primary and intended victim of any of the alleged fraudulent activity was the public, not the plaintiffs. Indeed, had the alleged scheme succeeded, the plaintiffs would have benefited at least as well as the defendants. This case is much closer on its facts to *Holmes* and *Anza* than it is to *Bridge.* And, contrary to the plaintiffs' assertion that the Supreme Court in *Bridge* was "clarify[ying]" its opinion in *Anza*, Opposition at 28, the *Bridges* opinion cannot reasonably be read to be intended to do anything other than apply the holdings of *Anza* and *Holmes* to the facts of the case then before it. 128 S.Ct. at 2144.

Nor did *Bridge* overrule in any sense the applicable opinions of the First Circuit on the question of causal nexus in a RICO claim. In *George Lussier Enters., Inc. v. Subaru of New England, Inc.*, 393 F.3d 36 (1st Cir. 2004), the First Circuit held that a plaintiff seeking to recover under Section 1964(c) of RICO must prove that "the defendant's specified acts of racketeering were the proximate cause of the plaintiffs' injuries." *Id.* at 51. "[P]laintiffs may not recover in a civil RICO claim if their injuries are so far removed from the defendant's acts that they are indirect and derivative." *Id.* Earlier, in *Camelio v. American Federation*, 137 F.3d 666 (1st Cir. 1998), the First Circuit applied the same requirement to uphold the dismissal of RICO

claims, alleging that the defendants had deprived the plaintiff of his job and his union membership in violation of RICO by misappropriating union funds and attempting extortion in violation of the Hobbs Act, because neither of the alleged acts directly caused him to lose his job or his union membership. *Id*. at 670.

The same is true of the acts alleged in the instant case. The complaint does allege that all of the defendants had the specific intent to defraud the plaintiffs, Complaint ¶¶ 1191, 1197, but that conclusory allegation is not supported by the specific factual allegations in the complaint, which set forth alleged defrauding of the public and schemes intended to accomplish that end. The First Circuit authority, as well as that from the Supreme Court, compels the conclusion that the plaintiffs' RICO claims against the DeWolfe defendants on Counts One through Three should be dismissed.[3]  *See generally Mendelovitz v. Vosicky*, 40 F.3d 182, 183-84, 185-86 (7th Cir. 1994) (shareholder may not recover on behalf of corporation whose directors allegedly engaged in fraud that damaged third party, allegedly leading to damage to corporation's loss of goodwill and reputation); *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 24 (2d Cir. 1990) (plaintiff was neither target of alleged racketeering enterprise nor competitor or customer of racketeers, so no proximate causation to support a RICO claim).

The RICO conspiracy count, to the extent that it is alleged against the DeWolfe defendants, should also be dismissed as to them.  If no violation of the substance of RICO has been successfully pled, no conspiracy based on the same violations can survive.  *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 21 (1st Cir. 2000).

This resolution of the motion makes it unnecessary to consider the alternative arguments advanced by the DeWolfe defendants.

---

[3] The issue is not raised by the DeWolfe defendants, but a close reading of the allegations in Count Three suggests that it is not asserted against the DeWolfes or Stanek, but only against defendants Alpine, Weaver, Adams, and Maguy, despite the prefatory language that the plaintiffs "complain against all Defendants."  Complaint at 163.

### 3. State-Law Claim (Count Seven)

The elements of the claim of tortious interference with a prospective economic advantage under Maine law are the existence of a valid prospective economic advantage, interference with that advantage through fraud or intimidation, and damages proximately caused by the interference. *Currie v. Industrial Sec., Inc.*, 2007 ME 12, ¶ 31, 915 A.2d 400, 408. The DeWolfe defendants contend that the complaint does not allege with sufficient particularity the fraud or intimidation by either of them that allegedly deprived the plaintiffs of a prospective economic advantage. DeWolfe Motion at 18-20. I agree that the complaint does not allege intimidation by either DeWolfe defendant that deprived the plaintiffs of any business that the plaintiffs reasonably expected to enjoy.

I need not reach the question of whether the complaint adequately alleges fraud resulting in such a deprivation, however. The plaintiffs identify the prospective economic advantage as one "with qualifying members of the public," because "approximately 40 million Americans lack health insurance, and MyFreeMedicine has processed over 100,000 individual prescription requests on behalf of qualified customers." Opposition at 41. They go on to assert that "[a]fter being subjected to state and federal lawsuits and all of their attendant notoriety, Plaintiffs were unable to continue MyFreeMedicine with those members of the public who were qualified." *Id.* at 42. This view of the second element of the tort is too speculative and too expansive.

Any number of businesses might envision millions of potential customers throughout the country. That does not mean that any act by a third party that might conceivably cause some of those potential customers not to purchase the business's products necessarily constitutes tortious interference with the business's prospective economic advantage. In such claims, "[u]sually a specific current or prospective business relationship is involved," *Mangan v. Rumo*, 226

26

F.Supp.2d 250, 252-53 (D. Me. 2002),[4] and here the plaintiffs offer nothing specific.  They offer only speculation that their business would have continued to grow had the defendants not engaged in the conduct complained of in the complaint.  But, an economic downturn, increased advertising of the direct availability of free drugs to those financially qualified by pharmaceutical companies, and any number of other factors could affect the plaintiffs' expressed expectations.

Count Seven, as pled, is simply too speculative to state a claim for tortious interference with a prospective economic advantage or relationship.  The DeWolfes' motion to dismiss this claim should be granted.

## C.  The Remaining Defendants' Motion

The remaining defendants, Alpine Investors, LP, Scott MacCheyne, Graham Weaver, William T. Maguy, William M. Adams, and Brian G. Flaherty (the "Alpine defendants"), move to dismiss all counts of the complaint.  Motion to Dismiss ("Alpine Motion") (Docket No. 35) at 1.

### 1.  RICO Counts

The Alpine defendants challenge the RICO claims asserted against them on many grounds, including the argument pressed by the DeWolfe defendants, that the RICO violations alleged could not be the proximate cause of the plaintiffs' alleged injuries.  *Id*. at 16-21; Reply Memorandum of Defendants Alpine Investors, LP, *et al*. ("Alpine Reply") (Docket No. 53) at 1-3.  For the reasons discussed in section III(B)(2) of this recommended decision, that argument is dispositive of Counts One through Four.   There is no need to address these defendants'

---

[4] *See also, e.g., Emamian v. Rockefeller Univ.*, 2008 WL 4443824 (S.D.N.Y. Sep. 25, 2008), at *7 (New York law); *Aller-Caire, Inc. v. Am. Textile Co.*, 2008 WL 4066976 (N.D. Ill. Aug. 28, 2008), at *2 (Illinois law); *USANA Health Scis., Inc. v. Minkow*, 2008 WL 619287 (D. Utah Mar. 4, 2008), at *7 n.9 (California law); *Tradition Homes, LLC v. Textron Fin. Corp.*, 2007 WL 28309 (M.D.Fla. Jan. 3, 2007), at *1 (Florida law).

remaining challenges to these counts.  They should be dismissed as against the remaining defendants.

### 2. *Count Seven*

The Alpine defendants raise the argument that I found convincing with respect to the DeWolfe defendants and the plaintiffs' claim of tortious interference with a prospective economic advantage.  Alpine Motion at 39-40.  For the reasons already discussed in connection with the DeWolfes' motion, the Alpine defendants are also entitled to dismissal of Count Seven.

### 3. *Count Five (Breach of Contract)*

Count Five is asserted only against defendant Alpine.  Complaint ¶¶ 1226-33.  It contends that Alpine breached the contract between MyFreeMedicine and Alpine that was signed on October 23, 2004, by "failing to disclose the nature and extent of the fraud, misrepresentations and the true racketeering enterprise behind AdvanceTel," "failing to deal with Plaintiffs with openness, full disclosure, and fairness to Plaintiffs," and "failing to disclose the financial circumstances of AdvanceTel."  Complaint ¶¶ 1230-32.  Alpine contends that no "racketeering enterprise" existed, as a matter of law; that the only specific factual assertion by the plaintiffs in support of the allegation that Alpine did not disclose its ownership interest in AdvanceTel is contradicted by another section of the complaint, and that no "obligation of good faith and fair dealing," *id*. ¶ 1229, may be implied in the contract under the circumstances of this case.  Alpine Motion at 38.[5]

The plaintiffs' response addresses only that portion of their breach-of-contract claim that is based on "the parties' self-imposed duty of good faith."  Opposition at 39-40.  This argument

---

[5] While it is true that Maine law does not recognize a cause of action for breach of an implied duty of good faith and fair dealing, with two exceptions not pertinent here, *Curran v. Camden Nat'l Corp.*, 477 F.Supp.2d 247, 261 (D. Me. 2007), and that the complaint alleges the existence of such an implied duty, Complaint ¶ 1229, the plaintiffs' memorandum of law makes clear that they do not rely on this allegation in opposing dismissal of this count. Opposition at 39-40.

may also be deemed to apply to the plaintiffs' claims of breach predicated upon the failure to disclose certain facts, since that could be the result of a failure to deal with the plaintiffs with "openness, full disclosure, and fairness."  Complaint ¶ 1230.  At oral argument, counsel for the plaintiffs contended that Adams signed the alleged contract "for Alpine Investors."  That may well be the case, but the fact remains that the contract language on which the plaintiffs rely, Opposition at 39, binds only defendant Adams, not Alpine.  It states: "Will Adams agrees that he (or, in his absence, his partners at Alpine Investors) will conduct his activities related to the MyFreeMedicine campaign with openness, full disclosure and fairness for all parties involved and that he will never act advance [sic] the interests of AdvanceTel Direct at the expense of the interests of MyFreeMedicine."  Memorandum dated October 23, 2004 from Will Adams/Alpine Investors to Geoff Hasler/My Free Medicine (signed by both individuals), Exhibit A to Complaint, at 2, "Media Funding Agreement" ¶ 3.  Many other sections of this document set forth obligations of Alpine Investors and MyFreeMedicine, but this language clearly describes an obligation of Will Adams as an individual.  Count Five is not asserted against Will Adams.

On the showing made, therefore, Alpine is entitled to dismissal of Count Five.

### 4. Breach of Fiduciary Duty (Count Six)

Count Six is alleged against defendants Alpine, Weaver, Maguy, and Adams, but not defendants MacCheyne and Flaherty.  Complaint at 168.  It alleges that the named defendants "undertook fiduciary obligations to the Plaintiffs" and "encouraged the Plaintiffs to place them in a position of trust and confidence," which imposed on them "an obligation to disclose their knowledge concerning the fraud and misrepresentations undertaken by the Enterprise as outlined above" and "an obligation to disclose their knowledge of AdvanceTel's financial circumstances," which they did not do.  *Id*. ¶¶ 1236-39.

The defendants named in this count contend that the plaintiffs' complaint alleges "no more than the existence of a conventional business deal, not a relationship that would give rise to fiduciary duties."   Alpine Motion at 39 (internal quotation marks omitted).   The plaintiffs respond that the complaint properly alleges that the parties were in disparate positions and that there was a reasonable basis for the plaintiffs to place trust and confidence in the superior party, the named defendants.  Opposition at 40.

Both sides rely on *Bryan R. v. Watchtower Bible & Tract Soc. of New York, Inc*., 1999 ME 144, 738 A.2d 829.  That case establishes that, under Maine law, a fiduciary relationship arises where there is a great disparity of position and influence between two parties, and one party places trust and confidence in the other.  *Id*. ¶ 19, 738 A.2d at 846.  There must be a reasonable basis for the placement of such trust and confidence under the circumstances of the case.  *Id*. ¶ 20, 738 A.2d at 846.  The plaintiffs assert that they have alleged these elements, by relating how the defendants "courted" MyFreeMedicine as an "exclusive" client, "boasted of their many successful business ventures, their advanced . . . degrees . . ., and the capital surpluses that they wanted to invest in MyFreeMedicine."   Opposition at 40.   They include Adams' assertions to the plaintiffs that they had proceeded too cautiously in building MyFreeMedicine and that competitors would copy their business model if they did not agree to the media funding program and exclusive use of the 121 Mill Street call center as proposed by the defendants.  *Id*. at 40-41.

But these allegations cannot reasonably be construed to show that the plaintiffs were so greatly unequal to the defendants in position and influence that they would reasonably place their trust and confidence wholly in the defendants, or even that the defendants were the "superior party" in the relationship.  What is alleged is much closer to a conventional business deal in

30

which one party will frequently be financially stronger or more experienced than the other.  *See Webber Oil Co. v. Murray*, 551 A.2d 1371, 1375 (Me. 1988).  Under Maine law, a fiduciary obligation arises only when "the relations between two persons are such that one is completely dependent and relies upon and necessarily reposes confidence in the other."  *Small v. Nelson*, 137 Me. 178, 182, 16 A.2d 473, 475 (1940).  No reasonable reading of the complaint would allow the inference that this was the relationship between the plaintiffs and the defendants named in Count Six in this case.

The moving defendants are entitled to dismissal of Count Six.

## IV.  Request for Discovery

The plaintiffs request that they be allowed to conduct discovery and amend the complaint "[s]hould the Court conclude that the Complaint has not satisfied the particularity requirements of Fed. R. Civ. P. 9(b) where they apply[.]"  Opposition at 1; *see also id.* at 19-24.  Because my recommendation that the defendants' motions be granted does not rest on this basis, that request is dismissed as moot.

## V.  Conclusion

For the foregoing reasons, I recommend that the defendants' motions to dismiss be **GRANTED**.

## *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within ten (10) days after being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to <u>de novo</u> review by the district court and to appeal the district court's order.*

Dated this 14th day of April, 2009.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge