## UNITED STATES DISTRICT COURT
### DISTRICT OF MAINE

| | | |
|---|---|---|
| *MYFREEMEDICINE.COM LLC,* | ) | |
| | ) | |
| *Plaintiff* | ) | |
| | ) | |
| *v.* | ) | *Civil No. 08-362-B-W* |
| | ) | |
| *ALPINE INVESTORS, et al.,* | ) | |
| | ) | |
| *Defendants* | ) | |

### RECOMMENDED DECISION ON DEFENDANTS' MOTIONS TO DISMISS

The nine defendants herein have filed between them three renewed motions to dismiss the plaintiff's first amended complaint.  The court allowed, Docket No. 82, the plaintiff's First Amended Complaint  to be the operative pleading in this matter, after I had filed my recommended decision that the defendants' previous motions to dismiss be granted, Docket No. 59, but before the court had ruled on the recommended decision. The court then dismissed as moot the previous motions to dismiss and terminated the recommended decision.  Docket No. 82. The motions at issue then followed.  After considering the First Amended Complaint and the defendants' renewed motions to dismiss, I continue to recommend that dismissal be granted, with the exception of a portion of Count Five.

### I.  Applicable Legal Standard

The motions invoke Fed. R. Civ. P. 12(b)(6).  Renewed Motion to Dismiss of Defendants Alpine Investors, LP, et al. ("Alpine Motion") (Docket No. 89) at 1; Motion of Defendants James N. DeWolfe and Frank G. DeWolfe to Dismiss Plaintiffs' First Amended Complaint ("DeWolfe Motion") (Docket No. 90) at 1; Defendant Jeffrey Stanek's Renewed Motion to

Dismiss ("Stanek Motion") (Docket No. 91) at 1.  The DeWolfe Motion also invokes Fed. R. Civ. P. 9(b).  DeWolfe Motion at 1.

> As the Supreme Court has clarified:
>
> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level.

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) (citations omitted).

"In ruling on a motion to dismiss [under Rule 12(b)(6)], a court must accept as true all the factual allegations in the complaint and construe all reasonable inferences in favor of the plaintiffs."  *Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001).  Ordinarily, in weighing a Rule 12(b)(6) motion, "a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment."  *Id.*  "There is, however, a narrow exception for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint."  *Id.* (citation and internal quotation marks omitted).

## II.  Factual Background

The 185-page, 1,322-paragraph First Amended Complaint adds the following potentially relevant factual allegations to those asserted in the initial complaint. Those initial factual allegations are recounted in my first recommended decision, Docket No. 59, and need not be repeated here.

Defendant Alpine Investors, LP ("Alpine"), a private equity firm, manages $300 million and invests in dozens of companies, including some involved in the nutritional supplement,

direct marketing, and mail industries.   First Amended Complaint (Docket No. 77) ¶ 117.
Defendants Will Adams and Graham Weaver exercised control over call center operations on
Alpine's behalf.  *Id*. ¶¶ 133-34.   From January 2004 until October 2004, Alpine encouraged
MyFreeMedicine to use the 121 Mill Street Enterprise ("Enterprise") as its exclusive call center.
*Id*. ¶ 136.  Members of Alpine currently derive revenue from, exercise positions of control over,
and participate in the activities of the Enterprise.  *Id*. ¶ 145.

Defendant Weaver supervised and controlled the media buying strategy led by defendant
William T. Maguy.  *Id*. ¶ 151.  He derived hundreds of thousands, if not millions, of dollars in
income from the Avacor and MyFreeMedicine activity.  *Id*. ¶ 152.  He conceived, directed, and
approved of Enterprise activity and fraud, and participated in Enterprise decision-making by
reviewing and ratifying correspondence between Alpine and MyFreeMedicine.  *Id*. ¶ 153.  He
personally solicited MyFreeMedicine as a client for the Enterprise.  *Id*. ¶ 154.  He spoke to
defendant Adams by interstate telephone on October 23, 2004, at which time he reviewed and
approved the contractual language that defendants Adams and Brian G. Flaherty negotiated with
the plaintiffs, thereby controlling the contractual relationship between MyFreeMedicine and
Alpine.  *Id*. ¶ 155.

The media buying strategy shaped by Maguy was designed to earn interest fees paid by
the plaintiffs to Alpine.  *Id*. ¶¶ 162, 169.  Maguy managed the advertising so as to maximize the
volume of phone calls and the profitability of the activity.  *Id*. ¶ 1220.

Adams controlled and directed all on-site Enterprise activity, and engaged in multiple and
repeated acts of wire fraud directed towards the plaintiffs.  *Id*. ¶ 172.  He regularly signed
contracts on behalf of Alpine, Weaver, Maguy, and other partners at Alpine.  *Id*. ¶ 176.  He
concealed misrepresentations made regarding MyFreeMedicine.  *Id*. ¶ 188.  When the plaintiffs

contacted him by telephone or e-mail regarding reports that the customer service representatives were misrepresenting MyFreeMedicine, he promised the plaintiffs that either no misrepresentation was taking place or that he would correct the problem. *Id.*

Defendant Frank DeWolfe prepared and transmitted weekly invoices to the plaintiffs via interstate mail and wire seeking payment for telephone calls in which the Enterprise misrepresented MyFreeMedicine to customers. *Id.* ¶ 200. On January 30, 2004, he sent an e-mail to the plaintiffs in which he represented that the "script is all set." *Id.* ¶ 203. On March 10, 2004, he sent an e-mail to the plaintiffs in which he requested a discussion of call volumes for the next four weeks and informed the plaintiffs that AdvanceTel Direct was "hoping to see a steady increase in calls as our agents are feeling much better about the calls." *Id.* ¶ 205. This representation was false. *Id.* ¶ 206.

Defendant James DeWolfe controlled the customer service representatives who spoke to MyFreeMedicine customers. *Id.* ¶ 212. He was paid hundreds of thousands, if not millions, of dollars derived from misrepresenting MyFreeMedicine, Avacor, Vinarol, and other products to tens of thousands of telephone customers. *Id.* ¶ 214. He exercised managerial control over or participated in all aspects of the call center. *Id.* ¶ 215.

Defendant Scott MacCheyne managed and executed all daily electronic bank transfers between MyFreeMedicine's customers and its bank account in Kentucky, and contributed fraudulent data to all invoices sent from members of the Enterprise to the plaintiffs. *Id.* ¶ 238.

Defendant Jeffrey Stanek was a shareholder and board member at AdvanceTel Direct. *Id.* ¶ 250. He was the bookkeeper, the bill collector and a senior manager in the Enterprise. *Id.* He received income derived from the Enterprise's pattern of racketeering, participated in racketeering activities, and exercised managerial control over others involved in a pattern of

4

racketeering activities. *Id.* ¶ 251. He assembled and transmitted through interstate mail and wire communications weekly bills in which the Enterprise charged MyFreeMedicine. *Id.* ¶ 253. He participated in and managed the call center's fraudulent billing of MyFreeMedicine. *Id.* ¶ 254.

Defendant Flaherty prepared and mailed or otherwise transmitted through interstate wire communications the fraudulent weekly invoices to the plaintiffs and otherwise oversaw the financial and accounting practices of the Enterprise. *Id.* ¶ 261.

The Enterprise operated a call center that interacted with the public through interstate telephone, wire, banking, and mail transactions. *Id.* ¶ 271. All calls in and out of the call center were regularly monitored by MacCheyne, Frank DeWolfe, James DeWolfe, and Adams. *Id.* ¶ 285. The Enterprise created a powerful incentive for the customer service representatives to close sales by any means, including fraud. *Id.* ¶ 300.

Alpine received money, derived from the sale and promotion of Avacor, which it reinvested in order to fund other fraudulent schemes. *Id.* ¶ 381. "Upselling" and continued billing of customers were regular practices during the Vinarol scheme and continue to be part of Great Falls Marketing's ongoing sales practices. *Id.* ¶ 434. The weight loss promises made to customers by the Enterprise misrepresented the nature of the Vinarol product. *Id.* ¶ 440. All of the Thermal Carb products were marketed as all-natural, even though they once contained the drug ephedrine. *Id.* ¶ 441. The Enterprise routinely misrepresented its consumer transactions to the plaintiffs and directly billed them for fraudulent sales activity. *Id.* ¶ 486.

The customer service representatives said whatever was necessary to sign up customers for MyFreeMedicine and earn a commission to be paid directly by MyFreeMedicine. *Id.* ¶ 493. James DeWolfe conceived the technique of misrepresenting MyFreeMedicine as a government

program and implemented it as part of the official training for customer service representatives, without disclosing the technique to the plaintiffs. *Id.* ¶ 497.

AdvanceTel agreed to process electronically payments from the plaintiffs' customers, deposit the funds in MyFreeMedicine's bank account in Kentucky, and charge the plaintiffs for all order fulfillment and sales reported by AdvanceTel. *Id.* ¶ 507. Defendants Stanek, Flaherty, and Frank DeWolfe transmitted invoices for commissions based on sales volume to the plaintiffs by mail and interstate wire communications on a weekly basis. *Id.* ¶ 511.

From his office in Auburn, Maine, James DeWolfe orchestrated several conference calls occurring in the spring and summer of 2004 between Alpine, Weaver, Maguy, and Adams at the Alpine offices in San Francisco, California, and the plaintiffs. *Id.* ¶ 545. During these calls, James DeWolfe stated that MyFreeMedicine was an "exciting" product, and that Avacor was the call center's most successful product, and suggested a chance for Alpine to emulate the Avacor success with MyFreeMedicine. *Id.*

An August 6, 2004, e-mail from Adams to plaintiff Geoffrey Hasler fraudulently misrepresented Alpine's intentions, as it failed to disclose Alpine's role in the fraudulent promotion and sale of Avacor and the Alpine partners' desire to use MyFreeMedicine as a vehicle for future fraudulent activity, including their desire to reinvest income derived from the Avacor scheme in the fraudulent promotion of MyFreeMedicine. *Id.* ¶ 548. Adams's promise in this e-mail that Alpine investors would be equally loyal to MyFreeMedicine and to AdvanceTel was a misrepresentation because Alpine already owned AdvanceTel and was primarily concerned with making AdvanceTel more profitable, even at the plaintiffs' expense. *Id.* ¶ 550.

In an August 2004 meeting with Hasler, the Alpine partners concealed their role in the widespread fraudulent promotion of Avacor. *Id.* ¶ 553. They also misrepresented their true

intent to facilitate the Enterprise's pattern of racketeering, including their intent to reinvest income derived from a pattern of interstate mail and wire fraud connected to marketing Avacor and other products in furtherance of the Enterprise's efforts to profit at the expense of MyFreeMedicine. *Id.* ¶ 555. Adams, Alpine, and the rest of the Enterprise aggressively pushed MyFreeMedicine to rely on their advice. *Id.* ¶ 559.

Adams and Flaherty attended a meeting on October 23, 2004, at MyFreeMedicine's offices in Kentucky, throughout which Adams was in regular telephone contact with Weaver, seeking Weaver's approval on the essential terms of the contract that was signed that day. *Id.* ¶ 563. Adams was acting on behalf of Alpine and each of its partners when he signed the contract with the plaintiffs. *Id.* ¶ 564.

With every television advertisement Alpine purchased through Quigley Simpson, the defendants profited through the direct interest payments from MyFreeMedicine. *Id.* ¶ 573. In a November 10, 2004, e-mail, the purpose of which was to increase the defendants' ability to escalate the media funding scheme on a weekly basis, Adams notified Hasler that Alpine had set up a bank account designed to service the media-buying campaign. *Id.* ¶¶ 574-75. Adams sent two e-mails from an account at Alpine to the plaintiffs on November 17, 2004, with respect to television advertising under the new agreement. *Id.* ¶ 577. After November 18, 2004, the defendants directly misrepresented their business practices to the plaintiffs after Hasler objected to their practice of deviating from the script. *Id.* ¶¶ 582-84.

An April 20, 2005, e-mail from Adams to Hasler fraudulently misrepresented customer services activity. *Id.* ¶¶ 587-88. Through weekly status updates the defendants concealed the fact that customer service representatives routinely told callers that unlisted medications were covered by MyFreeMedicine and directly misrepresented their employees' efforts to sell

7

enrollments in MyFreeMedicine. *Id.* ¶¶ 590-91. Despite Adams's November 18, 2004, e-mail promise to improve use of a script, the defendants actually encouraged customer service representatives to ignore callers' income and tell them that they qualified for the program in order to close a sale. *Id.* ¶ 596. Injuries to the plaintiffs' customers and potential customers caused by the defendants' misrepresentations ultimately injured the plaintiffs. *Id.* ¶ 609.

The Enterprise, through Frank DeWolfe, Flaherty, and Stanek, defrauded the plaintiffs when they transmitted invoices for sales commissions and order fulfillment activities using the mail, e-mail, telephone wires, and other electronic wire and mail communication devices. *Id.* ¶ 1175. The Enterprise claimed that its customer service representatives earned these commissions and initiated order fulfillment work when in fact they misrepresented the MyFreeMedicine eligibility criteria and program description in response to sales pressure from the defendants. *Id.*

Whenever a customer service representative working at AdvanceTel Direct signed up a caller for MyFreeMedicine, the caller's payment was deposited in the plaintiffs' bank account in Kentucky. *Id.* ¶ 1176. Once a week, the Enterprise sent an invoice to the plaintiffs requesting payment for all enrollments secured by telephone and for all registration packages shipped from the fulfillment center operated by Justin Featherman. *Id.* ¶ 1177. MacCheyne manipulated data regarding the number of calls received for MyFreeMedicine and the disposition of these calls, and provided the data to Flaherty and Stanek, who included them on invoices and transmitted them as charges to the plaintiffs every week by e-mail and facsimile, and through the mail. *Id.* ¶ 1178. When the plaintiffs paid these invoices, the defendants received income derived from acts of mail, wire, and bank fraud. *Id.* ¶ 1179.

On May 27, 2004, Hasler sent an e-mail to Flaherty in which he requested lists of customers who had been billed twice for the service and those who requested a refund, and expressed a desire to resolve the "very large proportion" of calls involving double-billing of customers in May 2004. *Id*. ¶ 1181. Flaherty responded by e-mail indicating that Stanek had provided a list of double-billed customers, confirming that a list of customers requesting credit card refunds had been sent, and promising to look into the issue of double-billing of customers. *Id*. ¶ 1182. Flaherty permitted the fraud directed at MyFreeMedicine and its customers to continue and concealed it from the plaintiffs when he promised to remedy what appeared to be isolated mistakes. *Id*.

On November 30, 2004, Maguy sent an e-mail to the plaintiffs in which he discussed advertising charges and made plans to spend $31,980 for the following week's media expenditures. *Id*. ¶ 1191. These charges were designed to increase the volume of calls, and thereby increase the opportunities for misrepresenting MyFreeMedicine, to increase the interest payments the plaintiffs owed Alpine, and to increase the number of sales commissions and order fulfillment fees for which the plaintiffs were billed on a weekly basis. *Id*. ¶ 1192.

Following a December 14, 2004, e-mail from Hasler to Adams, MyFreeMedicine eventually issued a refund to a complaining customer, while also paying a sales commission and other charges to AdvanceTel Direct, leaving MyFreeMedicine with a net loss due to the Enterprise's misrepresentation of the product. *Id*. ¶¶ 1193-94. The same thing happened in January 2005 with another customer. *Id*. ¶¶ 1197-98. On January 12, 2005, Maguy sent Hasler an e-mail containing a sophisticated economic model, which he represented as an analysis of the "current economics of the business," but which did not reveal the systematic billing of the plaintiffs for fraudulent sales calls or the Enterprise's misrepresentations of the nature of

MyFreeMedicine.  *Id.* ¶¶ 1199-1200.  The model was designed to encourage the plaintiffs to make further investments under the media funding regime and to mask the defendants' pattern of fraudulent activity.  *Id.* ¶ 1200.

Maguy contacted Hasler in January 2005 about payments owed by the plaintiffs.  *Id.* ¶ 1201.  On January 31, 2005, Stanek spoke with Hasler by telephone about MyFreeMedicine's outstanding bill due to AdvanceTel Direct in the amount of $30,658.55, covering invoices that had been e-mailed or transmitted by facsimile to the plaintiffs on a weekly basis between December 20, 2004, and January 18, 2005. *Id.* ¶ 1205.  Included in these invoices were charges for enrolling specific individuals based on misrepresentations made by customer service representatives.  *Id.* ¶¶ 1206, 1208, 1210-11.

MyFreeMedicine rebated, credited, or refunded to disadvantaged members of the public more than $500,000.  *Id.* ¶ 1222.  The plaintiffs did not discover the broad extent of the defendants' fraud until lawsuits were brought in 2005 by government actors and the defendants rapidly closed AdvanceTel Direct and refused to return the plaintiffs' phone calls or to help them gather evidence to defend themselves.  *Id.* ¶ 1223.

In an e-mail on September 18, 2006, Adams told the plaintiffs that he would provide recordings of calls made for MyFreeMedicine by AdvanceTel Direct, but after reviewing the recordings himself with MacCheyne, he refused to provide them.  *Id.* ¶ 1235.  The dissolution of AdvanceTel Direct and the refusal to produce the audio files were intended to shift all responsibility for the defendants' misrepresentations to the plaintiffs.  *Id.* ¶ 1237.  As a result of the misrepresentations, the plaintiffs paid hundreds of thousands of dollars in commissions and other fees to the Enterprise, and incurred expenses for refunds of approximately $500,000 to unqualified customers.  *Id.* ¶ 1238.

Alpine, Weaver, Adams, and Maguy injured the plaintiffs through the interest payments extracted under the media funding scheme, which was made possible by the defendants' derivation of income from the Avacor fraud.  *Id.* ¶ 1282.

On October 23, 2004, the plaintiffs signed a contract that was binding on Alpine, Adams, Maguy, Weaver, and Flaherty.  *Id.* ¶ 1293.  Adams, acting for himself and on behalf of Alpine, Maguy, Weaver, and Flaherty, expressly assumed a duty of good faith and fair dealing, when he promised to conduct all of their activities relating to MyFreeMedicine with openness, full disclosure, and fairness for all parties involved and never to advance the interests of AdvanceTel Direct at the expense of the interests of MyFreeMedicine.  *Id.* ¶ 1300.

Alpine, Adams, Weaver, Maguy, and Flaherty breached their promise to work exclusively on MyFreeMedicine from October 23, 2004, through the end of 2004 by continuing to market Avacor through television advertising, by shipping Avacor from Lewiston and Auburn, Maine, and by running a telemarketing call center and order fulfillment center that earned millions of dollars from the sale and promotion of Avacor during this period.  *Id.* ¶ 1303.

The defendants were aware that customer service representatives answered calls on behalf of MyFreeMedicine and misrepresented MyFreeMedicine to callers.  *Id.* ¶ 1305.  The defendants directly or indirectly shipped or caused to be shipped MyFreeMedicine registration packages to customers who were not qualified, but who agreed to enroll based on misrepresentations made by customer service representatives working at AdvanceTel Direct.  *Id.* ¶ 1306.  The defendants promised the plaintiffs that they would make sure that the customer service representatives accurately stated the MyFreeMedicine eligibility criteria to customers but failed to do so.  *Id.* ¶ 1308.  This failure, as well as the defendants' refusal to cooperate with the

plaintiffs' defense in the federal and state litigation filed against the plaintiffs, breached their duty of good faith and fair dealing. *Id.* ¶¶ 1310-11.

### III.   Discussion

The First Amended Complaint drops the count alleging breach of fiduciary duty that was Count Six in the original complaint.  The remaining six claims are asserted anew in the amended complaint, with the additional facts set forth above.  I will address the motions in the same order as in my initial recommended decision.[1]

### A.  Stanek's Motion

Defendant Jeffrey Stanek again adopts the arguments made by the other defendants in support of their motions to dismiss, and also contends that the amended complaint fails to state a claim against him.  Defendant Jeffrey Stanek's Renewed Motion to Dismiss ("Stanek Motion") (Docket No. 91) at 1-2; *see also* Recommended Decision on Motions to Dismiss ("Recommended Decision") (Docket No. 59) at 15-16.  I continue to agree with the latter contention, even considering the additional facts included in the amended complaint.

Counts One through Four (violation of 18 U.S.C. §§ 1962(a),(b),(c), and (d) & 1964(c) ("RICO")) and Six (tortious interference with prospective economic advantage) of the amended complaint are asserted against Stanek.  The specific factual allegations concerning Stanek added by the amended complaint to those asserted in the original complaint, *see* Recommended Decision at 16, that might bear on these claims are the following:  he received income derived from the Enterprise's pattern of racketeering, participated in racketeering activities, and exercised managerial control of others involved in a pattern of racketeering activities, Amended Complaint ¶ 251; he participated in and managed the call center's fraudulent billing of

---

[1] The caption of my original recommended decision mistakenly listed Geoffrey J. Hasler as a defendant.  He is a plaintiff.

MyFreeMedicine through interstate mail and wire communications on a weekly basis, *id*. ¶ 254; he transmitted invoices for commissions based on sales volume to the plaintiffs by mail and interstate wire communications, *id*. ¶ 511; he defrauded the plaintiffs when he transmitted invoices for sales commissions and order fulfillment activities using the mail, e-mail, telephone wires, and other electronic wire and mail communication devices, *id*. ¶ 1175; he included data manipulated by MacCheyne on invoices transmitted to the plaintiffs, *id*. ¶ 1178; and he spoke with Hasler by telephone on January 31, 2005, about MyFreeMedicine's outstanding bill due to AdvanceTel Direct, *id*. ¶ 1205.

In order to state a claim that Stanek violated RICO (Counts One through Four), the complaint must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Bessette v. Avco Fin. Servs., Inc.*, 230 F.3d 439, 448 (1st Cir. 2000) (citation omitted). "At a bare minimum, an allegation of RICO liability under 1962(c) must indicate how the defendant used the alleged enterprise to facilitate the fraudulent conduct." *Id*. at 449 (citation and internal punctuation omitted).  "RICO claims are subject to a heightened pleading standard . . . and require more detailed statements of claim." *In re Compact Disc Minimum Advertised Price Antitrust Litig*., 456 F.Supp.2d 131, 149 (D. Me. 2006) (citation and internal punctuation omitted).  A "pattern" requires at least two predicate acts of racketeering activity, 18 U.S.C. § 1961(5), and the plaintiff "must demonstrate that the predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *Id*. (citation and internal punctuation omitted; emphasis in original).  *See generally Hemi Group, LLC v. City of New York*, 559 U.S. ____, 2010 WL 246151 (Jan. 25, 2010).[2]

---

[2] This Supreme Court decision was brought to the court's attention by a letter from the attorney for the Alpine defendants.  Docket No. 98.  Unfortunately, that letter also contained argument based on the decision, which was not appropriate.  For that reason, the request of counsel for the plaintiffs, Docket No. 99, that the letter be stricken is **GRANTED**, and the letter is stricken from the record.

The plaintiffs do not respond directly to Stanek's arguments; rather, they have submitted a single consolidated opposition to all three motions to dismiss, Plaintiffs' Consolidated Opposition to the Defendants' Renewed Motions to Dismiss ("Opposition") (Docket No. 92), in which, as Stanek points out, Defendant Jeffrey Stanek's Reply to Plaintiffs' Consolidated Opposition ("Stanek Reply") (Docket No. 96) at 1 & n.1, they refer to Stanek specifically only once, as follows:

> Once the Defendants convinced Mr. Hasler and MyFreeMedicine to trust them, the Defendants systematically misrepresented their activities to the Plaintiffs.   For example, Defendant MacCheyne concealed recordings of misleading sales calls from the Plaintiffs, but then billed the Plaintiffs for these activities (such as the Ronnie Hicks transaction). Defendants Flaherty and Stanek regularly transmitted this information to the Plaintiffs with full knowledge that it was false.

Opposition at 6 (citations omitted).

It is not at all clear what information, false or otherwise, Stanek is alleged to have transmitted to the plaintiffs.  The plaintiffs do not allege that the calls for which they were billed did not take place.  Nor do they allege that Stanek was obliged, legally or otherwise, to inform them when he transmitted bills to them that the calls that were made had all been deliberately misleading, or that some of them had been, or that MacCheyne had not told them that recordings of some misleading sales calls existed.  Nor do the plaintiffs provide any allegation to the effect that Stanek stated, or even implied, to the plaintiffs that the bills were for sales calls made only in strict adherence to the script approved by the plaintiffs.

Even if it were clear, that the first amended complaint alleges that Stanek personally fraudulently billed the plaintiffs, the fact remains that the plaintiffs have not alleged the necessary predicate acts by Stanek.   Generalized, conclusory allegations that all of the defendants acted fraudulently or illegally are not sufficient. *See, e.g., Halpin v. David*, No.

14

4:06cv457-RH/WCS, 2009 WL 1753759 (N.D.Fla. June 22, 2009), at *7; *Progressive Northern Ins. Co. v. Alivio Chiropractic Clinic, Inc.*, No. Civ. 050951 (PAM/RLE), 2006 WL 1072055 (D. Minn. Apr. 21, 2006), at *2. There must be some indication that Stanek either engaged in the predicate acts himself or knew that someone else was going to engage in those acts on behalf of the enterprise of which he was allegedly a part. *See, e.g., Smith v. Jones, Gregg, Creehan & Gerace, LLP*, No. 2:08-cv-365, 2008 WL 5129916 (W.D.Pa. Dec. 5, 2008), at *1 (there must be a nexus alleged between the particular defendant and the pattern of racketeering activity). None of the Stanek-specific allegations in the amended complaint, repeated above, allege any predicate act of racketeering activity.

The same is true of the RICO conspiracy allegation (Count Four). In order to state a viable conspiracy claim against Stanek, the complaint must allege, *inter alia,* that he agreed to commit, or in fact committed, two or more specific predicate acts. *Feinstein v. Resolution Trust Corp.*, 942 F.2d 34, 41 (1st Cir. 1991). The amended complaint makes no such allegation against Stanek.

Stanek is entitled to dismissal of Counts One through Four of the amended complaint.

With respect to Count Six, which alleges tortious interference with a prospective economic advantage, the plaintiffs have incorporated by reference their previous argument on this issue. Opposition at 19. Accordingly, the prospective economic advantage at issue is that which the plaintiffs could have established with customers. *Id*. at 20, Recommended Decision at 18. The elements of such a claim under Maine law are the existence of a valid prospective economic advantage, interference with that advantage through fraud or intimidation, and damages proximately caused by the interference. *Barnes v. Zappia*, 658 A.2d 1086, 1090 (Me. 1995). The allegations in the amended complaint about this claim are conclusory, alleging only

that "[a]ll of the Defendants" interfered with the plaintiffs' prospective economic relationship with their customers "by participating in, encouraging, and misrepresenting MyFreeMedicine to callers, and by misrepresenting their activities to the Plaintiffs, as described above."  Amended Complaint ¶ 1318.  The amended complaint then lists specific misrepresentations allegedly made to existing and prospective customers of MyFreeMedicine, none of which are alleged to have been made by Stanek at any point in the amended complaint.  *Id*.  As was the case before the complaint was amended, there is no allegation in the amended complaint to the effect that Stanek himself participated in or encouraged any misrepresentation of the plaintiffs to people who called in to the call center.

Stanek's motion to dismiss should be granted.

### B.  The DeWolfe Motion

Defendants James and Frank DeWolfe argue that the amended complaint fails to allege facts sufficient to establish the causal nexus required to state a RICO claim against them, that it fails to allege a threat of continuity on their respective parts, that it fails to plead their participation with the necessary particularity, that the RICO claims are time-barred, and that the state-law tortious interference claim is "essentially unchanged" from the original complaint and should be dismissed for the reasons set forth in my earlier recommended decision.  Motion of Defendants James N. DeWolfe and Frank G. DeWolfe to Dismiss Plaintiffs' First Amended Complaint ("DeWolfe Motion") (Docket No. 90).  The RICO counts (Counts One through Four) and the tortious interference count (Count Six) are alleged against these defendants.

The following facts are alleged specifically against James DeWolfe in the amended complaint, additional to those alleged in the original complaint: he controlled the customer service representatives who spoke to MyFreeMedicine customers, First Amended Complaint

16

¶ 212; he exercised managerial control over or participated in all aspects of the call center in its "early days," *id.* ¶ 215; he implemented the technique of misrepresenting MyFreeMedicine as a government program and as part of the official training for customer service representatives, without disclosing it to the plaintiffs, *id.* ¶ 497; and he "orchestrated" several telephone conference calls in 2004 during which he suggested that Alpine emulate the success of Avacor with MyFreeMedicine, *id.* ¶ 545.

The following facts are alleged specifically against Frank DeWolfe in the amended complaint, in addition to those alleged in the original complaint: he prepared and transmitted weekly invoices to the plaintiffs seeking payment for calls in which the Enterprise misrepresented MyFreeMedicine to customers, *id.* ¶ 200, and he made the false representation to the plaintiffs that AdvanceTel Direct was "hoping to see a steady increase in calls as our agents are feeling much better about the calls," *id.* ¶¶ 205-06.

None of these additions requires any change in my analysis of the claims asserted against the DeWolfes in my initial recommended decision. As I said there, Recommended Decision at 23, a long line of cases interprets RICO to require that the alleged fraudulent conduct be the direct cause of the plaintiff's injury. None of the additional facts alleged against either James DeWolfe or Frank DeWolfe, set out above, would support a conclusion that either defendant engaged in fraudulent conduct that directly caused the plaintiffs injury. In addition, to the extent that any fraudulent conduct by either DeWolfe could possibly be inferred from the additional factual allegations, the additional pleading does not meet the pleading standards of Fed. R. Civ. P. 9(b), which is applicable in these circumstances. *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 456 F.Supp.2d 131, 149 (D. Me. 2006). It is not possible to tell from the

amended pleadings exactly what either of these defendants did that was fraudulent or, more important, why that conduct constituted fraud.

James DeWolfe and Frank DeWolfe are entitled to dismissal of Counts One through Four.

With respect to the count alleging tortious interference with an expected economic advantage (Count Six), the added factual allegations bear even less possible relation to that cause of action. For the reasons discussed above with respect to Stanek, these defendants are also entitled to dismissal of Count Six.

### C.  The Alpine Motion

Counts One through Four and Six of the amended complaint are asserted against all of the Alpine defendants. First Amended Complaint ¶¶ 1244-91, 1313-22.  Count Five, alleging breach of contract, is asserted against Alpine, Adams, Maguy, Flaherty, and Weaver.  *Id.* ¶¶ 1292-1312.  The Alpine defendants seek dismissal of all counts.

#### 1.  *The RICO claims*

The factual allegations added by the amended complaint seek to refocus the causal nexus analysis (that is, that the alleged fraudulent activity must be the direct cause of the plaintiff's injury, *see* Recommended Decision at 23-25) from injury to the public caused by the defendants, which resulted in injury to the plaintiffs as well,  to direct injury to the plaintiffs.  Thus, the new allegations include the following:

> o  Adams and Weaver controlled call center operations on Alpine's behalf.  First Amended Complaint ¶¶ 133-34.

> o  Members of Alpine control, participate in, and derive revenue from the call center's activities.  *Id.* ¶ 145,

o   Weaver controlled the media buying strategy that was led by Maguy.  *Id.* ¶ 151.

o   Weaver reviewed and ratified correspondence between Alpine and MyFreeMedicine.  *Id.* ¶ 153.

o   Weaver controlled the contractual relationship between Alpine and MyFreeMedicine by reviewing and approving the language of the contract.  *Id.* ¶ 155.

o   Maguy was instrumental in shaping the media buying strategy to earn interest fees paid by the plaintiffs to Alpine.  *Id.* ¶¶ 162, 169.

o   Maguy managed the advertising so as to maximize the volume of telephone calls.  *Id.* ¶ 1220.

o   Adams concealed misrepresentations made about MyFreeMedicine. *Id.* ¶ 188.

o   Frank DeWolfe prepared and transmitted weekly invoices to the plaintiffs seeking payment for telephone calls in which MyFreeMedicine had been misrepresented to customers.  *Id.* ¶ 200.

o   MacCheyne executed all daily electronic bank transfers between MyFreeMedicine's customers and its bank account, and contributed fraudulent data to all invoices sent from members of the Enterprise to the plaintiffs.  *Id.* ¶ 238.

o   Flaherty prepared and transmitted fraudulent weekly invoices to the plaintiffs and oversaw the financial and accounting practices of the Enterprise.  *Id.* ¶ 261.

o   Adams and MacCheyne monitored calls in and out of the call center.  *Id.* ¶ 285.

o   The Enterprise routinely misrepresented its customer transactions to the plaintiffs and billed them directly for fraudulent sales activity.  *Id.* ¶ 486.

19

o AdvanceTel charged the plaintiffs for all order fulfillment and sales it reported. *Id.* ¶ 507.

o Flaherty transmitted invoices for commissions based on sales volume to the plaintiffs on a weekly basis. *Id.* ¶ 511.

o In an August 6, 2004, e-mail, Adams misrepresented Alpine's intentions to Hasler, by failing to disclose Alpine's role in the fraudulent promotion and sale of Avacor and the Alpine partners' desire to use MyFreeMedicine as a vehicle for fraudulent activity. *Id.* ¶ 548.

o In an August 2004 meeting with Hasler, the Alpine partners concealed their role in the fraudulent promotion of Avacor and misrepresented their intent to reinvest income derived from a pattern of fraud connected to marketing Avacor and other products so that the Enterprise would profit at the expense of MyFreeMedicine. *Id.* ¶ 555.

o Adams was acting on behalf of Alpine and each of its partners when he signed a contract with the plaintiffs on October 23, 2004. *Id.* ¶¶ 563-64.

o Every time Alpine purchased a television advertisement through Quigley Simpson, the defendants obtained direct interest payments from MyFreeMedicine. *Id.* ¶ 573.

o Through Flaherty, the Enterprise defrauded the plaintiffs by transmitting invoices to them for sales commissions and order fulfillment activities that it claimed to have earned when in fact the customer service representatives misrepresented MyFreeMedicine's eligibility criteria and program description to customers. *Id.* ¶ 1175.

o  MacCheyne manipulated data regarding the number of calls received for MyFreeMedicine and the disposition of these calls and provided the data to Flaherty, who included the data on invoices sent to the plaintiffs.  *Id*. ¶ 1178.

o  On November 30, 2004, Maguy informed the plaintiffs of advertising plans that were designed to increase the volume of calls and thereby increase the interest payments that the plaintiffs owed Alpine and increase the sales commissions and order fulfillment fees for which the plaintiffs were billed on a weekly basis.  *Id*. ¶¶ 1191-92.

o  MyFreeMedicine issued refunds to two complaining customers, in December 2004 and January 2005, while also paying sales commissions and other charges to AdvanceTel Direct, leaving it with a net loss due to the Enterprise's misrepresentation of MyFreeMedicine's product.  *Id*. ¶¶ 1193-94, 1197-98.

o  MyFreeMedicine rebated, credited, or refunded more than $500,000 to disadvantaged members of the public.  *Id*. ¶ 1222.

o  Adams expressly assumed a duty of good faith and fair dealing for himself and on behalf of Alpine, Maguy, Weaver, and Flaherty, when he promised on October 23, 2004 to conduct all of their activities relating to MyFreeMedicine with openness, full disclosure, and fairness for all parties involved.  *Id*. ¶ 1300.

o  These defendants breached their promise to work exclusively on MyFreeMedicine from October 23, 2004, through the end of 2004 by continuing to market Avacor. *Id*. ¶ 1303.

- These defendants promised the plaintiffs that they would make sure that the customer service representatives accurately stated the MyFreeMedicine eligibility criteria to customers, but failed to do so.  *Id.* ¶ 1308.

- These defendants' refusal to cooperate with the plaintiffs' defense in the federal and state litigation filed against the plaintiffs breached their duty of good faith and fair dealing.  *Id.* ¶ 1310.

The plaintiffs argue that the defendants "systematically misrepresented their activities to the Plaintiffs," Opposition at 6-7, but do not explain how this misrepresentation directly harmed them.  That direct harm is no more apparent from the "new" facts recited above than it was at the time of my original recommended decision.  The plaintiffs contend that "[a]s a result of the Defendants' assertions that they were trustworthy partners of MyFreeMedicine, the Plaintiffs deposited over $1 million in advertising and interest charges in an Alpine controlled bank account." *Id.* at 7.  Yet, the plaintiffs fail to allege whether all, or any, of this money was lost.  The plaintiffs assert that they "also directly paid the Defendants hundreds of thousands of dollars in call center fees and commissions." *Id.*  But, again, there is no allegation that this resulted directly from the alleged misrepresentations, which the plaintiffs apparently now define as a failure to tell them that some portion of the sales upon which they were charged commissions and fulfillment fees were obtained as a result of misrepresentations to customers.[3]

My earlier discussion of the requirement of direct causation of a plaintiff's damages by the alleged racketeering, or proximate cause, still holds.  Recommended Decision at 23-25.  Even if the plaintiffs' revised pleadings could reasonably be read to allege direct causation, how the

---

[3] The plaintiffs also assert that they "spent thousands of dollars defending themselves in lawsuits brought by the FTC and the Attorneys General of Arkansas and Missouri," Opposition at 7, but there is no sense in which these expenses can possibly be considered to have been directly caused by any misrepresentations made *to the plaintiffs* by the Alpine defendants.  The same is true of any refunds paid by the plaintiffs to dissatisfied customers.

failure to reveal that some portion of the sales upon which the plaintiffs were charged commissions and fees were obtained as a result of misrepresentations to customers constitutes racketeering is not sufficiently alleged in the amended complaint.

To the extent that the plaintiffs rely on the account set up to fund advertising, they do not identify what constitutes the necessary fraud. The plaintiffs do not mention this element of their RICO claims in their memorandum in opposition to the Alpine defendants' motion to dismiss, nor do they describe how the media funding arrangement was part of any pattern of racketeering activity. Therefore, they cannot base any portion of their RICO claims on the funding of advertising.

With respect to the charges for commissions and fees, the only other apparent way in which the plaintiffs allege that they were damaged, the plaintiffs refer to "the additional specific predicate acts of fraud listed in" paragraphs 1175-1211 of the amended complaint.[4] Opposition at 11. From all that appears in the amended complaint, some of the acts included in these paragraphs might have formed part of a fraud directed at the plaintiffs, but in each case there is no allegation of a completed fraudulent act. Thus, the amended complaint alleges that Hasler asked Flaherty for a list of customers who had been billed twice and those who had requested a refund, and that Hasler responded that such lists had been provided. The complaint does not allege that no such lists had in fact been provided or that the defendants did not in fact "remedy"

---

[4] The first of the cited paragraphs provides, in full, as follows: "The 121 Mill Street Enterprise, through Defendants Frank DeWolfe, Brian Flaherty, and Jeffrey Stanek, defrauded the Plaintiffs when they transmitted invoices for sales commissions and order fulfillment activities using the mails, email, telephone wires and other electronic wire and mail communications devices. The Enterprise claimed that the customer service representatives they controlled earned these commissions and initiated order fulfillment work through their calls with MyFreeMedicine customers, when in fact the customer service representatives misrepresented the MyFreeMedicine eligibility criteria and program description in response to sales pressure from the Defendants." First Amended Complaint ¶ 1175. There is no allegation that the sales calls on which the commissions were based did not in fact take place. Indeed, they would have had to have taken place in order for the alleged misrepresentations to have been made to the customers. Nor is there any allegation that the order fulfillment work that generated invoices for fees did not in fact take place. So where did the fraud occur, other than during the contacts with the customers?

the double billing.  First Amended Complaint ¶¶ 1181-84.  Those circumstances might have alleged fraud directed against the plaintiffs rather than against customers; what is present in the amended complaint does not.

Another example of this omission is found in paragraph 1188 of the amended complaint, which asserts: "On November 17, 2004, Randy Bell, an employee at AdvanceTel Direct, sent an email to Plaintiffs in which he confirmed that the Information Technology department headed by Defendant Scott MacCheyne was actively reviewing a MyFreeMedicine sales script.  This was a fraudulent concealment and misrepresentation of the Enterprise's practice of encouraging 'freelancing' by customer service representatives and other deviations from MyFreeMedicine's approved script in order to increase sales at any cost."  Communicating "active review" of a script does not necessarily "conceal" or "misrepresent" the fact that the script is not in actual use or that its use was discouraged.  Nor would this activity, if it could reasonably be deemed to be fraudulent, cause any direct damage to the plaintiffs.  That was a central point of my earlier analysis of this issue in my first recommended decision and remains a shortcoming in the amended complaint.

In addition, some of the cited paragraphs cannot be accepted at face value.  For example, paragraph 1196 provides: "Defendant Flaherty promised to look into the order, which was a direct misrepresentation to the Plaintiffs because it implied that the Enterprise was not systematically lying about MyFreeMedicine, even though the 121 Mill Street Enterprise continued to misrepresent the service."  Flaherty's alleged promise cannot reasonably be read as a "direct misrepresentation" of anything, unless it is also alleged that he did not look into the order and had no intention of doing so when he made the promise.  That promise cannot possibly bear the weight assigned to it by the plaintiffs in this paragraph.

I emphasize that my recommended decision is not based on any lack of particularity in the new allegations of what the plaintiffs characterize as predicate acts of fraud. Opposition at 11. In this regard, the plaintiffs invoke *New England Data Servs., Inc. v. Becher*, 829 F.2d 286 (1st Cir. 1987), to support their request for formal discovery, presumably to be conducted before the current motions to dismiss are ruled upon. *Id*. That case merely makes limited discovery available where a RICO plaintiff demonstrates that detailed information about the alleged predicate acts of fraud is likely to be within the exclusive control of the defendant. 829 F.2d at 290. That is not the issue here.

To the extent that these new factual allegations are offered to show that the defendants directed the relevant misrepresentations directly to the plaintiffs, *see* Opposition at 10-13, I agree with the moving defendants, Alpine Motion at 21, that the other predicate acts alleged in the complaint and the amended complaint, involving other products such as Avacor and Vinarol, are no longer sufficiently "related" to the alleged scheme directed against the plaintiffs by the defendants to be considered as the necessary predicate acts of racketeering under RICO. *See, e.g.*, *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989) (plaintiffs must show that racketeering predicates are related to current alleged scheme), and *Soto-Negrón v. Taber Partners I*, 339 F.3d 35, 38 (1st Cir. 2003) (predicate acts related if they have same or similar purposes, results, participants, victims, or method of commission or otherwise are interrelated by distinguishing characteristics).

I need not address the moving defendants' remaining arguments. They are entitled to dismissal of Counts One through Three of the amended complaint.

With respect to Count Four, the RICO conspiracy count, if no violation of the substance of RICO has been successfully pled, no conspiracy based on the same violations can survive. *Efron Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 21 (1st Cir. 2000).

The Alpine defendants are entitled to dismissal of Counts One through Four of the plaintiffs' amended complaint.

### 2. Breach of Contract

Count Five of the amended complaint alleges breach of contract against defendants Alpine, Adams, Maguy, Weaver, and Flaherty.  Amended Complaint at 180.  In the original complaint this count was asserted only against Alpine, and I recommended its dismissal because the contract language on which the plaintiffs relied described only the obligation of Adams as an individual.  Recommended Decision at 28-29.

The moving defendants discount Count Five as "an effort to find a backdoor through which to fit their allegations that their entire business was destroyed as a result of the alleged actions of the Alpine Defendants."  Alpine Motion at 37.  This argument carries no weight because, whatever the plaintiff's motives, the court may only rule on what has been presented to it, not on the basis of surmised intention.

In support of Count Five, the plaintiffs continue to rely on the arguments made in connection with this count in opposition to the first motion to dismiss, Opposition at 18-19, and add that "each of these Defendants was bound by an express contractual duty to act honestly and to engage in fair dealing with the Plaintiffs, as well as an express obligation to work exclusively with MyFreeMedicine."  *Id*. at 19.  I continue to conclude, as I did in my first recommended decision, that the contract language on which the plaintiffs rely in this regard[5] binds Adams, but

---

[5] That language, the only contract language on which the plaintiffs rely, Opposition at 19, is the following: " If you are in agreement with the terms and direction outlined below, I personally, along with other members of the Alpine

not Alpine. Recommended Decision at 29. The plaintiffs apparently contend that since Maguy and Weaver, along with Adams, "are partners within Defendant Alpine," Adams' promise binding himself also binds all of them. They also contend that it binds Flaherty because he was "the Chief Operating Officer of AdvanceTel in 2004 and 2005, working under Alpine's ownership." Opposition at 18-19.

No authority is cited for this generous invocation of liability-by-association. There simply is no authority under Maine law,[6] which presumably governs this claim, by which an employee may be held personally liable under a contract that binds his employer or, even more tenuously, as here, the owner of his employer, let alone under a contract that binds only a single partner, when that owner is a limited partnership. Flaherty is entitled to dismissal of Count Five.

Turning to Maguy and Weaver, the Alpine defendants contend that the amended complaint does not state a claim against the named individual Alpine partners other than Adams because it does not allege that Adams was "absent" at any relevant time. Alpine Motion at 37 n. 18. That interpretation places too heavy a burden of factual detail on the plaintiffs in pleading what is a general state-law claim, not subject to the enhanced pleading standard applicable to claims of fraud such as those involved in RICO claims. In this regard, where the court must construe all reasonable inferences in favor of the plaintiffs, it is reasonable to construe the allegations in Count Five to include all instances of alleged breach, if any, in which Adams was "absent."

---

team will dedicate ourselves to working exclusively with your business for the remainder of the year [,]" and "Will Adams agrees that he (or, in his absence his partners at Alpine Investors) will conduct his activities related to the My Free Medicine [sic] campaign with openness, full disclosure and fairness for all parties involved and that he will never act [to] advance the interests of AdvanceTel Direct at the expense of the interests of My Free Medicine." E-mail dated October 23, 2004 ("Alleged Contract") (Exh. A to Amended Complaint) at [1] & [2].
[6] The same is true of Kentucky and California law, so far as I can determine, should either be applicable. *See* Amended Complaint ¶¶ 1-3, 6-7, 10.

The Alpine defendants also argue that the contract that they are alleged to have breached covers only media funding, and that any of the alleged breaches "in no way would have deprived [the plaintiffs] of the benefits they reasonably could have expected to receive under the Media Funding Agreement[.]" Alpine Motion at 38. This characterization of the contract at issue is too confined. The document itself states that its purpose is "to outline a general agreement for moving forward with the rapid ramp-up of the My Free Medicine [sic] campaign." Alleged Contract at [1]. Some of the language on which the plaintiffs rely directly follows this sentence in the first paragraph of the contract. *Id.*

The sub-titles in the document read "General Approach," "Media Funding Agreement," "Media Purchases," and "Ramp-up Schedule." *Id.* at [1]-[3]. The remaining language on which the plaintiffs rely appears in the section entitled "Media Funding Agreement," but that language cannot necessarily be construed as applying only to media funding. Indeed, the paragraph in which it appears discusses the use of AdvanceTel Direct as the sole call center for the campaign, a term that is not related at all to media purchasing or the funding of media purchasing.

While the question is a close one, I conclude that Count Five states a claim upon which relief may be granted against Maguy and Weaver, who are alleged, along with Adams, to be partners[7] in Alpine. First Amended Complaint ¶¶ 131, 144.

### 3. *Tortious Interference with a Prospective Economic Advantage*

Count Six of the amended complaint alleges that all of the defendants tortiously interfered with the plaintiffs' prospective economic advantage by making misrepresentations

---

[7] Alpine Investors is alleged to be a limited partnership. Amended Complaint ¶ 3. Under the Uniform Limited Partnership Act, which has been adopted in Maine, Kentucky, and California, *see* Table of Jurisdictions Wherein Act Has Been Adopted (immediately preceding 31 M.R.S.A. § 1301 (Supp. 2009)), neither a limited partner nor a general partner in a limited partnership may bind limited partners in that limited partnership as individuals. *See, e.g.,* 31 M.R.S.A. §§ 1342, 1343, 1352, 1353, 1355. The amended complaint does not specify whether Adams, Maguy, or Weaver is each a general or a limited partner, nor do the moving defendants address this point. I must accordingly assume, for purposes of evaluating the motion to dismiss, that Adams had the legal power to bind his partners in the limited partnership, Maguy and Weaver.

about them to prospective customers.   First Amended Complaint ¶¶ 1313-22.   The Alpine defendants contend that, since Count Six of the amended complaint "remains essentially unchanged from the original Complaint[,]" Alpine Motion at 39, they continue to be entitled to its dismissal for the reasons set forth in my original recommended decision.   The plaintiffs similarly incorporate by reference "their previous argument with respect to the tortious interference claim."   Opposition at 19.

The amended complaint makes three changes in this count.   First, it adds the adjective "qualified" before the word "customers" in what was paragraph 1245 in the original complaint and now is paragraph 1317 in the first amended complaint: "In this manner, a contract or prospective economic relationship existed between MyFreeMedicine and its qualified customers."   Second, it changes the word "contract" to the phrase "prospective economic advantage" and adds the following phrase to the end of the first sentence in what was paragraph 1246 in the original complaint and now is paragraph 1318 in the first amended complaint: "and by misrepresenting their activities to the Plaintiffs, as described above."   The first sentence of that paragraph now reads as follows: "All of the Defendants interfered with this prospective economic advantage by participating in, encouraging, and misrepresenting MyFreeMedicine to callers, and by misrepresenting their activities to the Plaintiffs, as described above."

Finally, a new paragraph has been added immediately after what was paragraph 1246 in the original complaint and is now paragraph 1318 in the first amended complaint.   That paragraph provides: "1319.   Plaintiffs relied on the Defendants' misrepresentations described above."

In my original recommended decision, I concluded that the claim for tortious interference was too speculative to state a claim on which relief could be granted.   Recommended Decision at

26-27.  The additional factual allegations set out above do nothing to change that conclusion. The plaintiffs at the time of the initial motions to dismiss described the prospective economic advantage at issue as one "with qualifying members of the public," *id*. at 26, so the addition of the adjective "qualified" before the word "customers" in the first amended complaint adds nothing to the plaintiffs' presentation of this claim.  I fail to see how the defendants' alleged misrepresentation of the defendants' activities *to the plaintiffs* interfered with the plaintiffs' prospective customer relationships in any way.  The final change, adding an allegation of reliance on the alleged misrepresentations, does not address an element of the tort.  *See* Recommended Decision at 26.

The Alpine defendants are entitled to dismissal of Count Six.

## IV.  Conclusion

For the foregoing reasons, I **STRIKE** the letter that is Docket No. 98 from the record, and I recommend that the Alpine defendants' motion to dismiss (Docket No. 89) be **DENIED** as to Defendants William M. Adams, Graham Weaver, and William T. Maguy only and only as to Count Five, and otherwise **GRANTED**; that the motion of defendant Jeffrey Stanek to dismiss (Docket No. 91) be **GRANTED**; and that the motion of defendants Frank G. DeWolfe and James N. DeWolfe (Docket No. 90) be **GRANTED**.  If the court adopts this recommended decision, remaining active will be the plaintiffs' breach of contract claim against defendants Adams, Maguy, and Weaver.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days after being served with a copy thereof.  A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to <u>de novo</u> review by the district court and to appeal the district court's order.*

Dated this 4th day of March, 2010.

<u>/s/  John H. Rich III</u>
John H. Rich III
United States Magistrate Judge

31