# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| MYFREEMEDICINE.COM, LLC, | ) | |
| and GEOFFREY J. HASLER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CV-08-362-B-W |
| | ) | |
| ALPINE INVESTORS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER AFFIRMING THE MAGISTRATE JUDGE'S
## RECOMMENDED DECISION

In January 2004, MyFreeMedicine, a Kentucky company that sold prescription-assistance services, began using a Maine call center, AdvanceTel Direct (AdvanceTel) as its telemarketing services provider. At the same time, MyFreeMedicine began discussing the promotion of its product with Alpine Investors, LP (Alpine), an AdvanceTel Direct investor. In October 2004, Alpine and MyFreeMedicine entered into an agreement in which Alpine agreed to work exclusively on MyFreeMedicine's media campaign, and MyFreeMedicine agreed to use AdvanceTel exclusively as its call center. During MyFreeMedicine's relationship with AdvanceTel, customers complained about MyFreeMedicine's product. In 2005, the Federal Trade Commission and several state Attorney General Offices launched an investigation into MyFreeMedicine and eventually sued the company for fraud. MyFreeMedicine has now initiated its own suit against Alpine and its partners, and several of the Maine call center's managers and

employers[1] alleging a pattern of mail, wire, and financial institution fraud in violation of the Racketeer Influenced and Corrupt Organization Act (RICO). MyFreeMedicine's Amended Complaint contains six counts: three RICO counts under 18 U.S.C. §§ 1962(c) and 1964(c), a RICO conspiracy count, a breach of contract count, and a tortious interference with prospective advantage count.

On October 1, 2009, the Defendants moved to dismiss Plaintiffs' Amended Complaint. On March 4, 2010, the Magistrate Judge filed his Recommended Decision recommending that the Court grant each motion as to the RICO and tortious interference claims. As for the breach of contract claim, the Magistrate Judge recommended that with the exception of Defendants William M. Adams, Graham Weaver, and William T. Maguy, the motions be granted; he recommended that Mr. Adams, Mr. Weaver and Mr. Maguy's motion on the breach of contract claim be denied. The Plaintiffs and Mr. Adams, Mr. Weaver, and Mr. Maguy objected to the Recommended Decision; the remaining Defendants responded.

After review and consideration of the Recommended Decision, together with the entire record, the Court has made a de novo determination of all matters adjudicated by the Magistrate Judge. The Court affirms the Recommended Decision. The Court agrees that the RICO and tortious interference with prospective economic advantage claims should be dismissed against all Defendants. The Court also agrees that the breach of contract claim should go forward against William M. Adams, Graham Weaver, and William T. Maguy. The Court denies

---

[1] Defendants Graham Weaver, William Maguy, William Adams and Brian Flaherty are alleged to have been both partners in Alpine and executives at AdvanceTel during MyFreeMedicine's involvement with the Maine call center.

William M. Adams, Graham Weaver, and William T. Maguy's motion to dismiss Count Five.

# I. STATEMENT OF FACTS

## A. The Parties

### 1. MyFreeMedicine and Geoffrey Hasler

In 2003, Geoffrey Hasler started MyFreeMedicine.com, LLC, in Kentucky where he resides. *First Am. Complaint* ¶¶ 1-2, 34 (Docket # 77) (*Am. Compl.*). MyFreeMedicine helped low-income individuals without prescription medication insurance obtain medication through Patient Assistance Programs (PAP).[2] *Id.* ¶¶ 15, 33. MyFreeMedicine's services to customers included identifying current PAP forms, assisting with the completion of the forms, and working with the customer, doctors, and pharmaceutical companies to ensure that medications available through PAP were received. *Id.* ¶¶ 36-48. It obtained customers through advertising, 1-800 telephone numbers, direct mail, doctor office referrals, and the Internet. *Id.* ¶ 34.

### 2. Alpine Investor

Alpine Investor, LLC (Alpine) is a limited partnership with a principal place of business in California; Alpine's partners include Graham Weaver, William Adams, and William Maguy.[3] *Id.* ¶¶ 3, 97, 110, 111, 112, 131, 144, 1293, 1294. Alpine is a private equity firm that manages three hundred million dollars and

---

[2] Most U.S. pharmaceutical companies have Patient Assistance Programs (PAP) through which they give free medicine to qualifying low-income individuals who lack prescription medication insurance. *Am. Compl.* ¶ 15.

[3] For reasons explained later, the Court concludes that Brian Flaherty was not an Alpine partner during the time MyFreeMedicine, Alpine, and AdvanceTel were working with one another.

invests in dozens of companies and industries including the nutritional supplement, direct marketing, and mail industries. *Id.* ¶ 117. After investing in a company, Alpine introduces new business strategies to its investment companies to increase profitability. *Id.* ¶ 122.

In 2002, Alpine Alpine acquired an ownership interest in the Maine call center located at 121 Mill Street, Lewiston, Maine, which became known as AdvanceTel Direct, LLC.[4] *Id.* ¶¶ 71, 72, 127. With MyFreeMedicine, Alpine helped develop telephone scripts for AdvanceTel's Maine call center and encouraged MyFreeMedicine to embark on a more expensive television advertising campaign. *Id.* ¶¶ 137-38. During MyFreeMedicine's involvement with AdvanceTel, Mr. Weaver, Mr. Adams, and Mr. Maguy were also involved with AdvanceTel's operations. *Id.* ¶¶ 80, 122, 131, 149, 177.

### 3.    Graham Weaver

Graham Weaver founded Alpine in 2001 and continues to be a partner at Alpine. *Id.* ¶¶ 110, 120. He served as the manager and chairman of the call center when it was named AdvanceTel Direct. *Id.* ¶¶ 149, 150. He approved the contractual language of the October 2004 Media Funding Agreement. *Id.* ¶ 155. He supervised and controlled the media buying strategy of MyFreeMedicine after it

---

[4] Since 1999, the call center located at 121 Mill Street, Lewiston has operated under a variety of names including PowerTel Marketing Group, LLC, PowerTel Marketing Group, Inc., FD&H Enterprises, LLC, AdvanceTel Direct and Great Falls Marketing, LLC. *Am. Compl.* ¶ 55. During the time of MyFreeMedicine's involvement with the call center, it operated under the name AdvanceTel Direct. To avoid unnecessary confusion, the Court generally refers to the Maine call center as AdvanceTel.

began doing business with AdvanceTel and encouraged MyFreeMedicine to invest more money in television advertising strategies.  *Id.* ¶¶ 151, 157.

### 4.     William ("Will") Adams

William Adams is an Alpine partner and was a high level manager of the call center.  *Id.* ¶¶ 111, 172.  He held himself out as the CEO of the call center when it was AdvanceTel Direct and later Great Falls Marketing.  *Id.* ¶¶ 97, 172, 175.  He was responsible for negotiating the terms of the Media Funding Agreement between MyFreeMedicine and Alpine and traveled to MyFreeMedicine's offices in Kentucky to finalize the Media Funding Agreement in October 2004.  *Id.* ¶¶ 185, 562.  Mr. Adams is alleged to have signed the contract on behalf of Alpine and his partners at Alpine including Graham Weaver and Bill Maguy.  *Id.* ¶¶ 564, 1293, 1294.

### 5.     William T. ("Billy") Maguy

William Maguy is an Alpine partner and an advertising specialist.  *Id.* ¶ 112, 159.    Beginning   in   November   2004,   he   had   primary   responsibility   for MyFreeMedicine's television advertising campaign.  *Id.* ¶ 162.  As part of Alpine's media buying strategy for MyFreeMedicine, Mr. Maguy enlisted the services of Quigley  Simpson,  a  Los  Angeles  based  advertising  firm,  and  served  as  an intermediary among the advertising firm, MyFreeMedicine, and the call center.  *Id.* ¶ 164.  He worked closely with Mr. Hasler and Quigley Simpson to purchase television advertising for MyFreeMedicine between October 2004 and the summer of 2005.  *Id.* ¶ 165.  Through Mr. Maguy, Alpine convinced MyFreeMedicine to

spend hundreds of thousands of dollars on television advertising that Alpine arranged. *Id.* ¶ 168.

### 6. Brian G. Flaherty

Brian Flaherty was the Chief Operating Officer (COO) of AdvanceTel Direct and senior member of the call center in 2004 and 2005. *Id.* ¶ 225. As the COO, he was responsible for the day-to-day operations of the call center, and for securing and maintaining clients for the call center. *Id.* ¶¶ 256, 257. He was responsible for shipping MyFreeMedicine information to members of the public, and for mailing weekly invoices to MyFreeMedicine, processing payments from MyFreeMedicine, and overseeing the financial and accounting practices of the call center. *Id.* ¶ 261. He was in Kentucky in October 2004 with Mr. Adams when the Media Funding Agreement between MyFreeMedicine and AdvanceTel Direct was signed. *Id.* ¶ 258.

### 7. Frank and James DeWolfe

Brothers Frank and James DeWolfe cofounded the Maine call center. *Id.* ¶¶ 192, 212. Both oversaw the call center's daily operations. *Id.* ¶¶ 197, 199-201. Frank was the Manger of AdvanceTel Direct, and James served as the President and CEO of AdvanceTel Direct. *Id.* ¶¶ 197, 220, 221. Both are alleged to have encouraged customer service representatives to misrepresent products being sold through the call center. *Id.* ¶¶ 209, 225. Both sold a portion or all of their ownership interest in the call center to Alpine. *Id.* ¶¶ 211, 229.

### 8. Scott MacCheyne

Scott MacCheyne was the IT director at AdvanceTel Direct. *Id.* ¶ 228. He is currently the president and chief information officer of the call center in its current form, Great Falls Marketing, overseeing all the day-to-day responsibilities of the call center. *Id.* ¶¶ 245, 248. During MyFreeMedicine's involvement with the call center, Mr. MacCheyne managed and controlled the call center's electronic activities including all telephone and computer information technology and banking transactions. *Id.* ¶¶ 230, 237, 238. He worked with Mr. Adams and Mr. Weaver, and is alleged to have been aware of the details of schemes undertaken by the call center enterprise. *Id.* ¶¶ 234, 235.

### 9. Jeffrey Stanek

Jeffrey Stanek was the financial controller at AdvanceTel Direct, with book keeping, bill collecting and management responsibilities. *Id.* ¶ 250. Mr. Stanek billed MyFreeMedicine weekly for the call centers services. *Id.* ¶¶ 25.

### B. The Call Center's Alleged Schemes

Before MyFreeMedicine began doing business with AdvanceTel, the call center sold a variety of health care type products including Avacor, which was marketed as an all natural hair replacement, *id.* ¶ 329, Vinarol marketed as a natural herbal formula to increase sexual desire and enhance the sexual experience for men and women, *id.* ¶ 388, Thermal Carb marketed as an all-natural diet tool, dual fat burner, and carbohydrate blocker, *id.* ¶¶ 423-24, and Glutotrin marketed as a drug that cures, mitigates, treats or prevents diabetes. Id. ¶ 479. The Amended Complaint alleges that Avacor and Vinarol contained drugs subject to the Federal

Food and Drug Administration (FDA) approval which the call center had not received, *id.* ¶¶ 348, 397, that Thremal Carb contained a drug that the FDA eventually banned, *id.* ¶¶ 446, 452, and that Glucotrin was not FDA approved. *Id.* ¶ 481. The call center is alleged to have misrepresented both the effectiveness of these products and their contents to members of the public who contacted the call center about them. *Id.* ¶¶ 328-485.

### C. MyFreeMedicine's Business Relationship with AdvanceTel and Alpine

In January 2004, due to the increasing volume of calls it was receiving about its services, MyFreeMedicine began to do business with the 121 Mill Street call center then known as AdvanceTel. *Id.* ¶ 50. On January 14, 2004, the Plaintiffs signed a Marketing Agreement with James DeWolfe acting on behalf of AdvanceTel Direct. *Id.* ¶ 506. MyFreeMedicine hired the call center "to provide telemarketing services." *Id.* ¶ 506. The agreement between MyFreeMedicine and AdvanceTel was substantially the same boilerplate language the call center used with all new clients. *Id.* ¶ 513. AdvanceTel agreed to receive telephone calls generated by MyFreeMedicine's advertising and to enroll qualified callers in the MyFreeMedicine program. *Id.* ¶ 507. AdvanceTel agreed to electronically process payments from customers and deposit the funds in MyFreeMedicine's bank account in Kentucky, and to charge the Plaintiffs for all order fulfillment and sales reported by AdvanceTel. *Id.* ¶ 507.

Throughout the spring and summer of 2004, Mr. Adams and the Alpine partners made repeated overtures to Plaintiffs to persuade MyFreeMedicine to deal

exclusively with AdvanceTel as its call center and fulfillment center, and to embark on an elaborate media buying campaign in which Alpine would loan MyFreeMedicine funds for television advertisements. *Id.* ¶ 546. Alpine proposed a partnership and offered to fund 50% of MyFreeMedicine's media advertising. *Id.* ¶ 551. In August 2004, Mr. Hasler met Mr. Weaver, Mr. Adams, and Mr. Maguy in Alpine's San Francisco office to discuss ways to enhance MyFreeMedicine's business prospects. *Id.* ¶ 552. Negotiations on the marketing agreement between Alpine and the Plaintiffs continued throughout the summer and fall of 2004. *Id.* ¶ 557. The parties finalized the Media Funding Agreement on or about October 23, 3004. *Id.* ¶ 562. On or about this date, Mr. Adams and Mr. Flaherty traveled to MyFreeMedicine's offices in Kentucky, and acting on behalf of Alpine and its individual partners, including Mr. Weaver and Mr. Maguy, Mr. Adams signed the Media Funding Agreement. *Id.* ¶ 562, 564. Pursuant to the terms of the Media Funding Agreement, Alpine agreed to work exclusively on MyFreeMedicine's media campaign, and MyFreeMedicine agreed to use AdvanceTel exclusively, with AdvanceTel Direct performing all point of sales services from its Maine facility. *Id.* ¶¶ 546, 566, 1296-99.

As part of the new media strategy devised by Alpine through the leadership of Mr. Maguy, MyFreeMedicine began to purchase television advertising time through Quigley Simpson. *Id.* ¶ 570. From November 2004 through the summer of 2005, the media advertising campaign continued, and all MyFreeMedicine calls were directed to the call center in Maine. *Id.* ¶ 586.

### D.     The Misrepresentations

The Plaintiffs allege that in order to boost their sales commissions, the Defendants misrepresented their business practices to them, and misrepresented MyFreeMedicine to current and potential customers through any means necessary. *Id.* ¶ 584. Unbeknownst to MyFreeMedicine, customer service representatives at the call center incorrectly quoted the price of MyFreeMedicine, told callers that unlisted medications were covered by MyFreeMedicine, misrepresented that MyFreeMedicine was a government program, withdrew funds from callers' bank accounts and charged their credit cards without authorization, misrepresented the income guidelines for enrolling in MyFreeMedicine, misrepresented the insurance guidelines for MyFreeMedicine, and misrepresented MyFreeMedicine's refund policy. *Id.* ¶¶ 589, 590, 593, 594, 595, 597, 598.

During the sixteen month period from January 2004 through May 2005, the call center sold approximately 10,843 subscriptions of MyFreeMedicine. *Id.* ¶ 1212. During this time, if MyFreeMedicine received a customer complaint attributable to the call center, someone associated with the call center would assure Plaintiffs that it had checked the recordings and verified that the sale was conducted consistent with the sales script. *Id.* ¶ 1215. On several occasions, Mr. Hasler contacted Mr. Flaherty or Mr. Adams to discuss customer complaints including double billing, customer service representative misrepresentations about covered medicines, and other misrepresentations about the MyFreeMedicine product. *Id.* ¶¶ 1181, 1193, 1195. Mr. Hasler was led to believe that the misrepresentations concerning the

MyFreeMedicine product were isolated incidents and he continued to do business with the call center enterprise, spending well over a million dollars in advertising and interest charges payable directly to Alpine through a joint bank account which Alpine alone controlled. *Id.* ¶¶ 1215, 1219.

Members of the public began to complain about MyFreeMedicine to federal and state officials, including the Attorney General of the United States, the Attorney General of Arkansas and Missouri, the Better Business Bureau, and the Federal Trade Commission (FTC). *Id.* ¶ 602. The Plaintiffs' Amended Complaint identifies thirty-eight individuals who, between January 2004 and February 2005, called the call center in response to a MyFreeMedicine advertisement, received incorrect information about MyFreeMedicine from a call center representative, and in response to the misrepresentation, filed a complaint with or contacted the FTC, a state Attorney General's Office, or the Better Business Bureau. *Id.* ¶¶ 610-1174. The Amended Complaint alleges five instances where MyFreeMedicine issued refunds to customers who complained about the misrepresentations. *Id.* ¶¶ 819, 898, 1172, 1194, 1998.

In the summer of 2005, the FTC and Attorney Generals of Arkansas and Missouri brought suit against MyFreeMedicine and Geoff Hasler alleging fraud. *Id.* ¶¶ 603, 1224, 1226, 1227. On June 6, 2006, the ABC television show Good Morning America featured a consumer segment on MyFreeMedicine and Geoff Hasler, which included a FTC recording of a telephone call to the Maine call center. *Id.* ¶ 1230, 1231. A call center representative answered the call on behalf of MyFreeMedicine

and proceeded to misrepresent the MyFreeMedicine product. *Id*. ¶ 1231. As the negative publicity spread, MyFreeMedicine as a business was destroyed. *Id*. ¶ 1221.

### E. Procedural History

On April 14, 2009, the Magistrate Judge issued his first Report and Recommended Decision on the Defendants' Motion to Dismiss recommending that the Plaintiffs' Complaint be dismissed in its entirety. *Recommended Dec. on Mots. to Dismiss* at 31 (Docket # 59) (*First Rec. Dec.*). On May 11, 2009, before this Court ruled on the Recommended Decision, the Plaintiffs moved to amend their complaint. *Mot. to Amend Complaint* (Docket # 63) (*Mot. to Am. Compl.*) On June 30, 2009, Plaintiffs filed their First Amended Complaint. *First Am. Compl.* (Docket # 77) (*Am. Compl.*). On August 11, 2009, this Court entered an order dismissing as moot the Defendants' Motions to Dismiss, terminating the Magistrate Judge's First Recommended Decision, and ordering that the Amended Complaint be the operative pleading. *Minute Entry* (Docket # 82).

On October 1, 2009, the Defendants moved pursuant to Federal Rule of Civil Procedure 12(b)(6) and 9(b) to dismiss the Amended Complaint.[5] *Renewed Motion to Dismiss of Defs.' Alpine Investors, LP, Scott MacCheyne, Graham Weaver, William T. Maguy, William M. Adams, and Brian G. Flaherty* (Docket # 89) (*Alpine's Renewed Mot.*); *Motion of Defs. James N. DeWolfe and Frank G. DeWolfe to Dismiss Pls.' First Am. Compl.* (Docket # 90) (*DeWolfes' Renewed Mot.*); *Jeffrey*

---

[5] The Alpine Defendants and Mr. Stanek moved to dismiss pursuant to Federal Rule of Procedure 12(b)(6) only. *Alpine's Renewed Mot.* at 1; *Stanek's Renewed Mot.* at 1. The DeWolfes moved to dismiss pursuant to Federal Rule of Procedure 12(b)(6) and 9(b). *DeWolfes' Renewed Mot.* at 1.

*Stanek's Renewed Mot. to Dismiss* (Docket # 91) (*Stanek's Renewed Mot.*).[6] The Plaintiffs filed their response on October 22, 2009. *Pls.' Consolidated Opp'n to the Defs.' Renewed Mots. To Dismiss* (Docket # 92) (*Pls.' Opp'n*). The Defendants replied. *Reply Mem. of Defs. James N. DeWolfe and Frank G. DeWolfe in Support of Mot. to Dismiss Pls.' First Am. Compl.* (Docket # 95); *Def. Jeffrey Stanek's Reply to Pls.' Consolidated Opp'n to the Defs.' Renewed Mot. to Dismiss* (Docket # 96); *Reply to Opp'n to Renewed Mot. to Dismiss of Defs. Alpine Investors, LP, Scott MacCheyne, Graham Weaver, William T. Maguy, William M. Adams, and Brian G. Flaherty* (Docket # 97).

On March 16, 2010, after considering the First Amended Complaint and the motions and responses, the Magistrate Judge issued his Recommended Decision in which he "continued to recommend that dismissal be granted, with the exception of a portion of Count five." *Recommended Dec. of Defs.' Mots. to Dismiss* at 1 (Docket # 100) (*Rec. Dec.*). The Magistrate concluded that "Count Five states a claim upon which relief may be granted against Maguy and Weaver, who are alleged, along with Adams, to be partners in Alpine" and "recommended that the Alpine Defendants' motion to dismiss (Docket No. 89) be DENIED as to Defendants William M. Adams, Graham Weaver, and William T. Maguy only and only as to Count Five." *Rec. Dec.* at 28, 30 (footnote omitted). He further recommended that the remainder of the counts be dismissed such that if "the court adopts this

---

[6] The nine Defendants have divided themselves into three groups: 1). Alpine Investors, LP, Scott MacCheyne, Graham Weaver, William Maguy, William Adams, and Brian Flaherty (the Alpine Defendants); 2). James DeWolfe and Frank DeWolfe (the DeWolfe Brothers); and, 3). Jeffrey Stanek.

recommended decision, remaining active will be the plaintiffs' breach of contract claim against defendants Adams, Maguy, and Weaver." *Id.* at 30.

On March 26, 2010, Mr. Adams, Mr. Maguy, and Mr. Weaver objected to the Magistrate's Recommended Decision on Count Five, and the Plaintiffs objected to the Magistrate's Recommended Decision as to the remaining counts. *Obj. of Defs. William M. Adams, William T. Maguy and Graham Weaver to Magistrate's Recommended Dec.* (Docket # 103) (*Adams, Maguy, and Weaver Obj.*); *Pls.' Partial Obj. to Recommended Dec.* (Docket # 104) (*Pls.' Obj.*). Jeffrey Stanek, James DeWolfe, and Frank DeWolfe responded to Plaintiff's partial objection. *Response of Defendants James N. DeWolfe and Frank G. DeWolfe to Pls.' Partial Obj. to Recommended Dec.* (Docket # 105) (*DeWolfe Resp.*); *Def. Jeffrey Stanek's Resp. to Pls.' Partial Obj. to Magistrate's Report and Recommended Dec.* (Docket # 107) (*Stanek Resp.*). On April 12, 2010, the Plaintiffs replied to Mr. Adams, Mr. Maguy and Mr. Weaver's objections. *Pls.' Reply to Objs. of Defs. Adams, Maguy and Weaver to Magistrate's Recommended Dec.* (Docket # 106) (*Pls.' Reply*). On the same day, Alpine, Mr. MacCheyne, Mr. Weaver, Mr. Maguy, Mr. Adams, and Mr. Flaherty replied to the Plaintiffs' objections. *Reply to Pls.' Obj. to Recommended Dec. of Defs. Alpine Investors, LP, Scott MacCheyne, Graham Weaver, William T. Maguy, William M. Adams and Brain G. Flaherty* (Docket # 108) (*Alpine's Reply*).

## II. DISCUSSION

### A. Legal Standard

In ruling on a motion to dismiss, a court is required to "accept as true all the factual allegations in the complaint and construe all reasonable inferences in favor of the plaintiff." *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 41 (1st Cir. 2009) (quoting *Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001)). To survive a motion to dismiss, a plaintiff must allege "sufficient facts to show that he has a plausible entitlement to relief." *Id.* (citing *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)).

## B. Counts I through III: The RICO Claims[7]

### 1. The Amended Complaint

RICO permits "any person injured in his business or property" by a pattern of racketeering activity to sue the racketeer in federal court for treble damages. *New England Data Servs., Inc., v. Becher*, 829 F.2d 286, 288 (1st Cir. 1987); 18 U.S.C. § 1964(c). Plaintiffs' Amended Complaint alleges violations of all four of the activities prohibited in 18 U.S.C. § 1962: receiving income from a pattern of racketeering activity and using it in the operation of an enterprise, § 1962(a) (Count III); acquiring and maintaining control over an enterprise through a pattern of racketeering activity, § 1962(b) (Count II); conducting or participating in a pattern of racketeering activity in the conduct of an enterprise's affairs, § 1962(c) (Count I);

---

[7] Counts I through IV use prefatory language that the Plaintiffs "complain against all Defendants" or "complain against each of the Defendants." *Am. Compl.* at ¶¶ 169, 175, 176, 178. As explained later, despite this language, Count III appears to be asserted only against Defendants Alpine, Mr. Weaver, Mr. Adams and Mr. Maguy. *Id.* ¶ 1283.

and, conspiring to violate these prohibitions on racketeering activity, § 1962(d) (Count IV).[8] *Am. Compl.* ¶¶ 1265, 1266, 1269, 1270, 1283, 1285-1289.

More specifically, MyFreeMedicine alleges that these Defendants "belonged to an association-in-fact" which the Plaintiffs refer to as "the 121 Mill Street Enterprise." *Am. Compl.* ¶ 1254. It says that this association was an "enterprise" within the meaning of the RICO Act and existed for the purpose of defrauding the Plaintiffs and the public. *Id.* ¶ 1254. As part of its scheme to defraud the Plaintiffs and the public, the Plaintiffs claim that the enterprise would sign up as many customers for MyFreeMedicine as possible, bill MyFreeMedicine for enrolling

---

[8] 18 U.S.C. § 1962(a), (b), (c), and (d) states:

> (a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code [18 USCS § 2], to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.

> (b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

> (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

unqualified members of the public, and derive interest payments from a media funding agreement. *Id*. ¶ 1256. The Plaintiffs allege that the schemes constitute long-term racketeering activity and include: charging them for fraudulent sales calls and other fulfillment activity, continually encouraging them to invest in the media funding scheme, continually misrepresenting to them that the customer service representatives were not engaging in fraudulent sales practices, misrepresenting products and services to thousands of members of the public through telephone calls, using an elaborate television advertising strategy to increase the volume of incoming calls to the Maine call center, shipping MyFreeMedicine Registration Packets to unqualified members of the public using the U.S. mails, shipping Avacor to thousands of members of the public using the U.S. mail, and fraudulently misrepresenting Avacor, Vinarol, Thermal Carb, Glucotrin, and MyFreeMedicine. *Am. Compl.* ¶ 1265. The Plaintiffs say that these actions demonstrate a continuous pattern of mail fraud, proscribed at 18 U.S.C. § 1341, wire fraud proscribed at 18 U.S.C. § 1343, and financial institution fraud as defined at 18 U.S.C. § 1344, which constitutes racketeering activity under RICO, 18 U.S.C. § 1961(1). *Id*. ¶¶ 1258, 1265, 1266.

## 2. The Renewed Motions

The Defendants' renewed motions to dismiss present a variety of arguments. First, all three groups of Defendants assert that the Plaintiffs cannot demonstrate a direct causal connection between any of the schemes the enterprise is alleged to have engaged in and the Plaintiffs' injury. Because the Plaintiffs' injuries are

17

indirect and derivative, the Defendants say they have failed to satisfy the RICO standing requirements established by the Supreme Court and applied in the First Circuit. *Stanek's Renewed Mot*. at 2-4; *Alpine's Renewed Mot*. at 7-12; *DeWolfes' Renewed Mot*. at 2-6. Second, all three groups of Defendants argue that the RICO claims fail because Plaintiffs have not demonstrated a "pattern of racketeering activity." Specifically, the health care product schemes and the media funding agreement do not qualify as predicate acts because they are not related or continuous. *Stanek's Renewed Mot*. at 5-6; *Alpine's Renewed Mot*. at 13-26; *DeWolfes' Renewed Mot*. at 6-7. Third, all three groups of Defendants contend that the underlying allegations of fraud and the alleged predicate acts have not been plead with particularity as required under Federal Rule of Civil Procedure 9(b). *Stanek's Renewed Mot*. at 4-5; *Alpine's Renewed Mot*. at 26-34, 36; *DeWolfes' Renewed Mot*. at 8-9. Finally, the Alpine Defendants and DeWolfe brothers allege that the complaint is time barred. *Alpine's Renewed Mot*. at 34; *DeWolfes' Renewed Mot*. at 9.

### 3.     Liability Under RICO

To be liable, a RICO defendant must engage in a pattern of racketeering activity." 18 U.S.C. § 1962(a),(b),(c), & (d). A "pattern of racketeering activity" consists of "at least two acts of racketeering activity" within a ten year period, 18 U.S.C. § 1961(5), often referred to as the "predicate acts" or "predicate crimes." *Miranda v. Ponce Federal Bank*, 948 F.2d 41, 45 (1st Cir. 1991). "Racketeering activity" includes any act indictable under numerous federal criminal provisions,

including mail and wire fraud as those offenses are defined at 18 U.S.C §§ 1341 and 1343.[9]  18 U.S.C. § 1961(1)(B).  To establish the requisite pattern of racketeering activity, a plaintiff "must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity."  *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989) (emphasis in original).  Finally, a RICO claimant must establish a causal relationship between the pattern of racketeering activity and his asserted injury.  *Sedima v. Imrex Co.*, 473 U.S. 479, 496-97 (1985); *see also* 18 U.S.C. § 1964(c) (stating that a plaintiff must allege that he has been "injured in his business or property by reason of" the claimed RICO violation).  In order to satisfy this requirement, a plaintiff must show "some direct relation between the injury asserted and the injurious conduct alleged."  *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992).  This requires a showing of proximate cause; "[o]therwise, plaintiffs may not recover in a civil RICO claim if their injuries are so far removed from the defendant's acts that they are indirect and derivative."  *George Lussier Enters. v. Subaru of New Eng., Inc.*, 393 F.3d 36, 51 (1st Cir. 2004).  The injury must be "caused by the commission of a [section 1961] predicate act," and not just any overt act furthering the RICO conspiracy.  *Miranda*, 948 F.2d at 48.

### 4.    Mr. Stanek

---

[9] To be liable, it is not necessary that a defendant be convicted of the predicate crimes, only that he could be indicted for them.  *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 486-88 (1985); 18 U.S.C. § 1961 (defining racketeering activity as conduct that is "chargeable," "indictable" and "punishable" under certain statutes).  Nor is it necessary that the predicate crimes be the same; they need only be related in purpose and "reflect or threaten" ongoing racketeering activity.  *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 238-39 (1989).

The Magistrate began his discussion by reiterating the factual allegations bearing on the RICO claims against Mr. Stanek that were added to the Amended Complaint:

> [Mr. Stanek] received income derived from the Enterprise's pattern of racketeering, participated in racketeering activities, and exercised managerial control of others involved in a pattern of racketeering activities, *Amended Complaint* ¶ 251; he participated in and managed the call center's fraudulent billing of MyFreeMedicine through interstate mail and wire communications on a weekly basis, *id*. ¶ 254; he transmitted invoices for commissions based on sales volume to the plaintiffs by mail and interstate wire communications, *id*. ¶ 511; he defrauded the plaintiffs when he transmitted invoices for sales commissions and order fulfillment activities using the mail, e-mail, telephone wires, and other electronic wire and mail communication devices, *id*. ¶ 1175; he included data manipulated by MacCheyne on invoices transmitted to the plaintiffs, *id*. ¶ 1178; and he spoke with Hasler by telephone on January 31, 2005, about MyFreeMedicine's outstanding bill due to AdvanceTel Direct, *id*. ¶ 1205.

*Rec. Dec*. at 12-13. The Magistrate Judge concluded that "it is not at all clear what information false or otherwise, Stanek is alleged to have transmitted to the Plaintiffs." *Rec. Dec*. at 14. Even if it were clear from these facts that Mr. Stanek personally fraudulently billed the plaintiffs, the Magistrate Judge concluded that "the plaintiffs have not alleged the necessary predicate acts by Stanek. Generalized, conclusory allegations that all of the defendants acted fraudulently or illegally are not sufficient." *Id*. "There must be some indication that Stanek either engaged in the predicate acts himself or knew that someone else was going to engage in those acts on behalf of the enterprise of which he was allegedly a part. None of the Stanek-specific allegations in the amended complaint . . . allege any predicate act of racketeering activity." *Id*. at 14-15 (citations omitted). The

Magistrate Judge thus concluded that Mr. Stanek was entitled to dismissal of all four RICO counts. *Id*. at 15.

The Plaintiffs object to the Magistrate Judge's conclusion that is it unclear what Mr. Stanek transmitted. To the contrary, they say that the First Amended Complaint "identifies specific invoices [Mr. Stanek] sent, payments he demanded, and fraudulent activity that was included in the invoices he sent." *Pls.' Obj*. at 2-3. They point out that the Amended Complaint "identif[ies] six separate invoices that he transmitted. [Mr.] Stanek sent these invoices to the Plaintiffs between December 20, 2004 and January 18, 2005. They were used to charge the Plaintiffs $30,658.55. These bills charge the Plaintiffs for calls in which the 121 Mill Street Enterprise misrepresented MyFreeMedicine to callers, including Marie Best. . . . When [Ms. Best] called 121 Mill Street customer service representatives made unauthorized withdrawals from her checking account, mailed her a registration package, and Mr. Stanek sent the Plaintiffs a bill, even though Ms. Best never agreed to enroll in MyFreeMedicine." *Pls.' Obj*. at 3 (internal citations omitted). These allegations, the Plaintiffs argue, clarify Mr. Stanek's activities within the enterprise and are sufficient predicate acts of fraud to support a RICO claim. The Plaintiffs also argue that the Court should allow the conspiracy count to proceed. *Id*. at 3-4. "[Mr. Stanek] is alleged to have agreed to conduct and participate in a pattern of racketeering. Mr. Stanek is not required to have known the entire sweep of the Enterprise's activity, or to have known every detail of customer service

activity in order for the Plaintiff to state a claim against him under 18 U.S.C. § 1962(d)." *Id.* (internal citations omitted).

### a. The Court's Analysis

The Court agrees with the Magistrate Judge's conclusion that the Amended Complaint, even with its new allegations, fails to state a claim against Mr. Stanek and that even if the Amended Complaint did allege that Mr. Stanek personally fraudulently billed the Plaintiffs, the Plaintiffs have not alleged the necessary predicate acts by Mr. Stanek. *Rec. Dec.* 12-14.

First, Mr. Stanek's involvement with the call center does not rise to the level of participation as required under 18 U.S.C. §1962(c).[10] The phrase "to conduct or

---

[10]  Count I, 18 U.S.C. § 1962(c), Count II, 18 U.S.C. § 1962(b), Count III, 18 U.S.C. § 1962(a) as alleged against the different Defendants were not separately addressed by the Magistrate Judge in his Second Recommended Decision.  As for Mr. Stanek, the Amended Complaint does not include any allegation he specifically maintained an "interest and control" in the call center as required by 18 U.S.C. § 1962(b) or that he "received" income from the enterprise and used or invested the income in the operation of the enterprise as required by 18 U.S.C. § 1962(a).  *Am. Compl.* ¶¶ 1269, 1270. Although a complaint does not have to contain "detailed factual allegations," Federal Rule of Civil Procedure 8 "demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949 (2009) (quotation marks and citation omitted).  "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do.  Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Id.* (quotation marks and citations omitted).

Furthermore, "'[t]o state a claim under Section 1962(b), the plaintiff must allege 'an acquisition or maintenance injury' separate and apart from the injury suffered as a result of the predicate acts of racketeering").  *In re Tyco Int'l Ltd., Multidistrict Litigation (MDL 1335),* 2007 U.S. Dist. LEXIS 42401, 71 (D.N.H. 2007) (quoting *U.S. Fire Ins. Co. v. United Limousine Serv.,* 303 F. Supp. 2d 432, 450 (S.D.N.Y. 2004)).  The Plaintiffs have failed to allege a distinct injury that resulted from the Defendants' acquisition or maintenance of an interest in or control of any RICO enterprise. The mere recitation of general statutory language without the support of factual allegations, is not enough to withstand a Rule 12(b)(6) motion.  Count II as alleged against all the Defendants is therefore dismissed.

Count III begins by alleging that "the Defendants received income derived from a pattern of racketeering activity, which they directly and indirectly invested in the 121 Mill Street Enterprise," but ends by stating "[w]hen Defendants Alpine, Weaver, Adams and Maguy received income from racketeering activity and invested it in the 121 Mill Street Enterprise and the scheme to defraud MyFreeMedicine, Defendants Alpine, Weaver, Adams and Maguy injured the Plaintiffs in their business and property within the meaning of 18 U.S.C. § 1964(c)." *Am. Compl.* ¶¶ 1273, 1283.  This Count appears to have been asserted against Alpine, Mr. Weaver, Mr. Adams and Mr. Maguy only.

participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity" found in section 1962(c) has been thoroughly analyzed by the Supreme Court. In *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993), the Supreme Court held that to be liable under section 1962(c) "one must participate in the operation or management of the enterprise itself." In *Reves*, the trial court ruled that

> Plaintiffs have failed to show anything more than that the accountants reviewed a series of completed transactions, and certified the Co-Op's records as fairly portraying its financial status as of a date three or four months preceding the meetings of the directors and the shareholders at which they presented their reports. We do not hesitate to declare that such activities fail to satisfy the degree of management required by [*Bennett v. Berg*, 710 F.2d 1361, 1365 (8th Cir. 1983)].

---

However, even if Count III of the Amended Complaint is interpreted to include all Defendants, it is deficient for the following reasons. The First Circuit has adopted the so-called "investment use rule," under which a plaintiff seeking to recover for a violation of § 1962(a) must allege a specific injury caused by the defendant's use or investment of racketeering proceeds. *See Compagnie De Reassurance D'Ile de France v. New England Reinsurance Corp.*, 57 F.3d 56, 91 (1st Cir. 1995); *System Management, Inc. v. Loiselle*, 91 F. Supp. 2d 401, 416 (D. Mass 2000); *Trustees of Boston Univ. v. ASM Communications, Inc.*, 33 F. Supp. 2d 66, 73 n.7 (D. Mass. 1998). This rule follows from the statutory requirement that a plaintiff has standing to bring a civil RICO claim only if he or she can establish an injury to his or her "business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). Accordingly, to recover based on a defendant's violation of § 1962(a), a plaintiff must show that his or her injury was caused by the defendant's use or investment of racketeering proceeds. *See Compagnie De Reassurance*, 57 F.3d at 91 (citing 18 U.S.C. §§ 1962(a), 1964(c)). Because this "use or investment injury" must be distinct from any injury caused by the predicate acts of racketeering, a plaintiff cannot comply with the "investment use rule" simply by "repeating the crux of [his or her] allegations in regard to the pattern of racketeering." *Id.* at 91-92 (quoting *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1188 (3d Cir. 1993)) (alterations added and internal quotation marks omitted).

Here, the Amended Complaint does not allege that any funds purportedly invested by the Defendants in the call center enterprise were the proceeds of racketeering activities. Second, even assuming that the Plaintiffs could surmount this first obstacle, many courts have concluded that the mere reinvestment of racketeering proceeds in a corporate enterprise with the result that the enterprise continues to engage in the predicate acts of racketeering, is insufficient to give rise to a "use or investment injury" that is distinct from the harm caused by the predicate acts. *See, e.g., Fogie v. THORN Americas, Inc.*, 190 F.3d 889, 896 (8th Cir. 1999); *Lightning Lube*, 4 F.3d at 1188-89; *Update Traffic Sys., Inc. v. Gould*, 857 F. Supp. 274, 282-83 (E.D.N.Y. 1994); *Gelb v. American Tel. & Tel. Co.*, 813 F. Supp. 1022, 1024-25 (S.D.N.Y. 1993). The Plaintiffs have not alleged that the Defendants' use or investment of racketeering proceeds caused them a specific injury. The Court must dismiss Count III against all Defendants.

507 U.S. at 176. The Supreme Court evaluated the phrase "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs" from 18 U.S.C. § 1962(c) and noted that "in the context of the phrase 'to conduct . . . [an] enterprise's affairs,' the word [conduct] indicates some degree of direction." *Id.* at 178. As for the word "participate" the Court determined that Congress intended the word to have its common understanding "to take part in." *Id.* at 179. The Court continued

> Once we understand the word 'conduct' to require some degree of direction and the word 'participate' to require some part in that direction, the meaning of § 1962(c) comes into focus. In order to 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs. Of course, the word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, . . . but *some* part in directing the enterprise's affairs is required.

*Id.* The legislative history of RICO confirms what the Court deduced from the language of section 1962(c) - - "that one is not liable under that provision unless one has participated in the operation or management of the enterprise itself." *Id.* at 183. In this case, Congress did not intend to extend RICO liability under section 1962(c) beyond those who participate in the operation or management of an enterprise through a pattern of racketeering activity. *Id.* at 184. The degree of Mr. Stanek's involvement in the enterprise is similar to that of the defendants in *Reves*; Mr. Stanek is alleged to have assembled and transmitted invoices. Such participation does not have "an element of direction" of the enterprise's affairs as required by *Reves. United States v. Cinanci*, 378 F.3d 71, 94 (1st Cir. 2004). The assembly and transmittal of invoices to MyFreeMedicine do not demonstrate that

Mr. Stanek participated in the operation or management to such a degree that he should be liable under section 1962(c).

In its objection, MyFreeMedicine argues that Mr. Stanek was a "knowing participant of the Enterprise's activity." *Pls.' Obj.* at 3. For support, MyFreeMedicine cites two paragraphs of its Amended Complaint:

> 253. As Financial Controller, Defendant Jeffrey Stanek assembled and transmitted through interstate mail and wire communications, weekly bills from the call center in which the Enterprise charged MyFreeMedicine, as well as other clients.

> 254. Defendant Jeffery Stanek participated and managed the call center's fraudulently billing of MyFreeMedicine and other clients for service that involved misrepresenting MyFreeMedicine and other products, and in which the call center charged MyFreeMedicine for services that were not provided.

*Amend. Compl.* ¶¶ 253, 254. These paragraphs only demonstrate Mr. Stanek's willingness to assemble and transmit invoices that were manipulated by someone other than himself or that contained charges incurred as a result of call center customer service representatives misrepresenting MyFreeMedicine. They do not demonstrate that Mr. Stanek knew about, participated in, or encouraged the manipulation of the invoices or that he knew about, participated in, or encouraged the misrepresentation of the MyFreeMedicine product.

The Court also agrees with the Magistrate Judge's conclusion that "[n]one of the Stanek-specific allegations in the amended complaint . . . allege any predicate act of racketeering activity." *Rec. Dec.* at 15. The Plaintiffs have not alleged that Mr. Stanek was involved in any of the other health care product schemes, thus the only possible scheme to which Mr. Stanek can be connected is the scheme to defraud

MyFreeMedicine.  This alone is insufficient to satisfy the pattern of racketeering element.  *Feinstein v. Resolution Trust Corp.*, 942 F.2d 34, 41 (1st Cir. 1991).  The Court must dismiss Count I of the Amended Complaint as alleged against Mr. Stanek.

### 5. Alpine, Mr. MacCheyne, Mr. Weaver, Mr. Maguy, Mr. Adams and Mr. Flaherty

Turning to Count I as alleged against Alpine, Mr. MacCheyne, Mr. Weaver, Mr. Maguy, Mr. Adams, and Mr. Flaherty (the Alpine Defendants), the Magistrate Judge noted that the "factual allegations added by the amended complaint seek to refocus the causal nexus analysis . . .  from injury to the public caused by the defendants, which resulted in injury to the plaintiffs as well, to direct injury to the plaintiffs." *Id.* at 18.  The new allegations include

o Adams and Weaver controlled call center operations on Alpine's behalf.  *First Amended Complaint* ¶¶ 133-34.

o Members of Alpine control, participate in, and derive revenue from the call center's activities.  *Id.* ¶ 145.

o Weaver controlled the media buying strategy that was led by Maguy.  *Id.* ¶ 151.

o Weaver reviewed and ratified correspondence between Alpine and MyFreeMedicine.  *Id.* ¶ 153.

o Weaver controlled the contractual relationship between Alpine and MyFreeMedicine by reviewing and approving the language of the contract.  *Id.* ¶ 155.

o Maguy was instrumental in shaping the media buying strategy to earn interest fees paid by the plaintiffs to Alpine.  *Id.* ¶¶ 162, 169.

o Maguy managed the advertising so as to maximize the volume of telephone calls.  *Id.* ¶ 1220.

o Adams concealed misrepresentations made about MyFreeMedicine. *Id.* ¶ 188.

o Frank DeWolfe prepared and transmitted weekly invoices to the plaintiffs seeking payment for telephone calls in which MyFreeMedicine had been misrepresented to customers. *Id.* ¶ 200.

o MacCheyne executed all daily electronic bank transfers between MyFreeMedicine's customers and its bank account, and contributed fraudulent data to all invoices sent from members of the Enterprise to the plaintiffs. *Id.* ¶ 238.

o Flaherty prepared and transmitted fraudulent weekly invoices to the plaintiffs and oversaw the financial and accounting practices of the Enterprise. *Id.* ¶ 261.

o Adams and MacCheyne monitored calls in and out of the call center. *Id.* ¶ 285.

o The Enterprise routinely misrepresented its customer transactions to the plaintiffs and billed them directly for fraudulent sales activity. *Id.* ¶ 486.

o AdvanceTel charged the plaintiffs for all order fulfillment and sales it reported. *Id.* ¶ 507.

o Flaherty transmitted invoices for commissions based on sales volume to the plaintiffs on a weekly basis. *Id.* ¶ 511.

o In an August 6, 2004, e-mail, Adams misrepresented Alpine's intentions to Hasler, by failing to disclose Alpine's role in the fraudulent promotion and sale of Avacor and the Alpine partners' desire to use MyFreeMedicine as a vehicle for fraudulent activity. *Id.* ¶ 548.

o In an August 2004 meeting with Hasler, the Alpine partners concealed their role in the fraudulent promotion of Avacor and misrepresented their intent to reinvest income derived from a pattern of fraud connected to marketing Avacor and other products so that the Enterprise would profit at the expense of MyFreeMedicine. *Id.* ¶ 555.

o Adams was acting on behalf of Alpine and each of its partners when he signed a contract with the plaintiffs on October 23, 2004. *Id*. ¶¶ 563-64.

o Every time Alpine purchased a television advertisement through Quigley Simpson, the defendants obtained direct interest payments from MyFreeMedicine. *Id*. ¶ 573.

o Through Flaherty, the Enterprise defrauded the plaintiffs by transmitting invoices to them for sales commissions and order fulfillment activities that it claimed to have earned when in fact the customer service representatives misrepresented MyFreeMedicine's eligibility criteria and program description to customers. *Id*. ¶ 1175.

o MacCheyne manipulated data regarding the number of calls received for MyFreeMedicine and the disposition of these calls and provided the data to Flaherty, who included the data on invoices sent to the plaintiffs. *Id*. ¶ 1178.

o On November 30, 2004, Maguy informed the plaintiffs of advertising plans that were designed to increase the volume of calls and thereby increase the interest payments that the plaintiffs owed Alpine and increase the sales commissions and order fulfillment fees for which the plaintiffs were billed on a weekly basis. *Id*. ¶¶ 1191-92.

o MyFreeMedicine issued refunds to two complaining customers, in December 2004 and January 2005, while also paying sales commissions and other charges to AdvanceTel Direct, leaving it with a net loss due to the Enterprise's misrepresentation of MyFreeMedicine's product. *Id*. ¶¶ 1193-94, 1197-98.

o MyFreeMedicine rebated, credited, or refunded more than $500,000 to disadvantaged members of the public. *Id*. ¶ 1222.

o Adams expressly assumed a duty of good faith and fair dealing for himself and on behalf of Alpine, Maguy, Weaver, and Flaherty, when he promised on October 23, 2004 to conduct all of their activities relating to MyFreeMedicine with openness, full disclosure, and fairness for all parties involved. *Id*. ¶ 1300.

o These defendants breached their promise to work exclusively on MyFreeMedicine from October 23, 2004, through the end of 2004 by continuing to market Avacor. *Id*. ¶ 1303.

o These defendants promised the plaintiffs that they would make sure that the customer service representatives accurately stated the MyFreeMedicine eligibility criteria to customers, but failed to do so. *Id.* ¶ 1308.

o These defendants' refusal to cooperate with the plaintiffs' defense in the federal and state litigation filed against the plaintiffs breached their duty of good faith and fair dealing. *Id.* ¶ 1310.

*Rec. Dec.* 18-22.

The Magistrate Judge's Recommended Decision focuses on the Plaintiffs' failure to allege fraudulent conduct that has directly injured the Plaintiffs, and the failure to allege a pattern of racketeering. The Magistrate Judge points out that "direct harm" to the Plaintiffs from the Defendants "systematic misrepresentations" "is no more apparent from the 'new' facts recited above than it was at the time of [his] original recommended decision." *Id.* at 22. He reiterates that "the requirement of direct causation of a plaintiff's damages by the alleged racketeering, or proximate cause, still holds." *Id.* at 22. As for the pattern of racketeering requirement, the Magistrate Judge concluded that the schemes involving the other health care related products were not "sufficiently 'related' to the alleged scheme directed against the plaintiffs by the defendants to be considered as the necessary predicate acts of racketeering under RICO." *Id.* at 25. In addition, the Plaintiffs have not "describe[d] how the media funding arrangement was part of any pattern of racketeering activity." *Id.* at 23. Therefore, the Plaintiffs "cannot base any portion of their RICO claims on the funding of advertising." *Id.* at 23.

The Plaintiffs object to the Magistrate Judge's "conclusion that they fail to explain how the Alpine Defendants' misrepresentations harmed them." *Pls.' Obj.* at

10.  The Plaintiffs reiterate that the Alpine Defendants sought the Plaintiffs' trust and then arranged for a joint bank account and began the media funding scheme. *Id*. at 11.  "The media funding scheme became a key component of the scheme to defraud MyFreeMedicine. . . . [T]he media funding scheme [was] designed to earn interest payments for Alpine, but it also channeled more telephone calls to the Enterprise, thus increasing the opportunity for customer service representatives to misrepresent MyFreeMedicine."  *Id*. at 11.  The Plaintiffs also argue that when all reasonable inferences are drawn in their favor, "they have alleged that the money in the joint bank account was indeed lost to the Defendants."  *Id*. at 12.  "The plaintiffs deposited over $1 million in advertising and interest charges in an Alpine controlled back account . . . This money far exceeds the amount *lost* by individual customers."  *Id*. at 12 (citation omitted).  Additional injury includes the hundreds of thousands of dollars in commission and fees that the Plaintiffs paid out that they would not have paid had they known that the Defendants were misrepresenting their product to the public and misrepresenting the call centers' operations to the Plaintiffs.  *Id*. at 13.  The Plaintiffs expressed concern that there was no mention of the Good Morning America segment in the Second Recommended Decision.  *Id*. at 14.

The Plaintiffs also take issue with the Magistrate Judge's analysis of the predicate acts requirement of a RICO claim.  *Id*. at 15-16.  "The Second Recommendation conducts only part of the analysis required for a pattern, and fails to explain how the allegations with respect to the scheme to defraud MyFreeMedicine, including the media funding arrangement, are no longer

sufficiently 'related' to the Avacor, Vinarol, and other schemes perpetrated by the Enterprise." *Id.* at 15 (citation omitted). The Plaintiffs argue that they have met the relatedness prong of the pattern element because the fraud directed at MyFreeMedicine and the call center's other schemes all "involved a call center located at 121 Mill Street in Auburn, Maine, the use of television advertising to direct callers to the call center, misrepresentation of products to consumers, and resulted in lawsuits being filed against clients of the Enterprise." *Id.* at 15.

### a.     The Court's Analysis: Standing

Section 1964(c) imposes a standing requirement under which a plaintiff seeking civil remedies for violation of § 1962(c) must establish that the defendant's racketeering activity caused injury to the plaintiff's business or property. *See* 18 U.S.C. § 1964(c); *Sedima*, 473 U.S. at 495-97; *Camelio v. Am. Fed'n*, 137 F.3d 666, 669-70 (1st Cir. 1998). More particularly, a plaintiff's standing to sue depends upon a finding that at least one of the defendant's predicate acts of racketeering was the proximate cause, as well as the but-for or factual cause, of the plaintiff's injury. *See Holmes*, 503 U.S. at 268, 276; *see, e.g., George Lussier Enters.*, 393 F.3d at 51 ("Section 1964(c) [of the RICO Act] requires that the defendant's specified acts of racketeering were the proximate cause of the plaintiffs' injuries.") (citing *Holmes*, 503 U.S. at 268)); *Camelio*, 137 F.3d at 670. The Supreme Court has indicated that "some direct relationship between the injury asserted and the injurious conduct alleged" is required to show proximate causation; if the connection is too remote, the

standing requirement is not satisfied. *See Holmes*, 503 U.S. at 268-69, 271-74; *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 456-61 (2006).

The Court agrees with the Magistrate Judge's conclusion that despite the new section in the Amended Complaint entitled "Direct Misrepresentations and Financial Costs to the Plaintiffs", *Am. Compl.* ¶¶ 1174-1243, they still have not demonstrated the proximate cause requirement of a RICO claim. To begin, the inclusion of paragraphs with the words "proximate result" is insufficient to remedy the Amended Complaint's earlier deficiencies. See *In re Am. Express Co. S'holder Litig.*, 39 F.3d 395, 400 n.3 (2nd Cir. 1994)(stating that "conclusory allegations of the legal status of the defendant's acts need not be accepted as true for the purposes of ruling on a motion to dismiss"). In addition, many of the alleged damages remain speculative. For example, the Plaintiffs provide no basis for the $500,000 figure they allege to have paid out in refunds. The Plaintiffs' pleading provides only five instances in which it issued refunds. *Id.* ¶¶ 819, 868, 1172, 1194, 1198. In the first two instances the refund amount was $195, in the next instance the amount was $199.95, and in last two instances no refund amount was provided. These five allegations do not even come close to the $500,000 alleged in the Amended Complaint. "If any proposition under RICO is well-established, it is that a RICO damages claim may not be based on mere speculation." *Circiello v. Alfano*, 612 F. Supp. 2d 111, 114 (D. Mass. 2009) (citing cases). In addition, the injury to MyFreeMedicine for having to defend itself in several legal actions was caused only because the alleged scheme the call center was perpetrating on the public was

exposed and thus failed. These injuries were not the "preconceived purpose" or the "specifically-intended consequence" of the Defendants' alleged racketeering. *In re Am. Express Co. S'holder Litig.*, 39 F.3d at 400. Therefore, any harm to MyFreeMedicine was neither the necessary result nor the foreseeable consequence of the scheme. *Id.*

### b. The Court's Analysis: Pattern of Racketeering Activity

In addition to failing to meet RICO's proximate cause requirement, the Plaintiffs have failed to demonstrate "a pattern of racketeering activity." To satisfy this element, the Plaintiff must demonstrate at least two acts of racketeering activity,[11] 18 U.S.C. § 1961(5), and "must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc.*, 492 U.S. at 239 (emphasis in original).

The Magistrate Judge concluded that "the other predicate acts alleged in the complaint and the amended complaint, involving other products such as Avacor and Vinarol, are no longer sufficiently 'related' to the alleged scheme directed against the plaintiffs by the defendants to be considered as the necessary predicate acts of racketeering under RICO." *Rec. Dec.* at 25. "To the extent that the plaintiffs rely on the account set up to fund advertising [as a predicate act]," they do not "describe

---

[11] RICO is not aimed at a single narrow criminal episode, "even if that single episode involves behavior that amounts to several crimes (for example, several unlawful mailings)." *Apparel Art Int'l., Inc. v. Jacobson*, 967 F.2d 720, 723 (1st Cir. 1992); *see also Fujisawa Pharmaceutical Co., Ltd. v. Kapoor*, 115 F.3d 1332, 1338 (7th Cir. 1997) (noting that if successive frauds "were installments in the sale of [a] company, the requirement of a pattern would probably not have been satisfied because the reality would have been that there was only a single fraud").

how the media funding arrangement was part of any pattern of racketeering activity." *Rec. Dec.* at 23.

Plaintiffs object to the Magistrate Judge's handling of the pattern element. *Pls.' Obj.* at 15. They complain that the Magistrate Judge "failed to apply the criteria for relatedness, or to explain why it concludes that none of the various schemes share 'distinguishing characteristics'" and did not address the continuity prong at all. *Id.* at 15.

### i.    Relatedness

Relatedness is readily shown where the predicate acts "have the same or similar purposes, participants, victims, or methods, or otherwise [are] interrelated by distinguishing characteristics." *H.J. Inc.*, 492 U.S. at 240. The Plaintiffs attempt to relate the schemes involving Avacor, Vinarol, Thermal Carb, and Glucotrin to the scheme to defraud MyFreeMedicine. *Pls.' Obj.* at 17. They argue that "the fraud directed at MyFreeMedicine is related to the Enterprise's other schemes because they involved a call center located at 121 Mill Street in Auburn, Maine, the use of television advertising to direct callers to the call center, misrepresentation of products to consumers, and resulted in lawsuits being filed against clients of the Enterprise." *Pls.' Obj.* at 15.

With regard to the Vinarol, Thermal Carb, and Glucotrin schemes, although the Amended Complaint contains allegations that the products were misrepresented by call center customer service representatives, there is no allegation that the Defendants encouraged, approved of, or benefited from this

misrepresentation. For example, several paragraphs simply allege that customer service representatives "were instructed" to misrepresent these products. *Am. Compl.* ¶ 433, 439, 479. The paragraphs do not state that the instructions were given by "the Defendants" collectively, much less by any one Defendant. Furthermore, apart from alleging that Alpine and Mr. Weaver, Mr. Maguy and Mr. Adams "control" Great Falls Marketing, the call centers' current name, *id*. ¶ 462, and that the DeWolfes, Mr. Weaver, Mr. Adams, Mr. Stanek, Mr. MacCheyne knew that Vinarol contained sildenafil citrate, the Defendants' names do not appear in the Amended Complaint's description of the Vinarol, Thermal Carb and Glucotrin schemes. *Id*. ¶¶ 413-418. As it relates to the Vinarol, Thermal Carb, and Glucotrin, the Amended Complaint does not include a description of a media funding scheme similar to the one alleged to have been perpetrated on MyFreeMedicine by the Defendants, or allege that "unqualified members" of the public were enrolled and billed for these products. Vinarol, Thermal Carb, and Glucotrin are not prescription medications, and the alleged victims of the Vinarol, Thermal Carb, and Glucotrin schemes were not low-income individuals. In addition, the Amended Complaint does not include allegations that the owners of the Vinarol, Thermal Carb, and Glucotrin products were duped, like MyFreeMedicine, into engaging in a media funding campaign. The Vinarol, Thermal Carb, and Glucotrin schemes may not be used as predicate acts in this case as the Amended Complaint has not sufficiently alleged that these schemes involved the same participants, victims, or methods.

Although the Plaintiffs' allegations regarding the Avacor scheme include slightly more details than their allegations regarding the Vinarol, Thermal Carb, and Glucotrin schemes, the Avacor scheme cannot be used as a predicate act to the MyFreeMedicine scheme. Apart from a statement that "James DeWolfe knew and told others, including the staff and employees, that Avacor had Minoxidil in it," the description of the Avacor scheme does not include allegations that the Defendants collectively or individually encouraged call center representatives to misrepresent the product. *Am. Compl.* ¶ 372. The Plaintiffs attempt to describe a media funding scheme similar to the one involving MyFreeMedicine and Quigley Simpson, but they have failed to connect the dots between Global Vision Products, Avacor, and Alpine. *Id.* ¶¶ 376-382. The Plaintiffs have not explained the relevance of Global Vision Products.

The Plaintiffs allege that "[t]he 121 Mill Street Enterprise misrepresented to the public" that Avacor was "all natural," "contained no chemicals," and had "no side effects." *Id.* ¶¶ 365, 366, 367. Like the RICO action, the Plaintiffs must plead predicate acts of fraud with particularity. Simply claiming that the Enterprise engaged in misrepresentations is insufficient. It is well established in the First Circuit that predicate acts of mail fraud alleged in civil RICO actions must be pleaded with particularity in accordance with the requirements of Rule 9(b) of the Federal Rules of Civil Procedure. *See Ahmed v. Rosenblatt*, 118 F.3d 886, 889 (1st Cir. 1997) (citing *Feinstein*, 942 F.2d at 42; *New England Data Servs.*, 829 F.2d at 290.) Under the First Circuit's interpretation of Rule 9(b)'s particularity

requirement, a civil RICO plaintiff alleging predicate acts of mail fraud must specify the time, place, and content of allegedly false mail communications. *See Ahmed*, 118 F.3d at 889; *Doyle v. Hasbro*, 103 F.3d 186, 194 (1st Cir. 1996); *New England Data Servs.*, 829 F.2d at 288, 290. The Plaintiffs have failed to do this.

The First Circuit has devised a special approach for civil RICO cases in which alleged predicate acts of mail and/or wire fraud fail to meet the standard required under Rule 9(b). In such cases, "a district court should make a second determination as to whether further discovery is warranted and, if so, the plaintiff should be provided with the opportunity to amend the complaint after the completion of this discovery." *Ahmed*, 118 F.3d at 890 (citing *New England Data Servs.*, 829 F.2d at 290); *see also Feinstein*, 942 F.2d at 43. A plaintiff is not, however, automatically entitled to such discovery and opportunity to amend. *See Ahmed*, 118 F.3d at 890; *Feinstein*, 942 F.2d at 44. For example, when a plaintiff "fail[s] to supply specific allegations which would indicate that critical information was in the sole possession of the defendants," he or she may not be entitled to discovery or the opportunity to amend. *See Ahmed*, 118 F.3d at 890. Moreover, the First Circuit has stated that "in a RICO action where fraud has not been pleaded against a given respondent with the requisite specificity and Rule 9(b) has been flouted, dismissal should follow as to that respondent unless the plaintiff, at a bare minimum, suggests to the district court, in a timely manner, that a limited period of discovery will likely allow him to plug the holes in the complaint and requests leave (i) to conduct discovery for this limited purpose and (ii) thereafter to amend his

complaint. It is only then that a district court must take a second look to ascertain whether a particular case is 'appropriate' for the special unguent of deferral." *Feinstein*, 942 F.2d at 44 (internal citation omitted).

In this case, the Plaintiffs have already had an opportunity to amend their complaint. Even so, the Amended Complaint does not explain how the Defendants' involvement in the other health care related schemes amounts to fraud. Furthermore, the Plaintiffs have not alleged that the Defendants have critical information within their possession. Consistent with *Feinstein*, the Plaintiffs have not convinced the Court that they should be given the opportunity to engage in limited discovery and to amend their complaint for a second time. The facts relating to the other health care product schemes, as alleged do not contain "any demonstrable imbrication" with the facts of the MyFreeMedicine scheme, and they are not sufficiently related.[12] *Feinstein*, 942 F.2d 34, 45.

Having failed to demonstrate that the racketeering predicates involve acts of fraud related to the alleged MyFreeMedicine scheme, the Plaintiffs RICO claims must be dismissed for lack of a "pattern of racketeering activity."[13] The Plaintiffs other objections are without merit.

---

[12] It is also true that the individual episodes of mail fraud, wire fraud, and financial institution fraud within the scheme to defraud MyFreeMedicine, although related, cannot establish the pattern of racketeering activity. *See* footnote 1l.

[13] The Plaintiffs have also failed to demonstrate the continuity requirement of "a pattern of racketeering activity." A plaintiff may satisfy the continuity requirement by evidence that the racketeering acts "include a specific threat of repetition extending indefinitely into the future" or "form part of an ongoing entity's regular way of doing business." *H.J. Inc.*, 492 U.S. at 242. The Plaintiffs argue that the Defendants continue to engage in criminal activity because they "continue[] to operate a telemarketing call center located at 121 Mill Street in Auburn, Maine and continue[] to sell products related to the healthcare industry" as demonstrated by the Glucotrin scheme. *Pls.' Obj.* at 15-16. As explained, the allegations surrounding Glucotrin merely state that call center

6. **DeWolfe Brothers**

Turning to the additional facts alleged against the DeWolfe Brothers, the Magistrate Judge pointed out that those against James DeWolfe include that

> he controlled the customer service representatives who spoke to MyFreeMedicine customers, *First Amended Complaint* ¶ 212; he exercised managerial control over or participated in all aspects of the call center in its "early days," *id*. ¶ 215; he implemented the technique of misrepresenting MyFreeMedicine as a government program and as part of the official training for customer service representatives, without disclosing it to the plaintiffs, *id*. ¶ 497; and he "orchestrated" several telephone conference calls in 2004 during which he suggested that Alpine emulate the success of Avacor with MyFreeMedicine, *id*. ¶ 545.

*Rec. Dec*. at 16-17. The additional facts alleged against Frank DeWolfe include that

> he prepared and transmitted weekly invoices to the plaintiffs seeking payment for calls in which the Enterprise misrepresented MyFreeMedicine to customers, *id*. ¶ 200, and he made the false representation to the plaintiffs that AdvanceTel Direct was "hoping to see a steady increase in calls as our agents are feeling much better about the calls," *id*. ¶¶ 205-06.

*Rec. Dec*. at 17. None of these additional facts changed the Magistrate Judge's earlier analysis of the claims against the DeWolfes. In his first Recommended Decision, the Magistrate Judge noted that "a long line of cases interprets RICO to require that the alleged fraudulent conduct be the direct cause of the plaintiff's injury. None of the additional facts alleged against either James DeWolfe or Frank DeWolfe . . . would support a conclusion that either defendant engaged in fraudulent conduct that directly caused the plaintiffs' injury." *Id*. at 17. With regard to the Rule 9(b) requirement that

---

representatives made misrepresentations about the product, but the Plaintiffs have not identified one Defendant who encouraged or actively participated in the misrepresentations, or identified one individual who was defrauded through the alleged acts of the Enterprise. *Am. Compl*. ¶¶ 458-485. To properly allege a claim in federal court, it is not enough merely to allege that a defendant acted unlawfully; a plaintiff must affirmatively plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). The Plaintiffs' pleadings do not sufficiently allege the continuity prong of the pattern of racketeering element.

claims of fraud be plead with particularity, the Magistrate Judge concluded that "the additional pleading does not meet the pleading standards of Fed. R. Civ. P. 9(b)." *Id.* at 17. "It is not possible to tell from the amended pleadings exactly what either of these defendants did that was fraudulent or, more important, why that conduct constituted fraud." *Id.* at 18. The Magistrate Judge concluded that James and Frank DeWolfe are entitled to dismissal of Counts One through Four.

The Plaintiffs object to the Magistrate Judge's Recommended Decision, arguing that he overlooked the DeWolfes' "central role" in "encouraging customer service representatives to misrepresent MyFreeMedicine" *Pls.' Obj.* at 5. James DeWolfe executed the initial agreements for MyFreeMedicine to use the Enterprise for telemarketing services and order fulfillment activity. *Id.* at 7. The DeWolfes encouraged employees to deviate from the script and freelance during sales calls, such as telling callers that MyFreeMedicine was a government program, in an effort to increase the call volume, and increase profit. *Id.* at 6, 7. All the while the DeWolfes gave assurances to Mr. Hasler that approved sales scripts would be honored. *Id.* at 6.

The Plaintiffs' Amended Complaint continues, however, to fail to allege predicate acts by the DeWolfe brothers that caused MyFreeMedicine's injury, to demonstrate a pattern of racketeering activity, and to meet the specificity requirements of Rule 9(b). The Plaintiffs' other arguments are without merit.

### C.    Count IV: The RICO Conspiracy Count, § 1962(d)

The Plaintiffs' 18 U.S.C. 1962(d) count alleging conspiracy to violate subsection (c) against all defendants fails because it does not adequately allege a

violation of that subsection.  *See Miranda,* 948 F.2d at 45 n.4; *see also Efron*, 223 F.3d at 21.  Count IV is dismissed.

### D.    Count V:  Breach of Contract Claim

#### 1.    The Amended Complaint

The named Defendants in Count Five, the breach of contact claim, are Alpine Investors, William Adams, William Maguy, Graham Weaver, and Brian Flaherty. Attached to Plaintiffs Amended Complaint is a memo to Mr. Hasler from Mr. Adams and copied to Mr. Flaherty.  *Am. Compl.*, Ex. A.  The email explains that "the purpose of this memo is to outline a general agreement for moving forward with the rapid ramp-up of the MyFreeMedicine campaign."  *Id*. at 1.  The memo includes five sections: general approach, media funding agreement, media purchases, ramp-up schedule, and roles and responsibilities.  *Id*. at 1-4.  The memo also contains a chart identifying different tasks and outlining the person responsible for those tasks.  *Id*. at 4.  The memo is signed by Geoff Hasler for MyFreeMedicine and William Adams for Alpine.  *Id*.  As part of the agreement Mr. Adams and "other members of the Alpine team" agreed to "dedicate [them]selves to working exclusively with [MyFreeMedicine] for the remainder of the year to develop the foundation for a long standing, high volume, and very profitable campaign."  *Id*. at 1.  In addition, "Will Adams agrees that he (or, in his absence his partners at Alpine Investors) will conduct his activities related to the MyFreeMedicine campaign with openness, full disclosure and fairness for all parties involved and

that he will never act advance (sic) the interests of AdvanceTel Direct at the expense of the interest of MyFreeMedicine." *Id*. at 2.

The Amended Complaint alleges that Mr. Adams signed this agreement with MyFreeMedicine on behalf of Alpine and its partners Mr. Maguy, Mr. Weaver, and Mr. Flaherty. *Am. Compl.* ¶ 1294. Pursuant to the agreement, the Plaintiffs say Mr. Adams promised that Alpine and its partners would work exclusively with MyFreeMedicine from October 23, 2004 through the end of the year. *Id*. ¶ 1296. The Defendants breached "their promise to work exclusively on MyFreeMedicine for the remainder of 2004 by continuing to work in furtherance of the Avacor scheme." *Id*. ¶ 1309. MyFreeMedicine also alleges that the Defendants breached their express duty of good faith and fair dealing "[t]hrough their failure to stop customer service representatives from misrepresenting MyFreeMedicine eligibility criteria" and "by refusing to cooperate with Plaintiffs' defense in the federal and state litigation filed against Plaintiffs." *Id*. ¶¶ 1310, 1311.

### 2. The Renewed Motion

In their renewed motion to dismiss, the Alpine Defendants argue that, even if true, their alleged actions would not "have deprived them of the benefits they reasonably could have expected to receive under the Media Funding Agreement, nor do they reflect a failure or refusal on the part of any of the Alpine Defendants to fulfill any of their alleged contractual responsibilities under the Media Funding Agreement." *Alpine's Renewed Mot.* at 38. Specifically, the Amended Complaint does not allege a claim against the individual Defendants because the language of

the contract "would bind only Will Adams, unless he was 'absent', which is not alleged by the Plaintiffs. *Id.* at 38 n.18. They argue that the Defendants "should not be permitted to bring a breach of fiduciary duty claim in the guise of a breach of contract claim." *Id.* at 39.

### 3. The Recommended Decision

The Magistrate Judge focused on the Defendants' assertion that the Amended Complaint does not state a claim against the individual plaintiffs because it does not allege that Adams was "absent" at any time, and stated that this "interpretation places too heavy a burden of factual detail on the plaintiffs in pleading what is a general state-law claim, not subject to the enhanced pleading standard applicable to claims of fraud such as those involved in RICO claims." *Rec. Dec.* at 27. Given the Court's obligation to construe all reasonable inferences in favor of the Plaintiffs, the Magistrate Judge determined that "it is reasonable to construe the allegations in Count Five to include all instances of alleged breach, if any, in which Adams was 'absent.'" *Id.* at 27. While the question is a close one, the Magistrate Judge concluded "that Count Five states a claim upon which relief may be granted against Maguy and Weaver, who are alleged against Adams, to be partners in Alpine." *Rec. Dec.* at 28.

### 4. The Objections

#### a. Mr. Adams, Mr. Weaver, and Mr. Maguy's Objection

Mr. Adams, Mr. Weaver, and Mr. Maguy argue that the Court misconstrued their arguments and the Plaintiffs' allegations regarding the alleged contract.

*Adams, Maguy, Weaver Obj*. at 3. Specifically, it is the Defendants' position that Plaintiffs "failed to allege any material failure on the part of the Defendants either to provide media funding *or* to perform the other tasks specified in the agreement. [] The Court did not take account of the latter half of this argument" which they claim is "fatal to the Plaintiffs' breach of contract claim." *Adams, Maguy, Weaver Obj*. at 5. "There are no allegations in Count Five that Messrs. Adams, Maguy or Weaver failed materially to fulfill any obligation in the Alleged Contract." *Adams, Maguy, Weaver Obj*. at 5. Mr. Adams, Mr. Weaver, and Mr. Maguy focus on paragraph 1303 of the First Amended Complaint:

> Defendants Alpine, Adams, Weaver, Maguy and Flaherty breached their promise to work exclusively on MyFreeMedicine from October 23, 2004 through the end of 2004, by continuing to market Avacor through television advertising, by shipping Avacor from Lewiston and Auburn, Maine, and by running a telemarketing call center and order fulfillment center that earned millions of dollars from the sale and promotion of Avacor, during the same time that they promised to only work on MyFreeMedicine.

*Am. Compl*. ¶ 1303. They argue that the Media Funding Agreement does not bind Alpine as an entity, and that if Alpine is not bound, "the allegations in paragraph 1303 are relevant only with regard to measuring the alleged actions of the individual defendants." *Id*. at 6. When evaluating the actions of the individual defendants, they say that "it is simply not plausible that Messrs. Adams, Maguy and Weaver under took in their individual capacities the wrongful activities alleged by the Plaintiffs." *Id*. at 6. "Responsibility for the actions alleged in paragraph 1303 lies at the entity level, if at all, not at the individual level." *Id*. at 7.

### b.    The Plaintiffs' Objections

The Plaintiffs object to the dismissal of Alpine and Brian Flaherty under Count Five. *Pls.' Obj.* at 16. With regard to Alpine, the Plaintiffs argue that "[w]hen Adams signed the [media funding] contract . . ., the words 'Alpine Investors' appear below his signature. . . . This appears to be the deliberate act of a partner to bind the partnership, and it is premature to dismiss Defendant Alpine Investors." *Id.* at 16. As for Mr. Flaherty, the Plaintiffs argue that "it is a fact question whether or not Will Adams's statement 'his partners at Alpine' included Mr. Flaherty, as he is alleged to have been a member of the organizational structure through which Alpine engaged in media funding and call center operations." *Id.* at 16-17.

### 5. The Court's Analysis

#### a. Mr. Flaherty's Status

Although the Amended Complaint alleges that Mr. Flaherty was present at the signing of the Media Funding Agreement between Alpine and MyFreeMedicine, and was designated in the Media Funding Agreement as responsible for several tasks, *id.* ¶¶ 258, 562, throughout the Amended Complaint when MyFreeMedicine describes Alpine, the Amended Complaint mentions Mr. Adams, Mr. Weaver, and Mr. Maguy, but not Mr. Flaherty. *See Am. Compl.* ¶¶ 12, 14, 131, 144, 169, 176, 376, 379, 462, 539, 545, 552, 554, 564, 580, 587, 1278, 1279, 1281, 1282, 1283, 1286. For example, paragraph 12 of the Amended Complaint states "[u]pon information and belief, Defendants Weaver, Adams, and Maguy are owners, employees, members, managers, and/or partners of Defendant Alpine Investors, LP." *Id.* ¶ 12.

With regard to the Media Funding Agreement, the Amended Complaint specifically states that "Defendant Will Adams was acting on behalf of Defendant Alpine, as well as all of the individual partners at Defendant Alpine, including Defendants Weaver and Maguy, when he signed the contract with Plaintiffs and listed 'Alpine Investors' below his signature." *Id.* ¶ 564. For these reasons, the Court agrees with the Magistrate Judge's conclusion that Mr. Flaherty cannot be liable on the Media Funding Agreement as an Alpine partner and "Flaherty is entitled to dismissal of Count Five." *Rec. Dec.* at 27.

### b. Breach of Contract Claim

Pursuant the Media Funding Agreement, Mr. Adams along with other members of the Alpine team agreed to "dedicate ourselves to working exclusively with [MyFreeMedicine] for the remainder of the year[,]" and Mr. Adams agreed "that he (or, in his absence his partners at Alpine Investors) will conduct his activities related to the My Free Medicine campaign with openness, full disclosure and fairness for all parties involved and that he will never act [to] advance the interests of AdvanceTel Direct at the expense of the interest of My Free Medicine." *Am. Compl.*, Ex. A at 1, 2.

In their Amended Complaint, the Plaintiffs allege that the Alpine Defendants "breached their promise to work exclusively on MyFreeMedicine from October 23, 2004 through the end of 2004, by continuing to market Avacor through television advertising, by shipping Avacor from Lewiston and Auburn, Maine, and by running a telemarketing call center and order fulfillment center that earned millions of

dollars from the sale and promotion of Avacor, during the time that they promised to only work on MyFreeMedicine." *Am. Compl.* ¶ 1303. In addition, the Plaintiffs allege that in failing "to stop customer service representatives from misrepresenting MyFreeMedicine eligibility criteria, the Defendants failed to conduct themselves with honesty, fair dealing, and good faith to which they were bound by the October 23, 2004 agreement." *Id.* ¶ 1310. The Court agrees with the Magistrate Judge's conclusion that the Plaintiffs adequately allege a breach of contract claim against Mr. Adams, Mr. Weaver and Mr. Maguy.[14] Count V is dismissed against all Defendants except Mr. Adams, Mr. Weaver and Mr. Maguy.

### E.      Count VI:  Tortious Interference Claim

#### 1.      The Amended Complaint

Count Six, the tortious interference with prospective economic advantage claim, is alleged against all Defendants. MyFreeMedicine claims that the Defendants interfered with the "prospective economic relationship [that] existed between MyFreeMedicine and its qualified customers" "by participating in, encouraging, and misrepresenting MyFreeMedicine to callers, and by misrepresenting their activities to the Plaintiffs." *Am. Compl.* ¶¶ 1317, 1318. "As a result of these misrepresentations, few qualified customers renewed their enrollment with MyFreeMedicine, causing further damage to Plaintiffs by depriving them of business revenue." *Id.* ¶ 1321.

---

[14] The Court agrees with the Magistrate Judge that the language in the Media Funding Agreement upon which the Plaintiffs rely for their breach of contract claim only binds the individual members of Alpine, and not Alpine the corporate entity. *Rec. Dec.* at 26-27.

In his Recommended Decision, the Magistrate Judge noted that the Amended Complaint made three minor changes to the tortious interference count. *Rec. Dec.* at 29. The Magistrate Judge stated that "[t]he additional factual allegations . . . do nothing to change" his earlier conclusion "that the claim for tortious interference was too speculative to state a claim on which relief could be granted." *Rec. Dec.* 29, 30. He explained that he "fail[ed] to see how the defendants' alleged misrepresentation of the defendants' activities *to the plaintiffs* interfered with the plaintiffs' prospective customer relationships." *Rec. Dec.* at 30.

In his first Recommended Decision, the Magistrate Judge pointed out that the "elements of the claim of tortious interference with a prospective economic advantage under Maine law are the existence of a valid prospective economic advantage, interference with that advantage through fraud or intimidation, and damages proximately caused by the interference." *First Rec. Dec.* at 26 (citing *Currie v. Industrial Sec., Inc.*, 2007 ME 12, ¶ 31, 915 A.2d 400, 408). He further noted that in a tortious interference with prospective economic advantage claim, "usually a specific current or prospective business relationship is involved," *Mangan v. Rumo*, 226 F. Supp. 2d 250, 252-53 (D. Me. 2002), and here the plaintiffs offer nothing specific." *First Rec. Dec.* at 26-27 (footnote omitted). According to the Recommended Decision, the Plaintiffs "offer only speculation that their business would have continued to grow had the defendant not engaged in the conduct complained of in the complaint." *First Rec. Dec.* at 27. As for the amendments, the Magistrate Judge "fail[ed] to see how the defendants' alleged misrepresentation of

the defendants' activities to the plaintiffs interfered with the plaintiffs' prospective customer relationships in any way. . . . [A]dding an allegation of reliance on the alleged misrepresentations, does not address an element of the tort." *Rec. Dec.* at 30.

### 2. The Plaintiffs' Objections

The Plaintiffs have renewed the objections in their objection to the first Recommended Decision and argue that "whether or not the Plaintiffs had a valid prospective economic advantage is at a minimum a fact question which is premature at this stage." *Pls.' Obj.* at 17.

### 3. The Court's Analysis

The Court agrees with the Magistrate Judge's conclusion. The relationship between Plaintiffs and any "potential customers" is in this case too attenuated and speculative to support their claim. *See Norris v. Bangor Publ'g. Co.*, 53 F. Supp. 2d 495, 509 (D. Me. 1999). Count VI is dismissed.

## III. CONCLUSION

The Court ADOPTS the Magistrate Judge's Recommended Decision (Docket # 100). The Court GRANTS Jeffrey Stanek's Renewed Motion to Dismiss (Docket # 91) and James N. DeWolfe and Frank G. DeWolfe's Renewed Motion to Dismiss (Docket # 90). As for the Alpine Defendants Renewed Motion to Dismiss, the Court GRANTS the motion as it applies to Alpine Investors, LP, Scott MacCheyne, and Brain G. Flaherty and DENIES the motion as it applies to Graham Weaver,

William T. Maguy, and William Adams only on Count five (Docket #89). The Remaining Counts are dismissed against Mr. Weaver, Mr. Maguy, and Mr. Adams.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 13th day of August, 2010